# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Source Search Technologies, LLC, ) | **DOCUMENT ELECTRONICALLY FILED** |
| Plaintiff, ) | Civil Action No. 2:04-cv-4420 (DRD) (SDW) |
| -- against -- ) | **(ORAL ARGUMENT REQUESTED)** |
| LendingTree, LLC, IAC/InterActiveCorp, and ServiceMagic, Inc. ) | |
| Defendants. ) | |

## DEFENDANTS' OPENING
## CLAIM CONSTRUCTION BRIEF

GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE
A Professional Corporation

Kevin J. McKenna, Esq. (KJM 7530)
Elvin Esteves, Esq. (EE 2216)
One Riverfront Plaza
Newark, NJ 07102-5497
Telephone (973) 596-4500
Facsimile (973) 596-0545

*Attorneys for LendingTree, LLC,
IAC/InterActiveCorp, and ServiceMagic, Inc.*

OF COUNSEL:

Holmes J. Hawkins III
A. Shane Nichols
James J. Mayberry
KING & SPALDING LLP
191 Peachtree Street
Atlanta, Georgia 30303
Tel.: (404)572-4600
Fax: (404)572-5145

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDING...............................................................1

OVERVIEW OF THE '328 PATENT .....................................................................1

ARGUMENT.........................................................................................................3

I.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION ...............................3

   A.   Claim Construction Generally ..............................................................3

   B.   Interpreting Means-Plus-Function Limitations ....................................4

   C.   Disavowal of Claim Scope ...................................................................6

II.   DEFENDANTS' PROPOSED CONSTRUCTIONS OF DISPUTED TERMS...............6

   A.   The Appropriate Level of Skill in the Art .............................................7

   B.   Construction of the Term "Request For Quotation".............................8

   C.   Construction of the Term "Filter Means"..............................................9

      1.   Claim 1 Recitation of a Filter Means...........................................10

         a.   Structure Disclosed in the Specification for the Filter Means Recited in Claim 1 ....10
         b.   "Filter Means" Excludes a Central Database of Prices, Goods, and Services..........11
         c.   Defendants' Construction of "Filter Means" is Consistent with the Prosecution History ...................13

      2.   Claim 12 Recitation of a Filter Means..........................................15

   D.   Construction of the Term "Filter and Broadcast Means .......................16

   E.   Construction of the Term "Computer Based Communications Network".........................18

   F.   Construction of the Term "Filter Conditions"...................................20

   G.   Construction of the Term "Network Member"....................................21

   H.   Construction of the Term "Goods And/Or Services".........................22

   I.   Construction of the Term "Communications Channel Storage Means" and "Storage Means"..................24

      1.   The Specification Fails to Disclose Any Structure for Containing the Identification of the Network Members ..................24

      2.   Communication Channel Storage Means" and "Storage Means" Cannot Include a Database of Goods, Services, or Prices ..................27

CONCLUSION ...................................................................................................28

#1038039 v2
105556-52625

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

Atmel v. Information Storage Devices, Inc.,
    198 F.3d 1374 (Fed. Cir. 1999) ...........................................................................5, 25

B. Braun Medical Inc. v. Abbot Laboratoriess,
    124 F.3d 1419 (Fed. Cir. 1997) ..........................................................................25, 26

Budde v. Harley-Davidson, Inc.,
    250 F.3d 1369 (Fed. Cir. 2001) ...................................................................................5

Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,
    296 F.3d 1106 (Fed. Cir. 2002) ...................................................................................5

Chiuminatta Concrete Concepts, Inc. v. Cardinal Industrial,
    145 F.3d 1303 (Fed. Cir. 1998) ...................................................................................4

Default Proof Credit System, Inc. v. Home Depot U.S.A., Inc.,
    412 F.3d 1291 (Fed. Cir. 2005) ..........................................................................26, 27

Harris Corp. v. Ericcson Inc.,
    417 F.3d 1241 (Fed. Cir. 2005) .................................................................................11

Interactive Gift Express, Inc. v. Compuserve, Inc.,
    256 F.3d 1323 (Fed. Cir. 2001) ...................................................................................7

JVW Enterprises v. Interact Accessories, Inc.,
    424 F.3d 1324 (Fed. Cir. 2005) ...............................................................................4, 9

Markman v. Westview Instruments, Inc.,
    52 F.3d 967 (Fed. Cir. 1995), <u>aff'd</u> 517 U.S. 370 (1996) ............................................3

Medical Instrumentation & Diagnostics Corp. v. Elekta AB,
    344 F.3d 1205 (Fed. Cir. 2003) ..................................................................5, 6, 9, 11,
                                                                                                        13

Netword, LLC v. Centraal Corp.,
    242 F.3d 1347 (Fed. Cir. 2001) ...................................................................................3

O.I. Corp. v. Tekmar Co.,
    115 F.3d 1576 (Fed. Cir. 1997) .............................................................................5, 11

#1038039 v2
105556-52625

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................3, 4, 6, 7

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.
    242 F.3d 1337 (Fed. Cir. 2001) ....................................................................................6

Toro Co. v. White Consolidated Industrial, Inc.,
    199 F.3d 1295 (Fed. Cir. 1999) ....................................................................................7

WMS Gaming Inc. v. International Game Technology,
    184 F.3d 1339, 1349 (Fed. Cir. 1999) ...................................................................10, 11

## FEDERAL STATUTES

35 U.S.C. § 112, ¶ 2..........................................................................................4, 5, 17, 19, 25

35 U.S.C. § 112, ¶ 6.................................................................................................4, 5, 9, 11

#1038039 v2
105556-52625

## NATURE AND STAGE OF PROCEEDING

On September 10, 2004, Plaintiff Source Search Technologies, LLC ("SST") filed this action against LendingTree, LLC ("LendingTree") and LendingTree's parent company, IAC/InterActiveCorp ("IAC"), alleging infringement of U.S. Patent No. 5,758,328 ("the '328 Patent").[1]  On October 15, 2004, SST filed its First Amended Complaint and joined another IAC subsidiary, ServiceMagic, Inc. ("ServiceMagic").   The parties have since completed fact discovery.

In accordance with the Court's November 15, 2005 Amended Scheduling Order, Defendants LendingTree, IAC, and ServiceMagic (collectively, "Defendants"), submit this Opening Claim Construction Brief ("Markman Brief") seeking construction of certain terms in the asserted claims of the '328 Patent.

## OVERVIEW OF THE '328 PATENT

The '328 Patent was filed on February 22, 1996, issued on May 26, 1998, and has 19 claims.  Plaintiff SST is the assignee if the '328 Patent and has asserted claims 1-7 and 11-14 against one or more Defendants.[2]  The asserted claims include four independent claims (claims 1, 3, 4, and 12).  Independent claims 1 and 4 are system claims and independent claims 3 and 12 are method claims.  The remaining asserted claims depend from claims 1, 3, 4, and 12 and, therefore, include all of the limitations of the claim from which they depend.

---

[1]     A copy of the '328 Patent is attached hereto as Exhibit A to the Declaration of Elvin Esteves (the "Esteves Decl.").  Relevant portions of the prosecution history for the '328 Patent are attached as Exhibits B-D to the Esteves Decl.  All Exhibit references in this Brief correspond to the Esteves Decl.

[2]     SST indicated in discovery that it is asserting claims 1-3 of the '328 Patent against ServiceMagic and claims 1-7 and 11-14 against LendingTree.  However, in response to Defendants' interrogatories requesting that SST explain the factual basis for its infringement contentions, SST only provided a substantive response for claim 1 as to ServiceMagic and for

The '328 Patent is generally directed to a "computerized quotation system" for processing "requests for quotation" (RFQ) for goods and services between network buyers and vendors. Col. 3, ll. 55-62.[3] More particularly, the computerized quotation system of the '328 Patent processes RFQs received from "network buyers," i.e., buyers who are registered with the system, and uses "filter conditions" to match those RFQs with "network vendors" who have registered with the system to receive RFQs meeting certain preestablished criteria. See, e.g., Col. 4, ll. 1-4; Col. 5, ll. 9-21. The '328 Patent indicates that the goods and services must be "standardized" to enable routing the RFQs on the basis of the filter conditions alone. See e.g., Col. 3, ll. 63-65. The vendors that receive the RFQs may respond with quotations for the goods or services identified in the RFQ.

The '328 Patent purports to eliminate the need for a central database of the goods and services available from the vendors, by storing only filter conditions set by the vendors, that enable the RFQs to be routed to the appropriate vendors. Indeed, it is a central tenet of the specification of the '328 Patent that the computerized system does not include a "central database of goods, prices, etc." See, e.g., Col. 2, ll. 41-42; Col. 3, ll. 60-62. For example, in the Background of the Invention section of the '328 Patent, the inventor specifically distinguishes his purported invention over prior art systems that include such central databases. See, e.g., Col. 1, ll. 53-56 ("It simply is not feasible for central database systems to satisfy the need of buyers to

---

claim 4 as to LendingTree. It is Defendants' position that SST should be barred from asserting infringement of any claims other than claim 1 as to ServiceMagic and claim 4 as to LendingTree. The Court need not address that issue here, since, for the purposes of this claim construction proceeding only and without waiving its objections, Defendants have addressed herein all of the disputed terms and/or limitations in claims 1-7 and 11-14.

[3]    Unless otherwise specified, the column and line notations throughout this Opening Markman Brief refer to column and line numbers set forth in the issued '328 Patent attached as Exhibit A. Subsequent citations to the '328 Patent omit reference to the patent number itself.

#1038039 v2
105556-52625

receive timely quotes on an enormous variety of goods and services from vendors anywhere in the world."). As is discussed in more detail below, the inventor made the same argument in every substantive correspondence he had with the United States Patent Office ("PTO") during the prosecution of the '328 Patent. The inventor's own statements, therefore, constitute a clear disavowal of "central database systems" that utilize "central database[s] of goods, prices, etc." In the event of such a clear disavowal, the Patent Laws require that the disavowed subject matter cannot be subsequently reclaimed within the scope of the properly construed claims.

<u>ARGUMENT</u>

I.    <u>LEGAL STANDARDS FOR CLAIM CONSTRUCTION</u>

Claim construction is a question of law to be determined by the Court. <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995), <u>aff'd</u> 517 U.S. 370 (1996). The role of claim construction "is neither to limit nor to broaden the claims, but to define, as a matter of law, the invention that has been patented." <u>Netword, LLC v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

A.    <u>Claim Construction Generally</u>

On July 12, 2005, the Court of Appeals for the Federal Circuit handed down an *en banc* opinion clarifying the framework within which patent claims are to be construed. <u>See</u> <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005). The Federal Circuit reiterated the centrality of the patent itself in construing the claims, and explained that "[t]he inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." <u>Id.</u> at 1313. The person of ordinary skill in the art from whose perspective the claim term is to be viewed must be understood to "read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the

#1038039 v2
105556-52625

entire patent, including the specification." Id.; see Markman, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."). In many cases, the specification "may reveal a special definition given to a claim term by the patentee," whereas "[i]n other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." Phillips, 415 F.3d at 1316. In both situations, "the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. In addition, the prosecution history should be considered as evidence of the inventor's understanding of the scope and meaning of the patent. Id. at 1317.

      B.     Interpreting Means-Plus-Function Limitations

The claims of the '328 Patent make extensive use of so-called "means-plus-function" limitations, which are permitted under and governed by 35 U.S.C. § 112, ¶ 6. A means-plus-function limitation recites a function to be performed rather than definite structure or materials for performing that function. See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., 145 F.3d 1303, 1307 (Fed. Cir. 1998). According to 35 U.S.C. § 112, ¶ 6, a means-plus-function limitation must be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." See also, Chiuminatta, 145 F.3d at 1308. "The construction of a means-plus-function limitation includes two steps. First, we determine the claimed function. Second, we identify the corresponding structure in the written description that performs that function." JVW Enters. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005) (internal citation omitted).

Under 35 U.S.C. § 112, ¶ 2, the claims of a patent must "particularly point out and distinctly claim the subject matter which the applicant regards as his invention." In the case of claims written in means-plus-function language, the patentee has a responsibility to disclose the

4

specific structure corresponding to the means in the specification in order to comply with this particularity requirement. Atmel v. Information Storage Devices, Inc., 198 F.3d 1374, 1382 (Fed. Cir. 1999). This is part of the *quid pro quo* that allows the patentee to utilize the means-plus-function claim language authorized under 35 U.S.C. § 112, ¶ 6. See id. "The price that must be paid for use of [means-plus-function claim language] is [the] limitation of the claim[s] to the means specified in the written description and equivalents thereof." O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1583 (Fed. Cir. 1997). If the patentee does not disclose the means in the specification, "then the patentee has not paid [the] price but is rather attempting to [impermissibly] claim in functional terms unbounded by any reference to structure in the specification." Med. Instrumentation & Diagnostics Corp. v. Elekta AB 344 F.3d 1205, 1211 (Fed. Cir. 2003). Accordingly, in order to satisfy 35 U.S.C. § 112, ¶ 2 for a specific claim written in means-plus-function format, "there must be [corresponding] structure in the specification." See id.

As noted above, the first step in construing a means-plus-function claim limitation is to define the particular function of the claim limitation. Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001); Med. Instrumentation, 344 F.3d at 1210. The Court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations. Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1113 (Fed. Cir. 2002). The next step in construing a means-plus-function claim limitation is to look to the specification and identify the corresponding structure for that function. Med. Instrumentation, 344 F.3d at 1210. "Under this second step, 'structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" Id. (quoting B. Braun

Medical v. Abbott Lab., 124 F.3d 1419, 1424 (Fed. Cir. 1997)).  If there is no disclosure of a structure corresponding to the function recited by the claim, then the claim is indefinite.  Med. Instrumentation, 344 F.3d at 1211.

C.    Disavowal of Claim Scope

As noted above, one of the reasons that the Court must review the specification of the patent while construing the claims is to determine if it includes "an intentional disclaimer, or disavowal, of claim scope by the inventor."  Phillips, 415 F.3d at 1316.  In such cases, "the inventor's intention, as expressed in the specification, is regarded as dispositive."  Id. (citing SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).  "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."  SciMed, 242 F.3d at 1341.  As set forth in more detail below, the specification and file history of the '328 Patent reveal a clear and unambiguous disavowal by the inventor of a computerized quotation system having a "central database of goods and services."

II.    DEFENDANTS' PROPOSED CONSTRUCTIONS
       OF DISPUTED TERMS

The evidence and authorities set forth below support Defendants' proposed claim constructions.  Specifically, nine terms used in claims of the '328 Patent require construction:

    A.  "Request for Quotations" (Claims 1-7, 11-14)
    B.  "Filter Means" (Claims 1 and 12)
    C.  "Filter and Broadcast Means" (Claim 4)
    D.  "Computer Based Communications Network" (Claims 1 - 3)
    E.  "Filter Conditions" (Claims 1-7, 11, 13-14)
    F.  "Network Member" (Claims 1-3)

#1038039 v2
105556-52625

        G.   "Goods and Services" (Claims 1-3; 12-14)
        H.   "Communications Channel Storage Means" (Claim 1)
        I.   "Storage Means" (Claims 1 and 3)

For each of these terms, the ordinary meaning of the claim language to one of skill in the art, the specification, and the prosecution history – i.e., the "intrinsic record" – provides the correct construction. Accordingly, it is unnecessary for the Court to resort to any "extrinsic evidence," such as expert testimony, in construing the claims.

        A.    <u>The Appropriate Level of Skill in the Art</u>

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1313 (Fed. Cir. 2005); <u>Interactive Gift Express, Inc. v. Compuserve, Inc.</u>, 256 F.3d 1323, 1332 (Fed. Cir. 2001); <u>Toro Co. v. White Consol. Indus., Inc.</u>, 199 F.3d 1295, 1299 (Fed. Cir. 1999). The claims of the '328 Patent apply two arts: purchasing/procurement, and computer programming. <u>See</u> '328 Patent, Field of the Invention, Col. 1, ll. 5-23. The named inventor of the '328 Patent, Mr. Joseph Giovannoli, testified in his deposition that his inspiration for the purported invention was his first hand observation of the difficulties inherent in a purchasing agent's efforts to manually obtain quotes for particular products that the agent needed to procure. <u>See</u> Deposition of Mr. Joseph Giovannoli, at 23:5 - 24:2 (Jun. 15, 2005). Every asserted claim of the '328 Patent is directed to processing requests for quotation and/or quotations, both of which are fundamental components of the purchasing/procurement field.

#1038039 v2
105556-52625

While some understanding of computer applications and communications would be necessary, a person of ordinary skill in the art relevant to the '328 Patent would not need extensive software programming experience. The '328 Patent purports to teach a system and method for processing requests for quotation by matching buyers with vendors who sell the good or services identified by the buyer. See '328 Patent, Col. 2, ll. 35-51 (attached as Exhibit E). It would be sufficient to be competent with general use applications such as word processing, database, and spreadsheet programs and have a general understanding that computers can communicate through a variety of means including modems, networks and the Internet. Indeed, the named inventor, Mr. Giovannoli is not himself a computer programmer. See Deposition of Mr. Joseph Giovannoli, at 146:20 - 147:20 (Jun. 15, 2005). The terms proposed by the parties for construction by the Court are not only computer-related terms (e.g., computer based communications network, storage means), but also include terms that are specific to the procurement arts (e.g., requests for quotation, goods and services, filter conditions). Consequently a person having the appropriate level of ordinary skill in the art need not possess more than a minimal understanding of computer applications and communications, but must have at least some experience in the procurement arts to properly understand the meaning of the claims of the '328 Patent.

B.      Construction of the Term "Request For Quotation"

Every claim of the '328 Patent recites a "request for quotation" and/or a "quotation." Independent claims 1, 3, and 12 recite "requests for quotation," while independent claim 4 recites "requests to engage in transactions" to which a "quote" is provided in response.[4] Neither

---

[4]      As discussed below, in connection with the proposed construction for "filter and broadcast means," Defendants do not believe that the term "requests to engage in a transactions" is supported by the specification of the '328 Patent.

#1038039 v2
105556-52625

"request for quotation" nor "quotation" is expressly defined in the specification of the '328 Patent, but they are commonly used terms in the field of purchasing and procurement  The well-understood ordinary meaning of the term "quotation" is "the quoting of current prices and bids for securities and goods; the prices or bids cited."  AMERICAN HERITAGE COLLEGE DICTIONARY 1124 (3d ed. 2000), or "the naming … of current prices … of securities or commodities" WEBSTER'S THIRD NEW INT'L DICTIONARY 1868 ((2002).  Accordingly, a "request for quotation" may be defined as simply "a request for the current price of something."

There is nothing in the specification or file history of the '328 Patent that suggests the inventor intended to give a different or specialized meaning to the terms "request for quotation" or "quote."  Indeed, the usage of those terms in the patent is entirely consistent with the ordinary meaning.  See, e.g., Figure 8 of the '328 Patent, and accompanying text.  Accordingly, Defendants submit that the proper construction of "request for quotation" is *"a request for a statement of the current price of something."*

C.    Construction of the Term "Filter Means"

Independent claims 1, 4, and 12 recite a "filter means" for performing various functions. Because the claim limitations in each of these claims do not by themselves provide any structure, the claim term "filter means" is a means-plus-function limitation and is, therefore, subject to construction under 35 U.S.C. § 112, ¶ 6.  As discussed above, the first step in construing a means-plus-function limitation is to determine the claimed function.  JVW Enters., 424 F.3d at 1330.  Because the function associated with the "filter means" recitation in each of these claims is slightly different, a separate claim construction analysis is appropriate for each of the claims reciting "filter means."  Once the recited function is determined, the second step in construing a

means-plus-function claim limitation is to look to the specification and identify the corresponding structure, if any, for that function.  Id.; Med. Instrumentation, 344 F.3d at 1210.

1.    Claim 1 Recitation of a Filter Means

Claim 1 recites:

> ***filter means*** for filtering the network members in said storage means to determine which network members are to receive said request for quotation based upon filter conditions set up by the network buyer in said request for quotation or by the central processing unit in accordance with preestablished conditions.

'328 Patent, claim 1 (emphasis added).  Thus, the function of the means-plus-function limitation of claim 1 is: "filtering the network members to determine which network members are to receive a request for quotation."

a.    Structure Disclosed in the Specification for the Filter Means Recited in Claim 1

The only "structure" disclosed in the '328 Patent that corresponds to the function of filtering the network members to determine which network members are to receive a request for quotation is the specific flow chart/algorithm illustrated in Figures 5 and 6. This flow chart/algorithm represents software that is executed by the quotation system computer to perform the function of filtering the network members to determine which network members are to receive the requests for quotations.  In other words, the structure corresponding to the filter means is not the quotation system computer itself, but rather software running on the computer system.

"In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."  WMS Gaming, Inc., 184 F.3d at 1349 (Fed. Cir. 1999).  In such a case, "[t]he

#1038039 v2
105556-52625

structure of a microprocessor programmed to carry out an algorithm is limited to the disclosed algorithm" and equivalents[5] thereof.  See id. at 1348; see also Harris Corp. v. Ericcson Inc., 417 F.3d 1241, 1253 (Fed. Cir. 2005) ("WMS Gaming restricts computer-implemented means-plus-function terms to the algorithm disclosed in the specification.").

Applying WMS Gaming to the present case, the structure corresponding to the "filter means" in claim 1 should be limited to the logic specifically disclosed in the specification and any equivalents thereof.  As stated by the Federal Circuit, "the price that must be paid for use of [means-plus-function claim language] is [the] limitation of the claim[s] to the means specified in the written description and equivalents thereof."  O.I. Corp., 115 F.3d at 1583 (Fed. Cir. 1997).  Further, as stated in Med. Instrumentation, "[i]t is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure."  344 F.3d at 1212.  Because the specific logic for filtering disclosed in Figures 5 and 6 is the only means for filtering in the specification, claim 1 should properly be limited to that means for filtering and any equivalents thereof.

        b.      "Filter Means" Excludes a Central Database
            of Goods and Services, or Prices

As generally discussed above, it is a specific requirement of the invention of the '328 Patent that the "filter means" includes **no central database** containing information about the goods and services for which the invention is used to generate quotations.  Col. 3, ll. 60-62.  The

---

[5]      Equivalents as stated under 35 U.S.C. § 112, ¶ 6 is not the same as the doctrine of equivalents.  See WMS Gaming Inc., 184 F.3d at 1351.  "The proper test for determining whether the structure in an accused device is equivalent to the structure recited in a section 112, ¶ 6, claim is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial."  Id.

#1038039 v2
105556-52625

intrinsic record is peppered with the inventor's repeated contentions that a central database of goods and services was a characteristic of prior art systems that limited the capacity of those systems. For example, in the specification of the '328 Patent, the inventor described the flaws of the prior art systems:

> The prior art describes computerized shopping systems which employ some kind of central database of goods and services offered to buyers. Information about the goods and services offered is stored centrally and must be kept current centrally. The volume of information required to be maintained and updated in a central database system restricts it to a limited type or number of goods and services or number of vendors it can offer. It is not feasible for such systems to provide access to all standard goods and services and all suppliers world wide. For such a central database to exist, the amount of information to be stored would be awesome as would be the task of keeping it current. It simply is not feasible for central database systems to satisfy the need of buyers to receive timely quotes on an enormous variety of goods and services from vendors anywhere in the world. For this reason existing centralized database systems are created and maintained by the one or a few vendors whose goods and prices are displayed. These systems necessarily restrict a buyer's choice of vendors.

Col. 1, ll. 42-60.

In contrast, the inventor repeatedly distinguished his invention from such prior art systems by noting the <u>absence</u> of any central database of goods and services:

> The present invention is analogous to a cross between telephone and broadcasting technologies. It is this difference which creates the opportunity for buyers to relate to vendors **without a rigid structure operating through a centralized computer database** as required by existing methods.

Col. 2, ll. 27-31 (emphasis added).

> The present invention is a computerized system forming a computer based communications network for processing requests for quotation for goods and/or services by broadcasting such requests to network members of the computerized system over any conventional transmitting medium, such as the Internet, to which the computerized system may be connected. **No central database of goods, prices, etc. is involved**.

Col. 2, ll. 35-41 (emphasis added).

#1038039 v2
105556-52625

> There is **no central pricing database** to limit the number of buyers and vendors of goods and services or to limit the number of goods and services which can be processed. However the goods and services must be standard items to ensure that there is no confusion as to what buyers are requesting and what sellers are offering to buyers.

Col. 5, ll. 60-65 (emphasis added). Accordingly, the claims and the specification make clear that the filter means cannot include a central database of goods, services, and/or prices .

c.     <u>Defendants' Construction of "Filter Means" is Consistent with the Prosecution History</u>

The absence of a central database of goods and service was also repeatedly relied upon by the inventor during the prosecution of the '328 Patent to distinguish the prior art. On several occasions, the inventor urged the Examiner at the Patent and Trademark Office ("PTO") to grant the '328 Patent over the prior art references cited by the Examiner on the basis that those prior art references included a central database of goods and services.

For example, in responding to the March 4, 1997 Office Action from the Patent Office, the inventor argued that his invention overcomes the difficulties of maintaining and managing a central database with "literally hundreds of millions of items available from millions of vendors worldwide." August 1, 1997 Response at 7 (attached as Exhibit B). The inventor also argued that the *Dworkin* prior art reference cited by the Examiner "discloses that all of the information on all of the items for sale are kept at the central database." <u>Id.</u> at 7.

In his February 5, 1998 Response to Office Action, the inventor summarized the claimed invention as follows:

> Before turning to the specific rejections, it is believed that a brief review of the invention as claimed would be helpful. Applicant's invention comprises a **central filter and broadcast means which receives RFQs, filters them to determine which particular vendor terminals may be able to service such requests, and sends the RFQs to those terminals.** As explained in applicant's originally submitted specification, *this eliminates the problem of having a central database which, if it were to make available products from many worldwide vendors,*

13

*would have to store hundreds of millions of entries*.  This would be inefficient and time consuming and thus, impractical.

*The present invention solves the problem by not providing a central database which contains all of the information on all items to be sold.  Rather, the invention uses a database with information regarding various vendors who may be able to supply classes of items.*  The central filter means then transmits the RFQ to appropriate vendors, and received back an appropriate quote from the vendors.  *The quote may include items such as delivery terms, price, etc., none of which are stored in the central database.*

February 5, 1998 Response at 4, 5 (emphasis added) (attached as Exhibit C).

The inventor also stated:

*In summary, none of the prior art teaches a system wherein the central database maintains information only sufficient to determine which sellers should receive the quote,* and wherein the central database filters and sends that request for quote only to the appropriate sellers.

February 5, 1998 Response at 8 (emphasis added).

Not surprisingly, the Examiner relied upon the inventor's unequivocal statements regarding the scope of his purported invention when deciding to allow the claims of the '328 Patent to issue.  Specifically, the Examiner stated:

*The systems of the prior art either maintain a central database containing all necessary information to answer an RFQ* or they require that the buyer specify the vendor to deliver the RFQ to.  *Applicant's system represents a significant improvement over these systems in that the filtering means only maintains enough information to determine which vendors to send the RFQ to, without having to maintain data on all possible goods and services.*

Notice of Allowability (Jan. 19, 1998) at p. 3 (attached as Exhibit D).

In view of the clear and unambiguous statements by the inventor in both the specification and the file history of the '328 patent, the term "filter means" should be construed to exclude a central database of goods and services that contains more information than is required to determine which sellers should receive an RFQ.

14

Accordingly, Defendants submit that the following construction for "filter means" as recited in claim 1 is:

> **Function:** *filtering the network members to determine which network members are to receive a request for quotation*
>
> **Structure:** *the algorithm set forth in Figures 5 and 6, but not including or using a central database that contains more information than is required to determine which network vendors should receive an RFQ*

This construction, including its negative limitation relating to the absence of a central database of goods and services is fully consistent with the claims, the specification, and the prosecution history of the '328 Patent.

### 2.    Claim 12 Recitation of a "Filter Means"

Claim 12 recites, in pertinent part:

> communicating, over said data network, to **a filter means**, at least one request for a quotation from a potential buyer of said goods or services;
>
> filtering, **at said filter means**, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services.

'328 Patent, claim 12 (emphasis added). Thus, the function of the means-plus-function limitation of claim 12 is: "filtering the request for quotation in order to ascertain a set of sellers potentially capable of supplying the requested goods or services."

Defendants submit that the structure corresponding to the filter means in recited in claim 12 would be the same as discussed above in connection with the filter means of claim 1.

Accordingly, Defendants submit that the proper construction of "filter means" as recited in claim 12 is as follows:

> **Function:** *filtering requests for quotation in order to ascertain a set of sellers potentially capable of supplying said goods or services*

#1038039 v2
105556-52625

> **Structure:** *the algorithm set forth in Figures 5 and 6, but not including or using a central database that contains more information than is required to determine which sellers should receive an RFQ*

This construction, including its negative limitation relating to a database of goods and services is fully consistent with the claims, the specification, and the prosecution history of the '328 Patent.

    D.    <u>Construction of the Term "Filter and Broadcast Means"</u>

Claim 4 of the '328 Patent recites:

> ***filter and broadcast means*** for receiving, over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals, and ***for filtering said requests to determine with which vendor terminals said requests should be matched.***

'328 Patent, claim 4 (emphasis added). Thus, the function of the means-plus-function limitation of claim 4 is two-fold: (1) receiving, over a data network, requests to engage in transactions with unspecified vendor terminals; and (2) filtering the requests to determine with which vendor terminals the requests should be matched.

    As an initial matter, there is absolutely no description in the specification of any structure or means capable of "receiving…requests…to engage in transactions with unspecified vendor terminals," nor is there any structure described in the specification for filtering such requests. The specification describes receiving and filtering requests for quotation, but never mentions requests to "engage in transactions." The specification certainly describes no "filter and broadcast means" capable of receiving or filtering such requests to engage in transactions. Because there is no structure in the specification corresponding to the "filter and broadcast

#1038039 v2
105556-52625

means" recited in claim 4, the claim does not satisfy the requirements of 35 U.S.C. §112, ¶ 2 and is thus invalid for indefiniteness. [6]

To save claim 4 from an indefiniteness challenge, SST may argue that the Court should look to the descriptions in the specification relating to the receiving and filtering of "requests for quotations" for structure corresponding to the limitation "filter and broadcast means" for receiving and filtering "requests to engage in transactions."  Such an argument should be rejected, as it would require the Court to essentially rewrite or at least ignore the plain language of claim 4.  In the event the Court chooses to do so, however, then the only structure described in the specification for receiving the requests for quotation is the quotation network computer itself. Col. 7, ll. 3-4 ("the request or requests are telecommunicated to a quotation network computer."); Col. 5, ll. 6-8 ("the RFQ is subsequently downloaded to a quotation system central office computer through a file transfer protocol (FTP) connection to the Internet Web server.")

As for the "filtering" function recited in claim 4, the analysis of the structure corresponding to the "filter and broadcast means" in claim 4 would be consistent with the analysis of the structure corresponding to "filter means" in claim 1, describe above.   In particular, to the extent that "requests to engage in transactions" are equated with "requests for quotation," claim 4 should be construed as follows:

> **Function:**   *receiving, over said data network, requests from a requestor to engage in transactions with unspecified vendor terminals, and for filtering the requests to determine with which vendor terminals said requests should be matched*
>
> **Structure:**   *the quotation system computer in conjunction with the algorithm set forth in Figures 5 and 6, but not including or using a central*

---

[6] Defendants intend to move for summary judgment of invalidity of Claim 4 and other claims on the grounds of indefiniteness under § 112, ¶ 2 after the conclusion of the Markman phase.

#1038039 v2
105556-52625

> *database that contains more information than is required to*
> *determine which sellers should receive an RFQ*

E.    Construction of the Term "Computer Based Communications Network"

Independent claims 1 and 3 recite a computer based communications network through

which the requests for quotation are processed.  Claim 1 specifically recites:

> A computerized system for forming a ***computer based communications network***
> … for processing requests for quotation for goods and services through at least
> one central processing unit including operating system software for controlling
> the central processing unit

Col. 8, ll. 22-27 (emphasis added).  Similarly,  claim 3 recites:

> A method for processing requests for quotation for goods and/or services . . .
> through a computerized system forming a ***computer based communications***
> ***network*** … for linking buyers with suppliers

Col. 8, ll. 49-53 (emphasis added).  From the plain language of the claims, it is clear that the

"computer based communications network" is a computer network through which the RFQs are

routed to appropriate vendors.  The specification and  prosecution history of the '328 Patent

further define this term.

> The specification describes the computer based communications network:

> The present invention is a computerized system forming a **computer based**
> **communications network for processing requests for quotation** for goods
> and/or services by broadcasting such requests to network members of the
> computerized system over any conventional transmitting medium, such as the
> Internet, to which the computerized system may be connected. **No central**
> **database of goods, prices, etc. is involved**.

Col. 2, ll. 35-42.  The inventor, thus, makes clear that the computer based communications

network does not use or include a "central database of goods, prices, etc."  At another part of the

specification, this point is repeated:

> The present invention is a computerized quotation system forming a **computer**
> **based communications network** for processing requests for quotation for goods
> and services from respective buyers or vendors who broadcast such requests to

network members of the computerized system. There is **no central pricing database** to limit the number of buyers and vendors of goods and services or to limit the number of goods and services which can be processed.

Col. 3, ll. 55-62.   The specification is, therefore, quite clear that the computer based communications network cannot include a database of goods, services, and/or prices.

As discussed above in connection with the construction of "filter means," the prosecution history unequivocally demonstrates the inventor expressly disclaimed a system or process that includes a central database that contains more information than is required to determine which network vendors should receive an RFQ.

During prosecution, the inventor distinguished claims 1 and 3 from the prior art cited by the Examiner, by arguing that claim 1 "describes a system wherein communications take place between a central database and numerous remotely located vendor databases."  February 5, 1998 Response at 5.  This statement clearly defines the "computer based communications network" of claim 1.  The inventor also argued that claim 3 should also be allowed over the cited art because it "contains similar language" as claim 1.  Id. at 7.  Based on these statements, and for the same reasons that the filter means cannot include a central database of goods and services, the computer based communications network that includes the quotation system computer also cannot include or use a central database  that contains more information than is required to determine which network vendors should receive an RFQ.

Based on the claims, specification, and prosecution history, Defendants submit that the proper construction of the term "computer based communications network" is:

> *a computer network that does not include or use a central database that contains more information than is required to determine which network vendors should receive an RFQ*

#1038039 v2
105556-52625

This construction is fully consistent with the claims, the specification, and the prosecution history of the '328 Patent.

F.    Construction of the Term "Filter Conditions"

The term "filter conditions" appears in every claim of the '328 Patent except for Claim 12.[7]  The term "filter conditions" is specifically described in the specification:

> filter conditions determine which of the network sellers will receive a buyer's request for quotation

'328 Patent, Col. 1, ll. 14-16.  Filter conditions may also be used to filter responses transmitted from vendors back to buyers:

> Alternatively, or in addition, the vendor responses may likewise be filtered to satisfy conditions of the vendors responding or in accordance with predefined conditions for facilitating a linkage between the prospective buyer and an acceptable seller.

Col. 8 ll. 16-20.

> The buyer and vendor filters may represent ***in their simplest form defined classes of suppliers and/or buyers and may extend to delineate conditions of sale and/or purchase. <u>Limitations or conditions included in the RFQ and/or in the response are defined for purposes of the present application as filter information or simply "filters"</u>. Filtering performed by a quotation system computer may simply involve limiting the network members to whom the RFQ is given and/or to whom responses are given*** or may be a more complex selection process.

Col. 5, ll. 15-25 (emphasis added).  The specification further supports the fact that "classes of suppliers" may simply include the subset of suppliers on the network that can provide a particular product sought by the buyer:

> In the preferred embodiment the vendor class of network members are filtered to be selected based on their likelihood to respond to the request for quotation.

Col. 8, ll. 13-16.

---

[7]    Even Claim 12, however, recites the step of "filtering [the requests for quotation] in order to ascertain a set of sellers potentially capable of supplying said good or services."

#1038039 v2
105556-52625

Accordingly, Defendants submit that the proper construction of "filter conditions" is:

> ***Limitations or conditions that determine which of the network vendors will receive a buyer's request for quotation and/or which buyers will receive a response from a network vendor***

This construction is fully consistent with the claims, the specification, and the prosecution history of the '328 Patent.

G.    Construction of the Term "Network Member"

Independent claims 1 and 3 of the '328 Patent recite "network members," and claim 1 further recites "network buyers" and "network vendors." The specification of the '328 Patent describes how vendors and buyers apply for membership to become network members:

> New vendors may ***apply for membership*** using the quotation system's World Wide Web application form or by contacting quotation system offices by other means. ***Buyer members*** would access the quotation system's World Wide Web site and ***apply for membership*** or request price quotations or other available information, such as a trade publication search engine or statistical charts of price versus time by product, provided through the quotation system's Web site. ***New members*** would receive password information via e-mail to ensure that applicants have provided correct e-mail coordinates.

Col. 4, ll. 50-60 (emphasis added). Similarly, the specification recites:

> A potential user accesses the Internet using any standard Web browser and ***becomes a quotation network user by completing a registration application providing necessary data about itself. Once registered, a member can access the forms necessary for preparing a request for quotation ("RFQ")***, which will be described in greater detail hereafter. The RFQ is subsequently downloaded to a quotation system central office computer through a file transfer protocol (FTP) connection to the Internet Web server.

Col. 4, l. 67 - Col. 5, l. 8 (emphasis added).

Thus, the specification makes it clear that a buyer or vendor must first apply for membership to the network (e.g., by completing a registration application) before it can avail itself of the claimed invention. Indeed, the specification describes no other way for a buyer or

#1038039 v2
105556-52625

vendor to become a "network member."    Accordingly, Defendants submit that the proper construction of "network member" is:

> ***A person or entity that has applied for membership to the network by completing a registration application or by contacting quotation system offices or by other means and has received password information or other means necessary to access and use the quotation system***

This construction is fully consistent with the claims, the specification, and the prosecution history of the '328 Patent.

H.    <u>Construction of the Term "Goods And/Or Services"</u>

Defendants believe that it is necessary that "goods and services" be construed to be limited to "**standardized** goods and services." It is clear from the specification that in order for the invention to work as described, the goods and services recited in the claims of the '328 Patent **must** be standardized. Defendants' contruction is fully consistent with the intrinsic record.

As described in detail above, the invention of the '328 Patent requires that there be no central database of goods and services. In order to accomplish proper routing of the requests for quotation to vendors that sell the product sought by the buyer without a database of goods and services, the invention of the '328 Patent requires that the goods and services be standardized. As expressly stated in the specification:

> There is no central pricing database to limit the number of buyers and vendors of goods and services or to limit the number of goods and services which can be processed. **However the goods and services must be standard items** to ensure that there is no confusion as to what buyers are requesting and what sellers are offering to buyers.

Col. 3, ll. 60-65. In other words, the trade-off for the elimination of a large central database containing the specifications of the available goods and services is the standardization of the

goods or services.  The purpose of the standardization is to enable the buyers and vendors to verify that the RFQs and responses to RFQs (i.e., quotes) are "comparing apples to apples."

The specification repeatedly stresses the necessity of using standardized goods and services, and even describes a menu-driven process for constraining a buyer's identification of classes of goods and services to pre-defined standards:

> To this end preprogrammed menu information is provided to classify product and services in catagories [sic] broken down by functional class and subclass corresponding to the products as they are commercially known and identified. Such menus are readily upgraded to include new and revised commercially available products and services from the manufactures or suppliers of such products and services. Buyers would use this information to prepare requests for quotation which will then be clearly understood by vendors. This product and other information and programming or software could be made available to network members either by direct electronic transfer to the user's personal computer or by providing information, software, or data on computer disks, compact disks, or other appropriate means. **Providing standardized information to network users is necessary to correlate product and service identifications for buyers and vendors among other system maintenance functions**.

Col. 4, ll. 12-26 (emphasis added).  The specification does not define what "standardized" goods and services are.  However, it is clear from the example provided above, that standardized goods and services must be standardized to the point where they can be divided into a menu structure of classes and sub-classes, and include such specificity as to enable the vendor to generate a quotation for the good or service so identified, without requiring additional information.

Accordingly, Defendants submit that the proper construction of "goods and/or services" is:

***Standardized articles of trade and performances of work for another***

This construction is fully consistent with the claims, the specification, and the prosecution history of the '328 Patent.

I.    Construction of the Term "Communications Channel Storage Means" and "Storage Means"

Independent claim 1 recites:

> said network members being remotely located from said central processing unit and connected thereto via a ***communication channel storage means*** containing identification of the network members.

'328 Patent, claim 1 (emphasis added).  Independent claim 3 recites a "***storage means*** containing the identification of the network members" (emphasis added).

Because the claims do not themselves provide structure for performing the recited function, the claim terms "communications channel storage means" and "storage means" are means-plus-function limitations and are, therefore, subject to construction under Section 112, ¶ 6.  Claim 1 recites two functions performed by the "communications channel storage means": (1) storing the identification of the network members and (2) connecting the network members to the central processing unit.  The recited function of the "storage means" in claim 3 is to store the identifications of the network members.

1.    The Specification Fails to Disclose Any Structure for Containing the Identification of the Network Members

The specification of the '328 Patent discloses only two structures capable of storing information, neither of which are suitable to store network member identities.  According to the specification, the quotation system computer includes the following structures:

> a random access memory for temporary storage of information, a read only memory for permanent storage of the computers [sic] configuration and basic operating commands, an input/output adapter for connecting peripheral devices and known input and interface devices, [and] a display adapter and display device.

Col. 6, ll. 35-42.  Notably, neither the random access memory nor the read only memory is identified as storing or containing the identifications of network members.  Indeed, the read only memory ("ROM") could not store network member identities, because such identities are not for

"permanent storage" and are not part of "the computer[']s configuration or basic operating commands." Moreover, network member identities could not be stored in ROM, because data in read only memory can be accessed, but not modified. Similarly, random access memory ("RAM") is commonly understood to refer to volatile memory, i.e., memory that loses its data when power is disconnected from the system, and as such would also be unsuitable for storing network member identifications or other data that would need to be accessed on a more permanent basis.

No other memory or storage structures are described in the specification and there is simply no description or disclosure of a "communications channel storage means" or a "storage means" for containing identification of the network members. See Col. 6, ll. 35-42. Necessarily, the specification also fails to describe a "communications channel storage means" that stores the identification of the network members **and** connects the network members to the central processing unit.

As stated in Atmel v. Information Storage Devices, Inc., 198 F.3d 1374, 1382 (Fed. Cir. 1999), the patentee must disclose the structure corresponding to the means in the specification in order to comply with the particularity requirement of 35 U.S.C. § 112, ¶ 2. Here, the specification is completely devoid of any structure that corresponds to the function of storing the identifications of the network members. Even if the only structures described in the specification for storing information were actually capable of storing the network member identities -- they are not -- the specification fails to clearly link or associate those structures with the recited function.

These facts are similar to ones considered by the Federal Circuit in B. Braun Med. Inc. v. Abbot Labs., 124 F.3d 1419 (Fed. Cir. 1997). In that case, the Court held that a valve seat disclosed in the specification was not "corresponding structure" for the recited function of

#1038039 v2
105556-52625

holding a flexible disc against a triangular member to restrain sideways movement because there was no clear link between that structure and the recited function.  See id. at 1425.  The court specifically stated that "[a]lthough [] the patent shows a valve seat, neither the specification nor the prosecution history contains any indication that the valve seat structure corresponds to the recited function, i.e., that it holds the flexible disc against the triangular member so as to restrain sideways movement."  Id. at 1425.  Similarly, in the '328 Patent, the specification contains no indication that the random access memory or read only memory are related to the function of storing the identification of network members.  See id.

In another similar case, the Federal Circuit held that "wire, hooks, and sutures were capable of performing [the recited] function, [but] neither the specification nor the prosecution clearly linked or associated them with that function.  Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc., 248 F.3d 1303, 1312 (Fed. Cir. 2001).  Here, the same reasoning is applicable: while the random access memory and read only memory might arguably be capable of performing the function of containing identification of the network members, there is no description of their use in that way and there is no link in the specification to associate them with that function.

The facts here are also similar to those of a recent Federal Circuit decision, Default Proof Credit System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291 (Fed. Cir. 2005).  There, Default Proof argued that its specification firmly linked a "means for dispensing debit cards" with a point of sale ("POS") terminal.  Id. at 1298-99.  Indeed, the title of the patent was, "System for Dispensing Prepaid Debit Cards Through Point-of-Sale Terminals."  Id. at 1299.  The court, however, analyzed the specification and  found that the specification did not clearly link the

"means for dispensing" with the point of sale terminal. As part of its reasoning, the court stated that:

> the specification describes certain aspects of the POS terminal, but omits any mention of parts capable of dispensing debit cards. The specification merely teaches that the POS terminal includes 'a keyboard with numbers, letters, names, signs, graphics, with a sliding open side' as well as 'necessary input and output hardware such as card charges and card debits [], computer assembly [] and associated storage assembly.

Id. at 1301. Thus, like Default Proof Credit System, Inc., here, the specification discloses a random access memory for temporary storage of information and a read only memory for permanent storage of the computer's configuration and basic operating commands. Col. 6, ll. 35-42. However, as in Default Proof Credit System, Inc., there is no disclosure of a structure perform the recited function and no link to associate the disclosed memory structures to the recited function.

Defendants submit that the specification of the '328 Patent discloses no structure capable of performing the functions associated with the "communications channel storage means" limitation in claim 1 and the "storage means" limitation in claim 3. Accordingly, Defendants submit that no construction of these means-plus-function limitations is possible and that claims 1 and 3 are, therefore, indefinite.

### 2. "Communication Channel Storage Means" and "Storage Means" Cannot Include a Database of Goods, Services, or Prices

If the Court determines that a construction of these means-plus-function limitations is possible, then, for the reasons described above in connection with "filter means," Defendants submit that any structure identified in the specification as corresponding to the "communication channel storage means" and/or "storage means" must specifically exclude a central database that contains more information than is required to determine which sellers should receive an RFQ.

<u>CONCLUSION</u>

For the reasons provided above, Defendants respectfully request that the Court construe the disputed claim terms as set forth herein.

Respectfully submitted,

December 7, 2005

GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE
A Professional Corporation


By:  <u>s/ Elvin Esteves (EE 2216)</u>

Kevin J. McKenna, Esq. (KJM 7530)
Elvin Esteves, Esq. (EE 2216)
One Riverfront Plaza
Newark, NJ 07102-5497
Telephone (973) 596-4500
Facsimile (973) 596-0545

*Attorneys for LendingTree, LLC, IAC/InterActiveCorp, and ServiceMagic, Inc.*


OF COUNSEL:

Holmes J. Hawkins III
A. Shane Nichols
James J. Mayberry
KING & SPALDING
191 Peachtree Street
Atlanta, Georgia 30303
Tel.: (404)572-4600
Fax: (404)572-514

#1038039 v2
105556-52625