# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------X
                                               :

Source Search Technologies, LLC,      :

                                      :

               Plaintiff,      :

                                      :  **Civil Action No. 2:04-CV-4420 (DRD)**

        v.                 :

                                      :  **Oral Argument Requested**

LendingTree, Inc., Service Magic Inc. and  :
IAC InterActiveCorp,         :

                                      :

               Defendants.   :
-------------------------------------------------------X

## PLAINTIFF SOURCE SEARCH TECHNOLOGIES LLC'S RESPONSIVE *MARKMAN* BRIEF

Dated: December 21, 2005

Jeffrey I. Kaplan (JK 4706)
Michael R. Gilman (MG 7608 *Pro Hac* Admittee)
KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*

## TABLE OF CONTENTS

**Page(s)**

I.  PRELIMINARY STATEMENT ..................................................................................1

II.  ARGUMENT..........................................................................................................1

A.  Defendants Mischaracterize the Level of Skill in the Art ......................................1

B.  Request for Quote ("RFQ") ............................................................................2

C.  Filter Means or Means for Filtering....................................................................6

D.  The Disclaimer is Not as Broad as Defendants Argue ...........................................9

1.  The Patent Specification Soundly Refutes
    Defendants Interpretation ........................................................................10

2.  The Claim Language Itself Soundly Refutes
    Defendant's Proffered Construction............................................................12

3.  The File History Soundly Refutes Defendants
    Proffered Construction..............................................................................15

4.  The Prior Art Refutes Defendants'
    Proposed Construction..............................................................................19

5.  Defendant's Misconstrue the Patent File ...................................................21

6.  Even if the Statement Can be Read as
    Defendants Urge, Defendants are Still
    Incorrect as to The Scope of the Disclaimer...............................................23

7.  Even if the Court Actually Read the
    Summary Statement As Defendants Urge,
    It Would Not Constitute a Disclaimer Because
    it is Directed to the Prior Art, not the Invention.........................................29

### TABLE OF CONTENTS (continued)

**Page(s)**

E.    Filter and Broadcast Means ...............................................................31

F.    Computer Based Communications Network ......................................32

G.    Filter Conditions ...............................................................................33

H.    Network Member ...............................................................................36

I.    Storage Means ...................................................................................36

   1.    The Claim is Not in Means Plus Function Format ..................37

   2.    If Storage Means is in Means plus Function Form, Several
         Corresponding Structures are Disclosed and Linked................39

J.    The Communications Channel Storage Means in a Red
      Herring and Should Not Be Construed by the Court at All .................43

K.    Goods and Services ...........................................................................45

III.    CONCLUSION...................................................................................46

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Astrazeneca AB, Actiebolacget Hassle et al. v.*
   *Mutual Pharmaceutical Company,*
     384 F.3d 1333 (Fed. Cir. 2004) ........................................................................19

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.,*
   262 F.3d 1258 (Fed. Cir. 2001) ........................................................................36

*CCS Fitness, Inc. v. Brunswick Corp.,*
   288 F.3d 1359 (Fed. Cir. 2002) ........................................................................12

*In re Chemtoy Corp.,*
   19 B.R. 475 (Bankr. N.D. Ill.1982) ....................................................................5

*Comark Communications Inc. v. Harris Corporation,*
   156 F.3d 1182 (Fed. Cir. 1998) ..........................................................................4

*Connectel LLC v. ITXC Incorporated,*
   2004 WL 540444 (E.D. Pa.) ..............................................................................4

*Cultor Corp. v. A.E. Staley Manufacturing Co.,*
   224 F.3d 1328 (Fed. Cir.  2000) .........................................................................4

*Cybor Corporation v. FAS Technologies, Inc.,*
   138 F.3d 1448 (Fed. Cir. 1998) ...............................................................26, 27, 34

*In re Donaldson Company, Inc.,*
   16 F.3d 1189 (Fed. Cir. 1994) ............................................................................1

*In re Dossel, et al.,*
   115 F.3 942 (Fed. Cir. 1997) .......................................................................1, 42

*Fuji Photo Film Co., Ltd. v. International Trade Commission,*
   386 F.3d 1095 (Fed. Cir. 2004) ........................................................................36

*Greenberg v. Ethicon Endo-Surgery, Inc.,*
   91 F.3d 1580 (Fed. Cir. 1996) ....................................................................38, 39

*Hockerson-Halberstadt, Inc. v. Avia Group International Inc.,*
   222 F.3d 951 (Fed. Cir. 2000) ..........................................................................25

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
   78 F.3d 1575 (Fed. Cir. 1996) ..........................................................................36

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*IMS Technology Inc. v. Haas Automation, Inc.*,
   206 F.3d 1422 (Fed. Cir. 2000) ....................................................................................25

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ...................................................................................13

*Inverness Med. Switz. Gmbh v. Princeton Biomeditech Corp.*,
   309 F.3d 1365 (Fed. Cir.  2002) ..................................................................................24

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   327 F.3d 1364 (Fed. Cir. 2003) ...................................................................................24

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999) .....................................................................................13

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ...................................................................................13

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967
   (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) .............................................10

*Middleton Inc. v. Minnesota Mining and Mfg. Co.*,
   311 F.3d 1384 (Fed. Cir.  2002) ........................................................................24, 27, 34

*Northern Telecom Ltd. v. Samsung Electronics Company*,
   215 F.3d 1281 (Fed. Cir. 2000) .............................................................................24, 30

*O.I. Corp. v. Tekmar Co.*,
   115 F.3d 1576 (Fed. Cir. 1997) .....................................................................................4

*Omega Engineering, Inc. v. Raytek Corporation*,
   334 F.3d 1314 (Fed. Cir. 2003) .............................................................................26, 27

*Pall Corp. v. PTI Techs. Inc.*,
   259 F.3d 1383 (Fed. Cir. 2001) ...................................................................................24

*Personalized Media Comm., L.L.C. v. I.T.C.*,
   161 F.3d 696 (Fed. Cir. 1998) .....................................................................................38

*Phillips v. AWH*,
   15 F.3d 1303 (Fed. Cir. 2005) ........................................................... 1-3, 10, 13, 36

## TABLE OF AUTHORITIES (continued)

Page(s)

*Quaker State Mushroom v. Dominick's Finer Foods,*
   635 F.Supp. 1281(N.D. Ill. 1986) ..............................................................5

*Reaction Molding Techs. v. Gen. Elec. Co.,*
   585 F.Supp. 1097 (E.D. Pa. 1984) ..............................................................5

*Reilly Foam Corp. v. Rubbermaid Corp.,*
   206 F.Supp.2d 643 (E.D. Pa. 2002) ..........................................................2, 5

*Rexnord Corp. v. Laitram Corp.,*
   274 F.3d 1336 (Fed. Cir. 2001) ............................................................24, 29

*Rodime PLC v. Seagate Tech. Inc.,*
   174 F.3d 1294 (Fed. Cir. 1999) ..................................................................37

*Salazar v. Procter & Gamble Company,*
   414 F.3d 1342 (Fed. Cir. 2005) ........................................................8, 28, 35

*Schwing GmbH v. Putzmeister Aktiengesellschaft,*
   305 F.3d 1318 (Fed. Cir. 2002) ............................................................24, 30

*Sci-Med Life Systems, Inc. v. Advanced Cardiovascular Systems,*
   242 F.3d 1337 (Fed. Cir. 2001) ..............................................................4, 19

*Smith Industries Medical Systems Inc. v. Vital Signs Inc.,*
   183 F.3d 1347 (Fed. Cir. 1999) ....................................................................8

*Standard Oil Co. v. American Cyanamid Co.,*
   224 F.2d 448 (Fed. Cir. 1985) ....................................................................25

*Storage Tech. Corp. v. Cisco Sys. Inc.,*
   329 F.3d 823 (Fed.Cir.2003) ......................................................................24

*Telemac Cellular Corporation v. Topp Telecom, Inc.,*
   247 F.3d 1316 (Fed. Cir. 2001) ..................................................................13

*Toro Co. v. White Consolidated Industries, Inc.,*
   199 F.3d 1295 (Fed. Cir. 1999) ....................................................................4

*Vanguard Products Corporation v. Parker Hannifin Corporation,*
   234 F.3d 1370 (Fed. Cir.  2000) ............................................................13, 24

## <u>TABLE OF AUTHORITIES</u> (continued)

<u>Page(s)</u>

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ...............................................................................3, 10, 12, 35

*Wenger Mfg. Inc. v Coating Mach. Sys. Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ......................................................................................37, 38

*WMS Gaming Inc. v. International Game Technology*,
    184 F.3d 1339 (Fed. Cir. 1999) ....................................................................................6, 32, 42

# I.  PRELIMINARY STATEMENT

Defendants correctly discuss Federal Circuit precedent noting the importance of the ***intrinsic*** record, and correctly note that this Court should ***not*** construe the claims based upon ***extrinsic*** evidence that contradicts the intrinsic record.  Then, defendants urge this Court to construe "Request for Quote" based ***exclusively*** on extrinsic evidence, that directly and unequivocally contradicts the patent specification and the file history - the intrinsic record.

Defendants then urge that the claims exclude a "central database", despite the fact that claim 4 of the '328 patent recites a "central database".  These and other errors in defendants' opening brief are discussed in more detail below.  For the reasons that follow, as well as those in SST's opening brief, the Court should adopt SST's construction of the disputed terms.

# II.  ARGUMENT

## A.  Defendants Mischaracterize the Level of Skill in the Art

As an initial matter, it is well settled that the patent specification and claims must be interpreted from the point of view of one of ordinary skill in the art.  *Phillips v. AWH Corporation,* 15 F.3d 1303 (Fed. Cir. 2005); *In re Dossel, et al.*, 115 F.3 942 (Fed. Cir. 1997); *In re Donaldson Company, Inc.*, 16 F.3d 1189 (Fed. Cir. 1994).  While defendants correctly state the foregoing proposition of law, they then attempt to establish the level of skill in the relevant art through use of mere attorney argument.  (Defendants Opening Brief, p. 8).  Defendants then compound their error by making a variety of arguments about FTP protocols and the technological capabilities of electronic Read Only Memory and Random Access Memory contained in computers, all of which they claim require the Court to adopt defendants' claim constructions.  (Defendants Opening Brief, pp. 17, and 24-25).  Yet, defendants support all of these specialized technical assertions with mere attorney argument.  *Id.*

1

SST submits herewith the declaration/preliminary expert report of Dr. Eric Dowling which sets forth the appropriate level of skill in the art.   Dr. Dowling is a fully qualified expert, and has extensive experience in electronics, networking, and computer software, and has several of his own patents directly related to the subject matter at issue here.[1]

Dr. Dowling opines that the ordinarily skilled artisan would have some basic level of computer programming and networking or similar expertise, perhaps a BS degree in computer science or a related field or the equivalent work experience.

Accordingly, when performing its claim construction analysis, this Court should accept SST's position as to the level of skill in the art, as supported by Dr. Dowling's expert testimony, not the unsupported assertions of defendants' attorney .

### B.  Request for Quote ("RFQ")

Defendants misconstrue the word "quote" in their definition of "Request for Quote".  In the context of the '328 patent, the request for quote is the request for *the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance*.[2]  In *Phillips*, the Federal Circuit noted that while it would leave open the possibility of some slight weight being placed on dictionary definitions, the use of dictionaries is disfavored, and may not be used to contradict the definition conveyed by the patent specification:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent.  Properly viewed, the "ordinary meaning" of a claim term is *its meaning to the ordinary artisan after reading the entire patent*.

---

[1] SST is not offering Dr. Dowling's testimony to contradict or alter the intrinsic record, but only to provide general background about the technology in issue and the level of skill in the art at the relevant time.  Such use of expert testimony is fully appropriate in connection with the Court's *Markman* analysis. *Phillips v. AWH Corporation,* 15 F.3d 1303 (Fed. Cir. 2005).

[2] Courts have previously adopted this same definition of quote.  *Reilly Foam Corp. v. Rubbermaid Corp*., 206 F. Supp.2d 643 (E.D. Pa. 2002).

(Emphasis added) *Id.*, at 1321.  The Court reemphasized that the patent specification and the prosecution history remain the most important sources for claim construction, and often the specification is the single dispositive source.  *Id.*  Moreover, extrinsic evidence may **never** be used to arrive at an interpretation that contradicts the intrinsic record, for if the claim is construable based upon the intrinsic record, it is reversible error to look to contradictory extrinsic evidence.  *Phillips; Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

Defendants argue that for all the terms to be construed here, "[T]he specification, and the prosecution history – i.e., the intrinsic record – provides the correct construction.  Accordingly, it is unnecessary for the Court to resort to any extrinsic evidence." (Defendants Opening Markman Brief, p. 7.)  Then, the first term they present to this Court for construction immediately thereafter is "Request for Quote", at pp. 8-9 of their brief.  They do not cite the patent specification or the prosecution history at all, and instead offer definitions of request for quote that rely **exclusively** on extrinsic dictionary definitions related to stocks and securities transactions.  These extrinsic definitions are divorced from, and completely contradict, the use of the term in the '328 patent, and are precisely what the *Phillips* Court denounced and what defendants' own brief argues is improper.

Defendants' statement of the law is correct, but their conclusion that a quote is merely the price results from their failure to apply that law.   Figure 2A of the '328 patent notes that "Each selected vendor responds to the requests(s) by providing its pricing **and other information**….." (Ex. A[3], '328 patent).  Similarly, defendants' proposed construction contradicts the specific

---

[3] Ex refers to the Declaration of Jeffrey I. Kaplan dated December 7, 2005, and submitted in connection with SST's Opening Markman Brief.  Exhibits to the Supplemental Kaplan Declaration filed herewith are denoted "Supp. Kaplan Dec".

3

teaching of the '328 patent at col. 5, lines 45-47, which describes the quote as including "pricing and other information *necessary* [not optional] to respond to the RFQ."  (Emphasis added).[4]

The specification thus mandates that the response includes ***more*** than just the price.  When words of mandate are used, they define the term as used in the claim. *Comark Communications Inc. v. Harris Corporation,* 156 F.3d 1182 (Fed. Cir. 1998); *Sci-Med Life Systems, Inc. v. Advanced Cardiovascular Systems,* 242 F.3d 1337 (Fed. Cir. 2001);  In *O.I. Corp. v. Tekmar Co*$_2$, 115 F.3d 1576, 1581, 42 U.S.P.Q.2d 1777 (Fed. Cir. 1997);   *Cultor Corp. v. A.E. Staley Manufacturing Co.*, 224 F.3d 1328 (Fed. Cir.  2000); *Toro Co. v. White Consolidated Industries, Inc.,* 199 F.3d 1295 (Fed. Cir. 1999) (rejecting dictionary definition as broader than definition in specification, and construing claim based upon specification instead); *Connectel LLC v. ITXC Incorporated*, 2004 WL 540444 (E.D. Pa.).

The file history notes that the "quote may include such items as delivery terms, price, etc.," (Ex. F, Office Action response, page 5).  The quote is so detailed that it is preferably sent to the user using a protocol to transfer entire files of data.  (Ex. A, '328 patent, col. 5, lines 5-8).  In fact, claim 12 recites that "at least part of the quote information" is stored remote from the central filter means. This can not be referring to merely a price, when part of it is stored at a remote computer, and part at a central computer, or when it is so lengthy that it is preferably sent using a protocol for transferring entire files.

Figures 7 and 8 of the '328 patent also shows that the returned quote includes pricing information as well as a variety of other terms.   In fact, Figure 8 is the response to the RFQ.  It is labeled "Price Quotation" and contains no less than twenty five (25) different detailed terms that

---

[4] Necessary means absolutely required, indispensable, required by compulsion, essential. (Supp. Kaplan Dec., Ex. C).   Thus, while defendants extrinsic evidence indicates quote means price only, the '328 patent indicates that something more than a price is "absolutely required".

describe the transaction completely, only one of which is the price. *Id.* Each time the '328 patent refers to a quote or a response to an RFQ, it references price as only a small part of the response.

But, most importantly of all, the quote contains ***a field for the user to accept it by simply clicking on his computer to issue a firm purchase order for the product***. Fig. 8. (ACCEPT/ REJECT QUOTE:). See also Col. 5, line 65, through col. 6, line 2, discussing in detail how a user may merely click a button to accept the quote and issue his purchase order. Even if this Court resorted to extrinsic definitions, when a quote is in such a detailed form so that it can be accepted, it is generally interpreted to mean an offer, not a mere statement of price. *Reilly*; *Reaction Molding Techs. v. Gen. Elec. Co.,* 585 F.Supp. 1097, 1106-07 (E.D. Pa. 1984); *Quaker State Mushroom v. Dominick's Finer Foods,* 635 F.Supp. 1281(N.D. Ill. 1986); *In re Chemtoy Corp.,* 19 B.R. 475, 479 (Bankr. N.D. Ill.1982).

Defendants have pointed to nothing in the intrinsic record that refutes any of the foregoing. Instead, they offer extrinsic evidence that a quote is merely a price in the context of securities transactions, although the '328 patent uses electronic parts purchasing as its example, and defines quotes differently. Defendants violate the critical teachings of the Federal Circuit precedent they cite. Accordingly, SST urges this Court to reject defendants' proffered definition from extrinsic evidence and construe "request for quote" as a request for ***the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance***.[5]

_____

[5] SST emphasizes that although the numerous cited cases above support SST's proffered definition of quote, SST is not citing this precedent to argue that this Court look to other case law to interpret the '328 patent. Quite the contrary, SST cites this precedent merely to emphasize that extrinsic evidence, divorced from the patent, will simply lead to conflicting definitions because there are at least two different widely accepted definitions of "quote". Thus, this court would be deciding between SST's cases cited herein and defendants' dictionary definitions that speak of securities and commodities. This is precisely what the Federal Circuit denounced in

C.    **Filter Means or Means for Filtering**[6]

This limitation should be construed as a computer programmed to ***apply or compare specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of informaiton.***

SST agrees with defendants' interpretation of *WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).  Specifically, when the patent disclosure shows the function of a means plus function claim being implemented by a computer, the structure to be used for claim construction purposes is the computer as programmed to implement the disclosed steps, and all equivalents thereof, not merely a computer.   However, defendants' ignore much of the disclosure of the '328 patent, which teaches the steps that should be implemented in the computer.

First, SST disagrees that the limitation is different in the three different claims 1, 4, and 12. Admittedly, claim 1 talks of filtering network members, and claims 4 and 12 talk of filtering the "request [for quotation]".   However, while that may mean that the claims define different inventions because different things are filtered, it does not mean that the definition of filter means should vary, or that the function that the filter means is performing on those different things should be defined differently.   Indeed, defendants have pointed to nothing in the patent specification to so indicate.

_____

*Philips* and *Vitronics* (If the claim is construable from the intrinsic record, it is reversible error to look to extrinsic evidence.)  Here, the definition given in the '328 patent is consistent with what other Courts have found the term to mean in the typical business circumstances of the cases before them. These typical business scenarios perhaps explain from where the '328 applicant, the founder of an electronics business himself, may have derived his usage of the term quote, as that is the manner in which the term is used in the electronics industry.  Nonetheless, this Court should look no further than the intrinsic record, because when the claim is construable intrinsically, it is error to look further. *Vitronics*.

[6] Defendants also discuss the disclaimer issue in connection with the filter means.  SST's rebuttal to that discussion is set forth in a separate section herein.

Second, defendants are incorrect that the structure disclosed in the '328 patent is limited to the algorithm in figures 5 and 6 of the specification.  For example, col. 7, lines 3-29, of the '328 patent describes filters for time sequencing the transmission of RFQ's based upon distance, and for transmitting RFQ's based upon the type of service selected by a vendor.  This disclosure is in addition to what is shown in figures 5 and 6, and thus, can not be ignored in construing the claims.

Figure 2A includes a flowchart that clearly and explicitly teaches that filtering consists merely of a comparison of the item being filtered to various conditions to determine if the conditions are met:

> THE QUOTATION SYSTEM PROCESSES THE REQUEST BY SELECTING A CLASS OF VENDORS WHO SELL THE REQUESTED PRODUCTS(S) AND **MEET THE FILTER REQUIREMENTS OF THE BUYER, VENDOR, AND THE QUOTATION SYSTEM.**

(Emphasis added)  This is teaching that the filter means is merely the software in the computer that that checks to see if the condition is met.

Similarly, Figure 3 is a portion of a flow chart that describes the filtering as something that forwards a special sale offer to users, "provided the user meets the vendor's and the quotation system's filter requirements."  Further when applying a particular filter condition, another part of Figure 3 notes that offers will be sent "provided the member is located in a vendor specified area."   Again, the logic being applied is a mere test to see if the location condition is met.

Notably, the patent examiner interpreted the claim the same way:

> The computer then searches the database to retrieve all products or services, within the selected category, **having the specifications required by the user**…one of ordinary skill in the art would have been motivated to incorporate **this filtering** in the embodiment of Shavit to solve the known problem of allowing users to [sic] order or obtain quotation information on products or services directly…**for a product or service meeting a set of specifications**.

7

(Emphasis added) (Ex. E, Office Action of December 22, 1997, p. 3).

Thus, the Examiner himself viewed the filtering means as a way of merely comparing the retrieved products to the "specifications required by the user" to locate a product or service "***meeting a set of specifications***."  The patent examiner's comments in this regard are of great probative value, because they indicate how one of skill in the art would read the claim, as well as the scope of what was negotiated between the applicant and the patent examiner on behalf of the public. *Salazar v. Procter & Gamble Company,* 414 F.3d 1342 (Fed. Cir. 2005).

Defendants' assertion that the claim is limited to only what is shown in Figures 5 and 6 not only disregards the remainder of the intrinsic record discussed above, but disregards most of Figures 5 and 6 as well.  Specifically, Figures 5 and 6 show a variety of other functions that are not related to filtering, such as "POPULATE FTP FILE", which involves setting up an FTP file for transmission of the quote (figure 5) and "GET RFQ", (figure 5) which relates to receiving an RFQ, creating tables, a separate step from the filtering step in the claim, and generating a letter to buyer requesting the quote (figure 6).

Requiring the filter means to have all of these unrelated items would improperly narrow the claim, because these items are not part of the claim language "means for filtering" in claim 1. Defendants' error in this regard is precisely the grounds upon which the Federal Circuit reversed the lower court in *Smith Industries Medical Systems Inc. v. Vital Signs Inc*., 183 F.3d 1347, 1357 (Fed. Cir. 1999) (Noting error in searching specification for a structure to supply gas ***under pressure;*** "Instead, the function recited by the means plus function claim limitation is simply the function of "supplying gas", and it is this function alone that serves as the touchstone for identifying the disclosed, corresponding structure that is recited by the means plus function claim limitation.")

8

One part of Figure 5 that actually deals with the filtering supports SST's construction, because it notes that the system tests to see if the vendors "quote in the buyer currency" or if they "deal in the buyers buyer type", etc.  (Ex. A, Figure 5).   Again, this is merely a simple logic test to determine if the condition is met.

Defendants instead urge the Court to read into the claim several portions of Figures 5 and 6 that do not relate to filtering, while also urging that the Court overlook other portions of the specification that *do* describe the filtering.    This compounds one error with another.

Based upon the entire intrinsic record, the function is filtering and the structure corresponding to the filter means is a computer programmed to ***apply or compare conditions to an item(s) of information to determine if the condition is met or not by the item,*** and all legal equivalents thereto under 35 USC §112.

**D.  The Disclaimer is Not as Broad as Defendants Argue**

In support of their definition of the term filter means, defendants urge that the applicant's disclaimed any central database that contains ***anything more*** than the information required to determine which sellers should receive the RFQ.  (Defendants' Opening Markman Brief, p. 16). SST submits that the applicant disclaimed a system wherein all of the information about all of the items for sale from all of the vendors was stored at the central database, so that a complete quote could be generated, and a transaction could be fully consummated, between the central database and the consumer.  A central database storing anything less was not disclaimed.

Thus, the issue for this Court is whether the claims can cover a system wherein the central database contains ***more*** information than ***only*** that which is required to determine which sellers should receive the RFQ, but ***less*** information than is necessary to generate the entire quote and consummate the sale.  In such a system, because the central database is lacking at least some of

the information required to generate the full quote and consummate the transaction, the filtering and transmission of the RFQ to selected vendors would still occur, and the quotes would come from the vendors, just as recited in the '328 patent claims. However, the central database would simply store something more than *only* the filter conditions.

SST respectfully submits that the claim most definitely can cover such a system. Further every source to which this Court may properly look for the answer - the patent specification, the file history, the claims themselves, the prior art, and Federal Circuit precedent - clearly and unequivocally state so. Even available extrinsic evidence firmly refutes defendants' position and supports SST's position, although such extrinsic evidence, while it may be considered, is to be given less weight than the intrinsic evidence. *Phillips, supra*.

1. The Patent Specification Soundly Refutes Defendants Interpretation

The patent specification is one of the most important sources to consult in construing claim. *Markman, Vitronics, Phillips*, ("The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.")

Contrary to defendants' assertion that the central database can store *nothing more* than "information required to determine which network vendors should receive an RFQ", the '328 patent specification notes that the central database stores product information such as price versus time by product type, vendor profile data, password information, user coordinates, and other items. (Ex. A, col. 4, lines 43-60, and Figure 4).

Additionally, the '328 patent provides a separate embodiment for "special sales" whereby a vendor can register certain products and their detailed specifications with the central office, and

the central office will forward this product information to certain buyers. *Id.*, at Figure 3, and col. 4, lines 52-59.

This detailed special sale product information continues to be stored by the central computer after being downloaded from the vendor, because even if a buyer registers his interest in receiving an offer for the special sale item ***after*** the vendor sent the sale information to the central computer, the central computer will ***still have stored*** the special sale item so it can send it to the buyer. *Id.*, at col. 6, lines 54-56, "[B]uyers will be informed of the sale if they identify ***or*** have identified the product or its category to the quotation system…" (Emphasis added). See also Figure 3, noting that such information will be sent to buyers if they register or have registered their interest. This information is not filter conditions for selecting vendors, and yet it is stored in the same central computer.

The central computer also stores the forms necessary to register as a member (Col. 5, lines 3-6). The central computer also stores an operating system and programming for the buyer's and vendor's type equipment. (Col. 6, lines 45-52.) Software updates are stored and distributed by the central computer, as is accounting data. Figure 4. Moreover, certain "application helper software" is stored in the central computer and provided to users as needed. (Ex. A, Figure 2B).

Figure 2B also notes that the system permits "appropriate credit information of the buyer [to] be provided to the vendor from ***records kept by the quotation system***". (Emphasis added)

Finally, the '328 patent provides an additional embodiment whereby the quotes themselves are subjected to an additional filtering step before being passed to the buyer. In this embodiment, an RFQ is sent from a buyer, filtered by the central computer, and transmitted to selected vendors. The selected vendors respond by sending their detailed quotes to the central computer, and the central computer then performs a second filtering operation on the quotes so

11

only a subset of them are sent back to the buyer. (Ex. A, at col. 8, lines 16-20). This separate feature of the ***additional*** filter conditions, different from the ones used to select vendors, is specifically claimed in claims 17-19. (Ex. A, claim 17, reciting "first set of filter conditions" for selecting vendors, the only thing defendants claim the central computer can store, and "additional filter conditions").

Yet, according to defendants, the central database does not store anything more than the first set of filter conditions necessary to select the vendors. This would lead to an internally inconsistent claim that defined a computer system that stores the first filter conditions and nothing more, and also stores some additional filter conditions that it does not store. This is "Alice in Wonderland," not patent law.

In short, reading the disclaimer such that the claims exclude any central computer database "storing more information than is required to determine which sellers should receive an RFQ", must be incorrect, because it contradicts virtually the entire patent specification, which calls for the storage of a variety of other items by the central computer.

As explained further below, the applicant only disclaimed a system wherein all of the information about all of the items for sale from all of the vendors was stored at the central database, so that a complete quote could be generated, and a transaction could be fully consummated, between the central database and the consumer. A central database storing anything less was not disclaimed.

2.  <u>The Claim Language Itself Soundly Refutes Defendant's Proffered Construction.</u>

The Federal Circuit has emphasized over and over again that the terms used in the claims bear a ***heavy*** presumption that they mean what they say and have the ordinary meaning that would be attributed to those words. *Vitronics*; *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d

12

1359, 1366 (Fed. Cir. 2002); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356; (Fed. Cir. 1999);

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).   In

*Phillips*, the Court explained that the usage of a claim term in the context of its surrounding

claim terms is often very useful in the claim construction analysis.  *Id,* at 1314.

Claim 4 recites that the central database contains "information insufficient to consummate

the transaction".  That simply means what it says – information that is something less than all the

information required to complete the transaction.  Claim 12 recites that "at least part of the quote

information is stored at a location remote from said filter means".  Again this simply means that

while ***some*** of the quote information may be stored at the central database where the filter means

is, something less than ***all*** of the information to be included in the quote is stored at the central

database.

Defendants want these claims interpreted such that they do ***not*** cover systems wherein the

central database contains "information insufficient to consummate the transaction", or wherein

"at least part of the quote" is stored remotely, merely because the central database stores

something more than the filter conditions.  This would contradict the very explicit language of

claims 4 and claim 12.   A claim construction "that flies in the face of the express language of the

claim" is incorrect.  *Interactive Gift Express, Inc. v. Compuserve, Inc*., 256 F.3d 1323 (Fed. Cir.

2001)*; Telemac Cellular Corporation v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed. Cir. 2001).

*See also*, *Vanguard Products Corporation v. Parker Hannifin Corporation*, 234 F.3d 1370 (Fed.

Cir. 2000) (prosecution statement that the invention uses "co-extrusion and tri-extrusion" was

not sufficient to disclaim system that uses co-extrusion, because claim itself called for a system that was "co-extruded", not co-extruded and tri-extruded.) [7]

Further, as explained above, the '328 patent claims a system wherein RFQ's are subjected to "a first set of filter conditions" to determine to which vendors the RFQ should be sent, and then the responding actual quotations are subjected to "additional filter conditions" to determine which subset of the quotes returned from the vendors should be sent on to the requesting buyer. Ex. A, col. 10, claims 17-19.  The first filter conditions and the additional filter conditions of claim 17 could be any of buyer, vendor or network filter conditions. (See claims 18 and 19). What is important here however, is that the first filter conditions of claim 17 are clearly ***different from*** the additional filter conditions of claim 17.

Claim 17 specifically recites that it is the first filter conditions, and not the additional filter conditions, that determine which sellers are to receive the RFQ.   Thus, clearly the central computer ***must*** store more filter conditions than those required to determine which seller is to receive an RFQ, because the central database also contains the ***additional filter conditions*** that are used to filter the quotes returned from the vendors.  These additional filter conditions are not even used until after the vendors have already received the RFQ and returned their quotes to the central office, and thus do not have anything to do with which network vendors are to receive the

---

[7] Defendants' construction also renders the '328 claims meaningless, because an infringer could simply put a file into his computer that stores a random, meaningless, never used number  - the number 6 – and then use all of the '328 filtering and two tier match limiting technology while claiming there is no infringement because a number that is not used for filtering is stored in the central computer.   This would give defendants here - who's revenue from using Mr. Giovannoli's patented filtering technology is believed to be measured in the billions - a complete free ride.

RFQ.  Therefore, the central database must store more than is required to determine which

vendors are to receive the RFQ, and defendants must be reading the disclaimer incorrectly.[8]

The Court should thus reject the notion that the claims do not cover a system wherein the

central database stores anything more than the filter conditions to select which vendors are to

receive the RFQ.

3.  The File History Soundly Refutes Defendants Proffered Construction

Turning to the file history of the patent, it becomes apparent what was in fact actually

disclaimed.  In the first office action response dated August 1, 1997, the applicant distinguished

certain prior art:

> Dworkin discloses that *all* of the information on *all* of the items for sale are kept at a
> central database…Applicant's invention…rather than storing *all* of the information
> necessary to generate *all* of the quotes…"

(Emphasis added) Ex. D, Office Action response, at page 8

Even more importantly, in the next office action response, the applicant added specific claim

limitations as underlined:

4.  A computerized system for engaging in transactions over a data network, said
computerized system comprising:

a plurality of terminals, at least one of which being designated a requestor and others of
which are designated vendor terminals;

filter and broadcast means for receiving, over said data network, requests from said requestor
to engage in transactions with unspecified vendor terminals, and for filtering said requests to
determine with which vendor terminals said requests should be matched; and

means for matching said requests with vendor terminals which meet predetermined filter
conditions for generating quotes from information contained in a database associated with said
vendor terminals, and for accepting said quotes from said vendor terminals, ***wherein the central
database contains information that is insufficient to consummate the transaction***.

---

[8] Other embodiments of the '328 patent forward the quotes directly to the buyer from the vendor,
bypassing the central computer.

8.  A method of purchasing goods or services over a data network comprising the steps of:

communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services;

filtering, at said filter means, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services; and

obtaining, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, *wherein at least part of the quote information is stored at a location remote from said filter means.*

(Underlining in original, other emphasis added)  Ex. F, Response of January 13, 1998, pp. 2-3).

Concurrently with the above, the following explanation was offered:

Applicant…has also slightly amended the claims to more clearly define the differences between the prior art and the claimed invention…The present invention solves the problem [of Dworkin] by not providing a central database which contains **all** of the information on **all** items to be sold…*several of the claims have been amended in order to more clearly define this concept*…

(Emphasis added) (Ex. F, Response of January 18, 1998, pp. 4-5.)

The applicant could not have been clearer than to explain that the '328 invention, as claimed, distinguished itself from that prior art, by "***not*** providing a central database which contains **all** of the information on **all** items to be sold" (Emphasis added) *Id.*   Then, the applicant stated that the claims were amended to define "this concept".

The amendments that "define[d]this concept" were that one claim was changed to require the central database contain "information that is insufficient to consummate the transaction", and another claim was changed to require "at least part of the quote information" was ***not*** stored at the central database.   In either case, in order to complete the purchase, the RFQ would be filtered and sent to the selected vendors for completion, because the '328 patent did not have a

central database that contained ***all the information about all the items such that users could get a complete quote and complete a purchase from the central database***.

This, SST submits, is the real scope of the disclaimer. The applicant disclaimed the system that stored everything about every item at the central database so that said central database could complete the quote and consummate the transaction. The added claim limitations distinguished the invention by noting that in the invention, ***something less than that*** was stored at the central database, so that the filtering would be used to forward the RFQ's to vendors and obtain the full quotes from them, instead of from the central computer.

Nothing was said about storing only filter conditions, and nothing more, as defendants urge. Yet, it would have been quite simple to amend the same claims by inserting "wherein said central database stores said filter conditions only and nothing more" Or, it would have been just as simple to argue "Applicant's invention provides a central database that contains the vendor filter conditions only and no other information at all". Neither statement was made.

The feature distinguishing the '328 invention was the use of a filter means that sent the RFQ's to the vendors to generate quotes, ***instead of*** storing all the information necessary to generate the full quotes and consummate the sale at the central database. The applicant was consistent about this throughout the proceedings:

> Dworkin [prior art] discloses that all of the information on all of the items for sale are kept at the central database; (Ex. D, p. 7)

> Applicant's invention as recited by claim 4 receives the quotes from the vendor terminals, rather then storing all information necessary to generate all of the quotes at the central database; (Ex. D, p. 8)

> Moreover, the combination of Shavit and Dworkin, although not suggested anywhere in the prior art, would not result in applicant's invention. Rather, such a combined system [of the prior art] would include one central database ***(Dworkin) wherein users could purchase products [i.e.; consummate the transaction]***…(Emphasis added)(Ex. F, p. 6)

The present invention solves the problem by not providing a central database that contains all of the information on all items to be sold.  (Ex. F, p. 5)

Applicant's invention comprises a central filter and broadcast means which receives RFQs, filters them to determine which particular vendor terminals may be able to service such requests, and sends the RFQs to those terminals.  (Ex. F, p. 4)

The central database provides filtering to determine which network members are to receive said request. (Ex. F, p. 5)

Regarding claim 1, the claim describes a system wherein communications take place between a central database and numerous remotely located vendor databases.  The central database provides filtering to determine which network members are to receive said request.  Additionally, claim 1 requires that the network members are remotely located and that they are communicated with, after the requests are filtered, via a communications channel.  Neither Dworkin nor Shavit as relied upon by the Examiner teach or even remotely suggest such a system…(Ex. F, p.4)

Rather, the invention uses a database with information regarding various vendors who may be able to supply classes of items.  The central filter means then transmits the RFQ to appropriate vendors…. (Ex. F, p. 4).

Despite discussing the patentable feature of the invention no less than eight different times, in two different responses,  the applicant never said that the patentable feature of the '328 invention was that the central database stores only the filter conditions to select vendors and that it stores nothing else.   The last statement above is particularly probative, because even though the applicant stated that the central database stores information about which vendors may be able to supply the product, he never stated that this was **all** that was stored.  Clearly had that been the intent, it would have been so stated in the same place.

Accordingly, all that was disclaimed was a system wherein all of the information about all of the items for sale from all of the vendors was stored at the central database, so that a complete quote could be generated, and a transaction could be fully consummated, between the central database and the consumer.  In such systems, there is no filtering and forwarding of RFQ's to vendors for response.  Applicant's invention was to ***replace such a system with the selective***

*filtering,* and then send the RFQs to the vendors to provide the quote and complete the transaction, rather than the central computer doing so.

A system that does not have a central computer database with all the required information to generate the quotes and provide for purchase of the items, and which instead does all of the filtering and matching of the '328 patent claims and forwards RFQ's to vendors for further processing, does not escape infringement merely because some extra data is put into the central database. Accordingly, this Court should rule that the '328 prosecution disclaimer is limited to systems having a central database storing all the information about all of the items for sale from all of the vendors so that a complete quote can be generated, and a transaction can be fully consummated, between the central database and the consumer.[9]

4.  The Prior Art Refutes Defendants' Proposed Construction

In assessing the scope of a disclaimer, the Court should also look to the prior art being distinguished to determine what was disclaimed. *Sci-Med Life Systems, Inc. v. Advanced Cardiovascular Systems,* 242 F.3d 1337 (Fed. Cir. 2001); *Astrazeneca AB, Actiebolacget Hassle et al. v. Mutual Pharmaceutical Company,* 384 F.3d 1333 (Fed. Cir. 2004).

---

[9] Defendants cite various statements from the patent specification stating that a central database was disclaimed. Defendants are correct, but merely beg the question. What is the definition of "central database" that was disclaimed? Was it anything storing more than the filter conditions to select vendors, or anything storing all the information about all of the items for sale from all of the vendors so that a complete quote could be generated, and a transaction could be fully consummated, between the central database and the consumer. The central database being disclaimed, as described in the '328 patent's description of the prior art, was the latter. Indeed, columns 1-2 of the '328 patent describe the prior art as containing a central database with "detailed information" about each vendor's product line so that the central database can present a full "offer" to the potential buyer and such potential buyer can "order items" from the database. SST agrees that this type of system was disclaimed. Applicant's could not have possibly disclaimed *any* central database, because claim 4 specifically recites a "central database", although, consistent with SST's position herein, claim 4 also recites that the central database is one that does not have enough information to consummate the transaction.

Here, examination of the Dworkin prior art reference that was being discussed by the '328 applicant also refutes defendants' position, and is fully consistent with SST's position.  Figure 2B of the Dworkin reference being distinguished shows that in that prior art, the central database has software that provides for the user to "ORDER PRODUCT".  Ex. C, Dworkin Patent No. 4,992,940.  Figure 7 of the '940 patent shows the central computer provides the potential buyer all the details of the product offering, as well as an option to ***order the product from the central database***.  (Ex. C, Figure 7).   Dworkin also notes that the system allows for "purchasing" products from the central database, that its system accepts "all the information needed to process the order, and prints the required documentation", that it can calculate shipping charges, and that a user may cancel an order already made – all from the central computer.  (Ex. C, col. 2, lines 57-59; col. 8, lines 25-56, col. 9, lines 49-51).  As a result, Dworkin requires the disadvantage that the vendors have to constantly update all their detailed product information at the central database.  (Ex. C, col. 10, lines 46-49).  This is the very disadvantage described in the '328 patent at cols. 1-2, and which was overcome by the substitution of the '328 filtering technology for the single central database system of Dworkin, from which users purchase product directly.

It was this central database purchasing system that was distinguished  and which is the subject of defendants' disclaimer argument.   The Dworkin system stores all of the information about all of the items for sale from all of the vendors at the central database, so that a complete quote is generated, and a transaction is fully consummated, between the central database and the consumer.  Thus, disclaiming this system is consistent with SST's position, not that of defendants.

5.  Defendant's Misconstrue the Patent File

Defendants' rebuttal to the above inescapable conclusion, which is fully supported by the clear, unwaivering and repeated position taken by the applicant throughout the prosecution, as well as the claim language itself, the prior art, the patent specification, and the patent examiner's comments[10], consists merely of a citation to a single closing sentence at page 8 of the second office action response filed by the applicant.  (Defendants Opening Markman Brief, p. 14).  Defendants harp on the words "information only sufficient to determine which sellers" and, by taking it out of context, try to twist that into meaning "only information sufficient to determine which sellers only and nothing more."  Defendants strained construction is clearly incorrect.

More specifically, the statement in issue is on the eighth page of the second office action response applicant filed.  The applicant had been *repeatedly* explaining to the patent examiner that prior art central database systems stored all information on all items for sale so the sale could be consummated between the buyer and the central database.  In contrast, the '328 central database served to determine which sellers were to receive the RFQ, did not consummate the transaction, and thus, could store less information. This was explained throughout the first and second office action responses, and in the 'description of the prior art in the '328 patent. Exhs. A, D, and F.  The removal of *at least some* of the quote information from the central database, and only at least some, is specifically reflected in the claim amendments being discussed:  "at least part of the quote information" is stored remotely, because the central database contains "information that is insufficient to consummate the transaction".

That discussion was properly summarized by stating that the  prior art failed to disclose a central database with information that was only sufficient to determine which sellers should

---

[10] Discussed later herein.

receive the quote and then forward the quote to them, rather than the central database having everything needed to actually sell the item to the customer.  It is normal English usage to distinguish between two thresholds being discussed by stating that because there is not enough for the second threshold, there is only enough for the first.  (i.e.;  My child cannot ride the roller coaster, he is only tall enough for the ferris wheel; My budget is only sufficient for the basic model, so I cannot buy the advanced model with all the features that I really want;  I cannot go see a movie with you, the time I have between appointments is only sufficient for a quick cup of coffee;  The space in my family room is only sufficient for this couch, so I will have to forego the entertainment center; or, the information in my central database does not include all the information on all the items to generate the full quote like in the prior art, as the information in my central database is only sufficient to do the filtering, *so I send the RFQ to the selected vendors to complete the quotation process.*[11]

    In none of the foregoing cases does it make any sense to take the statement as *an exact indication of the first threshold*, the position defendants here urge.  Nobody would assume that someone's living room were sized to the exact dimensions of the couch, or that the amount of money the person referenced above had was the exact amount of the basic item and not a penny more; or that the child's height was exactly the same as required for riding the ferris wheel and no more; or that the person's time between meetings were exactly the amount that it takes to drink a cup of coffee.  Instead, those statements simply mean that the family room was not large enough for the entertainment center, the person did not have enough money to buy the advanced

---

[11] Even the bolded second half of the above demonstrated logic is in the patent file, as the full sentence at issue states that there is only enough to do the filtering, so the RFQ is sent to the vendors.  Thus, the logical structure of the sentence at issue is precisely the same as the analogies above.  (Ex. F, Office Action Response, p. 8)

model, the child was not tall enough for the roller coaster, and that the movie would take too long and interfere with the second appointment.

Yet, the grammar of all the foregoing examples is exactly what was stated here. All the '328 applicant was doing in the summary statement was summarizing all the earlier arguments by telling the examiner again that as between central databases with all information on all items so they could consummate the transaction, and a central database of the '328 invention that instead merely filtered the RFQ's, the prior art did not show systems where there was only enough to do the filtering, as opposed to having enough to conclude the sale.

Indeed, the sentence begins "In summary…". Yet, defendants urge that the summary sentence at the end of it all did not summarize, but instead changed positions entirely and contradicted what had just been said repeatedly. Rather than the distinction being that, unlike the prior art, the '328 invention did not store all the information about all the items so that the user could purchase directly from the central database, now the distinction was that the '328 central database stored vendor selection conditions only and nothing more, and the prior art stored something more. It is unlikely that a sentence that began "In summary", did not summarize the prior argument, but instead completely changed the applicant's entire theory about how his invention was distinguishable from Dworkin, and presented a different theory that is explained no place else in the patent file. Accordingly, defendants' position is a strained and less than credible theory, and should be soundly rejected.

6. Even if the Statement Can be Read as Defendants Urge,
Defendants are Still Incorrect as to The Scope of the Disclaimer

Even assuming the language can be read as defendant's urge, defendants would not be able to establish a prosecution disclaimer of the scope they assert. There are few if any issues in patent law were the Federal Circuit has been more consistent and emphatic than in the area of

prosecution disclaimer.    The law could not be clearer that for a prosecution comment or argument to narrow the ordinary meaning of the claims, there must be a ***clear, unambiguous, deliberate disavowal of claim scope.***    Any ambiguity whatsoever must be resolved in favor of the patent owner.  *Middleton Inc. v. Minnesota Mining and Mfg. Co.,* 311 F.3d 1384 (Fed. Cir. 2002); *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448 (Fed. Cir. 1985); *Inverness Med. Switz. Gmbh v. Princeton Biomeditech* Corp., 309 F.3d 1365 (Fed. Cir.  2002); *Northern Telecom Ltd. v. Samsung Electronics Company,* 215 F.3d 1281 (Fed. Cir. 2000);  *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336 (Fed. Cir. 2001) (refusing to limit the ordinary meaning of the claim because the alleged disclaimer in the file wrapper was at best "inconclusive");  *Pall Corp. v. PTI Techs. Inc.,* 259 F.3d 1383 (Fed. Cir. 2001);  *Vanguard Prods. Corp. v. Parker Hannifin Corp.,* 234 F.3d 1370 (Fed. Cir. 2000) (No disclaimer where statements ambiguous); *Schwing GmbH v. Putzmeister Aktiengesellschaft,* 305 F.3d 1318 (Fed.Cir.2002);  *Storage Tech. Corp. v. Cisco Sys. Inc.,* 329 F.3d 823, 833 (Fed.Cir.2003) ("We therefore do not consider the applicants' statement to be a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided by the written description.");  *Invitrogen Corp. v. Biocrest Mfg., L.P.,* 327 F.3d 1364 (Fed. Cir.2003).

The Court summarized the law in *Omega Engineering, Inc. v. Raytek Corporation,* 334 F.3d 1314 (Fed. Cir. 2003):

> We have, however, declined to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous… Having independently considered the prosecution history, we viewed the inventors' statements as amenable to multiple reasonable interpretations… [W]e have required the alleged disavowing statements to be both ***so clear as to show reasonable clarity and deliberateness….and so unmistakable as to be unambiguous evidence of disclaimer….*** Consequently, for prosecution disclaimer to attach, ***our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.***

(Emphasis added).

24

The burden defendants must meet is best exemplified by comparing cases in which a disclaimer was found, to those in which disclaimer arguments were rejected.    In *Standard Oil v. American Cyanamid,* 774 F.2d 448 (Fed. Cir. 1985), the court found that a clear and unambiguous disclaimer had occurred.   The patent file had distinguished prior art by noting that such prior art "is in fact metallic copper ***which is outside [the] claims***".  (Emphasis added). Thus, it was clear to one reading the file that the patent monopoly excluded metallic copper, because that is what the applicant clearly and unambiguously had said.

Similarly, in *Hockerson-Halberstadt, Inc. v. Avia Group International Inc.*, 222 F.3d 951 (Fed. Cir. 2000), the patent owner submitted drawings and argued that his invention was patentable over the prior art specifically because the claimed invention provided "a much narrower groove…" than that displayed in the prior art.  Then, the patentee tried to enforce the claims against a system using grooves that were ***wider*** than those of the prior art.  Here again, it is clear how the inventor had disclaimed certain scope.

Contrast *IMS Technology Inc. v. Haas Automation, Inc.*, 206 F.3d 1422 (Fed. Cir. 2000) where the patent applicant argued:

> The present invention utilizes an interactive display which operates in a question and answer format ***without resorting to the M and G codes of the machine tool***…The interactive processing of the data blocks enables the machine tool operator to perform the tasks of both the programmer and machinist on the shop floor.  (emphasis added)

Id., at 1433-1434.

The Court rejected the defendant's argument that the use of M and G codes was disclaimed. The patentee had clearly stated that the invention used an interactive display.  Although he also stated that an interactive display operates without the use of M and G codes, he did not clearly state that the interactive display of the invention ***could not*** also operate with the M and G codes.

Thus, no broad disclaimer.

Similarly, in *Omega Engineering, Inc. v. Raytek Corporation,* 334 F.3d 1314 (Fed. Cir. 2003), the parties disputed the scope of a disclaimer based upon the following:

> The advantage offered by the invention of claim 1, amended, is that it provides a laser sighting device that relies on the use of at least one laser beam that is able to outline the energy zone on the surface to be measured ***rather than illuminate the entire zone***.  The clear advantage offered by such a device is that it ***only directs energy at the edge of the energy zone to be measured to outline the same*** and, as such, has virtually no effect on the temperature measurement to be taken.(Emphasis added).

In reversing the trial court, the Federal Circuit held that Omega did not "clearly and unmistakably disavow a device that directs light into the interior of the energy zone", but instead, only disclaimed devices that had added appreciable heat to the energy zone.

See also *Cybor Corporation v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (Statement that prior art "provides a separate container 12 for collecting permeate…Storkin discloses a permeate collecting container 12 that is separate from the conveying pump 13" did not disclaim any collecting container that was external to the pump, but only a physically unattached collecting container with independent functionality).

In the case at bar, even assuming the phrase in issue can be read as defendants urge, there are plural other readings of the language in issue.  It could mean that the information is only sufficient to perform the filtering as opposed to consummating the sale(like the size of the family room being only sufficient for the sofa, but not the entertainment center), it could mean there is no other information stored, or it could mean that while the stored information is sufficient, it is only sufficient, not necessary or optimum for the stated purpose.

According to strict rules of grammatical construction, "only" is to be placed immediately proceeding the word it modifies.  (See, Exhs. A and B to supplemental Kaplan Declaration attached hereto).  Defendants' own proffered interpretation is therefore wrong, as their reading

would be more accurately conveyed by switching the order of the language to "..the central database maintains only information sufficient…". [12]

In fact, the problem is worse here than usual. First, two different well respected dictionary sources each give at least five different definitions of "only", one of which is "at least" and would thus also support SST's assertion that the central database can have more information than required to do the filtering. (Supp. Kaplan Declaration Ex. A and B, Dictionary Sources.) More importantly however, both these sources agree that the *usage* of only is not fixed, and its meaning in a sentence is subject to multiple interpretations:

> The placement of only in a sentence has been the source of studious commentary since the 18th century, most of it intended to prove by force of argument that *prevailing standard usage is wrong*. After 200 years of preachment, the following observations may be made; ambiguity is avoided through sentence stress; and in print only tends to be placed *immediately before the word or words it modifies*.

(Emphasis added) (Ex. B, Webster's Dictionary, see also Ex. A, notes from the American Heritage Dictionary of the English Language) [13]

This is precisely why reading the sentence in a vacuum, divorced entirely from the remainder of the patent file, is denounced in the case law. *Middleton* (Reversing district court, noting that prosecution arguments must be read "in context"); *Cybor* (In view of prior art being distinguished, claim language, and full intrinsic record, prosecution argument "can not properly be interpreted" as a broad disclaimer."); *Omega* (Analyzing statements in context of entire file,

---

[12] Even this would itself be subject to multiple interpretations, because only is just before the "word or words" it modifies, and it would thus be unclear whether "only information sufficient to determine which sellers" means only that information and no more information, or only information to determine which sellers, and not the software and memory and other required items to determine which sellers.

[13] According to one usage note, "Though strict grammarians insist that the rule for placement of only should always be followed, there are occasions when placement of only earlier in the sentence seems much *more natural*, and if the context is sufficiently clear, there is no chance of being misunderstood." (emphasis added) (Supp. Kaplan Dec. Ex. A).

not in isolation).

The remainder of the intrinsic record includes the specification's explicit teaching of other information stored in, and activities performed by, the central computer, both of which require data in addition to that required to select the vendors, but insufficient to consummate a sale. Additionally, given the claims, the Dworkin prior art itself, and the patent applicant's statements nearly ten times that the feature that distinguished the invention was the use of a filter means to send the RFQ to vendors for obtaining the quote, rather than storing everything needed to generate the quote at the central database, SST respectfully submits that defendants have not established a clear and unambiguous disavowal of claim scope of any system that stores anything more than the filter conditions used to select the vendors.

Defendants cannot refute all of the foregoing by picking the one definition and the one usage of only that supports them, and then using it to construe the claim in a manner that directly conflicts with the entire remainder of the intrinsic record, and conflicts with the claim language itself. This is particularly true because 1) there is an alternative reading that is fully consistent with everything in the intrinsic record, and 2) the summary statement defendants cite was *specifically directed to* claim amendments that stated "information insufficient to consummate the transaction" and "at least part of the quote" was not stored centrally, both of which refute defendants' proffered construction and support the reading of the statement offered by SST.

Accordingly, this Court should rule that the applicant disclaimed only Dworkin-like systems with a central database that stores *all the information about all the items such that users can get a complete quote and complete a purchase from the central database*.[14]

---

[14]  Defendants citation to the patent examiner's reasons for allowance is also misplaced. First, the examiner distinguished the '328 invention the same way the applicant did: "However, the present invention distinguishes itself over these two embodiments by the use of filter means which is

7. Even if the Court Actually Read the Summary Statement As Defendants Urge, It Would Not Constitute a Disclaimer Because it is Directed to the Prior Art, not the Invention

Finally, it is important to note that the statement itself is directed to the prior art, not the claimed invention. "In summary, **none of the prior art teaches** a system wherein the central database maintains information only sufficient to….". (Emphasis added)  In essence, applicant according to defendants indicated that the prior art lacked a feature, call it X.

Contrast that to the applicant's description of his own invention as claimed in the '328 patent (all emphasis below added):

Applicant's invention as recited by claim 4 receives the quotes from the vendor terminals, rather then storing **all information necessary to generate all of the quotes at the central database**; (Ex. D, p. 8)

The present invention solves the problem by **not providing a central database that contains all of the information on all items to be sold.**  (Ex. F, p. 5)

Applicant's invention comprises a central filter and broadcast means which receives RFQs, filters them to determine which particular vendor terminals may be able to service such requests, and sends the RFQs to those terminals.  (Ex. F, p. 4)

The central database [of the invention] provides filtering to determine which network members are to receive said request. (Ex. F, p. 5)

Regarding claim 1, the claim describes a system wherein communications take place between a central database and numerous remotely located vendor databases.  The central database provides filtering to determine which network members are to receive said request.  Additionally, claim 1 requires that the network members are remotely located and that they are communicated with, after the requests are filtered, via a communications channel…(Ex. F, p.4)

Rather, the invention uses a database with information regarding various vendors who

---

used to determine which vendors to send the RFQ's to... The systems of the prior art either maintain a central database containing all necessary information to answer an RFQ or they require that the buyer specify the vendor to deliver the RFQ to……This feature of selectively filtering RFQ's is recited in each of applicant's claims".  The examiner never said that he was allowing the claim because the applicant stored filter conditions only and nothing more.  Second, the examiner's unilateral reasons for allowance can not constitute a disavowal of claim scope by the  applicant, even if the applicant is silent in response thereto.  *Salazar; Rexnord* (Reversing district court for narrowing claim based upon "isolated comment by the examiner".)

may be able to supply classes of items. The central filter means then transmits the RFQ to appropriate vendors…. (Ex. F, p. 4).

Assuming the summary statement were erroneously read as defendants urge, and assuming there were no other reading of it, and assuming is was clear and not ambiguous in any way, all of which are incorrect, the best defendants could show is that the applicant characterized the ***prior art*** as **lacking** feature X. The applicant also described the ***invention*** as ***requiring*** feature Y, not feature X. As the Federal Circuit has twice held, it is thus feature Y that is the focus of any disclaimer, not feature X.

In *Northern Telecom, Ltd v. Samsung Electronics Company,* 215 F.3d 1281 (Fed. Cir. 2000), the patent related to a plasma etching technique, and the patent owner had characterized certain prior art cited during prosecution as being directed to ion etching, not plasma etching. In rejecting the defendant's argument that the patent owner had disclaimed ion etching completely, the Federal Circuit rejected the very argument asserted here by defendants:

> We find the passage does not support Samsung's argument. In the main, paragraphs 1 and 2 above are descriptions of the asserted [prior art] references, as opposed to a description of the plasma etching process of claim 1. By contrast, it is paragraph 3 which describes the invention, and the specific way that the claimed process differs from the asserted references….These statements, while describing features of plasma etching [of the invention], do not exclude the possibility of ion bombardment.

*Id.*, at 1294. *See also*, *Schwing* (Reversing trial court for relying on patentee's characterization of the prior art to constitute disclaimer, holding that court should instead have looked to the portions of file history that explained the patentable feature of the claimed invention.)

So too here. Everyplace that the '328 file describes the "specific way that the claimed process differs from the asserted references" discusses elimination of the central database having all of the information on all of the items for sale so that the purchase is completed between the central database and the consumer.

Accordingly, the summary statement, even if it were not rejected for all the reasons stated above, can not constitute a disclaimer of the scope defendants urge because the disclaimer resulting from the applicant's characterizations of his **claimed invention** is a much narrower disclaimer, and must thus govern.  In short, the '328 patent specification, the prosecution history, the claims themselves, the examiner's comments, the prior art, the extrinsic evidence, and relevant Federal Circuit precedent, all point to the inescapable conclusion that the applicant's disclaimer is not what defendants wish to rewrite it as.

The Court should rule that applicant disclaimed a system with a central database that stores **all the information about all the items such that users can get a complete quote and complete a purchase from the central database**.

### E.  Filter and Broadcast Means

The filter and broadcast means of claim 4 should be construed as **the filter means as this Court defines that term coupled with a computer programmed to obtain an RFQ from a data network, as shown in Figure 5, or to permit entry of data by users either via HTML, the Internet or a menu function, and all equivalents thereof under 35 USC 112.**

Defendants first assert that claim 4 is invalid because it describes the request for quote as a request to engage in transactions.   The '328 patent specification describes repeatedly that a buyer wishing to make a purchase sends a request for quote.  (e.g., Ex. A, col. 5, lines 36-65; Figure 2A).  A request for a quote is simply a request for offers to engage in a type of a business transaction, namely a request to provide an offer for sale.   An offer for sale, or a sale, is included within the slightly more generic term "transaction".   Defendants have cited no law indicating that if the term in the claim, transaction, is slightly broader than the example given in the

specification, then claim is invalid or not construable.  Accordingly, their argument in this regard is without merit.

SST agrees with defendants that the filter part of the "filter and broadcast means" of claim 4 should be consistent with the analysis of the filter means of claim 1.   However, the additional function added by the broadcast part of the "filter and broadcast means" of claim 4 is that, unlike claim 1, it further includes the function of "receiving, over said data network, requests from said requestor."

The '328 patent describes several structures for implementing the function of receiving the request from the requestor.  First, col.4, lines 1-9, describes the use of Internet HTML pages for such a purpose.   Second, col. 4, lines 12-26 describes a menu function for permitting users to enter RFQ information to be conveyed to the central computer.   Third, in accordance with *WMS Gaming*, *supra*, Figure 5 shows a flow chart specifically programmed to get the RFQ from the network.  (See top of Figure 5, "GET RFQ"). *[15]*

Accordingly, the filter and broadcast means of claim 4 is ***the filter means as this Court defines that term coupled with a computer programmed to obtain an RFQ from a data network, as shown in Figure 5, or to permit entry of data by users either via HTML, the Internet or a menu function, and all equivalents thereof under 35 USC 112.***

### F.  Computer Based Communications Network

Defendants assert that this term means "a computer network…" and then use the remainder of their definition to either repeat or essentially summarize their erroneous view of the disclaimer issue discussed above. (Defendants' Opening Markman Brief, pp. 18-20).   Having addressed the disclaimer issue above, SST merely notes here its agreement that this term should be defined

---

[15] The '328 patent indicates that the functions may be implemented on one computer or across plural computers.  Col. 6, lines 24-34.

as a computer network, albeit without the disclaimer defendants urge.   The Court should so construe the claim.

### G. Filter Conditions

In SST's opening *Markman* Brief, SST argued for the following definitions:

**Vendor filter conditions** : conditions that the vendor specifies that define a class of RFQs which the vendor is interested in receiving;

**Buyer filter conditions** :  conditions specified by the buyer that limit the class of vendors to receive the RFQ so that all vendors that sell the item(s) specified in the RFQ will not receive the RFQ;

**Network filter conditions** : additional filter conditions that prevent all sellers and buyers from being matched equally when the buyer and seller filter conditions match each other.

SST showed in detail how these definitions were supported by the intrinsic record, and will not repeat that analysis here.

Defendants cite language from column 8 of the patent specification: "Limitations or conditions included in the RFQ and/or the response are defined for purposes of the present application as filter conditions or simply filters."   Then, they offer a definition of "Limitations or conditions that determine which of the network vendors will receive a buyer's request for quotation and/or which buyers will receive a response from a network member."  (Defendants Opening Markman Brief, p. 21).

Notably, defendants' proposed definition differs from their cited language, in that defendants have deleted the phrase "included in the RFQ and/or the response".  Defendants have obviously anticipated the problem with their use of the column 8 cited language to limit the definition in the claim:  Neither the vendor filter conditions nor the network filter conditions are necessarily included in the RFQ or the response.  Instead, the example in the '328 patent shows the vendor filter conditions may be communicated to the central computer, in advance of any RFQ's being

received, by voice, telephone, fax, or by the use of programming provided for that purpose. (Ex. A, col. 7, lines 31-38). The '328 patent, by way of example, also indicates that the network filter conditions are not included in either the request or the response, as they are simply used by the network to process quotes or responses as they pass through the central computer. (Ex. A, col. 7, lines 19-47). So, recognizing the language they cite must be the wrong way to construe the claims, defendants merely alter it to suit their needs, delete the problematic portion, and then essentially argue that their definition must be correct because it is ***almost*** the same thing as the language they cite.

SST agrees that limitations or conditions included in the RFQ and/or the response are filter conditions, just as stated at column 8 of the '328 patent. However, they are not the only filter conditions described in the '328 patent. The proper analysis is to look to the entire intrinsic record, and to construe the phrase in the context in which it is used. C*ybor Corporation v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998); *Middleton Inc. v. Minnesota Mining and Mfg. Co.*, 311 F.3d 1384 (Fed. Cir. 2002). Defendants instead take one isolated statement and alter it to describe additional items that it clearly does not describe, while they ignore the parts of the patent document that do describe these additional items.

For example, the specification also makes clear that there are additional filter conditions that the network adds that prevent all sellers and buyers from being matched equally when the buyer and seller filter conditions match each other. (e.g. col. 7, lines 19-47, and analysis in SST's Opening Brief). These filter conditions are not typically in the request or the response, and thus, are not part of the discussion at column 8 of the '328 patent relied upon by defendants.

The '328 patent specification also further explains vendor filter conditions at col. 7, lines 31-41.  And, the specification makes clear that the buyer's filter conditions are criteria in addition to the product identification.  (See SST's opening Markman brief, pp. 15-26, and cites therein.)

In fact, the examiner himself understood that the buyer filter conditions did not include the product type or service selected.  In applying the claim, he reasoned as follows:  "The computer then searches the database to retrieve all products or services, ***within the product or service category selected, having the specifications required by the user***…[the system allows buyers] to determine the best price available, from a plurality of possible suppliers, ***for a product or service, meeting a set of specifications***…."  Clearly the examiner treated the set of specifications required by the user, what we call here the buyer filter conditions, as a separate item from the product specified.

Only a few months ago, the Federal Circuit held that the examiner's comments are probative of how one of skill in the art would interpret the term, and of what was actually negotiated between the patent office on behalf of the public and the applicant. *Salazar, supra.*

In short, while defendants' cited language is correct, it is incomplete.    For the reasons largely stated in SST's opening *Markman* brief, and those above, the Court should instead construe the limitations in issue as follows:

> **Vendor filter conditions**: conditions that the vendor specifies that define a class of RFQs which the vendor is interested in receiving;

> **Buyer filter conditions**:  conditions specified by the buyer that limit the class of vendors to receive the RFQ so that all vendors that sell the item(s) specified in the RFQ will not receive the RFQ;

> **Network filter conditions**: additional filter conditions that prevent all sellers and buyers from being matched equally when the buyer and seller filter conditions match each other.

**H.  Network Member**

A network member is ***one who has registered as a user by completing an application"***.
Frankly, this one is simple.  The specification states "A network member is anyone or any
company which has registered as a user by completing an application…" Ex. A, col. 4, lines 1-
4).  The patent owner has given his specific definition, and this is dispositive.  *Phillips, Vitronics*,
90 F.3d at 1582 (*citing*, *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.
Cir. 1996)); *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.,* 262
F.3d 1258 (Fed. Cir. 2001).

Defendants attempt to improperly read into the claim a requirement to receive password
information.  The '328 patent notes by way of example that the new members would receive
password information, but that does not mean that one ***must*** receive such password information
to be a network member, nor is that part of the specific definition given. In fact, the above quoted
language clearly shows that one may become a network member with or without any password
information.   Defendants invite reversible error by requesting the Court improperly read
limitations from the specification into the claims.  *Fuji Photo Film Co., Ltd. v. International
Trade Commission*, 386 F.3d 1095 (Fed. Cir. 2004).

Accordingly, the Court should construe network member as ***one who has registered as a
user by completing an application***.

**I.  Storage Means**

Before turning to the reasons why defendants' analysis of the "storage means" limitation is
not correct, it is important that the Court appreciate what it is defendants ask for when they
indicate they will move for summary judgment that the claims are invalid because no storage
means is disclosed.  (Defendants Opening Markman Brief, fn 6, p. 17).  Mr. Giovannoli, an

independent inventor and entrepreneur, was granted a patent on his computer matching system with the two tier match limiting technology described in SST's opening *Markman* brief. Defendants are large corporations whose revenue from their infringement is now measured in the hundreds of millions or billions.

Defendants are asking this Court to declare Mr. Giovannoli's patent invalid on the grounds that he forgot to tell the public that a computer can store information in memory and on a disk or other storage medium. Defendants then urge that the ordinarily skilled artisan, whom plaintiff's expert indicates would have a degree in computer science or electrical engineering, would have no way of figuring out that a computer has a disk and memory to store information.

SST submits that the Court need go no further than to state defendants' position to recognize that it borders on the absurd. Indeed, this Court can take judicial notice of the fact that computers have memory and storage. Defendants' argument in this regard says more about the lengths to which they will go to stomp on the rights of an inventor than it does to assist the Court in construing the claims. In any event, defendants' assertion that no corresponding structure is disclosed is wrong for **numerous** different reasons.

1. The Claim is Not in Means Plus Function Format

Two conditions rebut the presumption that a claim term using the word "means" is in means plus function format. First, if no function is recited as being performed by the means, the claim is not in means plus function form. Second, if one of skill in the art reading the claim would associate it with a well known structure, then the fact that the term uses functional language does not matter, and 35 USC § 112 is not invoked. *Rodime PLC v. Seagate Tech. Inc.*, 174 F.3d 1294 (Fed. Cir. 1999); *Wenger Mfg. Inc. v Coating Mach. Sys. Inc.* 239 F.3d 1225 (Fed. Cir. 2001);

*Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996); *Personalized Media Comm., L.L.C. v. I.T.C.*, 161 F.3d 696 (Fed. Cir. 1998).

Here, both conditions are clearly met.   First, the relevant claim does not recite a means for storing, and does not recite the function of storing.  Instead, it calls for a "storage means", and indicates that the storage means contains the identification of network members. It recites ***no function performed or executed by the storage means***, and hence, does not fit the form of a means for performing a function.   (Ex. A, claims 1,3).   Even the fact that it contains network member identifications, while describing a characteristic of what it has, does not define a function that is actually performed (i.e.; executed) by anything. ***The storage means is not defined as doing anything***, but is instead defined as a structure. Had it called for a "storage system" of the computer, it would be clear to what it was referring.  Using the term means instead of system does not convert the language to functional language, because the language still does not specify a function that is performed.

Accordingly, the present facts are substantially identical to the situation in *Wenger Mfg. Inc. v Coating Mach. Sys. Inc*. 239 F.3d 1225 (Fed. Cir. 2001). ("means defining a plurality of separate product coating zones, longitudinally spaced…" not in means plus function format because there is no function described as executed by the means.).  Thus, the storage means is not in means plus function format, does not trigger 35 U.S.C. §112, and simply refers to the storage provided for the computer system.

Further "storage means" presents a situation similar to that in *Greenberg v. Ethicon Endo-Surgery, Inc.,* 91 F.3d 1580, 39 USPQ2d 1783 (Fed.Cir.1996).   While in *Greenberg*, the term "mechanism" was used rather than means, the Court's analysis did not turn on that, and it is clear that the analysis is equally applicable here:

[T]he fact that a particular mechanism--here "detent mechanism"--is defined in *functional terms is not sufficient to convert a claim element containing that term into a "means for performing a specified function*" within the meaning of [§112, ¶ 6]. Many devices take their names from the functions they perform. The examples are innumerable, such as "filter," "brake," "clamp," "screwdriver," or "lock.".... "Detent" (or its equivalent "detent mechanism") is just such a term....It is true that "detent" does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as "clamp" or "container." What is important is not simply that a "detent" or "detent mechanism" is defined in terms of what it does, but that the term, as the name for structure, *has a reasonably well understood meaning in the art*. (Emphasis added).

Dr. Dowling opines that one of ordinary skill in the art reading the term storage means with an indication that it contains data, in connection with a computer system, would understand it to be the computer's memory and/or file and disk storage system, and not just anything that stores information, such a pen and paper, for example. (Dowling Declaration). Indeed, the Court can take judicial notice of this fact. As in *Greenberg*, while the structure of the '328 patent is called a storage means and hence invokes functional language, that language denotes a structure having a known meaning in the art. Indeed, computer personnel often talk of the computer's storage.

Accordingly, 35 USC §112 is not invoked, and this Court should construe the storage means as simply a structure that stores information for the computer, just as the claim says. The Court may not invoke 35 U.S.C. §112, because the claim does not recite "means for storing" and is otherwise not in means plus function format.

2.  If Storage Means is in Means Plus Function Form, Several
    Corresponding Structures are Disclosed and Linked

Even if the Court deems the limitation at issue to be in means plus function form, the specification discloses a variety of structures that correspond to the function of storing, making the claim clearly construable.

First, the specification indicates that RAM also known as "Random Access Memory" is used as the computer's temporary storage. Ex. A, col. 6, lines 36-42. The claimed filter operates on

the data in the storage means - "means for filtering the network members in said storage means" – which is the temporary storage, or the RAM.  Dr. Dowling explains that an ordinarily skilled artisan understands completely that the computer loads the data into temporary storage RAM before operating on the data, and any filtering done with respect to the network members is done when they are stored in RAM, just as the claim states.  (Dowling Declaration, ¶16-17).

Defendants' urge that because RAM storage is temporary, it is unsuitable for permanent storage of the network member information.    However, the claim language does not say that the network members are permanently stored in the storage means, but instead, merely calls for a "storage means containing identification of the network members,…filter means for filtering the network members in the storage means…" Ex. A, claim 1.   Defendants do not deny, nor does SST believe they can or will ever deny, that when the data is operated on by the filter means, it actually *is* in the temporary RAM storage of the computer, just as Dr. Dowling explains, and just as the claim recites.  Hence, the RAM is one structure clearly linked to perform the function of the storing.

Even more to the point, Figure 5 of the '328 patent is reproduced below, with numerals 500-505 added for explanation:



FIG. 5

Step 500 is labeled "**CREATE EMPTY TABLE TO HOLD VENDORS THAT WILL BE SELECTED FOR THIS RFQ (tmp_SELECTED TABLE).** As the name of the table states (tmp), this is nothing more that the creation of a ***temporary*** table in the temporary storage. The computer in the '328 patent is shown as having steps that reserve storage to hold the network members so they can be filtered. Then, step 501 (**GET A VENDOR FROM tmp_SELECTED TABLE**) reads the vendors from the temporary storage table and processes them through the filter steps shown at 505. Therefore, the '328 patent clearly discloses that the storage means that holds the information upon which the filter means will operate is RAM. In this embodiment, the temporary RAM storage of the computer is firmly linked to that operation. Ex. A, col. 6, lines 36-42. Therefore, the RAM is a storage means, if this Court interprets the limitation as being in means plus function format, which it should not do.

41

Additionally, the '328 patent discloses at col. 6, lines 36-42, that the central computer contains "peripheral devices and known input and interface devices." Dr. Dowling opines that one of ordinary skill in the art would thus understand that "peripheral devices and known input and interface devices" would include a hard drive or any other storage device that could hold a computer file system and interface with the computer for the input and output of data.

In fact, Dr. Dowling details numerous other places within the '328 patent specification where one of skill in the art would clearly read the '328 patent specification as disclosing a permanent hard drive or similar file storage system for storing the network member information.    Rather than reiterate here, we respectfully refer the Court to Dr. Dowling's declaration analyzing the '328 disclosure from the point of view of one of ordinary skill in the art in 1996, and the citations therein.  In view of the cited disclosure, one of skill in the art would understand that the computer also can store the information on permanent hard disk or similar storage prior to loading it into RAM for the filtering operation.  Accordingly, the computer's disk or other permanent storage is still another structure disclosed in the '328 patent specification for storing the network members.

Finally, the computer itself may be the storage means.  *WMS Gaming* holds that the computer can not represent the structure for performing a specified function, because the computer can not perform that function unless and until its switches are programmed to do so.   Here, ***every computer stores data***, so the fact that the '328 patent does not specifically state that the computer is the storage means is of no moment.  *In re Dossel* (holding that computer itself can be the structure when the function is not a specific algorithm, but instead, is a function that every computer does inherently, such as performing mathematical calculations.)

In short, the '328 storage means is not in means plus function, but refers to a specific structure – the computer's permanent and temporary storage.   If the term is construed as a means plus function term, the corresponding structure may be *the computer's RAM or other temporary storage, the hard disk or similar permanent storage, the computer with the space allocated in RAM to store the network members to be filtered, or the computer itself.*  Hence, the storage means should be construed as these structures and their equivalents under 35 USC 112, but only in the unlikely event the Court finds this limitation to be in means plus function format, which SST strongly believes would be error.

### J.  The Communications Channel Storage Means is a Red Herring and Should Not be Construed by the Court at All

Defendants' discussion of the "communications channel storage means" is silly. Defendants know there is no such claim term to be construed, and offer this to distract the Court and create confusion where there is none.

Originally filed claim 1 in the '328 patent read as follows, with emphasis added for the explanation to follow:

> A computerized system for forming a computer based  communications network of network members inclusive of network buyers and or network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit*, storage means containing identification of the network members,* means for network buyers to generate request for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for filtering the network members *in said storage means* to determine which network members are to receive said request for quotation.…

(Supp. Kaplan Declaration, Ex. D)

As shown, the claim originally called for a storage means containing the identification of the network members, which was isolated from its before and after neighboring phrases by a set of commas, also emphasized above.

In a response filed January 13, 1998, the applicants amended the claim as below, with the underlining in the originally submitted amendment, but the other emphasis added here:

A computerized system for forming a computer based communications network of network members inclusive of network buyers and or network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit, ***said network members being remotely located from said central processing unit and connected thereto via a communications channel*** storage means containing identification of the network members, means for network buyers to generate request for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for ***filtering the network members in said storage means*** to determine which network members are to receive said request for quotation…

In referring specifically to the underlined language being added, the applicant explained that the claim had been amended such that "[C]laim 1 requires that the network members are remotely located and that they are communicated with, after the requests are filtered, via a communications channel." Ex. F, p. 5.

The claim calls for "said network members being remotely located from said central processing unit and connected thereto via a communications channel" just as the applicant explained. The claim also calls for a "storage means containing identification of the network members", just as was in the originally submitted claim. That is why the latter part of the claim refers to filtering the ***network members in said storage means***.

In fact, if one imagines a comma between "channel" and "storage", the meaning of the claim is easier to ascertain. However, because the term "communications channel" happens to be placed next to the previously existing "storage means", defendants are trying to read the two together to contrive a meaningless term that is discussed nowhere in the patent – to create confusion where there is none. Under such silly logic, the Court should construe the term

"buyer vendor" as a vendor who buys something because those two independent terms are written next to each other in claim 3.

In short, the Court should construe storage means as above, and need not construe communications channel, as that is just a channel for communications. There is no term "communications channel storage means" to be construed.

## K. **Goods and Services**

This term is merely goods or services, and needs no construction. Defendants practice snippet litigation by citing language indicating the goods or services must be standard goods or services. However, col. 4, lines 9-16 of the '328 patent, offers the complete teaching on the subject:

> Standardization of product or service *descriptions* is essential to avoid confusion *unless a more text oriented specification* is appropriate to the product or service type. (Emphasis added).

The '328 patent does not say that only standard products or services can be offered. The '328 patent merely stated that in order to ensure there was no confusion about what is was being requested by a buyer, either the *descriptions* of the products had to be standardized, or the products had to be described with text to be clear.

For example, in Figure 8 of the '328 patent, the quote is for 5000 "TYPE J RESISTOR[S]". What is a "type J" resistor? The language quoted above from the '328 specification was noting that there must either be (1) a standard description convention so that everybody knows what type J resistors are, or (2) a text oriented approach to specifying the product or service, so that a user can request a quote on a specified quantity of one thousand ohm resistors of a certain material, with a certain heat tolerance, maximum current and voltage, and any other specifications that would otherwise be conveyed by requesting a "type J" resistor.

45

In other words, the **descriptions** must be standard, unless one wants to write out text to specify the desired product.  This does not say that the system is limited in any way by the products or services it can sell.  Accordingly, goods and services merely means goods and services, and nothing more.

## III.    <u>CONCLUSION</u>

The Court should construe the claim terms as outlined in SST's opening brief and above, and not as defendants urge.

Respectfully submitted,

KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone (732) 634-7634
Facsimile (732) 634-6887


Dated: December 21, 2005        By: _____ s/Jeffrey I. Kaplan/ _____
                                    Jeffrey I. Kaplan (JK 4706)
                                    Michael R. Gilman (MG 7608 *pro hac vice*)
                                    *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

It is hereby certified that on this 21st day of December, 2005, the undersigned has served a true and correct copy of the foregoing **PLAINTIFF SST'S RESPONSIVE MARKMAN BRIEF** and **SUPPLEMENTAL DECLARATION OF JEFFREY I. KAPLAN** to the following counsel for Defendants Via Electronic Mail:

Elvin Esteves, Esq.
**GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE**
One Riverfront Plaza
Newark, NJ 07102
Telephone (973) 596-4500
eesteves@gibbonslaw.com

- and -

Holmes J. Hawkins, III, Esq.
**KING & SPALDING, LLP**
191 Peachtree Street
Atlanta, GA 30303
Telephone (404) 572-4600
hhawkins@kslaw.com

DATED: December 21, 2005       By: ____s/Jeffrey I. Kaplan/_____