**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Source Search Technologies, LLC    :    Civ. No. 04-4420 (DRD)
                                   :
    Plaintiff,                  :    **O P I N I O N**
                                   :
    v.                          :
                                   :
Lending Tree, LLC, IAC/InterActiveCorp,    :
and Service Magic, Inc.            :
                                   :
    Defendant.                  :
_____:

Jeffrey I. Kaplan, Esq.
Michael R. Gilman, Esq.
KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, New Jersey 07095
    Attorneys for Plaintiff
    Source Search Technologies, LLC

Kevin J. McKenna, Esq.
Elvin Esteves, Esq.
GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE
One Riverfront Plaza
Newark, New Jersey 07102-5497

Holmes J. Hawkins, III, Esq.
A. Shane Nichols, Esq.
James J. Mayberry, Esq.
KING & SPALDING, LLP
191 Peachtree Street
Atlanta, Georgia 30303
    Attorneys for Lending Tree, LLC
    IAC/InterActiveCorp, and ServiceMagic, Inc.

**Debevoise, Senior District Judge**

Plaintiff, Source Search Technologies, LLC ("SST") instituted this patent infringement action against defendants, Lending Tree, LLC, ("Lending Tree"), IAC/InterActive Corp. ("IAC"), and Service Magic, Inc. ("Service Magic") (collectively, "Defendants") alleging infringement of U.S. Patent No. 5,758,328 (the '328 patent).  Defendants denied infringement and assert that the '328 patent is invalid and unenforceable.  A Markman hearing was held to determine the meaning of disputed claim terms.  Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

## I. Background

SST is the owner by assignment of the '328 patent entitled COMPUTERIZED QUOTATION SYSTEM AND METHOD.  The '328 patent relates generally to computerized buying and selling of good and services over a data network, such as the internet.

The application for the '328 patent was filed on February 22, 1996.  The patent issued on May 26, 1998, and has 19 claims.  SST has asserted claims 1-7 and 11-14 against one or more of the Defendants.  The asserted claims include four independent claims (claims 1, 3, 4 and 12). Independent claims 1 and 4 are systems claims, and independent claims 3 and 12 are method claims.  The remaining asserted claims depend from these independent claims.  As computers became more commonly used for the purchase and sale of goods and services there arose the problem of the prospective buyer having too many or too few options from which to choose.  The central database system was one in which a single database contained everything the consumer needed to find the item he or she wanted and complete a purchase of that item; as, for example, the price, terms, quantities and all other information required to sell all available goods and

services from many different vendors.  Maintaining a large central database current and properly managed was difficult due to the large number of products and vendors and the ever changing details of each product or service offered by such vendors.  On the other hand, a system wherein the buyer would directly connect to a specific vendor over the computer network and complete a purchase required that the buyer know in advance the identity of the vendor from which he or she sought to obtain the product or service, and comparison shopping was difficult.

The invention of the '328 patent addresses the too much or too little problem.  Very simply, there is no central database containing all the information needed to complete a transaction.  The buyer can establish "filter conditions" which limit the vendors to which the buyer's request for a quotation ("RFQ") will be sent; and similarly the vendor can establish filter conditions which will limit the buyers to which its quotation will be sent.

The '328 patent is generally directed to a "computerized quotation system" for processing RFQs for goods and services between network buyers and vendors.  Col. 3, ll. 55-62.  More particularly, the computerized quotation system of the '328 patent processes RFQs received from "network buyers," i.e., buyers who are registered with the system, and uses "filter conditions" to match those RFQs with "network vendors" who have registered with the system to receive RFQs meeting certain preestablished criteria.  See, e.g., Col. 4, ll. 1-4; Col. 5, ll. 9-21.  The '328 patent indicates that the goods and services must be "standard items" . . . "unless a more text oriented specification is appropriate to the product or service type," to enable routing the RFQs on the basis of the filter conditions alone.  See e.g., Col. 3, ll. 63-65, Col. 4, ll. 9-12.  The vendors that receive the RFQs may respond with quotations for the goods or services identified in the RFQ.

The '328 patent purports to eliminate the need for a central database of the goods and

3

services available from the vendors, by storing filter conditions set by the vendors, that enable

the RFQs to be routed to the appropriate vendors.  The computerized system of the '328 patent

does not include a "central database of goods, prices, etc."  See, e.g., Col. 2, ll. 41-42; Col. 3, ll.

60-62.  For example, in the Background of the Invention section of the '328 patent, the inventor

specifically distinguishes his purported invention over prior art systems that include such central

databases.  See, e.g., Col. 1, ll. 53-56 ("It simply is not feasible for central database systems to

satisfy the need of buyers to receive timely quotes on an enormous variety of goods and services

from vendors anywhere in the world.").

Independent claim 1 reads as follows:

> 1.  A computerized system for forming a computer based communications
> network of network members inclusive of network buyers and or network vendors
> for processing requests for quotation for goods and services through at least one
> central processing unit including operating system software for controlling the
> central processing unit said network members being remotely located from said
> central processing unit and connected thereto via a communications channel
> storage means containing identification of the network members, means for
> network buyers to generate request for quotation for goods and/or services, means
> for transmitting said request for quotation to said central processing unit, filter
> means for filtering the network members in said storage means to determine
> which network members are to receive said request for quotation based upon filter
> conditions set up by the network buyer in said request for quotation or by the
> central processing unit in accordance with preestablished conditions, means for
> broadcasting said request for quotation to the network members selected by said
> filter means and means for responding to the generator of said request with either
> a response from the selected network members or with a list of said selected
> network members for said generator of said request to establish independent
> communication.

Independent claim 3 reads as follows:

> 3.  A method for processing requests for quotation for goods and/or services from
> a party representing a buyer or supplier of goods and/or services through a
> computerized system forming a computer based communications network of
> network members for linking buyers to suppliers with the computerized system

4

having at least one central processing unit including operating system software for controlling the central processing unit and storage means containing the identification of the network members, wherein the method comprises the steps of:

> receiving a buyer's request for quotation over a communication network; selecting one or more appropriate vendors to be sent the buyer's request for quotation based upon filter conditions, set by the buyer, vendor and the network software; transmitting the buyer's request for quotation separately to said selected vendors over said communications network; and with said selected vendors communicating their quotations either directly to the buyer or to the computerized system which in turn transmits said received quotations to the requesting buyer.

Independent claim 4 reads as follows:

> 4.  A computerized system for engaging in transactions over a data network, said computerized system comprising:

>> a plurality of terminals, at least one of which being designated a requestor and others of which are designated vendor terminals;

>> filter and broadcast means for receiving over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals and for filtering said requests to determine with which vendor terminals said requests should be matched; and

>> means for matching said requests with vendor terminals which meet predetermined filter conditions for generating quotes from information contained in a database associated with said vendor terminals and for accepting said quotes from said vendor terminals wherein the central database contains information that is insufficient to consummate the transaction.

Independent claim 12 reads as follows:

> 12.  A method of purchasing goods or services over a data network comprising the steps of:

>> communicating, over said data network, to a filter means at least one request for a quotation from a potential buyer of said goods or services;

>> filtering, at said filter means, the at least one request in order to ascertain a

5

set of sellers potentially capable of supplying said goods or services; and

obtaining, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.

In addition to disagreement about a significant number of claim terms, the parties have major disagreements about i) the extent of a disclaimer that the inventor of the '328 patent made during the prosecution of his application and ii) the structure disclosed in the '328 patent that corresponds to the functions asserted in the respective claims.

SST asks the court to construe i) Vendor Filter Conditions; ii) Buyer Filter Conditions and iii) Network Software Filter Conditions.

Defendants ask the court to construe i) Request for Quotations (claims 1-7, 11-14), ii) Filter Means (claims 1 and 12), iii) Filter and Broadcast Means (claim 4), iv) Computer Based Communications Network (claims 1-3), v) Filter Conditions (claims 1-7, 11, 13-14), vi) Network Member (claims 1-3), vii) Goods and Services (claims 1-3, 12-14), viii) Communications Channel Storage Means (claim 1) and ix) Storage Means (claims 1 and 3).

## II. <u>Discussion</u>

A. <u>Legal Standards</u>: In the recent case of <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit articulated at some length general principles of claim construction. Under <u>Markman</u>, of course, claim construction presents a question of law to be resolved by the court. "It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" <u>Phillips</u>, 415 F.3d at 1312. Further, "the words of a claim 'are generally given their ordinary and customary meaning.'" and "the ordinary

and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. The court "'cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, [it] must look at the ordinary meaning in the context of the written description and the prosecution history.'" Id.

The Court noted that "[b]ecause the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" Id. at 1314 (citations omitted).

By way of further guidance, the Court suggested that "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the

independent claim." Id. at 1314-15 (citations omitted).

Referring specifically to the specification, the Court noted that "the specification 'is always highly relevant to the claims construction analysis.  Usually, it is dispositive; it is the best single guide to the meaning of a disputed term' . . . 'The specification is, thus, the primary basis for construing claims.'  On numerous occasions since then, we have reaffirmed that point, stating that 'the best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.'" Id. at 1315 (citations omitted).  Despite the importance of the specification the Court referred to Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002), which noted "'one of the cardinal sins of patent law - reading a limitation from the written description into the claims.'" Id. at 1319.

Referring to the prosecution history, the Court stated that "[i]n addition to consulting the specification, we have held that a court should also consider the patent's prosecution history, if it is in evidence.' . . . Furthermore, like the specification, the prosecution history was created by the patentees in attempting to explain and obtain the patent.  Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of their negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id. at 1317 (citations omitted).

The Federal Circuit has "also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'  However, while extrinsic evidence 'can shed useful light on the relevant art,' we have explained that it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'  Within the

8

class of extrinsic evidence, the court has observed that dictionaries and treaties can be useful in claim construction.  We have especially noted the help that technical dictionaries may provide to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms.  Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention."  Id. at 1317-18 (citations omitted).

As a cautionary note, the Federal Circuit stated that "[w]e have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms . . .  In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of the patent claim scope unless considered in the context of the intrinsic evidence."  Id. at 1318-19.

As the Court explained, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  Id. at 1324.

With these principles in mind the court will attempt to resolve the parties' disputes about the meaning of the claim language.

B.  Disclaimer: In support of their definition of filter means Defendants contend that during the prosecution of the application leading to the issuance of the '328 patent the applicant disclaimed any central database that contained anything more than the information required to determine which vendors should receive the buyer's RFQ.  SST contends that the applicant

9

disclaimed a system wherein all of the information about all the items for sale from all the vendors was stored at the central database, so that a complete quote could be generated, and a transaction could be fully consummated, between the central database and the consumer, i.e., a central database storing anything less was not disclosed.

The portion of the application file upon which Defendants rely gives some support to their argument.

In his February 5, 1998 Response to Office Action, the inventor summarized the claimed invention as follows:

> Before turning to the specific rejections, it is believed that a brief review of he invention as claimed would be helpful. Applicant's invention comprises a central filter and broadcast means which receives RFQs, filters them to determine which particular vendor terminals may be able to service such requests, and sends the RFQs to those terminals. As explained in applicant's originally submitted specification, this eliminates the problem of having a central database which, if it were to make available products from many worldwide vendors, would have to store hundreds of millions of entries. This would be inefficient and time consuming and thus, impractical.
>
> The present invention solves the problem by not providing a central database which contains all of the information on all items to be sold. Rather, the invention uses a database with information regarding various vendors who may be able to supply classes of items. The central filter means then transmits the RFQ to appropriate vendors, and received back an appropriate quote from the vendors. The quote may include items such as delivery terms, price, etc., none of which are stored in the central database.

February 5, 1998 Response at 4, 5.

The inventor also stated:

> In summary, none of the prior art teaches a system wherein the central database maintains information only sufficient to determine which sellers should receive the quote, and wherein the central database filters and sends that request for quote only to the appropriate sellers.

February 5, 1998 Response at 8.

The Examiner, when deciding to allow the claims of the '328 patent to issue, stated:

> The systems of the prior art either maintain a central database containing all
> necessary information to answer an RFQ or they require that the buyer specify the
> vendor to deliver the RFQ to.  Applicant's system represents a significant
> improvement over these systems in that the filtering means only maintains enough
> information to determine which vendors to send the RFQ to, without having to
> maintain data on all possible goods and services.

Notice of Allowability (Jan. 19, 1998) at p. 3.

At best from Defendants' point of view the Examiner's statement is ambiguous.  He

stated both that "[t]he systems of the prior art either maintain a central database containing all

necessary information to answer an RFQ" and also that "[a]pplicant's system represents a

significant improvement over these systems in that the filtering means only maintains enough

information to determine which vendors to send the RFQ to . . ."  He did not address the situation

in which the central database does not contain all the necessary information to answer an RFQ

but does contain more information than is necessary to determine which vendors to send the RFQ

to.

For a prosecution comment or argument to narrow the ordinary meaning of claims there

must be a clear, unambiguous, deliberate disavowal of claim scope.  Any ambiguity must be

resolved in favor of the patent owner.  Middleton Inc. v. Minnesota Mining and Mfg. Co., 311

F.3d 1384 (Fed. Cir. 2002).

Apart from the ambiguous statement upon which Defendants rely, everything else in the

prosecution history and in the specification and claims demonstrates that SST's contention is

correct, namely, that the applicant disclaimed only a system wherein all of the information about

11

all the items for sale from all the vendors was stored at the central database.  He did not disclaim

a central database that contained something more than the information required to determine

which vendors should receive the buyer's RFQ but less information than that which is necessary

to generate the entire quote and consummate the sale.

The file history preceding that portion upon which Defendants rely is replete with

statements to the effect that the prior art discloses that all of the information on all of the items

for sale is kept at a central data base, distinguishing prior art from applicant's invention, which

does not store all of the information necessary to generate all of the quotes, e.g., First Office

Action Response dated August 1, 1997, p. 8; Response of January 13, 1998, pp. 2-3.

The '328 patent specification refutes Defendants' assertion that the central data base can

store nothing more than information required to determine which network vendors should receive

on RFQ.  The specification notes that the central database stores product information such as

price versus time by product type, vendor profile data, password information, user coordinates,

etc. (Col. 4, ll. 43-60).  The '328 patent provides a separate embodiment for "special sales"

whereby a vendor can register certain products and their detailed specifications with the central

office, and the central office will forward this product information to certain buyers (Col. 4, ll.

52-59).  The central computer stores forms necessary to register as a member (Col. 5, ll. 3-6).

This information is not filter conditions for selecting vendors, but it is stored on the same central

computer.

The allowed claims of the '328 patent are inconsistent with Defendants' disclaimer

contention.  For example, the '328 patent claims a system wherein RFQ's are subjected to "a first

set of filter conditions" to determine to which vendors the RFQ should be sent, and then the

responding actual quotations are subjected to "additional filter conditions" to determine which

subset of the quotes returned from the vendors should be sent on to the requesting buyer.  (Col.

10, claims 17-19).  The first filter conditions of claim 17 are different from the additional filter

conditions of claim 17.  Claim 17 recites that it is the first filter conditions, and not the additional

filter conditions, that determine which sellers are to receive the RFQ.  Thus the central computer

must store more filter conditions than those required to determine which seller is to receive an

RFQ.

      These various factors compel rejection of Defendants' contention that by virtue of a

disclaimer the claims do not cover a system wherein the central database stores anything more

than the filter conditions to select which vendors are to receive RFQs.

      C.  <u>Level of Skill in the Art</u>: For each of the disputed terms, the inquiry is how a person

of ordinary skill in the art at the time of the filing of the application understands the claim terms.

<u>Phillips</u>, 415 F.3d at 1313.  Defendants emphasize that the '328 patent is directed to processing

requests for quotations and/or quotations, both of which are fundamental components of the

purchasing/procurement field, suggesting that "[w]hile some understanding of computer

applications and communications would be necessary, a person of ordinary skill in the art

relevant to the '328 patent would not need extensive software programming experience. . . .

Consequently a person having the appropriate level of ordinary skill in the art need not possess

more than a minimal understanding of computer applications and communications, but must

have at least some experience in the procurement arts to properly understand the meaning of the

claims of the '328 patent."  (Defendants' Opening Brief at p. 8).

      Simply a reading of the '328 patent and a consideration of the arguments of the parties

suggest that the relevant art encompasses the need for a considerably greater knowledge of computer technology than defendants propose.  SST submitted the affidavit of Dr. Eric M. Dowling, who appears to be highly qualified in the field of computer science.  His unrebutted opinion is that he regards "one of ordinary skill in the art to be one with a BS degree in computer science or an equivalent field like electrical engineering, or having the equivalent work experience, and someone with experience designing and/or using Internet related software and commerce systems.  (Dowling Declaration, para 2).  The court adopts this definition.

D.  <u>Buyer, Vendor, Network Filter Conditions</u>: SST asks the court to construe the following terms as follows:

Vendor Filter Conditions: conditions that the vendor specifies that define a class of RFQs which the vendor is interested in receiving.

Buyer Filter Conditions: conditions specified by the buyer that limit the class of vendors to receive the RFQ so that all vendors that sell the item(s) specified in the RFQ will not receive the RFQ.

Network Software Filter Conditions: additional filter conditions that prevent all sellers and buyers from being matched equally when the buyer and seller filter conditions match each other.

Initially it must be noted that these specific terms do not appear in the claims.  None of the claims refers specifically to "vendor filter conditions," "buyer filter conditions," or "network software filter conditions."  Rather the claims use such language as "based upon filter conditions, set by the buyer, vendor and the network software."  (Claim 3, '328 patent, Col. 8, ll. 62-64).  Throughout the specification there appear repeatedly such phrases as: "filter conditions set by the

buyer and/or the seller and/or the network operator." (Col. 2, ll. 45-47); "filter conditions

defined by the buyer in said request for quotation and/or by the vendor and/or by the central

processing unit" (Abstract); "filter conditions, if any, set by the buyer, vendor and the network

software." (Col. 2, ll. 64-65).

The key term is "filter condition." It pertains whether in any particular context it is

imposed by the buyer, the vendor or the network. It can be defined as "limitations or conditions

included in the RFQ and/or in the response" or by the network. (e.g., Col. 5, ll. 18-19). There is

no occasion to go further to define separately vendor, buyer and network filter condition. A mere

reading of a claim or specification will disclose to which entity imposing the filter condition

reference is being made. Defendants' proposed definition of "filter condition" is discussed

below.

E. Request for Quotations: The claims of the '328 patent refer to a "request for

quotation" and/or a "quotation." Noting that neither term is expressly defined in the

specification, defendants assert that they are commonly used terms in the field of purchasing and

procurement and that "[t]he well-understood ordinary meaning of the term 'quotation' is 'the

quoting of current prices and bids for securities and goods; the prices or bids cited.' AMERICAN

HERITAGE COLLEGE DICTIONARY 1124 (3d ed. 2000), or 'the naming . . . of current prices

. . . of securities or commodities' WEBSTER'S THIRD NEW INT'L DICTIONARY 1868

(2002). Accordingly, a 'request for quotation' may be defined as simply 'a request for the

current price of something.'" (Defs' Opening Br., at p. 9).

The specification and the file history clearly demonstrate that the use of "quotation" and

"request for quotation" is not confined to the narrow dictionary meaning that Defendants seek to

impose.  For example Figure 2A of the '328 patent refers to "The Price Quotation System" but elaborates with the statement "[t]he system provides a <u>list of options</u>, <u>one of which</u> is 'Do you want to request a price quotation?  The buyer selects this option."  (emphasis added).  A price quotation was not the only option.  When the buyer decides on the item or items in which he is interested, "[t]he Buyer submits the request by selecting <u>an option</u> on the internet site request form" (emphasis added).  In due course "[each selected vendor responds to the request(s) by providing its pricing <u>and other information</u> to the quotation system."  (emphasis added).  This concept is reflected in the description of the invention: ". . . the quotation system would interrigate [sic] the vendor's product database (using suitable software which links or cross references the vendor's inventory to the quotation system product and services lists) and retrieve pricing <u>and other information</u> necessary to respond to the RFQ". (Col. 5, ll. 43-48) (emphasis added).  The February 16, 1996 Office Action Response at p. 5 includes the statement that "[t]he quote may include such items as delivery terms, price, etc., none of which are stored in the central database."

In addition figures 7 and 8 of the '326 patent and the implications of claim 12 demonstrate the "quotation" and "request for quotation" include contract terms other than price.  Rather, as SST contends, a request for a quote is a request for the price and other terms of a particular transaction "in sufficient detail to constitute an offer capable of acceptance."

G.  <u>Filter Means</u>: The term "filter means" appears in claims 1, 4 and 12.

Claim 1 recites:

<u>filter means</u> for filtering the network members in said storage to determine which network members are to receive said request for quotation based upon filter conditions set up by the network buyer in said request for quotation or by the

16

central processing unit in accordance with preestablished conditions.

Claim 4 recites:

filter and broadcast means for receiving, over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals, and for filtering said requests to determine with which vendor terminals said requests should be matched.

Claim 12 recites; in pertinent part:

communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services

filtering, at said filter means, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services.

The parties agree that these limitations are written in means - plus - function format, making applicable 35 U.S.C. § 112, ¶ 6 (1994). "Under that provision, '[a]n element of a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.' We have stated that 'for a means-plus-function limitation to read [literally] on an accused device, the accused device must employ means identical to or the equivalent of the structures, material, or acts described in the patent specification. . .'" WMS Gaming, Inc. v. International Game Technology, 184 F.3d 1339, 1347 (Fed. Cir. 1999).

The "filter means" terms are means-plus-function limitations, and because the claims limitations in each of these claims do not by themselves provide any structure, the term is subject to construction under 35 U.S.C. § 112, ¶ 6. Defendants contend that these claims fail the §112 test as applied in WMS Gaming, Inc., 184 F.3d at 1349: "[i]n a means-plus-function claim in

17

which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programed to perform the disclosed algorithm."

It is first necessary to determine the claimed function. In claim 1 the claimed function is "filtering the network members . . . to determine which network members are to receive said request for quotation." In claim 4 the claimed function is i) "receiving, over said data network, requests to engage in transactions with unspecified vendor terminals" and ii) "filtering said requests to determine with which vendor terminals said requests should be matched." In claim 12 the claimed function is "filtering . . . at least one request in order to ascertain a set of sellers potentially capable of supplying said goods and services."

The next step in construing a means-plus-function claim limitation is to look to the specification and identify the corresponding structure, if any, for the function. Medical Instrumentation & Diagnostics Corp. v. Elektra AB, 344 F.3d 1205, 1210 (Fed. Cir. 2003).

There is an initial question whether one evaluates the recital of the structure that implements the means through the eyes of a lay person or through the eyes of one skilled in the art. At the Markman hearing counsel for defendants argued that skill in the art is irrelevant in this inquiry and that it is an English test, not a technical test:

> This patent doesn't use a means plus function test once, it uses it repeatedly. And, the price of using means plus function is that you must in fact describe what is the mechanism that actually performs the function. You can't just say any old means. You can't say, well, anybody of ordinary skill would know that a computer could store or could write a computer program to sort or could write a computer program to select. That may be true. But, . . . that isn't the issue.
>
> The issue is whether the patentee, in the specification, has described it in sufficient detail that it could be built, not that it's anyway that you could do it but

18

the way, and he limits it to the way he discloses it.

Finally, the skill [in] the art. Your Honor has made it clear, from your earliest questions, that you're influenced by what, how skilled somebody of ordinary skill would be in trying to decide could you use a computer to store this. I think that may be true but it's irrelevant to the issue. Because, the question is not whether a rocket scientist or a computer expert or simply a purchasing agent would understand that you could use a computer memory or hard drive to store things, we'll stipulate that. The issue is whether there's any linkage to the function of storing the membership described in the specification. That's an English test. That's not a technical test. And, in fact, there is no such linkage that is found here.

Transcript, March 31, 2006 hearing, pp. 94, 96.

Defendants' linkage analysis is based upon a faulty premise. The determination of whether the specification has described the structure in sufficient detail is not simply an English test; it is a technical test in that the sufficiency of the disclosure of the structure is based on the understanding of one skilled in the art.

We have previously observed that an analysis under §112, ¶2 is inextricably intertwined with claim construction, and that in the § 112, ¶ 6 context, a court's determination of the structure that corresponds to a particular means-plus function limitation is indeed a matter of claim construction. As it is well established that claims are to be construed in view of the understanding of one skilled in the art, the closely related issue concerning whether sufficient structure has in fact been disclosed to support a means-plus-function limitation should be analyzed under the same standard.

• • •

For the reasons outlined above, we thus conclude that the District Court erred by failing to assess whether sufficient structure was disclosed in the specification to support the high-voltage means limitation based on the understanding of one skilled in the art.

Amtel Corp., v. Information Storage Devices, Inc., 198 F.3d 1374, 1379-80 (3d Cir. 1999)

(citations omitted).

19

Turning to the claim 1 function, "filtering the network members . . . to determine which network members are to receive said request for quotation," Defendants argue that the only structure disclosed in the '328 patent that corresponds to this function is the software running on the computer system, i.e., specific flow chart/algorithm illustrated in Figures 5 and 6, rather than the quotation system computer itself.

Defendants submit as the structure related to filtering function of claim: "the algorithm set forth in Figures 5 and 6 but not including or using a central data base that contains more information than is required to determine which network vendors should receive an RFQ." The court has already construed the disclaimer upon which Defendants rely to support the "but not including" portion of this proposed structure. SST argues that the algorithm disclosed in Figures 5 and 6 is not the only filter means disclosed in the specification and that the term "filter means" should be more broadly construed as "a computer programmed to apply or compare specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information." (Pl.'s Responsive Br. at 6).

In WMS Gaming Inc. v. International Game Technology, 184 F.3d 1339 (Fed. Cir. 1999) the court noted that 35 U.S.C. § 112 permits the use of means-plus-function language in claims with the proviso that the claims are limited to the structure, material, or acts disclosed in the specification and their equivalents. The Federal Circuit determined that the District Court had erred in construing the claim in question to cover any table, formula, or algorithm that performed the recited function rather than limiting the claim to the specific algorithm disclosed in the claim.

As the Federal Circuit stated, "[t]he written description of the . . . patent [was] almost completely devoid of any structure to support [the] limitation of the claim. The district court

apparently took [that] lack of disclosure to indicate that the limitation read[] on any means for performing the recited function.  However, [such a] construction is at odds with the requirements of 35 U.S.C. § 112."  Thus, the structure in the present case must be limited to the tables, formulas, and algorithms recited in the specification.

Defendants argue that the algorithm in Figures 5 and 6 is the only relevant structure disclosed in the specification.  SST disagrees with that proposition and cites several examples of other structures.

For example, SST cites to Col. 7, ll. 3-2, of the '328 Patent as an example of additional filter means recited in the specification.  That section describes filters for time sequencing the transmission of RFQ's based upon distance, and for transmitting RFQ's based upon type of service selected by a vendor.

Additionally, Figure 2A is a flowchart that describes the system's user interface and how a user (buyer or vendor), and the network, might set filter conditions.  The chart further demonstrates that filtering consists of comparing information to various conditions in order to see if those conditions are satisfied.

Figure 3 also pertains to filter means.  It describes a process by which vendors can send specific offers to buyers that meet certain filter conditions that can be set by the vendor, buyer, and quotation system.

Thus, filter means cannot be limited to the algorithm in Figures 5 and 6.  Rather, the definition of that term must encompass each of the various descriptions of the structure found throughout the specification.  Moreover, the various figures described above demonstrate that the algorithm operates to compare filter conditions set by the buyer, vendor and system, to various

pieces of information provided by those same parties, to determine whether the conditions have

been satisfied.  As such, the court accepts SST's definition of filter means: "A computer

programmed to apply or compare specified conditions to an item(s) of information to determine

if the condition is met or not by the item(s) of information."

Finally, Defendants argue that "[b]ecause the function associated with the 'filter means'

recitation in each of [the three] claims is slightly different, a separate claim construction analysis

is appropriate for each of the claims reciting 'filter means.'" (Defs.'Opening Br. at 9).  However,

as stated above, when interpreting a claim term, one should read it not only in the context of the

particular claim in which the disputed term appears, but in the context of the entire patent,

including the specification.  Moreover, claim terms are normally used consistently throughout the

patent.  Thus, the above definition applies to filter means as it is used in each claim.

H.  <u>Filter and Broadcast Means</u>: The above discussion of filter means is pertinent to the

construction of filter and broadcast means as the term appears in claim 4:

> filter and broadcast means for receiving over said data network, requests from said
> requestor to engage in transactions with unspecified vendor terminals, and for
> filtering said requests to determine with which vendor terminals said requests
> should be matched

Defendants attack the language referring to a request "to engage in transactions with

unspecified vendor terminals."  In the context of the entire specification this can only mean a

buyer wishing to make a purchase sending a request for a quote, i.e., seeking to engage in a

business transaction.

Filter means has already been addressed.  The court finds persuasive SST's position that

broadcast means incorporates the function of "receiving, over said data network, requests from

said requestor," and that the '328 patent describes several structures for implementing that function, namely, use of Internet HTML pages (Col. 4, ll. 1-9), a menu function for permitting users to enter RFQ information to be conveyed to the central computer (Col 4, ll. 12-26), Figure 5's depiction of a flow chart programmed to get the RFQ from the network (See top of Figure 5, "Get RFQ").

I. <u>Computer Based Communications Network</u>: Defendants' proposed construction of computer based communication network is a presentation of their disclaimer contention in a different form. They note the use of the phrase in independent claims 1 and 3. Claim 3, for example, reads:

> A method for processing requests for quotation for goods and/or services . . .through a computerized system forming a <u>computer based communications network</u> . . . for linking buyers with suppliers

(Col. 8, ll. 49-53) (emphasis added).

Defendants then observe that in various places in the specification where reference is made to a computer based network, there appears the language "No central database of goods, prices, etc. is involved" (Col. 2, ll. 35-42) or "[t]here is no central pricing database to limit the number of buyers and vendors of good and services or to limit the number of goods and services which can be processed."  (Col. 3, ll. 55-62).

Relying on the claims, specification and prosecution history, Defendants urge that the proper construction of the term "computer based communications network" is "a computer network that does not include or use a central database that contains more information than is required to determine which network vendors should receive an RFQ."  The court has already

rejected this construction in its rejection of Defendants' disclaimer contention.

J. <u>Filter Conditions</u>: Defendants propose the following definition of "filter conditions":

> Limitations or conditions that determine which of the network vendors will receive a buyer's request for quotation and/or which buyers will receive a response from a network vendor.

The limitations or conditions included in the RFQ and/or the response are filter conditions, but they certainly are not the only filter conditions described in the '328 patent. For example, the specification also refers to additional filter conditions that the network adds that prevent all sellers and all buyers from being matched equally when the buyer and seller filter conditions match each other (e.g., Col. 7, ll. 19-47). These filter conditions are not typically in the request or response, and thus are not part of the discussion at column 8 of the '328 patent relied upon by Defendants.

This definition is consistent with the language of the specification and applies regardless of whether the filter conditions are set by a buyer, vendor, or network software. For example:

> filter conditions determine which of the network sellers will receive a buyer's request for quotation

Col. 1, ll. 14-16.

> Alternatively, or in addition, the vendor responses may likewise be filtered to satisfy conditions of the vendors responding or in accordance with predefined conditions for facilitating a linkage between the prospective buyer and an acceptable seller.

Col. 8, ll. 16-20

> The buyer and vendor filters may represent in their simplest form defined classes of suppliers and/or buyers and may extend to delineate conditions of sale and/or purchase. <u>Limitations or conditions included in the RFQ and/or in the response are defined for purposes of the present application as filter information or simply "filters"</u>. Filtering performed by a quotation system computer may simply involve

24

> limiting the network members to whom the RFQ is given and/or to whom
> responses are given or may be a more complex selection process.

Col. 5, ll. 15-25 (emphasis added).

It is SST's contention that the term "filter conditions" must exclude product information. In its opening brief SST expressed the belief that "defendants will try to claim that the buyer filter conditions may consist merely of a code or label that specifies the product or class of products that the buyer wants to buy. In other words, if the buyer merely states he is interested in purchasing light bulbs, defendants are expected to argue that the code designating light bulbs in the RFQ is a buyer filter condition, and thus meets the language of the claim." (at p. 16).

Defendants disavow such a narrow meaning of filter conditions imposed by the buyer: "Defendants' argument is not that a filter condition set by a buyer must be a product code. Defendants acknowledge that the specification describes filter conditions other than product codes (e.g., geographical limitations, quantity limitations, etc.), but there is simply no support for SST's contention that the intrinsic record requires that the buyer-set filter conditions exclude product information." (Defs' Opening Br. at p. 6). (emphasis in original). Thus the issue is whether filter conditions can include product designation, as Defendants contend or whether filter conditions must exclude product designation, or SST contends.

The term "filter condition" is used extensively in the claims. At no point are specific goods and services excluded from being selected as filter conditions. SST argues that the language of claims 12 and 13 demonstrates that the product cannot be a filter condition. Claim 12 of the '328 patent specifies that the filter means filters a buyer's RFQ to determine which sellers can supply the goods and services specified in the RFQ. Claim 13 which is dependent on

claim 12 adds the additional "step of accepting filtering conditions from said potential buyer, and utilizing said filter conditions in said step of filtering to determine a subset of potentially capable sellers." SST contends that Defendants position that goods and services specified in the RFQ are buyer filter conditions cannot be correct because then claim 13 would be rendered superfluous. If the product of claim 12 were a filter condition, claim 13, which adds the step of accepting filtering conditions from the buyers, would add nothing to claim 12. Defendants respond that there is nothing inconsistent with having a product serve as a filter condition in both contexts with other filter conditions added in the claim 13 context.

Relying upon preferred embodiments in the specification, SST proffers examples that are consistent with its contention that a product cannot be a filter condition. Fig. 7 shows a separate line for "Product Identification" and below it has a line reading "Vendor Qualifications (Filter Conditions)." A note at the bottom reads: "Buyer Filter Conditions Might Include Language Spoken, Currency of Quotation, Type of Vendor (e.g. Manufacturer, Distributor, Retailer, Etc.). Or Location of Vendor."

Fig. 2A of the patent includes a flow chart. In the box representing the second step it is stated that "The Buyer Next Selects A Product Type, e.g.: Computer Products, Appliances, Electronic Parts and Components, Et Cetera." In the box representing the fourth step it is stated: "The Quotation System Processes The Request by Selecting a Class of Vendors Who Sell The Requested Product(s) and Meet The Filter Requirements Of The Buyer, Vendor and The Quotation System." SST argues that his demonstrates that simply designating a product does not constitute specifying a filter condition.

SST relies upon the steps designated in Fig. 5 and Fig. 6 for the same purpose.

26

These examples cannot serve to define filter conditions.  Fig. 7 does not state that filter

conditions cannot include product identification.  It may be a preferred embodiment, but a

preferred embodiment may not be used to narrow a claim construction.  Phillips v. AWH Corp.,

415 F.3d 1303, 1332 (Fed. Cir. 2005).  The specification describes Fig. 5 and Fig. 6 as "sample

logic for processing filter conditions to accomplish vendor selection for a given RFQ."  (Col. 5,

ll. 32-34).

SST quotes from the Summary of the invention to support its contention that filter

conditions are optional: "selecting one or more appropriate vendors to receive the buyer's request

for quotation based on filter conditions, if any, set by the buyer, vendor and the network

software."  (Col. 2, ll. 2-4).  Read in its entirety the Summary of the Invention portrays the

selection of vendors strictly through the use of filter conditions.  The "if any" probably reflects

that the network and the vendor might not set filter conditions, but the process must be through

the use of filter conditions.

The claims themselves do not exclude the product from the term "filter condition."  The

specification includes goods and services as a category of filter condition.  Use of filter

conditions by a vendor is described as follows:

> When a vendor wants to receive requests for quotation over the network, the
> vendor notifies the network of the class of goods or services in which the vendor
> deals (a "request for quotation class definition").  This can be communicated by
> voice, telephone, fax, et cetera, or by use of programming provided for that
> purpose, but the preferred method is to use programming provided for that
> purpose by the network.  The request for quotation class definition is transmitted
> to the network and the network uses that definition to filter all requests for
> quotation routed to the vendor, i.e., to the class defined by a buyer of which the
> vendor is a member.  In this way the vendor receives only those requests for
> quotation which conform to the vendor's request for quotation definition.  The
> number of vendors within a class to receive a request for quotation may be very

> large. To keep the process manageable network software may be arranged to limit the number of vendors to receive a request for quotation.

Col. 7, ll. 31-47 (emphasis added).

Here the vendor first defines a class of goods or services in which the vendor deals. The network then uses that class definition to filter requests for quotation routed to the vendor. The class of goods and services set by the vendor is a filter condition as that term is used in the specification.

Defendants' definition of "filter condition" is the proper one.

K. <u>Network Members</u>: Defendants seek to limit network members by defining the term 'network member' as follows:

> A person or entity that has applied for membership to the network by completing a registration application or by contacting quotation system offices or by other means and has received password information or other means necessary to access and use the quotation system.

The specification defines a network member: "A network member is anyone or any company which has registered as a user by completing an application. . ." (Col. 4, ll. 1-4). The specification also provides an example of methods of applying for membership and access to and use of the quotation system, but this illustrative example cannot be construed as a straight jacket defining network members. The definition of network member is as stated in the specification.

L. <u>Goods and Services</u>: Defendants construe "goods and services" as "standardized articles of trade and performances of work for another." They rely upon the following language in the specification for support:

> There is no central pricing database to limit the number of buyers and vendors of goods and services or to limit the number of goods and services which can be processed. <u>However the goods and services must be standard items</u> to ensure that

28

> there is no confusion as to what buyers are requesting and what seller are offering buyers.

Col. 3, ll. 60-65 (emphasis added).

SST has not objected to Defendants' contention, and therefore it will be accepted.

M.  <u>Communications Channel Storage Means and Storage Means</u>: These terms appear in claims 1 and 3.  Independent claim 1 recites:

> said network members being remotely located from said central processing unit and connected thereto via a <u>communication channel storage means</u> containing identification of the network members.

(emphasis added).  Independent claim 3 recites a "<u>storage means</u> containing the identification of the network members "(emphasis added).  It is Defendants' contention that these terms are means-plus-function limitations subject to construction under Section 112, ¶ 6, and that they fail to pass muster under that section.

Defendants assert that claim 1 recites two functions performed by the "communications storage means": (i) storing the identification of the network members and (ii) connecting the network members to the central processing unit; and they assert that the recited function of the "storage means" in claim 3 is to store the identifications of the network members.

1.  <u>Defendants' Contentions</u>:  According to Defendants the specification of the '328 Patent discloses only two structures capable of storing information, neither of which are suitable to store network member identities.  According to the specification, the quotation system computer includes the following structures:

> a random access memory for temporary storage of information, a read only memory for permanent storage of the computers [sic] configuration and basic operating commands, an input/output adapter for connecting peripheral devices and known input and interface devices, [and] a display adapter and display device.

29

Col. 6, ll. 35-42.  Neither the random access memory ("RAM") nor the read only memory

("ROM") is identified as storing or containing the identifications of network members.  The

ROM could not store network member identities, because such identities are not for "permanent

storage" and are not part of "the computer['s] configuration or basic operating commands."

Moreover, network member identities could not be stored in ROM, because data in read only

memory can be accessed, but not modified.  Similarly, RAM is commonly understood to refer to

volatile memory, i.e., memory that loses its data when power is disconnected from the system,

and as such would also be unsuitable for storing network member identifications or other data

that would need to be accessed on a more permanent basis.

No other memory or storage structures are described in the specification and there is no

description or disclosure of a "communications channel storage means" or a "storage means" for

containing identification of the network members.  <u>See</u> Col. 6, ll. 35-42.  Necessarily, the

specification also fails to describe a "communications channel storage means" that stores the

identification of the network members and connects the network members to the central

processing unit.

Defendants conclude that "[a]s stated in <u>Amtel v. Information Storage Devices, Inc.</u>, 198

F.3d 1374, 1382 (Fed. Cir. 1999), the patentee must disclose the structure corresponding to the

means in the specification in order to comply with the particularity requirement of 35 U.S.C. §

112, ¶ 2.  Here, the specification is completely devoid of any structure that corresponds to the

function of storing the identifications of the network members.  Even if the only structures

described in the specification for storing information were actually capable of storing the

network member identities, . . . the specification fails to clearly link or associate those structures

30

with the recited function."   (Defs' Opening Br. at 25)

2. <u>Discussion:</u> SST advances two reasons why Defendants' position lacks merit.  First, the claims are not in means plus function format.  Second, if the storage means is in means plus function form, several corresponding structures are disclosed and linked.

Section 112, ¶6 provides that:

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.  The section operates to restrict claim limitations drafted in such functional language to those structures, materials, or acts disclosed in the specification (and their equivalents) that perform the claimed function.  <u>Personalized Media v. International Trade Com'n</u>, 161 F.3d 696, 703 (Fed. Civ. 1998).

A court first "must decide the subsidiary question of whether the claim element disputed by the parties invokes § 112, ¶ 6 in the first instance."  <u>Rodine PLC v. Seagate Technology, Inc.</u>, 174 F.3d 1294, 1302 (Fed. Cir. 1999).  In reaching that decision:

> The word "means" is "part of the classic template for functional claim elements." Accordingly, in determining whether a claim element falls within § 112, ¶ 6, this court has presumed an applicant advisedly used the word "means" to invoke the statutory mandate for means-plus-function clauses."

<u>Id</u>. at 1302 (citations omitted).

This presumption can be overcome:

> Two specific rules, however, overcome this presumption.  First, a claim element that uses the word "means" but recites no function corresponding to the means does not invoke § 112, ¶ 6.  Second, even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply.

31

Id. at 1302 (citations omitted).  SST contends that the language in question does not implicate §

112, ¶ 6 because it recites no function.

There must first be noted the distinct difference in the language construed in the case

upon which the Defendants rely so heavily, WMS Gaming Inc., supra, and the instant case.  In

WMS Gaming the disputed claim language read:

>means for assigning a plurality of numbers representing said angular positions of
>said reel . . .
>
>means for randomly selecting one of said plurality of assigned numbers
>
>Means for stopping said reel at the angular position represented by said selected
>number

That is classical means-plus-function language.  It is to be contrasted with the language of

the '328 patent under consideration here:

>A computerized system for forming a computer based communications network of
>network members inclusive of network buyers and or network vendors for
>processing requests for quotations for goods and services through at least one
>central processing unit including operating system software for controlling the
>central processing unit, said network members being remotely located from said
>processing unit and connected thereto via a communication storage means
>containing identification of the network members, means for network buyers to
>generate request for quotation for goods and/or services, etc.

Claim 1 (emphasis added).

>A method for processing requests for quotation for goods and/or services from a
>party representing a buyer or supplier of goods and/or services through a
>computerized system forming a computer based communications network of
>network members for linking buyers to suppliers with the computerized system
>having at least one central processing unit including operating systems software
>for controlling the central processing unit and storage means containing the
>identification of the network members, wherein the method comprises the steps
>of, etc.

Claim 3 (emphasis added).

Defendants urge rejection of the declaration of Eric M. Dowling, Ph.D., E.E., asserting that he is not a person skilled in the art and that the substance of his declaration is irrelevant. The court finds that Dr. Dowling is highly skilled in the art and that the information he provides is relevant.

The pertinent means-plus-function language in <u>WMS Gaming</u> clearly must find its structure apart from the claim itself. In the '328 patent, on the other hand, the language to be construed is a noun. It is not pointing to something else; it is itself a storage means which contains identification of the network members. "Storage means" was recited in both the abstract and summary of the '328 patent. The summary states "and storage means containing the identification of the network members," (Col. 2, ll. 59, 60) and "storage means containing appropriate identity and other information about members of the network, means for potential buyers of product and/or services to transmit a request for quotation to said central processing unit. .." (Col. 3, ll. 10-14).

Used as a noun, "storage means" identifies a known structure, i.e., a device into which bits of information can be written and later recalled, such as a disk, ubiquitously found on computer systems. As stated by Dr. Dowling, "[t]o one of ordinary skill in the art, 'storage means' as used in Abstract and the above two citations, taken in light of the rest of the disclosure [ ], would mean 'one or more computer storage devices capable of storing computer files.' Typically, this would involve a disk, like a hard drive, but could involve other types of storage devices such as semi conductor disks implemented with RAM and/or ROM (EPROM) devices. Alternatively, the storage means could be a memory such as a RAM where data is temporarily

stored so it can be manipulated upon a CPU."  (Dowling Decl. para. 10).

In Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580 (Fed. Cir. 1996) the district court held that words "detent mechanism" used in the following claim language was within § 112(6), ¶ 6: "a radically enlarged wheel on said sleeve and said wheel and said one handle having a cooperating detent mechanism defining the conjoint rotation of said shafts in predetermined intervals."  In addition the summary of the invention used "detent means."  The Federal Circuit disagreed, with the district court, stating ". . . the fact that a particular mechanism - here 'detent mechanism' - is defined in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112(6).  Many devices take their names from the functions they perform . . . 'Detent' (or its equivalent, 'detent mechanism') is just such a term"  Id. at 1583.  The Court found no significance in the fact that the patent specification used on two occasions the words "detent means" rather than "detent mechanism."  Further the Court noted that the patentee did not use the "means-plus-function" language.

The present case is similar to Greenberg.  The terms in question, "storage means" and "communications channel storage means," are devices taking their names from the functions they perform, as "detent mechanism" did.  The patentee in Greenberg enjoyed a favorable presumption: ". . . that the failure to use the word 'means' creates a presumption that § 112, ¶ 6 does not apply," Personalized Media, 161 F.3d at 703-04.  SST faces the opposite presumption: ". . . the use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates form means-plus-function clauses.'" Id. at 703.

In Personalized Media, supra, the International Trade Commission construed the

34

limitation "digital detector" as a means-plus-function limitation under § 112, ¶ 6.  Rejecting this holding, the Federal Circuit referred to the presumptions, stating that "[i]n deciding whether either presumption has been rebutted, the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit of § 112, ¶ 6," 161 F.3d at 704. The Court noted that the "'digital detector' limitation does not use the word 'means,' and therefore this limitation is presumed not to invoke § 112, ¶ 6." Id. Following the reasoning of Greenberg, the Court concluded:

> Even though the "detector" does not specifically evoke a particular structure, it does convey to one knowledgeable in the art of a variety of structures known as "detectors."  We therefore conclude that the term "detector" is a sufficiently definite structural term to preclude the application of § 112, ¶ 6"

Id. at 705.

Although the limitations "storage means" and "communications channel storage means" are subject to the presumption of § 112, ¶ 6 applicability, they convey to one knowledgeable in the art a definite form of structure and overcome whatever presumption that may exist.

SST urges another route to avoid § 112, ¶ 6.  "[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format even if the claim uses the term means." Sage Prods. v. Devon Indus., Inc., 126 F.3d 1420, 1427-28 (Fed. Cir. 1997). SST relies upon two cases to support its contention that Claims 1 and 3 themselves elaborate sufficient structure to perform entirely the recited function.

At issue in Wenger Mfg. v. Coating Machinery Systems, 239 F.3d 1225 (Fed. Civ. 2001), was the question whether § 112, ¶ 6 applied to a claim limitation reading "means defining a

35

plurality of separate product coating zones."  The district court held that this limitation was not

subject to § 112, ¶ 6.  The Court of Appeals agreed, concluding that in spite of the presumption

of applicability "it is unclear whether there is any function recited that corresponds to the word

'means.'"  Regardless of that consideration, the Court stated:

> . . . we agree with Wenger that § 112, ¶ 6 does not apply because the claim recites
> sufficiently definite structure for performing the function of "defining."  See
> Rodine, 174 F.3 at 1302, 50 USPQ 2d at 1434 ("[E]ven if the claim element
> specifies a function, if it also recites sufficient structure or material for performing
> that function, § 112, ¶ 6 does not apply.").

Id. at 1237.  The Court then noted that "[t]he claim specifically recites structure including spray

nozzles that are directed toward the sidewall of the reel, which 'define' (i.e., establish the

boundaries of) the separate product coating zones that are longitudinally spaced along the reel."

Id.

Rodine, supra, is to the same effect.  The Federal Circuit held that § 112, ¶ 6 was

inapplicable even though (i) the claim used the term 'means,' (ii) there was therefore a

presumption of applicability, and (iii) the claim language linked the means with a function.  The

claims in question used the limitation "positioning means."  For example, in claim 3, the element

at issue began, "positioning means for moving said transducer means between the concentrically

adjacent tracks on said micro-hard disk," 174 F.3d at 1302.  The district court held that this

language invoked § 112, ¶ 6.  The Federal Circuit reversed, stating that although the first steps in

the required analysis appeared to bring the claim element within § 112, ¶ 6, "[t]he final step in

the analysis, however, requires this court to determine whether the claim nevertheless recites

sufficient structure for performing the moving function to take it outside the bounds of that

provision."  Id. at 1303.

The Federal Circuit examined the claim and noted that after the language in question, claim 3 further provided a list of the structure underlying means: "said positioning means including: two support arms . . . a pivot shift . . . a positioning arm . . . a bearing assembly. . . a stepper motor . . . means for operating said stepper motor . . . and a tensioned steel band . . .".  In addition the claim recited the specific location and interconnection of each of these structural sub-elements.  "This detailed recitation of structure for performing the moving function takes this claim element out of the scope of § 112, ¶ 6." Id. at 1303-4.

In the present case if it were assumed that "storage means" were not a noun identifying itself and not referring to another structure, then either i) the claims themselves contain a detailed recitation of structure for performing the function so as to take them out of the scope of § 112, ¶ 6 or ii) the details contained in the claims themselves, together with the details contained in the specification constitute compliance with § 112, ¶ 6.

Claim 1 calls for, along with a communications channel storage means, a computerized system for forming a computer based network and processing RFQs through at least one central processing unit including operating system software for controlling the central processing unit. Claim 3 calls for similar components.  As Dr. Dowling stated:

> By 1996 it was well known that various types of physical storage devices could be used to store computer files on a PC or central server.  Commonly known and commonly used storage devices included, by 1996 and before: hard drives, floppy drives, magnetic tape drives, RAM-Disks (file system portion loaded into RAM to speed file system access performance), ROM-Disks (disk equivalent implemented using semiconductor ROM technology), and optical disks, among others.  All such storage devices were well known and commonly used by 1996 to implement computer file systems, and would have been obvious design choices well known to those of ordinary skill in the art by 1996 or as early as 1993, or before.

(Dowling Decl. para. 14).

37

If the detail in the claims themselves were not sufficient to bring this case within <u>Wenger</u> and <u>Rodine</u> and the limitations at issue were held to be in means plus function form, the detail in the claims and in the specification is sufficient to comply with § 112, ¶ 6. The specification states that RAM is used as the computer's temporary memory. (Col. 6, ll. 36-42). The claimed filter operates on the data in the storage means - "means for filtering the network members in said storage means" - which is the temporary storage for the RAM. As Dr. Dowling explained, a person ordinarily skilled in the art would understand that the computer leads the data into temporary storage RAM before operating on the data, and any filtering done with respect to the network members is done when they are stored in the RAM in accordance with the claim. (Dowling Decl. para. 16-17).

Fig. 5 of the '328 patent, labeled "CREATE EMPTY TABLE TO HOLD VENDORS THAT WILL BE SELECTED FOR THIS RFQ (tmp - SELECTED TABLE)," discloses that the storage means that holds the information upon which the filter means will operate is RAM. The RAM is storage means.

Further, at Col. 6, ll. 36-42 the specification reads: "The quotation system computer is schematically (sic) shown in Fig. 4 as the 'Central Office' and includes a random access memory for temporary storage, a read only memory for permanent storage of the computers configuration and basis operating commands, an input/output adapter for connecting peripheral devices and known input and interface devices." Commenting on this language, Dr. Dowling wrote: "One of ordinary skill in the art would thus understand that 'peripheral devices and known input and interface devices' would include a hard drive or any other storage device that could hold a computer file system. To one of ordinary skill in the art, it would be unmistakable that the

38

'Central Office' computer system includes the storage means recited in the abstract, summary, and claims and that 'storage means' could be implemented using 'known input and interface devices,' e.g., hard drive or any other well known device in common use for storing computer files."  (Dowling Decl. para. 155).

The court concludes, however, that the better view is that the '328 patent storage means (including its use in "communications channel storage means" is not in means plus function format, but refers to a specific structure - the computer's permanent and temporary storage.

### Conclusion

The foregoing constitutes the court's construction of the disputed claim terms.  They will be incorporated by reference in an order that the court will file.


                                         **   /s/ Dickinson R. Debevoise   **
October 16, 2006                          DICKINSON R. DEBEVOISE
                                                  U.S.S.D.J.