**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

-----------------------------------------------------X

Source Search Technologies, LLC,

Plaintiff,

v.

Lendingtree, Inc., ServiceMagic Inc. and IAC InterActiveCorp,

Defendants.

-----------------------------------------------------X

Civil Action No. 2:04-CV-4420 (DRD)

**PLAINTIFF SOURCE SEARCH TECHNOLOGIES LLC'S ("SST") COMBINED MEMORANDUM IN OPPOSITION DEFENDANT SERVICEMAGIC'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF SST'S MOTION FOR SUMMARY JUDGMENT ON THE INFRINGEMENT ISSUE**

Dated: March 20, 2007

Jeffrey I. Kaplan (JK 4706)
KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ 07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*

# TABLE OF CONTENTS

**PAGE(S)**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ....................1

II. BACKGROUND OF THE '328 PATENT AND THE SERVICEMAGIC PROCESS ....................2

A. The '328 Two Tier Filtering Technology ....................2

B. The "One way" And "Two way" Embodiments ....................4

C. Brief Description of the Service Magic Website ....................7

III. SERVICEMAGIC INFRINGES CLAIMS 1 -3 AND ITS SUMMARY JUDGMENT MOTION MUST BE DENIED ....................8

A. ServiceMagic's System Processes Requests For Quotes ....................8

B. In the Process of Attempting to Religate Issues Already Decided, ServiceMagic Has Conceded the Infringement Issue in Its Entirety ....................13

C. SM System Offers Standard Goods and Services ....................16

D. SM Misconstrues this Court's Markman Ruling ....................17

E. Standardized Does Not Always Mean Standard, and Clearly Does Not Mean Standard in the Context of the '328 Patent ....................18

F. The '328 Patent Consistently Uses Standard and Standardized to Convey Totally Different Concepts ....................21

G. The Requirement for Standard Items is Different From the Requirement for Standardized Identifications, and the SM System Meets Both Requirements ....................32

H. ServiceMagic's Motion for Summary Judgment Must Be Denied Regardless of What The Court Determines About Standard and Standardized ....................33

IV. THERE ARE NO MATERIAL ISSUES OF FACT IN DISPUTE WITH RESPECT TO SST'S CROSS MOTION, AND SST IS ENTITLED TO SUMMARY JUDGMENT ON THE INFRINGEMENT ISSUE ....................38

V. CONCLUSION ....................43

# TABLE OF AUTHORITIES

**PAGE(S)**

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359, 1366 (Fed. Cir. 2002)....................25

*Fuji Photo Film, Ltd. v. ITC*,
386 F.3d 1095 (Fed. Cir. 2004)....................14, 15, 36

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985, 989 (Fed. Cir. 1999)....................25

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)....................25

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
358 F.3d 898 (Fed.Cir.2004)....................15

*Mickowski v. Visitrak,*
36 F.Supp.2d 171 (S.D.N.Y. 1999)....................12, 40

*Moleculon Research Inc. v. CBS Corp*.,
793 F.2d 1261 (Fed. Cir. 1986)....................12, 40

*Tandon Corp. v. US Int'l Trade Commission*,
831 F.2d 1017 (Fed. Cir. 1987)....................21

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
299 F.3d 1313, 1325 (Fed.Cir. 2002) ....................15

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

ServiceMagic, Inc. ("SM") claims it does not infringe the '328 patent in suit because it does not process "requests for quotes" ("RFQs"), but instead processes requests for "referrals". Yet, contractors receiving such a "referral" from the SM website are instructed by SM to "respond quickly" and "contact the customer ***to quote on*** their repair, maintenance, or remodel project" because the customer is "[R]eady to buy. From you. Right now!" Consumers are advised that the responses they receive from contractors should include "a detailed description of the work…dollar amounts associated with each task…anticipated start and finish date...payment schedule…" and numerous other terms of a quote. Moreover, the "referral" system that SM itself agrees it operates is, perhaps ironically, one of the preferred embodiments of processing requests ***for quotes*** that is disclosed and taught by the '328 patent specification. SM processes RFQs. Therefore, Source Search Technologies, LLC's ("SST") motion for summary judgment on this issue should be granted and SM's motion must be denied.

SM's second argument is that its system does not use "standard goods and services." SM misdefines the phrase "standard goods and services" from the '328 patent. The interpretation of the phrase SM takes is inconsistent with its own prior arguments and contrary to this Court's Markman ruling in this case. SM's interpretation is also inconsistent with the '328 patent in no less than fifteen places, and would result in the claims excluding the preferred embodiment of the '328 patent. In fact, SM's interpretation of the phrase at issue requires this Court to accept the rather unique proposition that the same term used the same way, consistently throughout the '328 patent, has different meanings in different places, but that two different terms used differently in the '328 patent actually have the same meaning.

Based upon its incorrect definition of standard goods and services – the source of which is neither the '328 patent nor external dictionaries but which remains unknown - SM draws an illusory distinction between the goods and services offered by SM, and those described in the '328 patent. When the proper interpretation of the phrase "standard goods and services" is utilized, the goods and services offered by SM are identical in all material respects to those described in the '328 patent – essentially the preferred embodiment of the '328 patent. In fact, SM's marketing literature describes SM goods and services as, quite literally, ***the definition*** of "standard".

SM cannot avoid infringement by claiming that it does not infringe because it practices the preferred embodiment that is shown in the '328 patent as the main example of the two claim limitations at issue. Quite the contrary, this merely emphasizes SM is performing the claim limitations in issue. Moreover, because the remaining limitations of claims 1-3 are present in the SM system – SM's own 30(b)(6) witness has acknowledged so – there are no material factual issues in dispute and SST is entitled to summary judgment on the infringement issue. [1]

## II. BACKGROUND OF THE '328 PATENT AND THE SERVICEMAGIC PROCESS

### A. The '328 Two Tier Filtering Technology

Before turning to the above arguments in more detail, some background on the '328 patent, taken to some extent from this Court's October 16, 2006 Markman Opinion, warrants discussion.

As computers became more commonly used for the purchase and sale of goods and

[1] In its Markman Opinion of October 16, as reconsidered in another Opinion dated November 13, 2006, this Court construed the claims to incorporate the limitation from column 3 of the '328 patent specification, "The goods and services must be standard items…" Unfortunately, it now appears the parties dispute what that language from the '328 patent ***specification*** means, so this Court is called upon to now further interpret the phrase in issue.

services, there arose the problem of the prospective buyer having too many or too few options from which to choose. The central database system was one in which a single database contained everything the consumer needed to find the item he or she wanted and complete a purchase of that item; as, for example, the price, terms, quantities and all other information required to sell all available goods and services from many different vendors. On the other hand, a system wherein the buyer would directly connect to a specific vendor over the computer network and complete a purchase, required that the buyer know in advance the identity of the vendor from which he or she sought to obtain the product or service, and in addition, comparison shopping was difficult.

The invention of the '328 patent addresses the ***too much*** or too little problem. Very simply, there is no central database containing all the information needed to complete a transaction. The buyer can establish "filter conditions" which ***limit the vendors*** to which the buyer's request for a quotation ("RFQ") will be sent; and similarly the vendor can establish filter conditions which will limit the buyers to which its quotation will be sent. The network itself can also establish a third set of filter conditions as well, to limit or otherwise prioritize the vendors which receive the RFQ. ('328 Patent, at col. 7) [2]

The ***too much*** problem is solved in the '328 patent by limiting vendors that receive the RFQ, thereby limiting those who may respond. Rather than send the consumer's request to all vendors that sell a specified product, the '328 patent discloses a system that allows the number of vendors that get the RFQ to be "throttled" in two additional ways. First, the buyer can expand and contract the qualifications necessary for a vendor to receive the RFQ, regardless of whether the vendor sells the product or not, by adding additional filter conditions. ('328 patent, col. 7).

---

[2] The '328 patent in suit is attached as Ex. A to the Declaration of Elvin Esteves dated February 22, 2007, and included with SM's present motion for summary judgment. We thus cite here to the '328 patent, rather than to our own exhibit.

Second, and most importantly, even after the system matches the buyer and vendor filter conditions, it does not simply send the RFQ to all the matched vendors. Instead, ***the central computer system itself adds an additional filter***, which may result in many of the otherwise qualifying vendors being eliminated from receiving the RFQ, or in certain vendors receiving the RFQ sooner or otherwise being prioritized over others. (‘328 patent at Col. 7). These two features are indicated by the figures below, which depict also how the ‘328 methodology differs from some of the prior art.




### B. The “One way” And “Two way” Embodiments

Another important aspect of the ‘328 patent is the distinction between what we term here the “one way embodiment” and what we call the “two way embodiment.” In the two way embodiment, users submit RFQ’s that are filtered by a filter means and transmitted to vendors

selected by the filter means as described above. Also, vendors respond by sending their quotes back to the filter means, which forwards them on to the individual that submitted the RFQ. Claim 4 of the '328 patent, among others, is exemplary of the two way embodiment, which is not in issue here.[3]

In the one way embodiment at issue here, quotes need not go back through the system, or at all. Instead, the one way embodiment is a lead service. The one way embodiment accepts a request from a buyer seeking a quote on some project, filters it to select a list of potential vendors that may be able to supply such a quote based upon the novel filtering algorithm of the '328 patent, and sends the RFQ to the selected vendors. Optionally, the buyer may receive a list of those vendors to contact. It is not required that quotes actually come back to the buyer through the system, ***or at all***. Claim 1 is exemplary of the one way embodiment, with emphasis added here:

> A computerized system for forming a computer based communications network of network members inclusive of network buyers and or network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit, said network members being remotely located from said central processing unit and connected thereto via a communications channel storage means containing identification of the network members, means for network buyers to generate request for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for filtering the network members in said storage means to determine which network members are to receive said request for quotation based upon filter conditions set up by the network buyer in said request for quotation or by the central processing unit in accordance with preestablished conditions, means for broadcasting said request for quotation to the network members selected by said filter means and means for responding to the generator of said request with either a ***response*** from the selected network members ***or with a***

[3] The two way embodiment is in issue with respect to codefendant Lendingtree.

> ***list of said selected network members for said generator of said request to establish independent communication.***

The one way embodiment is discussed repeatedly throughout the '328 patent. For example, the '328 patent describes the invention as "a cross between a telephone call and a radio broadcast where the ultimate recipient is neither an individual nor a mass audience, but a class of recipients identified by their characteristics." This has nothing to do with returning quotes, but only with selecting vendors to which the RFQ will be routed. The '328 specification further notes that after the RFQ is received by the vendors, rather than only a quote being returned, "communications between buyers and sellers may be by telephone, email, or other means". (col. 6, lines 6-11).

In accordance with the one way embodiment, if a buyer submits an RFQ for plastic red widgets, the system will route the buyer's RFQ to selected vendors likely to sell plastic red widgets, and who meet other filter conditions of the network, vendor, or buyer, as appropriate. The list of selected vendors is then returned to the buyer.

The vendors may then follow up by calling, emailing, or otherwise contacting the buyer, if they wish, but this does not matter for purposes of infringement. ('328 patent, col. 6, lines 7-11). Or, the buyer can establish independent communication by calling the vendors. (Claim 1). In short, the one way embodiment is a ***referral service***, wherein buyers wishing to obtain quotes are referred to vendors who are ***likely to be able to supply the quotes*** based upon the patented filtering algorithm. ('328 patent, col. 8, lines 15, noting vendors are "selected based on their likelihood to respond to the request for quotation").

Alternatively, as stated in claim 3 and at the top of column 3 of the '328 specification, vendors may simply contact the buyer directly and supply quotes. No requirement that quotes be returned by or through the computer system is present in claim 3, and no requirement that quotes

be returned at all is present in claim 1. It is "one way", in that RFQs go through the system to vendors but quotes need not come back through the system from the vendors (or at all for claim 1).

**C. Brief Description of the Service Magic Website**

The SM website provides the claimed referral service - as SM admits - with respect to hundreds of standard home services such as electrical wiring, flooring, etc. An exemplary and typical use of the SM website is shown, screen by screen, in Ex. B.[4] A user selects a category (e.g. carpet installers) from a few hundred standard home services offered. (568-571). The user is then asked to select a subcategory such as installation, dyeing of carpet, stretching, etc. (572). Numerous other parameters are entered by the user, such as the location of the job, when the work needs to be completed, etc. A menu structure is then completed that allows the user to specify details of the task such as whether the carpet is to be sisal, berber, plush, etc., the room to be carpeted, the type of stairs if any, etc. (573-580).

The system then advises the user that it is matching the consumer to "prescreened pros" (584). The system uses a filtering algorithm that matches a variety of factors input by a consumer that describe the project in which he/she is interested, with numerous filter conditions that have been specified by various service contractors to specify the types of projects on which they would like to bid. Additionally, the SM system itself adds filters that cap the number of service professionals to receive the RFQ, accounts for the various types of contracts the service professionals have with SM to prioritize who get the RFQ, just like col. 7 of the '328 patent states, and then accounts for numerous other criteria that the network adds to optimize who gets the RFQ. (Ex. C, pp. 11-24, and 32-35). In other words, the system does not merely send the

[4] Refers to the Kaplan declaration submitted herewith. Numerals cited with respect to Ex. B represent the last three digits of the bates numbers.

RFQ to all matched service professionals, but instead, adds a layer of filtering by the SM system itself to narrow down or otherwise prioritize who gets the RFQ and when.

The SM system then selects up to four service professionals, who are sent the user's RFQ and instructed to contact the consumer to follow up and give a quote. (Ex. C, Zurcher Dep., pp. 46-49). The SM system also sends the user back a list of the service pros with whom he has been matched, and an instruction to "CONTACT YOUR MATCHING PROS NOW!" (Ex. A, D).

Those contractors then call, email or otherwise contact the user to provide their quotes. Often, they call the consumer and may meet the consumer to provide the written proposal. (Ex. D, generally). However, the RFQ submitted by the consumer contains enough information for the contractor to "ballpark" the job ahead of time. (Ex. D, at 7). Alternatively, as instructed by SM, the consumer may call or email the contractors from the list provided to the consumer, and set up an appointment for the contractor to provide a proposal. (Ex. A). Contractors are encouraged to call and provide their quotes quickly in order to maximize the chance of winning the job. (Ex. D, generally, and pp. 14-18).

## III. SERVICEMAGIC INFRINGES CLAIMS 1 -3 AND ITS SUMMARY JUDGMENT MOTION MUST BE DENIED

### A. ServiceMagic's System Processes Requests For Quotes[5]

SM's noninfringement argument concerning quotes, set forth at pp. 16-17 of its memorandum, represents a misunderstanding of the requirements of claims 1and 3. There, SM indicates that the "online forms completed by homeowners on SM's website are not requests for

[5] Most of SM's production was not bates numbered, and other documents were pulled from SM's website. To make reference to the documents at Ex. D easier, all documents have been separately hand numbered, and it is to those numbers that we refer here.

quotations because they do not contain sufficient information… to enable a contractor to respond with a quotation containing price and any other essential terms".

First, the underlying logic is fatally flawed. It simply does not follow logically that ***because*** something does not have everything needed to give the quote, it can not be a request for a quote. A person can conventionally telephone any painter or other service technician, indicate they are interested in having three rooms painted, for example, and ask for a quote. The fact that the painter says he will come to review the project, measure the rooms, etc., and then provide his written detailed quote at that time does not mean that the person has not ***requested*** a quote.

Indeed, when anyone conventionally wants any service, such as roofing services, it is typical practice to call several roofers and have each of them come to give a quote. Many yellow pages advertisements indicate that the contractor will come to give a free quote. The consumer would ***never*** convey all the information needed to give the quote in the phone call. Thus, the logic of SM's position, that submitted forms are not RFQ's "***because*** they do not contain sufficient information…to enable a contractor to respond with a quotation" is simply incorrect, and in conflict with the way RFQs always work.

Second, the one way embodiment does not require that contractors respond with a quotation containing price or other essential terms – or that contractors even respond at all. Nor is there any requirement that the RFQ must contain enough information to actually generate the quote. As discussed further below, the exemplary embodiments of the '328 patent, as well as the ordinary meaning of RFQ, are to the contrary.

Instead, the relevant limitation of claim 1 is met if consumers looking for a quotation can submit their RFQ, have it filtered and routed to potential contractors who may be able to supply the quote, according to the patented filtering methods, and then get a "response from said

selected network members, or a list of said selected [contractors] for said generator of said request to establish independent communication." ('328, claim 1) Notably, the "response" may be by email, telephone or other means ('328 patent, col. 6, lines 9-11), and, unlike other claims in the '328 patent, does not require a quote to be immediately returned.

The SM system meets this limitation two different ways. First, in response to the consumer's RFQ, SM provides the consumer with such a list of the selected vendors, with names and contact information, and a large message that states "CONTACT YOUR MATCHING PROS NOW!" (Ex. A). Second, in accordance with SM's instructions, the contractors call/email the consumer to respond as claim 1 also states. (Ex. D and Kaplan Dec.) Accordingly, SM's entire discussion of RFQ's not containing enough information to return quotes is a red herring, because there is nothing in the claims (or the '328 patent specification) that imposes such a requirement, and as discussed below, the '328 patent actually teaches to the contrary. [6]

Claim 3 recites that after the vendors receive the RFQ, any quotes they wish to submit may go directly from the vendor receiving the RFQ to the buyer, outside of the computer system. According to the '328 patent, this can be by email, telephone, or any other means. ('328 patent, col. 6, lines 9-11).

SM tells contractors that when the contractor receives a lead, it should "Contact the customer ***to quote on their repair***, maintenance, or remodel project." (Emphasis added)(Ex. D, at 1). According to SM, vendors should respond with either "a quote or additional information [needed to send the quote]." (Ex. D, at 2). This is because SM customers, who SM here claims are not looking for quotes on their work "ha[ve] indicated their desire for getting this work done

[6] ServiceMagic does not dispute here that it does all the filtering in accordance with the claims. That will be discussed further below in connection with SST's cross motion.

(or receiving an estimate depending upon the type of work) and thus you should approach the call ***presuming the scheduling of the work or the bid.***" (Emphasis added) (Ex. D, at 18).

Moreover, SM consumers who submit these requests "know exactly what they want, have thought through every aspect of their project… are ready to buy, from you, ***right now***". (emphasis added). They are all "ready to act, ready to hire, ready to buy." (Ex D, at 4, and 7). According to one SM executive, a good referral service does ***not*** send " simply a list of consumers who expressed interest in finding a cleaning service…" (Emphasis added, Ex. D, at 5, "Lead Quality").

After consumers receive the list of service contractors, according to SM, they should "Get free estimates [from responding contractors], then pick a pro" but they should also make sure "each estimate details your specifications". (Ex. D, at 20, 23). SM further advises that a consumer should "make sure the following…are included in your contract" before signing: "a detailed description of the work…dollar amounts associated with each task…anticipated start and finish date...payment schedule…" and numerous other terms. SM advises that the consumer may need to "give the contract [provided by the contractor] to an attorney for review" before signing. (Ex. D 21-22). In fact, pages 1-24 of Ex. D are only a tiny sampling of SM material produced in this case, but those documents are replete with representations from SM that its consumers are using the website to obtain contractors who then call, email or otherwise meet with them and provide proposed contracts to sign to complete the work. (See Ex. D, entirely).

SM admits in its brief that the vendors and buyers in its system directly work together to provide the quote and sign the contract (SM Brief, p. 17), and the evidence at Ex. D is irrefutable on this issue. Thus, in accordance with claim 3, SM vendors are "communicating their

quotations…directly to the buyer", trying to close the job. Indeed, the carpet request shown in Exhibit B resulted in the vendors calling and emailing, asking for an appointment to come measure to provide a quote for the carpet, just as described at column 6 of the '328 patent. (Kaplan Dec., herewith).[7]

Thus, SM's requests for "referrals" are requests from someone "ready to buy" something, and are expected to result in a list of contractors supplied to the consumer and in the contractors responding by "contact[ing] the customer to quote on their repair, maintenance or remodel project" with a written proposals with price and other terms to supply whatever good or service the consumer is "ready to buy." Far from avoiding infringement of claims 1 and 3, this merely shows that SM is practicing ***one of the preferred embodiments of claims 1-3 described in the '328 patent***. ('328 patent, col. 6, lines 9-11, noting that communications between buyers and sellers after the RFQ is routed may be by telephone or any other means, and claim 1, requiring only that a list of selected vendors be sent back to the buyer for "independent communication" – not for quotes. See also '328 patent, col. 3, lines 1-2). To argue that operating a system that not only literally meets the claim language, but which is precisely the preferred embodiment of claims 1 and 3 disclosed repeatedly in the '328 patent specification itself, is a ***defense*** to an infringement claim, is odd to say the least. Instead, this entitles SST to a finding that the relevant claim limitations are being practiced, and SM's motion must be denied.

[7] Vendors pay SM for each lead, whether they close or not (Ex. D, p. 18). Thus, they are more than motivated to contact the buyer directly to provide a quote and attempt to close the job. Additionally, SM can not be heard to claim that its contractors do not follow the very instructions given to them by SM to quickly follow up, submit their quotes, and presume the close. *Moleculon Research Inc. v. CBS Corp*., 793 F.2d 1261 (Fed. Cir. 1986); *Mickowski v. Visitrak,* 36 F.Supp.2d 171 (S.D.N.Y. 1999); *aff'd* 230 F.3.d 1379 (Fed. Cir. 2000)(Unpublished) (Both holding that when infringer instructs customers to do something, it can not defend infringement case by claiming customers may not have followed the infringers instructions.)

**B. In the Process of Attempting to Religate Issues Already Decided, ServiceMagic Has Conceded the Infringement Issue in Its Entirety**

At its core, SM's "quote" argument is really an improper attempt to read the claims as if the patentee disclaimed any system wherein the RFQ is missing any last detail that is needed to fully quote the desired good or service. (SM brief, pp. 16-17, RFQ's "are not requests for quotations ***because*** they do not contain sufficient information from the homeowner about the contemplated project to enable a contractor to respond with a quotation containing price and any other essential terms")(Emphasis added). While this factual assertion is blatantly false – Ex. D at page 7 clearly notes the requests include details and "every aspect" of the project, and permits the contractor to "ballpark the job ahead of time" – even if it were true, it would not entitle SM to summary judgment.

First, this Court considered extensively SM's disclaimer theories and its proposed definition of RFQ, and rejected them both in the Markman ruling. (Opinion, October 16, 2006). SM is simply trying again to litigate the construction of the claims on issues that were already decided adversely to it. The definition of RFQ does not include a requirement that it contain everything necessary to generate the quote.

Second, even if the logic weren't flawed and the argument untimely, it is wrong on the merits. While the '328 patent notes that quotes can be provided by email, it also states that in response to an RFQ, "***communications*** [not only quotes] between buyers and sellers may be by telephone, email or other means". (Emphasis added)('328 patent, col. 6, lines 9-11). Similarly, claim 1 indicates buyers and sellers, in response to the routing of the RFQ, can establish "independent communication", or that a buyer can receive a "response" from a vendor, which contrasts with many of the other claims that require "quotes" to be returned. (Compare '328 patent, claims 1, 4, 17)

Thus, it is indisputable that the '328 patent contemplates - and claims - a system wherein the response to the RFQ is not a quote, but merely a responsive phone call or email from a selected vendor to discuss the RFQ – "independent communications" - or a list of vendors for the buyer to contact who might be able to supply the requested quote. Accordingly, there is simply no basis to read into the '328 claims a requirement that the RFQ include everything needed to give the quote and prohibit the contractor from gathering further information prior to doing so, because such phone calls and contact would of course result in further discussion concerning the proposed project, and because there is not even a requirement in claim 1 that a quote be returned at all.[8]

Third, while SST has shown above that the '328 patent actually contemplates a system wherein any quotes ultimately provided would actually be based upon contact, phone calls or emails beyond the original RFQ, let there be no mistake – this is not SSTs burden. Even if such a system were not disclosed in the '328 patent, it would be ***clear legal error*** for this Court to exclude such a system from coverage on the basis that it was not disclosed in the '328 patent.

The recent case of *Fuji Photo Film, Ltd. v. ITC*, 386 F.3d 1095 (Fed. Cir. 2004) is exactly on point. At issue in *Fuji Photo* was a three step method claim for loading film into a special type of camera. The patent specification showed that all three steps should be performed in a darkroom, and contained no disclosure of any of the steps being performed in the light. The lower tribunal so limited the claim, but the Federal Circuit reversed:

> The Commission's argument that "there is no suggestion in the '649 patent that steps 2 and 3 of claim 1 could be performed outside a darkroom" has it backwards; ***the proper question is whether the specification indicates that the second and third steps cannot be performed outside a darkroom***, and thus that the claim must be interpreted more narrowly than its language

[8] It is also worth noting that the '328 patent throughout discusses the procurement of goods and "services." ('328 patent, see, e.g.; Summary of the Invention, paragraphs 1-3, claim 1). Most if not all such services would require an on-site estimate, or further specifics.

> appears to require. *See Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002) (an accused infringer cannot overcome the heavy presumption that claims should be given their ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification"); *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed.Cir.2004) ("the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope"). (Emphasis added)

In the SM system, quotes are directly supplied to the consumer by SM contractors, a fact not denied by SM. Claim 3 states that selected vendors "communicat[e] their quotations either directly to the buyer or…..". Also, the SM system supplies a list of selected vendors to the consumer, with a note to CONTACT YOUR MATCHING PROS NOW!" (Ex. A). Claim 1 states that the system provides " a list of said selected network members for said generator of said request to establish independent contact". SM acknowledges so in its brief, and it is thus indisputable that the SM system meets the literal claim language.

SM thus must overcome a "heavy presumption that claims should be given their ordinary meaning" by showing a clear and unambiguous disclaimer. *Fuji Photo Film, Ltd,* at 1105*;* See also, *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed.Cir.2004) ("the claims of the patent will not be read restrictively unless the patentee ***has demonstrated a clear intention to limit the claim scope***"). (Emphasis added). The fact that the '328 patent affirmatively discloses the embodiment SM says was disclaimed simply makes SM's disclaimer argument borderline frivolous, but it is not SST's burden nor this Court's role, to find the SM system disclosed identically in the '328 patent. Instead, SM's total failure to point to a clear and unambiguous disclaimer of any system where the RFQ contains anything less then all details needed to give the quote requires rejection of SM's position. There is simply no basis in the '328 patent or otherwise to exclude from coverage the SM system that literally meets the claims language

simply "because" the RFQ does not contain everything needed to return the quote.[9]

Finally, far from establishing its entitlement to summary judgment, SM has essentially conceded the infringement issue. Specifically, SM argues that it is a lead service that processes "requests", supplies names of contractors to consumers, and those consumers' names to the contractors, and that it leaves it to those entities to communicate and if they wish, enter into a transaction. (ServiceMagic Br. p. 17). Not only do claims 1-3 of the '328 patent claim precisely such a system, but Col. 7 of the '328 patent describes it exactly:

> The request or requests are telecommunicated to a quotation network computer and is thereafter routed to the specified class of vendors…Vendors in the defined class respond to the buyer's request for quotation and the buyer ***may*** purchase from a responding vendor. (Emphasis added).

Vendors "respond" – not necessarily with an immediate quote, and not necessarily through the computer system. Such response can be by telephone or email, or other means. ('328, col. 6). SST is entitled to summary judgment on the "request for quote" issue, because this is exactly what SM itself claims its system does.

**C. SM System Offers Standard Goods and Services**

SM asserts that it is entitled to summary judgment on the infringement issue because its system does not use standard goods and services. In support of this erroneous assertion, SM notes that since "the scope, nature, and cost of any given home project depends upon numerous

[9] According to SM, a system in which the contractor calls the consumer and states "I'm calling to give you my quote on that project you requested through ServiceMagic to paint three rooms. It will be $400" would constitute infringement of claims 1 and 3. However, the system would be non-infringing if the contractor stated: "I'm calling to give you my quote on that project you requested through ServiceMagic to paint three rooms. It will be $400, unless I need to do extra spackling. I'll let you know for sure when I see the walls if I have to charge another $50 for the spackling". This is because in the latter situation, the RFQ would not have enough information to give the quote. There is no basis in the '328 patent or otherwise for such an artificial distinction.

factors…", it is not amenable to standardization. (SM Brief, p. 11). SM's main error is that it is reading the patent and this Court's Markman ruling incorrectly, but even if that were not the case, summary judgment in SM's favor would be inappropriate.

**D. SM Misconstrues this Court's Markman Ruling**

Before turning to the reasons why SM's "standard" argument is without merit, it is important to note that SM is attempting to convince this Court that it ruled in a manner that it did not. Specifically, at page 4 of its Opinion of November 13, 2006 this Court correctly quoted the following language from the '328 patent:

> The goods and services must be standard items to ensure that there is no confusion….

The parties had been disputing whether or not that language limited the claims, or was merely an exemplary embodiment of the '328 patent. SM's entire position was based only on the idea that the phrase "goods and services must be standard items …" was a limitation of the claims. (SM Markman Brief, filed December 7, 2006, at p. 22). After discussing extensively the word "must" and the applicable case law concerning that term, and further correctly citing the above "must be standard items" language again at page 5 of that Opinion, this Court agreed with SM, held that the foregoing language was not exemplary, but mandatory, and did limit the claims. (Opinion on Reconsideration, November 13, 2006, at Ex. N hereto).

However, at page 3 of the same November 13 Opinion, this Court purported to quote the '328 patent, but inadvertently this time misquoted the above language as "the goods and services must be ***standardized*** items to ensure…."(Emphasis added). The Court then ruled that goods and services in the claims must be standardized, as a result of the subject language. Given that

the Court's ***entire analysis*** in the November 13 Opinion was directed to the issue of whether "the goods and services must be standard items", and case law discussing "must", the Court's use of standardized was clearly intended as a slightly different grammatical form of the word standard. (November 13 Opinion). The holding of the November 13 Opinion simply read the phrase "must be standard items" from col. 3 of the '328 patent as mandatory to the claims.

However, standardize and its other form, standardization, also has other meanings that are ***drastically different*** from merely a different grammatical form of standard as this Court used it, a fact of which SM tries to take advantage here. The two ***different*** meanings between standardized and standard were maintained by the patentee consistently, strictly, and repeatedly throughout the entire '328 patent specification to mean ***very*** different things.

After convincing this Court to rule that ***because of, and only because of,*** the '328 patent stating that "goods and services must be standard items" the claims should be limited to standardized items, SM bases its ***entire analysis*** on a definition of standardized that is ***drastically different from*** that of standard, and which is thus contrary to this Court's Markman ruling.

Basic judicial estoppel, as well as fairness and common sense, prohibit such a result. And when the correct interpretation of "standard items" is used, SM's entire brief falls to dust because its goods and services are just as standard – indeed more so – than those of the '328 patent.[10]

### E. Standardized Does Not Always Mean Standard, and Clearly Does Not Mean Standard in the Context of the '328 Patent

First, standard means "**Usual, common, or customary: Chairs are standard furniture in American households**" or "**Normal, familiar, or usual….commonly used or supplied"**

[10] As shown later herein, even if SM were correct in its definition, summary judgment in SM's favor would still be inappropriate because even under SM's "standardized" analysis, its products and services meet the claim language.

(Ex. E). This is consistent with common usage, as well as the '328 patent's usage, which notes that "A potential user accesses the Internet using any standard Web browser." ('328 patent, Col. 4, line 67 – col. 5, line 1). For example, doors, screws, hinges, and drills are standard hardware items, just as the dictionary states that chairs are standard furniture in most homes, even though there are many different types of drills, doors, chairs, etc. that require further specification before an accurate quote on a specific item can be given. Voltmeters and computer monitors, the exemplary goods from the '328 patent, are also standard items in the electronics business described in the '328 patent.[11]

Second, confusion is defined as "when people do not understand what is happening, what they should do or who someone ***or [what] something is***" (Ex. F).

Substituting the proper definitions into the sentence that states "Goods and services must be standard items to ensure there is no confusion…." yields a meaning drastically different from that put forth by SM: "***Goods and services must be usual, commonly supplied, customary items - commercially known and familiar to people - to ensure that buyers understand what is being offered.***"[12]

If a good or service is not commonly available and familiar to system users, but is instead some new and unique product of a particular seller – hopsidutical widgets - users reviewing a list of items on a computer would not understand what is being offered. And, because the '328 patented technology matches consumers seeking goods and services from vendors ***unknown to them***, there would be nobody to even call or ask for more explanation. So, a consumer would sit there looking at his menu of goods and services to order on his computer, totally confused about

[11] Defendants themselves represented to this Court, in arguing that the "must be standard items" language was a limitation of the claim, that "certainly nails are a commodity and a standard item." (Markman Hearing, March 31, 2006, Tr. p. 46)

[12] The same is true for sellers being confused about what a buyer wants to buy.

what a hopsidutical widget even is, with no means to get further information, and thus, no chance of ever ordering it.

To avoid this confusion "as to…what sellers are offering", the '328 patent notes that "The goods and services must be standard items" – common usual and customary goods and services that are familiar to the user population. The exemplary embodiment in the '328 patent relates to the electronics industry, and thus, voltmeters and computer monitors are "commonly supplied" and "familiar" – i.e.; standard items, just as the "standard Web browser" referred to in the '328 patent – notwithstanding the fact that merely specifying a computer monitor as the '328 patent contemplates still leaves many details to be filled in before a quote can be generated.

Unlike the "common" and "familiar" definition of standard (i.e.; chairs are standard household furniture), standardized can mean "brought into conformity with a standard;" Standardized thus implies a requirement of ***conformance*** – properties something ***has*** to have. Standardized items have certain required properties in common. DVD players are standardized – they all read the same format of encoded music and video. MP3 music players and high definition TVs are standardized to process a specific format of signal.

This distinction was repeatedly and strictly respected by the patent owner throughout the '328 specification. Every time the '328 patent talks about ***conforming*** different things, it speaks of standardized. And every single time the '328 patent refers to usual, commercially known, familiar, common, or customary, it uses standard – without a single exception. In fact, there are no less than ***fifteen*** different reasons directly in the '328 patent why this distinction is clear and inescapable, not the least of which is that it refers to standard services in a manner that

specifically provides that the specific parameters of the service may vary from job to job – the very reason SM claims its system does not infringe.[13]

### F. The '328 Patent Consistently Uses Standard and Standardized to Convey Totally Different Concepts

For the Court's convenience, the language in issue is reproduced here:

> However, the goods and services must be **standard** items to ensure that there is no confusion as to what buyers are requesting and what sellers are offering. (Col. 3, lines 63-65)
>
> [The '328 system] would include information sufficient for network members to identify **standard** goods or services that they wish to identify in a request for quotation. **Standardization of product or service descriptions** is essential to avoid confusion unless a more text oriented specification is appropriate to the product or service type. To this end preprogrammed menu information is provided to classify product and services into categories broken down by functional class and subclass corresponding to the products as they are **commercially known and identified**…providing **standardized** information to network users is necessary to correlate product or service identifications. (Emphasis added) (Col. 4, lines 7-31).
>
> A potential user accesses the Internet using any **standard** Web browser…(Emphasis added)(Col 4, line 66 – Col. 5, line 1).

First, there is a strong presumption that different words have different meanings, a rule of law not only acknowledged, but emphasized, by SM. (SM Brief, at 17, citing *Tandon Corp. v. US Int'l Trade Commission*, 831 F.2d 1017 (Fed. Cir. 1987)). Here, given that the two words have potentially drastically different meanings – standardized may not mean merely common,

---

[13] SST, while not waiving its right of appeal with respect to this Court's limiting the claim to "standard items", nonetheless does not take any issue with this Court's use of standardize in the November 13 ruling, because it is clear from that decision that this Court used that language as synonymous with "standard items", and as merely a way of implementing its holding that the "must be standard items" language was required by the claims. By analogy to one famous children's story, the Court examined language in the specification that stated that the drapes and window shades must be closed to keep the room dark. After the parties debated whether this was a limitation of the claims, the Court ruled it was, and that the claims do require that the drapes and shades be drawn prior to practicing the invention. SM, harping on the word "drawn", is now claiming that the claims require that someone must draw a picture of the drapes.

familiar, or usual - and that both words are used as adjectives to modify different nouns in the same paragraph, and different words repeatedly throughout the '328 patent, the presumption is even stronger than normal.

Second, col. 4 of '328 patent states that the '328 system provides "***standardized*** information to network users…to correlate product or service ***identifications*** for buyers and vendors***".*** This Court already ruled that this language is not directed to what the items are, but instead "simply suggests how the network member can ***identify*** the standard goods or services that are the subject of his request." (Emphasis added) (November 13 Opinion, Ex. N hereto). Thus, the discussion at col. 4 of the '328 patent, where the term ***standardized*** is used, is about parties ***conforming*** the manner in which they identify goods and services, so that buyers and sellers identify the same item the same way – a couch is a couch, and not a sofa - hence the word standardized, not standard.

Third, one sentence in column 3 of the '328 patent says that the way to avoid confusion is to use "standard items" and another sentence ***in the next column of the patent***, which discusses a totally different topic, says the way to avoid confusion is to use "***standardized***…***descriptions***" (Emphasis added). If these mean the same thing, standardized, and avoid the same confusion, why would the patentee not have just said that confusion is avoided by using "standardized goods, services, and product and service descriptions…?" Why wouldn't they just be in the same statement, rather than in two different sections of the patent that speak of two totally different topics – using two different words, with two different meanings, separated by half a column of text?

When standard is interpreted as "commonly supplied" or "usual", and standardize as "brought into conformity" it makes perfect sense that these two different topics would be treated

differently in the ‘328 patent. By using commonly known items, familiar to system users, everyone will understand what the offered items are. By conforming the manner in which buyers and sellers identify those common items – agreeing in advance that everyone will call a sofa a sofa and not a couch - the system will avoid a different problem – failing to match couch buyers with sofa sellers. So the patentee simply discussed two completely different things in two different places.

Fourth, the ‘328 patent also uses standard as an adjective in the sentence that bridges cols. 4 and 5: “A potential user accesses the Internet using any standard Web browser, and becomes a quotation network user…” The clear, indisputable meaning of standard in the above sentence is “commonly used or supplied”, which can literally be substituted for “standard” without changing the meaning of the sentence at all. Just as users can order any standard items (staplers, carwashing services, etc.), they can do it with any standard Web browser – even though the Web browsers may vary drastically in their particular features, and even though such features may not be specified.

SM’s interpretation would require this Court to accept the proposition that when the ‘328 patent used the same adjective “standard” to describe goods and services, the patentee meant ***something different*** from when he used “standard” - the same word – to describe a Web browser just a few paragraphs later. Yet, SM also asks the Court to accept the idea that when the patentee used the word “standard” at the bottom of col. 3 and the top of column 4, he meant the ***same*** thing as the different word “standar***dized”***, which has a different meaning, and is also used at column 4. Thus, SM’s position is that when the patentee changes from one word to another word with a different meaning, in two adjoining sentences, he really means the same thing, but when he twice uses the same word in the same way, he really means two different things. SM

has certainly pointed to nothing in the '328 patent to support such an extraordinarily odd conclusion, and it thus must be rejected.

Fifth, the change at col. 4 of the '328 patent from standard to standardize is immediate, glaring, and deliberate. The programming enables "network members to identify standard goods or services that they wish to identify in a request for quotation. ***Standardization*** of product or service descriptions…" Whatever the patentee meant by standardize, why would he use a different term with a different meaning to convey that same concept in the ***immediately preceding*** sentence?

If standard meant what SM claims, ***why*** does column 4 of the '328 patent not state as follows:

> [The programming enables] network members to identify ***standardized*** goods or services that they wish to identify in a request for quotation. ***Standardization of*** product and service descriptions is essential to avoid confusion unless a more text oriented specification is appropriate to the product or service type….providing ***standardized*** information to network users is necessary to correlate product or service identifications. [The first standardized above actually reads "standard" in the '328 patent.]

Why, in the actual '328 patent text at col. 4, is the ***conforming*** information needed to ***correlate*** product or service ***descriptions*** being modified with the adjective "standardized", while the goods and services are being described as just standard items, not standardized as shown above, immediately prior thereto? One explanation for the change in wording is that the patentee intended to switch from "commonly supplied" to "conforming", which would be consistent with normal usage of the terms, and usage throughout the remainder of the '328

patent. This explanation is also fully consistent with the context of the entire passage. SM has offered no explanation at all, but instead, simply intentionally obfuscates this distinction.[14]

Sixth, the '328 patent refers to standard items many times throughout, yet each time, the term standard is used to denote common, commercially available, familiar, products. ***Never*** is the word standardized or standardization used in that context, despite the fact that standardize ***is*** used to refer to different things that conform. (Compare, use of the term standard, Col. 1, lines 49-50, col. 2, lines 45, col. 3, lines 63, Col. 4, line 66- col. 5, line 1 with the use of the term standar***dize*** at col. 4, lines 9-10, and line 27, to indicate compliance with certain properties) Thus, the two terms were used six different times in total, but the difference in meaning was always maintained. And, ***unlike*** the two uses of standardization at col. 4, in ***each and every one of*** the four places where the word standard is used, substituting the term "commonly supplied", or anything similar thereto, leaves the meaning unchanged. What possible basis is there to totally disregard that distinction and rewrite the meaning of the language here?[15]

Seventh, the '328 patent processes quotes on standard "services", not only goods. Virtually ***no*** service could be a standard service under SM's definition, because any standard service - painting, washing, accounting, computer repair, etc. - would always vary from job to job depending upon the specifics of the particular buyer. Indeed, rather than require all the

---

[14] Importantly, the Federal Circuit has been clear that it is not this Court's job to determine, from between the two reasonable readings, which is correct. Instead, absent a clear, unambiguous, disclaimer of scope, the term standard is entitled to its full ordinary meaning, which includes commonly supplied, usual, and customary. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999); *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). The fact that such meaning in the '328 patent makes perfect sense merely makes SM's position even more incorrect.

[15] Not surprisingly, when the word "common" or "commonly supplied" is substituted at col. 4 for the word standardization or standardized, a sentence that makes no sense results. Even more telling is that when the word "conformance" and "conforming" is substituted for the words "standardization" and "standardized", respectfully, those sentences remain unchanged in meaning. Similarly, if one replaces the four occurrences of the word "standard" in the '328 patent with "conforming", nonsense results again. Thus, in each and every place in the '328 patent, if the wrong word is paired with the wrong definition, the meaning is lost. Standard and standardize are thus ***never*** used interchangeably.

specifics of any job to be directly in the RFQ as SM argues, the ‘328 patent recognizes that the parameters of each job for the requested service may vary.

More specifically, col. 4 indicates that the critical requirement is only to make sure the standardized menus are “sufficient for network members to ***identify*** standard…services [e.g.; painting, wall papering, car washing] that they wish to ***identify*** in a request for quotation.” (Emphasis added). Only the service itself needs to be identified.

SM itself advertises that an advantage of its system is that users can “identify” the services they desire, and that once their “needs are identified” SM will facilitate communications between contractors who wish to do the job and the consumer. (Ex. D, p. 31). Thus, SM’s own description of its system reads substantially identically to the description provided at cols. 3, 6 and 7 of the ‘328 patent, and claimed in claims 1-3. In both the ‘328 patent and the SM system, users identify the services they want, and the system then facilitates independent communications between buyers and vendors likely to be able to provide those services to work out the details of the project - just as stated at col. 6 of the ‘328 patent. These services are no less identified simply because carpet installation, for example, requires the carpet installer to measure the room before calculating the cost or installing the carpet.[16]

Eighth, the language does not say, as SM would like, that using standard items avoids confusion ***between*** what buyers are requesting and what sellers are offering. This would be the case if the term “avoid confusion” at col. 3 were intended to ensure the system matches “apples

[16] The ‘328 patent does ***not*** state that the parameters of the rooms to be painted, the size of the walls, the type of car, or countless other parameters need to be specified in the RFQ. SM’s reading of “standard items to avoid confusion” as precluding any further information outside the RFQ from being used to formulate the quote makes no sense. Neither a consumer nor a roofer is “confused” because the roofer needs to measure the roof before quoting the project.

with apples" between buyers and sellers – essentially what SM claims by changing the word to mean conforming.

Instead, it states that standard goods will avoid confusion "***as to*** what…sellers are offering…." Confusion "as to" what something is means that others will not understand what the thing is, not that the system will confuse one for the other. (e.g., Let's stipulate to a briefing schedule, so there will be no confusion as to the due date of my opening brief and the due date of your responsive papers). The foregoing is not directed to avoiding switching the order or due dates of the briefs, or to conforming the due dates in any way, but to making sure ***each*** party knows what ***his*** respective due date is.

The ***standardization*** of product or service ***descriptions***, discussed at column 4 of the patent, is what avoids confusion ***between*** what buyers are requesting and what sellers are offering, by making buyers and sellers identify the same product in the same way, so that there is clarity between the two. The restriction of the system to commonly known, familiar goods and services – standard items - ensures that a buyer is not ***himself*** confused "***as to***" what services are being offered. Hence the term standard - not standardize - at col. 3 to avoid "confusion" – not knowing what something is. Standardize in the '328 patent instead deals with two different parties conforming the way they do something. [17]

Ninth, figure 2A and col. 7 of the '328 patent notes that a buyer can request a quote on a specific item - a model 225 disk drive – or a ***generic item***, such as computer monitors or volt meters. A vendor quoting "computer monitors" or "volt meters", of which there are thousands of types and specifications, would have the same ambiguity as the SM vendor quoting a water

[17] Even the most basic Internet search shows that "confusion as to" means that someone does not know what the thing is, because that is how that phrase is ***always*** used. (Ex. L, showing numerous uses of the phrase, consistently to mean lack of understanding about what the thing is, and never being used to mean mistaking one thing for another.)

heater or the attic fan of Ex. G hereto. In both cases, the "scope nature and cost", to use SM's argument, would also vary from user to user. What size computer monitor? Do you need it on a rush basis which costs more? Do you want the optional extended warranty? How long? Do you need a USB interface? What resolution should the screen have? When the language is properly understood, both the generic computer monitors of Figure 2A and the SM items are standard items, because both are well known, common items with which the user population to which the system is directed is ***familiar*** – literally the definition of standard.

Thus, these items would not confuse most users of the system – leave them not understanding what the product is. The consumers would instead understand the monitors come in different varieties, just as consumers understand that standard carpet installation service requires the rooms to be measured. Just as claim 1 and col. 6 of the '328 patent state, further communications to work out the specifics can be handled outside of the system, by phone, email, or "independent communication".

Tenth, the language at col. 4 notes that "providing ***standardized*** information to network users is necessary to correlate product or service identifications" and that "***standardization*** of product or service descriptions is essential to avoid confusion." The menus distributed to buyers and sellers with the conforming descriptions ensure a particular good or service is identified the same way, and thus, avoids mistaking one good or service offered for a different one requested.

However, if a product included in the menu distributed to system users is a hopsidutical widget – a unique item sold only by one or two vendors – the system will have another problem, even though both buyer and seller will have to identify that item as a hopsidutical widget. Users may not know what the item is that is being offered. The language of col. 3 solves this ***second*** problem, in an environment where consumers can not see the product, there is no salesperson,

and, when filling out a form to be matched with sellers, would not even have the name of a seller to call, as that is yet unknown. According to SM, the language at col. 3 is entirely superfluous and directed to the same issue discussed at col. 4. This makes no sense, particularly when there is an equally plausible reading that avoids the language being superfluous.

Eleventh, the subject text notes that "***Standardization*** of product or service ***descriptions*** is essential…to this end, preprogrammed menu information is provided to classify product and services in categories broken down by functional class and subclass corresponding to the products as they are ***commercially known…***Such menus are readily upgraded to include new and revised ***commercially available*** products and services…***"*** (Emphasis added). Thus, the preprogrammed menu information is used to ensure that buyers and sellers will ***conform*** the way they each ***describe*** the same desired product or service – as it is ***commercially known***. Hence, the term ***standardization.*** But the products or services themselves are described as commercially ***available*** and again at the top of col. 4 as "standard goods and services". That sounds a lot like commonly known, commonly supplied services - and nothing here either says a commonly supplied service such as carpet installation is not a commonly supplied standard home service simply because it involves measuring the room size before quoting.

Twelfth, SM argues that the type J resistor of Figure 8 of the '328 patent "will not cause any confusion" (SM Brief, at 13). Actually, a type J resistor is a real product that is sold in a large number of varieties that would require further specification. (Ex. I) Even after requesting a type J resistor - a standard item - the tolerance, quantities, shipment date, any special packaging instructions, etc. would all have to be specified before a quote could be given, and all vary among requests. In the two way embodiment of Figs 7 and 8 of the '328 patent, where a quote is being automatically returned as textually described at the bottom of col. 7, additional information

that may effect the "scope, nature and cost" of the request are specified as "buyer notes" as shown, and still further information may be specified directly in the RFQ. (See, Fig. 8, specifying 5% tolerance, quantity desired, etc.). In the one way embodiment, the same additional information can be conveyed when the buyer and vendor speak by telephone or meet personally, as stated at col. 6 of the '328 patent, and as SM contractors practice.

But the critical issue for present purposes is not ***how*** the additional information is specified. The important point is that a type J resistor is the standard product, yet RFQ's for type J resistors vary drastically from customer to customer depending upon requested tolerances, special shipping requirements, delivery dates, quantity requested, and any of an infinite number of other "buyer notes" that the consumer may insert, or convey to the seller in a phone call or meeting. (e.g.; I need them packaged 3 dozen per box). This is no different from a consumer ordering standard berber carpet needing to further specify the square footage, type of padding, etc. Thus, SM's argument, that because each request has some particulars unique to that customer, the service is not a standard service, would exclude the preferred embodiment, and must be rejected.

Thirteenth, the interpretation of "standard items" SM takes has the same problem as SM's belated RFQ definition. It disregards the fact that the '328 patent allows vendors to respond directly to the requesting buyer with a phone call or email, and that claim 1 indicates the response facilitates "independent communication". (Col. 3, lines 18-19, and col. 6, lines 9-11). That being the case, how could one possibly read the '328 patent as clearly and unambiguously disclaiming any system wherein the vendor discussed further the RFQ in that phone call?

Fourteenth, as noted at col. 7, of the '328 patent, all that is required for the system to work without mistakes is that the system properly route the RFQ to the proper class of vendors

that have identified an interest in quoting on that class of item. Thus, voltmeters, computer monitors, etc. – standard items - can be sent to vendors that have agreed to quote on that type of item. Any specifics thereafter, such as the type of voltmeter, size of computer monitor, etc., may be handled directly between the buyer and seller. (Claims 1, 3, Col. 6, lines 9-11).

Fifteenth, SM's own use of the word standard to describe its services is fully consistent with SST's position here, and normal usage of the terms in issue. For example, according to one letter written by the co-founder of SM, "standard pools take about three to six weeks to build, so plan accordingly." (Ex. D, at 29-30). Yet, the very same letter speaks of the various pools being constructed to suit individual tastes and specifications. *Id.* Pool installation services are actually offered at the SM website, and of course, are a standard home service, one of the "common" home services offered by SM. (Ex. B, first page) Thus, SM refers to its own services as either "standard" or "common" - the definition of standard. (Ex. D, p. 26 – 28). SM can hardly now claim that use of standard services in the '328 patent to describe common services is unusual, or that SM does not offer common or standard services.[18]

For all of the above reasons, SM's assertion concerning "standard" is wrong, because the '328 patent uses standard and standardize (standardization) differently, and the definitional distinction between the two can not simply be disregarded merely because the words sound similar, or because this Court used standardize in a slightly different manner to adjudicate the parties' dispute as to whether the phrase "must be standard items" at col. 3 of the '328 patent was a limitation of the claims.

[18] Other SM marketing material notes that SM is more effective than using "standard advertising efforts to obtain a new customer". (Ex. D, at 27.) Again, this means common, usual, and familiar, such as newspaper ads, yellow pages, etc.

### G. The Requirement for Standard Items is Different From the Requirement for Standardized Identifications, and the SM System Meets Both Requirements

When the two words in issue are properly distinguished, it is clear that the '328 patentee set forth two ***different*** requirements directed at two ***different*** technical issues. Taking services as exemplary, the system must use commonly supplied services that are familiar to system users so that everyone understands what services are being offered. Confusion - "not knowing what something is" is avoided. This is the text at col. 3 of the '328 patent, and which the Court ruled is required by the claims. SM complies with this by offering "common" services, in its words, that are familiar and understandable to its users – installation of a new shingle roof, repair of a water heater, etc. The offering of ***commonly supplied*** services avoids confusion by making sure buyers are not left in a state of "not knowing what" [the offered service] is" – confusion. (Ex. F, p. 2).

Second, unless a text oriented approach is proper, those services also must be identified by system users in an agreed upon manner. ('328 patent, col. 4). This avoids a different confusion – "taking one thing to be another". (Ex. F, p. 4) SM complies with this also, by ensuring that landscape architectural services are identified as such, and not as groundskeeper services by one party and lawn design services by another, a situation that would lead the system to believe there was no match when there really was a match between buyer and seller. This is a different confusion, which is why it is discussed totally separately in the '328 patent, and why it is avoided by standard***izing*** – conforming – the manner in which products and services are ***identified***.[19]

[19] The system also permits different identifications to be used, as long as they are "correlated" to one another (Col. 4, '328 patent).

Neither statement constitutes a clear and unambiguous disclaimer that excludes any services where the vendor and buyer discuss the matter after the RFQ is routed, instead of the vendor immediately sending a quote back through the system. Such a system is explicitly ***claimed*** in claims 1 and 3, and clearly and unequivocally disclosed as one of the exemplary embodiments at columns 3 and 6 of the '328 patent. Thus, there is no clear and unambiguous disclaimer that requires the RFQ to contain everything needed to give the quote, and SM does not avoid infringement on the this ground – even if is RFQ's did not specify everything needed to give the quote, a fact hotly disputed below.

### H. ServiceMagic's Motion for Summary Judgment Must Be Denied Regardless of What The Court Determines About Standard and Standardized

Having clarified the distinction between standard and standardized, we now turn to the merits of SM's motion for summary judgment. That motion, to the extent based upon the idea that SM does not sell standard goods and services, must be denied for three reasons, two of which are valid even if the Court disagrees with SST's analysis of "standard" above.

First, things like the installation of fans, water heaters, skylights, roofing and gutters, carpet, etc. are not things that most consumers have never heard of, or that cause consumers to not "understand… ***[what] something is***". Just as voltmeters and computer monitors of the '328 patent, they may require further specifics unique to each transaction, but they certainly do not leave anyone in a state of not knowing what something is. And the fact that users may communicate directly to work out the details of the quote is nowhere disclaimed in the '328 patent, and indeed, explicitly contemplated. (Claim 1, col. 6, lines 9-11).

Instead, all of the services offered on SM's website are common, usual, familiar services- "commonly used or supplied" to quote one definition of standard. In fact, SM itself

boasts that it offers "over 240 different ***common*** home service needs..." and in a later message from its co-founder, that it offers "490 common home services". (Ex. D, p. 26, 28). But common is quite ***literally the definition of standard***. (Ex. E, p. 5 "Usual, ***common***, customary") (Emphasis added). Thus, for this reason, SM's motion must be denied.[20]

Second, even if the Court were to erroneously equate standard with SM's extraneous definition of standard***ized***, standardized merely requires conformance, but does not mandate that there can not be different variations of the standardized product. Pencils are standardized in that there are number 2 and number 3 lead pencils, but each comes in countless varieties. Roofs are typically standardized as either 20 year shingle roofs or 30 year shingle roofs, but there are many types, sizes, and colors. Digital video disc players are standardized, in that they all read the same format of signal, but they too come in countless varieties.

SM's products are also standardized products, because all 40 gallon water heaters are the same volume, all gable mounted solar powered attic fans use the same type of power source and are mounted in the same way, sheetrocking typically involves quarter inch or half inch sheetrock, etc. Consumers wanting a quote on insulation choose from "Batt, Rolled, Foam, Poured, or Reflective" insulation – 5 different standardized types. Roofing customers also choose between standardized roofs - asphalt shingle, wood shake, or slate. And, homeowners needing electrical services select from among numerous standardized items, including GFI upgrades, installation of 220 volt outlets, fluorescent lighting, etc. (Ex. J).

Virtually all services offered on the SM website are standardized because they conform to certain requirements. GFI electrical outlets all have certain properties, and all conform to each other in this regard. They merely have different varieties within the standard, just as the

---

[20] SM services are also identified using standardized menus with classes and subclasses, just as taught at col. 4 of the '328 patent. (Ex. B). Thus, again, SM is "defending" this infringement claim by urging that it does not infringe because it practices the preferred embodiment of the '328 specification.

computer monitors and voltmeters of the '328 patent. And, like the embodiment of Figure 8 of the '328 patent, the desired product or service is specified (e.g., a type J resistor, or a 40 gallon water heater) and numerous other parameters must be specified that affect the quote. So, even if the term standardized were erroneously adopted, SM's motion must be denied because its services ***are*** standardized. (Ex. B, showing a number of standardized carpet installations on stairways, and standardized other items).

SM's argument about standard is really a repeat of its argument that the RFQ must be such that no further information may be gathered before a quote is given, because all information needed to give the quote must be in the RFQ. This is nowhere in the '328 patent, nowhere in the definition of standard, and nowhere even in the definition of standardized. And it is totally contrary to claim 1 and col. 6 of the '328 patent, which indicates that a vendor merely calls the buyer to further discuss the RFQ, and that the quote does not even have to be returned. It is totally contrary to the idea of requesting a quote on "computer monitors", leaving all the details to be worked out later. And, it is contrary to the '328 patent's teaching that for services, users ***need only correctly identify the standard service itself***.

In fact, the entire basis of the present dispute is the statement "The goods and services must be standard items to avoid confusion…." That statement simply does not say "The goods and services must be fully specified to the last detail in the RFQ so that no further information is needed to give the quote…" A carpet installer not "confused" because he wishes to measure the room to be carpeted before rendering his quote, nor is a plumber confused because he explains that the charge for putting in a water heater might be more if more piping has to be run.

Whether the consumer wants a type J resistor, computer monitors, a room of berber carpet, or a 40 gallon water heater, the specifics of the job such as quantity, etc. must be added,

and nobody is confused about that. And nothing in the ‘328 patent constitutes a clear and unambiguous disclaimer of any system, that is indisputably within the literal language of claims 1 and 3, but wherein additional information is conveyed outside of the RFQ, in the communications described, for example, at col. 6 of the ‘328 patent. Indeed, the entire result of claim 1 is no more than a list of potential vendors for the buyer to contact by telephone. How can the ‘328 patent clearly and unambiguously disclaim any system wherein the buyer and seller discuss that project, when the entire point of claim one is to facilitate such communications? *Fuji Photo Film, Ltd. v. ITC*, 386 F.3d 1095 (Fed. Cir. 2004) (“The Commission's argument that there is no suggestion in the ‘649 patent that steps 2 and 3 of claim 1 could be performed outside a darkroom has it backwards; the proper question is whether the specification indicates that the second and third steps cannot be performed outside a darkroom”)

Third, even if the Court were to adopt SM’s assertion that the RFQ must specify everything needed to give the quote – a position directly opposite the teachings of the ‘328 patent - summary judgment in SM’s favor would be inappropriate because SM would be infringing under the doctrine of equivalents. The doctrine of equivalents prevents insubstantial changes to the claimed invention to avoid infringement. *Valmont Industries, Inc v. Reinke Mfg. Co. Inc*, 983 F.2d 1039 (Fed. Cir. 1993).

The exemplary embodiment of the ‘328 patent, shown at Fig. 8, does not merely request a quote for a “Type J resistor”. Instead, the quantity, tolerance, delivery terms, etc. are all further specified, and all affect the quote. Similarly, a user of the SM system does not merely request a quote on a 40 gallon water heater. Instead, just as the example of Fig. 8 of the ‘328 patent, many other parameters are given in the RFQ, such as the type of power, etc. (Ex. B, G). In fact, using these other parameters, the contractor can “ballpark the job ahead of time.” (Ex. D, p. 7).

Thus, even if this Court were to accept SM's erroneous argument that all the terms to give the quote must be in the RFQ, the SM system is including in the RFQ ***almost*** all of the terms, so the contractor has ***almost*** everything he needs to give the quote – he can ballpark the job.

The last detail is conveyed during the phone call that is specifically contemplated by the '328 patent. If this does not entitle SST to summary judgment on the equivalents issue, it certainly, at the very least, creates a factual issue for a jury concerning equivalents, and thus precludes entry of summary judgment in SM's favor even if the RFQ is erroneously construed to require everything needed to give the quote.

In the end, SM's position requires the Court to accept at least four different legally erroneous ideas. First, two different words with two different meanings are to be treated as if they had the same meaning. Second, the ordinary definition of standard, which has not been disclaimed in any way in the '328 patent, should be narrowed – for reasons that presently remain unknown - to exclude the "commonly supplied, usual" definition of standard – even though substituting that definition for the word standard in the '328 leaves the meaning of the relevant phrases unchanged. Third, the '328 patent should be read as clearly and unambiguously disclaiming any system where, after receiving the RFQ with the desired standard product or service designated, the vendor gathers additional information or otherwise discusses the project with the buyer before conveying his quote - despite the fact that the '328 patent at Fig. 2A contemplates a system wherein generic computer monitors may be requested, and the user in response is supplied with no more than a list of vendors who sell computer monitors to call and further discuss the RFQ (Claim 1). And fourth, SST is entitled to no scope of equivalents on the term at issue.

Yet, SM points to nothing that would justify even a single one of the three disclaimers, and nothing from the patent file that would preclude the doctrine of equivalents from being used to establish infringement. For example, if a known definition of standard is common, commonly supplied, and if that definition makes perfect sense in the context in which that language is used in the '328 patent, ***from where does the authority come to simply change the word to something else with a different meaning?*** SM's motion for summary judgment of non-infringement must be denied, because its user request quotes and it contractors sell "common", standard home services.

## IV. THERE ARE NO MATERIAL ISSUES OF FACT IN DISPUTE WITH RESPECT TO SST'S CROSS MOTION, AND SST IS ENTITLED TO SUMMARY JUDGMENT ON THE INFRINGEMENT ISSUE.

As set forth herein, *supra,* the SM system allows buyers to insert a variety of conditions concerning desired products and services, and also then matches them with vendors. The vendors may also specify the types of jobs they want by entering a variety of filter conditions, and the filter conditions set by the buyer, service contractor, and the SM system are used to match potential buyers with up to four service contractors. (Ex. C, generally, and pp. 11-25, and 30-40). The SM system filter prioritizes vendors based upon their contractual relationship with SM and numerous other factors, and then caps the number of matching vendors that may receive the lead, exactly the preferred embodiment of the network filter in claims 1 and 3 that is also disclosed at col. 7 of the '328 patent. (Compare, '328 patent, col. 7, with Ex. C hereto).

In order to facilitate expert reports in a more streamlined manner, the parties agreed to update their contentions in late December, 2006, and early January 2007. This agreement was to bring current the parties' contentions after this Court's Markman ruling and after all the

relevant facts were revealed in discovery, and to focus the dispute on the specific claims left to be litigated. Only claims 1-3 are presently in issue with respect to SM.

SST updated its infringement contentions, and SM updated its response to the following interrogatory: "Identify, by specific claim language, any limitation in the claims of the patent in suit that defendant asserts it does not practice in the operation of its business." Ex. H hereto is a chart SM supplied in response to that interrogatory, showing SST's position with respect to infringement, and SM's noninfringement position, limitation by limitation.

As the Court can readily appreciate from the responses SM provided and the following discussion, each and every one of SM's defenses involves only a dispute of claim interpretation, and in each case, the operation of the SM system is agreed upon by the parties. Accordingly, there is no issue of fact, and SST is entitled to summary judgment on the infringement issue.

Taking SM's noninfringement contentions in the order in which they appear at Ex. H, SM first states that its consumers are not network members, apparently conceding that its service professionals are. However, when a consumer visits the SM website, he has a choice between "Member Login" wherein he enters a user name and password, or "Not a member? Click here to Register with Servicemagic" after which he is sent to a screen that requires a variety of personal information and details, such as name, email address, phone number, password, etc., to be filled in so he can become a network member. (Exs. G, K). The SM website also notes, "**I**NTRODUCTION TO SERVICEMAGIC. Upon your registration, you may choose your own password or ServiceMagic will assign you a password to access the ServiceMagic services through the ServiceMagic Web site." (Ex. D, p. 32).

Once a member, every time the individual goes back to the website, the user's name is displayed with choices to "rate your pros", view "Your Account" or other choices. The

welcome screen states "Welcome back, ____" with the person's name. (Exs. G, K). In fact, SM tells its consumers all about "Member benefits". *Id.*

A network member is "anyone or any company that has registered as a user by completing an application…" (Markman Decision, October 16, 2006). SM's own statement of undisputed facts, at item 4, in connection with its summary judgment motion, states "To use the ServiceMagic website, a homeowner must complete an online form that asks the homeowner to provide his or her name, geographic location…" SST is thus entitled to summary judgment that SM consumers are network members.

SM's next defense is that it does not process requests for quotes but instead, it processes requests for "leads". This has been addressed above. If SM consumers are not looking for quotes on new projects, what are they looking for the contractors to do? Get together for a social meeting? Have a date? For what are the contractors paying SM if not the right to bid on, i.e.; quote, jobs? And why does SM tell its contractors to "contact the customer to quote on their repair." (Ex. D, at 1). Why do all the documents at Ex. D, and thousands more like them, show the contractors responding to the "leads" by calling and/or meeting with the customer, and providing written proposed contracts for the customer to sign, just as the '328 patent describes? Why does the SM literature state that the consumers putting in the RFQ are counting on getting the work done or receiving an estimate?

SM is trying to improperly claim that its customers, the contractors, do not do what they pay SM for the right to do, and what SM tells them to do. This is no defense. *Moleculon Research Inc. v. CBS Corp*., 793 F.2d 1261 (Fed. Cir. 1986); *Mickowski v. Visitrak, Corp*, 36 F.Supp.2d 171 (S.D.N.Y. 1999); *Aff'd* 230 F.3.d 1379 (Fed. Cir. 2000) (Unpublished) (Both holding that when infringer instructs customers to do something, it can not defend infringement

case by claiming customers may not have followed the infringers instructions.) In any event, at the very least, claim 1 is infringed because it requires only the list of contractors to be returned to the consumer. (Compare '328 claim 1 with Ex. A hereto). SST is entitled to judgment as a matter of law on this issue, because again, a review of the parties' briefs reveals total agreement on how the system works.

SM's third defense is that it does not offer "standard" goods and services. But, SM states that it sells "common" home improvement services. (Ex. D, p. 26, 28). Common is, quite literally, the ***definition*** of standard. (Ex. E, p. 5). To avoid this limitation, SM would have to show that all of the items on its offering list at Ex. B hereto are unique, unknown goods or services such that consumers are confused about what is being offered. All SM can show is that each job may require measurements or jobsite review to quote, a fact which SST will dispute, but which SST accepts as correct for purposes of SST's present motion only. But even if true, that is not "confusion" and does not mean that the offered services are not common – SM advertises that they are. Thus, SST is entitled to judgment as a matter of law on this issue.

The foregoing constitutes each and every "limitation in the claims of the patent in suit that [SM] asserts it does not practice in the operation of its business" with respect to claim 1. Accordingly, SST is entitled to summary judgment that SM infringes claim 1.

SM's defense to claim 2 is that not all of its consumers contact SM through the Internet. SM's 30(b)(6) technical witness believes three percent of its RFQ's do not come from the Internet. (Ex. C, p. 40). However, whatever small percentage use some other methodology merely goes to the damages to which SST is entitled, but clearly Ex. B and D hereto show use of the Internet by consumers, a fact verifiable, and indisputable, at www.servicemagic.com. Thus, summary judgment in SST's favor is appropriate at this time.

With respect to claim 3, in addition to repeating the same defenses stated above, SM adds only two more. First, since the preamble of claim 3 states that the RFQ's come from a "party representing a buyer and/or supplier of goods and/or services", SM asserts that it does not infringe because its users interact directly with the system, and do not hire someone else such as an agent or representative to do so. Represent merely means to "act the role of." (Ex L) For example, "He represents one of the finest cardiologists to ever practice medicine."

The language of claim 3 merely means that a computer can be configured to act in the role of a buyer or a seller. This is discussed at col. 7 of the '328 patent, lines 54-65: "Users can be buyers and/or vendors…. A typical situation in which a user who is predominantly a buyer may choose to be a vendor." SST is entitled to summary judgment on the issue.

And finally, SM asserts that it does not infringe claim 3 because, in its system, "The operating system software does not set filter conditions". Claim 3 does not require that the operating system set filter conditions. Instead, claim 3 states that filter conditions are set by the "buyer, vendor and the network software". Column 7, lines 45-47 of the '328 patent, states "the network software may be arranged to limit the number of vendors to receive the request for quotation." In any event, any software would have to run under the control of the operating system, so the network filter would of course involve the operating system.

SM's 30(b)(6) witness states that the SM system is programmed to limit the number of contractors that receive the RFQ, in order to maximize the benefit to the contractors. (Ex. C, p. 41). Summary judgment in SST's favor is appropriate on this issue as well.

No other defenses are asserted by SM to SST's infringement claims regarding claims 1-3.

## V. CONCLUSION

The Court should grant SST's motion for summary judgment on the infringement issue, and deny that of SM.

Respectfully submitted,

KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ 07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*

Dated: March 20, 2007

By: s/Jeffrey I. Kaplan/
Jeffrey I. Kaplan (JK 4706)