**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------

SOURCE SEARCH TECHNOLOGIES,    :
LLC,

                                   :

                 Plaintiff,        :              Civ. No. 04-4420 (DRD)

                                   :

                 v.             :

                                   :

LENDING TREE, LLC,             :        **O P I N I O N**
IAC/INTERACTIVECORP, and     :
SERVICEMAGIC, INC.,

                                   :

                 Defendants.     :

                                   :

-------------------------------------------------------

Jeffrey I. Kaplan, Esq.
Michael R. Gilman, Esq.
KAPLAN, GILMAN, GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, New Jersey 07095

*Attorneys for Plaintiff Source Search Technologies, LLC*


Kevin J. McKenna, Esq.
Elvin Esteves, Esq.
GIBBONS, P.C.
One Gateway Center
Newark, New Jersey 07102-5310

A. Shane Nichols, Esq.
James J. Mayberry, Esq.
KING & SPALDING, LLP
191 Peachtree Street
Atlanta, Georgia 30303

*Attorneys for Defendants Lending Tree, LLC, IAC/InterActiveCorp, and ServiceMagic, Inc.*

**DEBEVOISE, Senior District Judge**

## I. PROCEDURAL HISTORY

Plaintiff, Source Search Technologies, LLC ("SST") instituted this patent infringement action against defendants, Lending Tree, LLC, ("Lending Tree"), IAC/InterActive Corp. ("IAC"), and ServiceMagic, Inc. ("Defendant" or "SM") (collectively, "Defendants") alleging infringement of U.S. Patent No. 5,758,328 (the "'328 patent"). Defendants deny infringement and assert that the '328 patent is invalid and unenforceable.

On October 16, 2006, the court filed a Markman opinion in this case, construing the terms of the '328 patent (the "Markman Opinion"). On November 13, 2006, the court, upon SST's motion for reconsideration, reaffirmed its holding of that portion of the Markman Opinion construing the term "Goods and Services." Defendant, ServiceMagic, and Plaintiff now cross-move for summary judgment. For the reasons stated below, Defendant's motion will be denied and Plaintiff's motion will be granted.

## II. BACKGROUND

SST is the owner by assignment of the '328 patent entitled COMPUTERIZED QUOTATION SYSTEM AND METHOD. The '328 patent relates generally to computerized buying and selling of goods and services over a data network, such as the internet. SM operates a website that matches homeowners with pre-screened contractors for a variety of home projects.

**The '328 Patent**

The application for the '328 patent was filed on February 22, 1996. The patent issued on

2

May 26, 1998, and has 19 claims.  SST has asserted claims 1-7 and 11-14 against one or more of the Defendants.  The asserted claims include four independent claims (claims 1, 3, 4 and 12).  Independent claims 1 and 4 are systems claims, and independent claims 3 and 12 are method claims.  The remaining asserted claims depend from these independent claims.

As computers became more commonly used for the purchase and sale of goods and services there arose the problem of the prospective buyer having too many or too few options from which to choose.  The central database system was one in which a single database contained everything the consumer needed to find the item he or she wanted and complete a purchase of that item; as, for example, the price, terms, quantities and all other information required to sell all available goods and services from many different vendors.  Maintaining a large central database current and properly managed was difficult due to the large number of products and vendors and the ever changing details of each product or service offered by such vendors.  On the other hand, a system wherein the buyer would directly connect to a specific vendor over the computer network and complete a purchase required that the buyer know in advance the identity of the vendor from which he or she sought to obtain the product or service, and comparison shopping was difficult.

The invention of the '328 patent addresses the too much or too little problem.  Very simply, there is no central database containing all the information needed to complete a transaction.  The buyer can establish "filter conditions" which limit the vendors to which the buyer's request for a quotation ("RFQ") will be sent; and similarly the vendor can establish filter conditions which will limit the buyers to which its quotation will be sent.  The network itself can also establish a third set of filter conditions to limit or otherwise prioritize the vendors which

3

receive the RFQ.

The '328 patent is generally directed to a "computerized quotation system" for processing RFQs for goods and services between network buyers and vendors. Col. 3, ll. 55-62. More particularly, the computerized quotation system of the '328 patent processes RFQs received from "network buyers," i.e., buyers who are registered with the system, and uses "filter conditions" to match those RFQs with "network vendors" who have registered with the system to receive RFQs meeting certain preestablished criteria. See, e.g., Col. 4, ll. 1-4; Col. 5, ll. 9-21. The '328 patent indicates that the goods and services must be "standard items" . . . "unless a more text oriented specification is appropriate to the product or service type," to enable routing the RFQs on the basis of the filter conditions alone. See e.g., Col. 3, ll. 63-65, Col. 4, ll. 9-12. The vendors that receive the RFQs may respond with quotations for the goods or services identified in the RFQ.

The '328 patent purports to eliminate the need for a central database of the goods and services available from the vendors, by storing filter conditions set by the vendors, that enable the RFQs to be routed to the appropriate vendors. The computerized system of the '328 patent does not include a "central database of goods, prices, etc." See, e.g., Col. 2, ll. 41-42; Col. 3, ll. 60-62. For example, in the Background of the Invention section of the '328 patent, the inventor specifically distinguishes his purported invention over prior art systems that include such central databases. See, e.g., Col. 1, ll. 53-56 ("It simply is not feasible for central database systems to satisfy the need of buyers to receive timely quotes on an enormous variety of goods and services from vendors anywhere in the world.").

Independent claim 1 reads as follows:

1.   A computerized system for forming a computer based communications network of network members inclusive of network buyers and or network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit said network members being remotely located from said central processing unit and connected thereto via a communications channel storage means containing identification of the network members, means for network buyers to generate request for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for filtering the network members in said storage means to determine which network members are to receive said request for quotation based upon filter conditions set up by the network buyer in said request for quotation or by the central processing unit in accordance with preestablished conditions, means for broadcasting said request for quotation to the network members selected by said filter means and means for responding to the generator of said request with either a response from the selected network members or with a list of said selected network members for said generator of said request to establish independent communication.

Independent claim 3 reads as follows:

3.  A method for processing requests for quotation for goods and/or services from a party representing a buyer or supplier of goods and/or services through a computerized system forming a computer based communications network of network members for linking buyers to suppliers with the computerized system having at least one central processing unit including operating system software for controlling the central processing unit and storage means containing the identification of the network members, wherein the method comprises the steps of:

receiving a buyer's request for quotation over a communication network; selecting one or more appropriate vendors to be sent the buyer's request for quotation based upon filter conditions, set by the buyer, vendor and the network software; transmitting the buyer's request for quotation separately to said selected vendors over said communications network; and with said selected vendors communicating their quotations either directly to the buyer or to the computerized system which in turn transmits said

5

received quotations to the requesting buyer.

Independent claim 4 reads as follows:

> 4. A computerized system for engaging in transactions over a data network, said computerized system comprising:
>
>> a plurality of terminals, at least one of which being designated a requestor and others of which are designated vendor terminals;
>>
>> filter and broadcast means for receiving over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals and for filtering said requests to determine with which vendor terminals said requests should be matched; and
>>
>> means for matching said requests with vendor terminals which meet predetermined filter conditions for generating quotes from information contained in a database associated with said vendor terminals and for accepting said quotes from said vendor terminals wherein the central database contains information that is insufficient to consummate the transaction.

Independent claim 12 reads as follows:

> 12. A method of purchasing goods or services over a data network comprising the steps of:
>> communicating, over said data network, to a filter means at least one request for a quotation from a potential buyer of said goods or services;
>>
>> filtering, at said filter means, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services; and
>>
>> obtaining, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.

6

At the <u>Markman</u> hearing, SST asked the court to construe i) Vendor Filter Conditions; ii) Buyer Filter Conditions and iii) Network Software Filter Conditions.

Defendants asked the court to construe i) Request for Quotations (claims 1-7, 11-14), ii) Filter Means (claims 1 and 12), iii) Filter and Broadcast Means (claim 4), iv) Computer Based Communications Network (claims 1-3), v) Filter Conditions (claims 1-7, 11, 13-14), vi) Network Member (claims 1-3), vii) Goods and Services (claims 1-3, 12-14), viii) Communications Channel Storage Means (claim 1) and ix) Storage Means (claims 1 and 3).

In the <u>Markman</u> Opinion, the court construed those terms as follows:

<u>Filter Condition</u>: "limitations or conditions included in the RFQ and/or in the response"

<u>Request for Quotation</u>: "a request for the price and other terms of a particular transaction 'in sufficient detail to constitute an offer capable of acceptance.'"

<u>Filter Means</u>: "A computer programmed to apply or compare specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information."

<u>Broadcast Means</u>: "incorporates the function of 'receiving, over said data network, requests from said requestor.'"

<u>Filter Conditions</u>: "Limitations or conditions that determine which of the network vendors will receive a buyer's request for quotation and/or which buyers will receive a response from a network vendor."

<u>Network Member</u>: "anyone or any company which has registered as a user by completing an application."

<u>Goods and Services</u>: "standardized articles of trade and performances of work for another."[1]

<u>Communication Channel Storage Means and Storage Means</u>: "a specific structure - the computer's permanent and temporary storage."

**The ServiceMagic Website**

---

[1] The court reconsidered this definition in its November 13, 2006 opinion and arrived at the same conclusion it arrived at in the <u>Markman</u> Opinion.

ServiceMagic was founded in 1998, and launched its website (www.servicemagic.com) in 1999 (the "Website"). The Website matches homeowners with pre-screened contractors for a variety of home projects, ranging from repairs and maintenance to complete remodeling projects. The Website allows homeowners to request the contact information and other information for contractors who provide the desired type of service. Contractors pay SM a referral fee for the service while the service is free for homeowners.

To use the Website, a homeowner must complete an online form and include his/her name, geographic location, and basic information about the desired home project. Depending on the homeowner's desired project, the form prompts the homeowner to provide general information about the project, including the square footage of the home, the status of the project, and the time frame for completing the project. The Website then sends the information provided to contractors who have indicated an interest in receiving leads for the project type, including specific subcategories of projects, and geographic area. These contractors can then contact the homeowner to discuss, obtain additional information relating to, and quote on, the home project.

Contact information of up to four local contractors who may be interested in working on the project  is also sent to the homeowner. The information sent to the homeowner by the Website may include a contractor's profile and contact information, previous customers' ratings and reviews, and a link to the contractor's website. If SM is unable to match the homeowner with a contractor, it displays a directory of local contractors that it obtains from a third-party source. Although tips are provided to improve successful matches, both the homeowners and contractors are free to contact each other, but are under no obligation to do so.

# III. **DISCUSSION**

## A. **Standard of Review**

Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson, 477 U.S. at 255).

"Summary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1369 (Fed. Cir. 2002). "[A]n accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001). "[T]he party opposing the motion for summary judgment of noninfringement must point to an evidentiary conflict created on the record, at least by a

9

counter-statement of a fact set forth in detail in an affidavit by a knowledgeable affiant."

TechSearch, 286 F.3d at 1372 (Fed. Cir. 2002).

"[I]nfringement must be shown literally or equivalently for each limitation; general assertions of facts, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden."  Id.  "Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims."  Novartis, 271 F.3d at 1046.  However,

> [i]n many a patent suit, there arise issues of fact as to which the testimony of expert witnesses may be important. Then the credibility of those witnesses is crucial, and it would be erroneous, by a summary judgment, to deprive either party of a 'live trial' at which the trial court could observe the witnesses' demeanor in evaluating their testimony.

Vermont Structural Slate Co. v. Tatko Bros. Slate Co., 233 F.2d 9, 10 (2d Cir. 1956).

**B.  Infringement**

"An infringement analysis is 'a two-step process in which we first determine the correct claim scope, and then compare the properly construed claim to the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent.'" TechSearch, 286 F.3d at 1371 (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1247-48 (Fed. Cir. 1998)).

"To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system."  Id. at 1371.  However, under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may

10

nonetheless be found to infringe if there is 'equivalence' between the elements of the accused

product or process and the claimed elements of the patented invention." Warner-Jenkinson Co.,

Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997).

> A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method.

Aquatex Indus., Inc. v. Techniche Solutions, No. 2006-1407, 2007 WL 582392, at

*4 (Fed. Cir. Feb. 27, 2007).

> What determines equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect.

520 U.S. at 24-25 (quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 609

(1950)). "Each element contained in a patent claim is deemed material to defining the scope of

the patented invention, and thus the doctrine of equivalents must be applied to individual

elements of the claim, not to the invention as a whole." Id. at 29. "Where the evidence is such

that no reasonable jury could determine two elements to be equivalent, district courts are obliged

to grant partial or complete summary judgment." Id. at 39 n.8.

SM argues that it does not infringe claims 1 through 3 under a literal infringement

analysis or the doctrine of equivalents because its website: (1) does not involve "goods and

services"; and (2) does not process or otherwise involve "requests for quotation."

**1. "Goods and Services"**

11

SM contends that it does not literally infringe claims 1-3 of the '328 patent. It claims that "[t]he '328 patent makes clear that the quotation system it discloses only works if the goods and services to be exchanged are *standardized* items." (Def.'s Br. 11). SM points to examples of standardized goods provided in the patent, including "Type J resistors," "personal computer monitors," and "Seagate Model 225 Hard Disk Drive." (Id.). It argues that "[t]he home projects for which SM provides contractor referrals are, by definition, not standardized and not amenable to standardization" because the "scope, nature, and cost of any given home project depends upon numerous factors, including the layout and condition of the home, the subjective preferences of the homeowner, the type and quality of the materials to be used on the project, and the complexity of the work to be done." (Id.). SM contends that "[a]s a result, a contractor typically would not be able to provide a quotation for a home repair, maintenance or improvement project without a detailed understanding of the scope of the project, which can only be gained from speaking to the homeowner, and, in most cases, visiting the home." (Id. at 11-12).

SM also attacks the expert report of Dr. Eric M. Dowling (the "Dowling Report"). SM contends that Dowling's opinion that the projects themselves are standardized services because the Website organizes home repair and improvement project descriptions into broad categories, is faulty for two reasons. (Id. at 12). First, SM contends that Dowling's opinion is premised on the incorrect view that the '328 patent requires that only the product descriptions be standardized, not the goods and services themselves. (Id.). SM argues that this court considered and rejected SST's argument that only the descriptions and of the goods and services must be standardized. (Id.). It argues that it is therefore irrelevant that the services for which referrals are available on the Website may be described and grouped in some manner. (Id. at 12-13). SM contends that

merely describing services does not render them "standardized" and that if SST's view was correct, "*every* type of service would be covered by claims 1 through 3, and the Court's construction of 'goods and services' would be meaningless surplusage.'" (Id. at 13).

Second, SM contends that a homeowner's selection of a generic service category on the Website, such as "additions," "remodels," or "install carpentry," cannot dispel "confusion as to what buyers are requesting and what sellers are offering." (Id.). SM argues that by selecting a category such as "Additions & Remodels" on the Website, the homeowner is merely telling potentially interested contractors that it wants to build an addition or remodel. (Id.). It is SM's contention that this says nothing about the desired project and that in order for the contractor to understand the project's scope, the contractor must obtain further information. (Id.).

SM also contends that it does not infringe claim 1-3 under the doctrine of equivalents. SM argues that the Website "does not involve standardized goods and services, or any 'equivalent' thereof" and instead "involves only non-standardized home repair, maintenance, and improvement projects." (Def.'s Br. 14). SM argues that "[t]o conclude that a non-standardized good or service is the equivalent of a standardized good or service would eviscerate from the claims the requirement that the goods and services be standardized." (Id. at 15).

SST argues that SM misconstrues the court's Markman ruling by basing its entire analysis on a definition of the term "standardized" that is drastically different from the term "standard." (Pl.'s Br. 17-18). SST correctly points out that the court, in its November 13, 2006 opinion, inadvertently used the terms interchangeably where they clearly have two different meanings. Having reviewed the November 13, 2006 opinion in light of this inadvertence, the court must modify the opinion to reflect the different meanings. Thus, the November 13, 2006 opinion is

amended to state as follows:[2]

> It is Defendants' position that the specification explicitly disclaims a broad reading of goods and services, i.e., that goods and services means <u>any</u> goods and services.  They point to the following language:

>> The present invention is a computerized quotation system forming a computer based communications network for processing requests for quotations for goods and services from respective buyers or vendors who broadcast such requests to network members of the computerized system.  There is no central pricing database to limit the number of buyers and vendors of goods and services or to limit the number of goods and services which can be processed.

>> <u>However, the goods and services must be</u> **standard** <u>items to ensure that there is no confusion as to what buyers are requesting and what sellers are offering to buyers</u>.  Fig. 1 shows the system of this invention as configured using the Internet as the communications network.

> ('328 patent, col. 3, ll. 55-67) (emphasis added).

> This is pretty unambiguous langauge: ". . . the goods and services <u>must</u> be **standard** items to <u>ensure</u> that there is no confusion as to what buyers are requesting and what sellers are offering to buyers."  The cases have distinguished between the terms "must" and "may" or "can" as used in patents.  The word "must" is mandatory language; whereas "may" and "can" are permissive terms.  <u>See</u> <u>BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC</u>, 303 F. 3d 1332, 1340 (Fed. Cir. 2002).

> SST asserts that **"goods and services" needs no construction and that** the paragraph of the specification that follows the paragraph upon which Defendants rely completes the teaching on the subject.  It includes the statement:

>> Standardization of product or service descriptions is

---

[2]The amended portions of the opinion are in bold.

essential to avoid confusion <u>unless a more text oriented specification</u> is appropriate for the product or service type.

('328 patent, col. 4, ll. 9-16) (emphasis added).

It is SST's contention that the specification provides two options for identifying the goods and services for which a quotation is sought: i) **using standardized descriptions of the** product or service, or ii) **using** a text oriented specification **where** appropriate. **SST contends that the '328 patent does not say that only standard goods and services can be offered but merely that one of the two options above must be used to identify the goods and services. However, t**his would open up the request for goods and services to any product or service, **standard** or not.

If one follows the pertinent language of the specification which incorporates all the language upon which the parties rely ('328 patent, col. 3, l. 55 to col. 4, l. 12), it becomes clear that Defendants' interpretation is the correct one**, to the extent that the goods and services are "standard."**

It starts with the paragraph containing the language, "However, the goods and services must be standard items to ensure that there is no confusion as to what buyers are requesting and what sellers are offering buyers." ('328 patent col. 3, ll. 63-65). The next paragraph describes how network members can use the computerized system. Once again there is a reference to **standard** goods or services: "The programming . . . which enables network members to interact with the network would include information sufficient for network members to identify <u>standard goods or services</u> that they wish to identify in a request for quotation." ('328 patent col. 4, ll. 4-9) (emphasis added).

The next sentence, the sentence upon which SST relies, simply suggests how the network member can identify the standard goods or services that are the subject of his request: "Standardization of product or service descriptions is essential to avoid confusion unless a more text oriented specification is appropriate to the product or service type." ('328 patent col. 4, ll. 9-12). This sentence in no way suggests that the particular product for which a "text oriented specification is appropriate" is not to be **standard**.

This conclusion is illustrated by Figure 8 of the '328 patent to which SST refers. The quote given in Figure 8 is for 5000

15

"TYPE J RESSISTOR[S] 5%." Thus a text oriented specification is provided, namely 5000 and 5%. Nevertheless, the underlying product - the Type J resistor - is a **standard** item.

Having corrected the deficiency of the October 16, 2006 opinion by considering the matter it previously overlooked, the court arrives at the **conclusion that "Goods and Services" is construed to mean "standard** articles of trade and performances of work for another." The court will file an order implementing this opinion.

The court, having arrived at the proper construction of the term "Goods and Services," will now address the SST's contention that the Website literally infringes by dealing in standard goods and services. SST points to the language of the patent that "the goods and services must be standard to ensure that there is no confusion as to what buyers are requesting and what sellers are offering to buyers." ('328 patent, col. 3, ll. 63-65).

SST argues that the use of standard goods and services avoids confusion by making sure that buyers are not left in a state of not knowing what the offered good or service is. It argues that "things like the installation of fans, water heaters, skylights, roofing and gutters, carpet, etc. are not things that most consumers have never heard of, or that cause consumers to not 'understand...*[what] something is'*." (Pl.'s Br. 33). SST claims that the fact that users may communicate directly to work out the details of the quote is not disclaimed in the '328 patent. (Id.). It argues instead, that this is specifically contemplated in the '328 patent and cites the following: "As an alternative, communications between buyers and sellers may be by telephone, e-mail or other means." (Id.; Claim 1, col. 6, ll. 9-11).

Additionally, SST argues that all of the services SM offers are "common, usual, familiar services" and uses the following examples from the Website to support this contention: (1) "Service Magic currently addresses over 240 different common home service needs from simple

home repairs and maintenance to complete home remodeling projects"; and (2) "ServiceMagic.com currently addresses over 490 common home services . . ." (Id. at 33-34) (citing Declaration of Jeffrey I. Kaplan ("Kaplan Decl."), Ex. D, p. 26, 28).  SST argues that "common" is literally the definition of standard.  (Id. at 34).

Finally, SST argues that "even if the Court were to adopt SM's assertion that the RFQ must specify everything needed to give the quote . . . summary judgment in SM's favor would be inappropriate because SM would be infringing under the doctrine of equivalents."  (Pl.'s Br. 36). SST contends that "the exemplary embodiment of the '328 patent, shown at Fig. 8, does not merely request a quote for a 'Type J resistor.'  Instead, the quantity, tolerance, delivery terms, etc. are all further specified, and all affect the quote."   (Id.).  SST argues that just as the example at Fig. 8, other parameters are given in SM's users' RFQs.  (Id.).  SST quotes SM's Website wherein it states that customers "provide a detailed project request up-front so . . . [contractors] can ballpark the job ahead of time."  (Id. (Kaplan Decl., Ex. D, p.7)).

Having determined that the term "goods and services" means "standard articles of trade and performances of work for another," the issue becomes whether the services on the Website are "standard."  In order to answer that question, the court must define the term "standard."

The court is cognizant that "the specification is 'the single best guide to the meaning of a disputed term,' and that the specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" Phillips v. AWH Corp., 415 F.3d 1303, 1321 (Fed. Cir. 2005) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  However, the court is "authorized 'to rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including . . . dictionaries'

17

as one of many claim construction tools."  Terlep v. Brinkmann Corp., 418 F.3d 1379, 1384 (Fed. Cir. 2005) (quoting Phillips, 415 F.3d at 1317).

Here, SST offers several definitions of "standard" and ultimately argues that "standard means 'Usual, common, or customary' . . . or 'Normal, familiar, or usual . . . commonly used or supplied.'" (Pl.'s Br. 18 (quoting YourDictionary.com; Dictionary.com)).  As SM has not offered a different definition, the court adopts SST's definition.

The court finds that the services offered on the Website are those contemplated by the '328 patent and are in fact standard.  SM's main argument is that because a contractor would not be able to provide a quotation for a home project without more information than what is provided through the Website, the services are not standard.  However, the fact that a contractor may need more information in order to provide a quotation for a service, e.g., measurements, materials, etc., does not automatically make that service not standard.

A visit to the Website reveals that the services offered are standard, i.e., usual, common, familiar or usual.  The services include additions and remodels, carpentry, cleaning, flooring, painting, siding, windows and doors, and many other common services.  Indeed, the Website characterizes these services as common: "Service Magic currently addresses over 240 different common home service needs from simple home repairs and maintenance to complete home remodeling projects."  (Kaplan Decl., Ex. D at 28).

Furthermore, the '328 patent specification states that "the goods and services must be standard items to ensure that there is not confusion as to what buyers are requesting and what sellers are offering to buyers."  As the services on the website would not cause confusion to a buyer, they fall within that specification.

18

### 2. **"Requests For Quotation"**

SM contends that it does not infringe claims 1 through 3 under a literal infringement analysis or under the doctrine of equivalents because the Website "does not process or otherwise involve 'requests for quotation,' which this Court has construed to mean 'request[s] for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance.'" (Def.'s Br. 16).

SM argues that the forms completed by homeowners on the Website are not RFQs because they "do not contain sufficient information from the homeowner about the contemplated project to enable a contractor to respond with a quotation containing price and any other essential terms." (Id.). SM contends that "[t]o conclude otherwise would eviscerate from the asserted claims the patent's requirement . . . that the request from the buyer be not just any request, but a request for a *quotation*." (Id. at 17). SM argues that under SST's view, "[a]ny inquiry, however attenuated the intention to actually buy something, would become 'a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance.'" (Def.'s Reply 16).

Additionally, it is SM 's contention that it does not infringe under the doctrine of equivalents because the online form on the Website does not perform substantially the same function as a request for quotation. (Def.'s Br. 18). SM argues that the function of an RFQ is to identify and provide sufficient detail about the goods and services so that the seller can respond with a quote, whereas the function SM's online form is to collect just enough information to generate referrals. (Id.). SM asserts that the Website "is far more analogous to looking in the Yellow Pages or asking friends about contractors they have used in the past than to participating

in the procurement system disclosed in claims 1-3." (Id.).

SST contends that "[i]t simply does not follow logically that **because** something does not have everything needed to give the quote, it can not be a request for a quote." (Pl.'s Br. 9). SST argues that the fact that a contractor says he will come to review a project or measure rooms before providing a quote does not mean that the homeowner has not *requested* a quote. (Id.).

SST further contends that the one way embodiment of the '328 patent does not require that contractors respond with a quotation containing price or other essential terms or that the RFQ contain enough information to generate a quote. Instead, SST argues, "the relevant limitation of claim 1 is met if consumers . . . can submit their RFQ, have it filtered and routed to potential contractors . . . and then get a 'response from said selected network members, or a list of said selected [contractors] for said generator of said request to establish independent communication.'" (Id. at 10 (quoting '328, claim 1)). SST argues that SM meets the claim limitation because: (1) in response to an RFQ, SM provides the consumer with a list of selected vendors with names and contact information and a message that states, "CONTACT YOUR MATCHING PROS NOW!"; and (2) in accordance with SM's instructions, contractors call/e-mail the consumer to respond. (Id.).

SST also claims that "in accordance with claim 3, SM vendors are 'communicating their quotations...directly to the buyer', trying to close the job." (Id. at 11-12). SST argues that under claim 3, any quotes that a vendor wishes to submit may go directly from the vendor receiving the RFQ to the buyer, outside the computer system by using e-mail, telephone, or any other means. (Id. at 10 (citing '328 patent, col. 6 ll. 9-11)). SST relies on the following statements on the Website addressed to contractors:

20

(1) "Contact the customer to quote on their repair, maintenance or remodel project." (Kaplan Decl., Ex. D at 1);

(2) "[Lender] [r]esponds to borrower via ServiceMagic's automated e-mail response system; either with a quote or a request for additional information." (Id. at 2);

(3) "The ServiceMagic consumer has indicated their desire for getting this work done (or receiving an estimate depending on the type of work) and thus you should approach the call presuming the scheduling of the work or the bid." (Id. at 18);

(4) "We find customers: Who know exactly what they want. Who have thought through every aspect of their project. Who provide a detailed project request up-front so you can ballpark the job ahead of time. Who are ready to buy. From you. Right now!" (Id. at 7);

(5) "With ServiceMagic you will deal with customers who are ready to act, ready to hire, ready to buy." (Id. at 4).

Additionally, SST relies on the following statements on the Website addressed to consumers:

(6) "Get FREE estimates, then pick a pro!" (Id. at 23);

(7) "Make sure each estimate details your specifications." (Id. at 20);

(8) "[M]ake sure the following basics are included in your contract: . . . the work to be done . . . detailed list of building materials . . . start date and a target end date . . . payment schedule . . . ." (Id. at 22);

(9) "You could give the contract to an attorney to review, but this is usually not necessary if you are dealing with a reputable service professional." (Id.).

SST contends that the SM material produced in this case "are replete with representations from SM that its consumers are using the website to obtain contractors who then call, email or otherwise meet with them and provide proposed contracts to sign to complete the work. (Pl.'s Br. 11). SST also argues that SM incorrectly contends that any inquiry would be a RFQ under SST's view. SST contends that SM's users do not enter attenuated inquiries, but rather "put in requests that are specific, well defined, and which are filtered and sent to contractors . . . ." (Pl.'s Reply 11).

Finally, as to the application of the doctrine of equivalents to this issue, SST argues that

"[i]f the RFQ is deemed to require all terms needed to give the quote, the [sic] SST must be given an opportunity to supplement its expert report, because this claim limitation was never in the definition of RFQ, so SST's expert never addressed the equivalents issue." (Id.).

Initially, it is important to note where the parties deviate in their positions as to what part of the RFQ is the focal point of the '328 patent. SM contends that the focus should be on the quotation and argues that the forms on the Website are not RFQs because they do not contain sufficient information to enable a contractor to respond with a quote. SST, on the other hand, emphasizes the request and argues that the fact that a contractor may need more information about a project before providing a quote does not mean that the homeowner has not requested a quote.

The court has construed the term "request for quotation" as "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." SM's interpretation would have the court look from the perspective of the contractor to see whether the homeowner had in fact requested a quotation. The proper inquiry, however, is from the perspective of the homeowner, who would be completing the forms and providing information.

To use the Website, a homeowner must complete an online form and include his/her name, geographic location, and information about the home project. For example, if a homeowner was interested in painting the exterior of their home, the form prompts the homeowner to enter (1) the type of project; (2) how many stories the home is; (3) what kinds of surfaces need to be painted; (4) whether the color will be lighter or darker than the existing color; (5) when the last time the house was painted; (6) whether the house shows signs of any wear,

22

e.g., peeling paint, cracking, rusty nails, etc.; and (7) the square footage of the house and what percentage needs to be painted.  Additionally, another form prompts the homeowner to enter: (8) the status for the project, i.e., whether ready to hire or planning and budgeting; (9) the time frame that the homeowner would like the painting completed; (10) whether the location is an historical structure; (11) whether the location is a commercial location; (12) whether the homeowner owns the home for the request; and (13) a short description of the project.

Considering the amount of information that these forms require in order to be processed, it is beyond comprehension that a homeowner is not requesting a quote from potential contractors.  Thus, the court finds that the forms completed by homeowners on the Website are requests for quotations.

Because the services offered on the Website are standard and because the Website processes requests for quotations, SM's motion for summary judgment of non-infringement will be denied.

## C. SST's Cross-Motion for Summary Judgment

SST, in its cross-motion for summary judgment, refers the court to a chart (Kaplan Decl., Ex. H) that was supplied by SM in response to an interrogatory by SST.  The chart shows the claim elements, SST's infringement contentions, and SM's non-infringement contentions.  The chart refers to three  non-infringement contentions by SM: (1) customers are not "network members"; (2) the Website does not process "requests for quotation"; and (3) the Website does not satisfy the "goods and services" limitation of the claim.  SST contends that each of SM's defenses involves a dispute of claim interpretation and that because there is no issue of fact, SST is entitled to summary judgment on the infringement issue.  The court, having decided the issues

relating to "requests for quotation" and "goods and services" above, will address only SST's contention that SM's customers are "network members."

SST relies on several pages from the Website in support of its contention. First, SST points to a page where the consumer has a choice between signing in under "Member Login" and entering a username and password, or clicking on a link that states "Not a member? Click here to Register with Servicemagic." (Kaplan Decl., Ex. K)). If the customer chooses the latter, he/she is sent to a new page and is required to enter personal information such as name, e-mail address, phone number, and "Login Information." (Id.). Next, SST refers to another page from the Website which shows that once logged in to the Website, the user is greeted, his/her name is displayed, and he/she is provided with many options including accessing his/her account, taking a poll, and getting started on a home project. SST argues it is entitled to summary judgment based on (1) the pages from the Website; (2) the court's construction of the term "network member"; and (3) SM's own statement that "[t]o use the ServiceMagic website, a homeowner must complete an online form that asks the homeowner to provide his or her name, geographic location, and basic information about the desired home project."

In opposition, SM states generally that SST has not satisfied its burden of demonstrating that the Website meets each and every claim limitation. In a footnote, SM states that SST has "failed to demonstrate how ServiceMagic's website satisfies the "network members" claim limitations . . . ." (Def.'s Reply 22 n.10).

The court has construed "network members" to mean, "anyone or any company which has registered as a user by completing an application." It is clear from the pages of the Website referenced above that customers using the Website register as users by completing an application.

Thus, SM's customers are "network members."

SST also addresses the preamble to claim 3 which states that RFQ's come from "a party representing a buyer and/or supplier of goods and/or services." SST argues that, in contrast to SM's assertions, "[r]epresent merely means to 'act the role of.' For example, 'He represents one of the finest cardiologists to ever practice medicine.'" (Pl.'s Br. in Supp. of Mot. for Summ. J. 42). SST argues that "[t]he language of claim 3 merely means that a computer can be configured to act in the role of a buyer or a seller." (Id.). SST cites to the following language: "Users can be buyers and/or vendors. . . .A typical situation in which a user who is predominantly a buyer may choose to be a vendor . . . ." ('328 patent, col. 7, ll. 56-63). SST argues that "the '328 patent in fact uses the term represent just this way - in two places." (Pl.'s Reply 19). SST cites to: (1) col. 3, ll. 32-34 ("FIG.2 shows a block diagram representing how a buyer interacts with the computerized system of this invention via the Internet."); and (2) col. 5, ll. 15-16 ("The buyer and vendor filters may represent in their simplest form defined classes of suppliers and/or buyers and may extend to delineate conditions of sale and/or purchase."). Finally, SST contends that "[n]othing in the '328 patent even remotely suggests that users must have an agent to use their computers." (Id.).

SM argues that "SST has failed to demonstrate . . . that ServiceMagic's website processes requests for quotations from 'a party representing a buyer or supplier.'" (Def.'s Reply 22). SM disagrees with SST's definition of represent, i.e., to "act the role of." SM argues that "SST's proposed definition of 'represent' is no definition at all because it renders superfluous the words 'a party representing.'" (Def.'s Reply 23).

Additionally, SM disagrees with SST's contention that "claim 3 merely means that a

computer can be configured to act in the role of a buyer or a seller."  SM claims that "one of ordinary skill in the art would not understand a 'party' to refer to a computer."  (Def.'s Reply 23 (citing Declaration of Walter Scacchi, Ph.D. ("Scacchi Decl."), ¶ 10)).  SM contends that the patent elsewhere refers to computers and terminals by name and that the patent applicant meant something else when he used the term "party" in the claims.  (Id. at 23-24).  SM argues that "one of ordinary skill in the art would understand 'a party representing a buyer or supplier' to refer to an individual or entity acting as an agent or other type of representative on behalf of the buyer or supplier."  (Id. at 24 (citing Scacchi Decl., ¶ 11)).  SM argues that under this definition, SST has not demonstrated that the Website processes requests for quotations from "a party representing a buyer or supplier."  (Id.).

The court finds that SST's construction is entirely consistent with the '328 patent.  The statement "a party representing a buyer and/or supplier of goods and/or services" means that a user can be a buyer or supplier depending on the way the computer is configured, i.e., "representing" is used in claim 3 to mean "acting the role of."  The applicant's usage of the term "represent" in other contexts reinforces this construction.  For example, as SST points out, "represent" is used as follows: "The buyer and vendor filters may represent . . . defined classes of suppliers and/or buyers and may extend to delineate conditions of sale and/or purchase."  ('328 patent, col. 5, ll. 15-16).  Here, the applicant clearly uses "represent" to mean that the filters may be defined classes of suppliers and/or buyers.  SM's construction, on the other hand, is inconsistent with the '328 patent.  Nothing else in the patent indicates that a user must have an agent or other type of representative acting on his/her behalf.

26

Finally, SM contends that "SST has not affirmatively demonstrated that the ServiceMagic website performs the claimed functions, nor has it demonstrated that the ServiceMagic website employs the precise structure(s) disclosed in the patent or any structural equivalent thereof." (Def.'s Reply 23). SM argues that this failure warrants denial of its cross-motion.

As the court's foregoing analysis demonstrates, the record shows that there is no genuine issue of fact that SM infringes both literally and under the doctrine of equivalents.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendant's motion for summary judgment will be denied and Plaintiff's motion for summary judgment will be granted. The court will enter an order implementing this opinion.

/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:        May 2, 2007