## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------X
                            :

Source Search Technologies, LLC,     :

               Plaintiff,    :

                           :     Civil Action No. 2:04-CV-4420 (DRD)

         v.           :

                           :

Lendingtree, LLC, ServiceMagic Inc. and:
IAC InterActiveCorp,        :

                           :

           Defendants.   :
-------------------------------------------------------X

### PLAINTIFF SOURCE SEARCH TECHNOLOGIES LLC'S ("SST") COMBINED REPLY MEMORANDUM IN SUPPORT OF SST'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT LENDINGTREE'S MOTION FOR SUMMARY JUDGEMENT ON THE INFRINGEMENT ISSUE

Dated: August 27, 2007

Jeffrey I. Kaplan (JK 4706)
Michael R. Gilman (7608) *Pro Hac Vice*
KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

I.      INTRODUCTION AND SUMMARY OF ARGUMENT .................................................1

II.     THE LENDINGTREE SYSTEM PROCESS REQUESTS
FOR QUOTES ON GOODS AND SERVICES ..............................................................2

       A.    LT's First Two Assertions Concerning Goods and
Services Confuse the Issue Before This Court .......................................................2

       B.    LT Has Affirmatively Asserted that Its Banks Provide
Financial Services, and is Judicially Estopped From
Claiming Otherwise .................................................................................5

       C.    LT's Remaining Arguments Concerning Goods and
Services Are of No Merit .......................................................................10

III.    LT BORROWERS ARE NETWORK MEMEBERS .......................................................12

       A.    The RFQ Need Not Be Mutually Exclusive
From the Membership Application .......................................................13

       B.    LT's Remaining Assertions with Respect to the
"Network Member" Limitation are also Incorrect .................................17

IV.    LT INFRINGES CLAIMS 12-14 .................................................................................19

       A.    LT Mistakes the Law Concerning Preambles With
Respect to Preamble Language Being Used as
an Antecedent Basis .................................................................................20

       B.    Precedent Mandates that Claim 12 Not be Limited
by Its Preamble .......................................................................................23

       C.    *Boerhenger Ingelheim* is in Accoradnce with Other Federal Circuit
Case Law and Requires Rejection of LT's Position Here ....................27

**<u>TABLE OF CONTENTS (continued)</u>**

**<u>PAGE(S)</u>**

D.     LT Has Failed to Address SST's Remaining Arguments on "Purchasing"...........28

V.     THE DOCTRINE OF EQUIVALENTS (DOE) REQUIRES DENIAL OF LT'S SUMMARY JUDGMENT MOTION .............................................................29

VI.     CONCLUSION .........................................................................................31

## TABLE OF AUTHORITIES

**PAGE(S)**

*Abbott Laboratories v. Andryx Pharmaceuticals Inc.*,
  473 F.3d 1196 (Fed. Cir. 2007) .......................................................................30

*Abraxis Science Inc. v. Mayne Pharma USA, Inc.*
467 F.3d 1370 (Fed. Cir. 2006).    ................................................................. 30

*Advanced Medical Optics, Inc. v. Alcon Inc.*,
  361 F.Supp.2d 370 (D. Del. 2005), ............................................................25, 27

*Bell Communications v. Vitalink*
  55 F.3d 15 (Fed. Cir 1995) ...........................................................................22

*Boerhenger Ingelheim, Inc., v Schering Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003) ....................................................................25

*Bristol-Myers Squibb Company v. Ben Venue Laboratories, Inc.*,
246 F.3d 1368 (Fed. Cir. 2001)...........................................20, 21, 23, 25, 27

*Catalina Marketing v. Coolsavings*
289 F. 3d 801 (Fed Cir. 2002)...................................................................21, 22

*Cummings v. Bahr*
295 N.J. Super 374 (App. Div. 1996) .............................................................9

*Depuy Spine Inc. v. Medtronic Sofamar Danek, Inc.*
469 F.3d 1005 (Fed. Cir. 2006) ...................................................................29

*Festo Corp. v. Shoketsu Kinsoko Kabushiki*
535 U.S. 722 (2002) )   ...............................................................................29

*Fuji Photo Film, Ltd. v. ITC*,
386 F.3d 1095 (Fed. Cir 2004)......................................................................12

*Graver Tanks & Manufacturing Co. v. Linde Air Products Co.*,
339 U.S. 605 (1950)  ...................................................................................29

*IMS Tech., Inc. v. Haas Automation, Inc.*,
  206 F.3d 1422, 1434, 54 USPQ2d 1129, 1136-37 (Fed.Cir.2000)...............20

*Intertool, Ltd. v. Texar Corporation*,
69 F. 3d 1289 (Fed Cir. 2004) ...................................................................20, 25

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898, 906 (Fed.Cir.2004).................................................................12

*Palcsesz v. Midland Mutual Life Insurance Company*
  87 F.Supp. 2d 409 (D. NJ 2000)(Debevoise, SJ)..............................................9

*Phillips v. AWH Corp.*
  415 F.3d 1303 (Fed. Cir. 2005).  .................................................................29

*Ryan Operations, GP, v. Santiam Midwest Lumber Co.*
  81 F.3d 355 (3rd Cir. 1995) .........................................................................9

*Schumer v. Laboratory Computer Systems, Inc.*
  308 F.3d 1304 (Fed. Cir. 2002) ...............................................................22, 25

*Shu-Hui Chen v. Bouchard*
  347 F.3d 1299 (Fed. Cir. 2003)...................................................................7, 8

*STX, LLC v. Brine, Inc.,*
  211 F.3d 588, 591 (Fed.Cir.2000).................................................................20

*The Li Second Family Limited Partnership v. Toshiba Corporation,*
  231 F.3d 1373 (Fed. Cir. 2001) ......................................................................8

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
  299 F.3d 1313, 1325 (Fed.Cir.2002)..............................................................12

*University of Rochester v. G.D. Searle & Co., Inc.,*
  358 F.3d 916 (Fed. Cir. 2004)…....................................................................7

I.    **INTRODUCTION**

LT offers only three non-infringement defenses:  1) The loans offered by its member banks are neither goods nor services (LT does not state what they are); 2) LT buyers are not network members; and 3) the LT system does not meet the purchasing language from the preamble of claim 12.

First, LT member banks offer financial services.  LT is judicially estopped from claiming otherwise, because in other agency proceedings, LT affirmatively asserted that banks offering loans were offering financial services – and obtained two different advantageous rulings based upon that assertion.   Even absent judicial estoppel, those prior assertions by LT are powerful admissions that, when coupled with the fact that virtually every dictionary and other reputable source defines loans and mortgages as financial services, and LT's own documents that consistently refer to the services provided by lenders as financial services, require rejection of LT's defense.  In fact, the '328 patent specifically contemplates the provision of financial services such as loans as services.

Second, LT's claim that its borrowers are not members must also be rejected.  LT's papers are very carefully worded to avoid referring to its pre-September, 2006 system.   The assertions made by LT with regard to borrowers not being network members can not be made - and are not made by LT - with respect to the system prior to September, 2006.  Instead, LT's assertions are limited to the system that it redesigned last year.   LT completely concedes the "member" claim limitation for its systems prior to September, 2006.  In any event, even the post September, 2006 system meets the network member limitation, because prior to applying for a loan, users must fill out an application essentially identical to that described in the '328 patent itself.

Finally, LT claims that the preamble of claim 12 limits that claim to "purchasing" goods or services, and that this does not occur in the LT system. LT misreads the relevant case law, but even if the claim were limited by the preamble, LT still meets the limitation.[1]

## II.    THE LENDINGTREE SYSTEM PROCESSES REQUESTS FOR QUOTES ON GOODS AND SERVICES

### A.    LT's First Two Assertions Concerning Goods and Services Confuse the Issue Before This Court

LT's analysis with respect to "goods and services" is set forth at pp. 14-17 of its memorandum. First, LT sets up its position by noting that "A loan is an obligation to repay money, not work performed for a consumer of a service". (LT Memorandum, pp. 15). This argument evidences a misunderstanding of the infringement issue presently before this Court.

By way of analogy, consider a car rental service offered by Hertz or Avis. These services provide consumers with a car to use for an agreed upon time – say three days – after which the car must be returned. The consumer pays Hertz for *the use of* the car for three days. Nobody would seriously argue that a car rental agency is not providing a rental service, but is instead selling to consumers "an obligation to [return a car]".

Just like a car rental agency sells a service – use of a car for an agreed upon time in exchange for a fee – lenders on the LT network do the same thing. A bank on the LT network is providing the consumer with a financing service - the use of funds for an agreed upon time. In exchange, the consumer pays the bank for the use of the funds, wherein the payment is known as

---

[1] In our Opening Memorandum, we erroneously indicated that the design change implemented by LT was in October, 2006. In fact, the change took place on September 14, 2006. (Ex. F hereto, letter from LT counsel to the Delaware Court). We apologize for the error.

interest.  Of course, the thing that the consumer uses for the agreed upon time – the original funds – must also be returned, just like the car has to be returned to Hertz.[2]

Arguing that providing financing services in the form of loans is not a service because it is an obligation to repay money is no different from arguing that a car rental agency is not providing car rental services but is instead selling people an obligation to return a car. Consumers do not go to Hertz because they wish to purchase an obligation to return a car, and consumers do not go to the LT website to purchase an obligation to pay money back to a bank. Instead, a consumer's purchase of financing services merely gives rise to an obligation to repay the money, just as a consumer's signature on a car rental agreement gives rise to an obligation to return the car.   In either case, the consumer pays for the service of allowing use of the car (funds) for the agreed upon time.

Thus, the question before this Court is not whether an obligation to repay money is a service.  Instead, the issue is: "Does a bank that, in exchange for a fee, provides a consumer with financing so that the consumer can purchase homes, cars, and college educations that he or she otherwise would not be able to purchase provide a service to that consumer?"   LT does not take any position on ***this*** issue, leaving SST's Opening Memorandum unrebutted.

LT's second argument attempts to rebut the fact that the Patent and Trademark Office typically registers trademarks for banks in the mortgage and lending business in ***services*** classes. (Op. Ex. T[3]).  Trademark applicants, such as banks that sell their services on the LT network, typically describe the services they offer under such trademarks as financial services or lending

---

[2] Defendants themselves argued to this Court that car rental services exemplified the type of services that are within the scope of the claims of the '328 patent in suit.  (ServiceMagic Reply Brief on Summary Judgment, p. 6 -7, Ex. A hereto).
[3] Op. Ex. ___refers to the exhibits attached to SST's Opening Memorandum with the Kaplan Declaration dated June 29, 2007.  Ex. ___refers to the exhibits submitted herewith.

services. (Ex. E hereto, describing mortgage lending services, and "financial services, namely money lending")

A search of www.uspto.gov reveals hundreds if not thousands of trademarks registered to entities that are in the business of lending money – and all of these are registered in service classes and described as financial services, lending services, etc. (e.g.; Ex. E hereto).  LT does not in any way dispute the official PTO records, or the fact that they consistently classify mortgage lending services as just that - services.    Instead, LT, at the sentence bridging pp. 16-17 of its brief, attempts to diminish the impact of this fact:  "The PTO's classification of services performed for potential borrowers in connection with mortgage lending is not a definition of the ***mortgage itself***…" (emphasis added).  This too, misunderstands the infringement issue *sub judice.*

The "mortgage itself" is merely "a conveyance of an interest in property as security for the repayment of money borrowed."  www.dictionary.com.  The mortgage note gives the bank the right to take one's real estate in the event the money borrowed is not returned.  The Hertz rental agreement typically gives Hertz the right to charge one's credit card for an extra day in the event the car is returned late, or not returned at all.

Consumers do not visit the LT website because they wish to purchase from the bank a conveyance of an interest in their property to the bank, any more than they visit Hertz because the wish to give Hertz permission to charge their credit card.    Instead, the obligation to repay money and the conveyance of a legal interest in real estate (i.e.; the mortgage itself) are both terms of the loan contract under which the purchase of what ***is*** being purchased - financing services - will take place.  The infringement question before this Court is whether the financing services – i.e.; the lending services - provided under that contract to a consumer in exchange for

a fee is a service.    The infringement question here is not whether a condition of the contract under which those services are provided is itself a service.  Thus, LT's "mortgage itself" argument is not relevant to whether the lending service offered by banks – in exchange for which a consumer *gives* a mortgage note – is a service.

Finally, LT does not state in what economic activity a bank is engaged if not providing goods or services. This is not surprising, as any definition of economics defines that term as the study of the production, distribution, and consumption of goods and services. www.wikipedia.com, www.dictionary.com.  *Any* economic activity falls into one of these categories, and lending services are no different.  For these reasons, LT's "good or service" argument must be rejected.


### B.    LT Has Affirmatively Asserted that Its Banks Provide Financial Services, and is Judicially Estopped From Claiming Otherwise

LT's third argument on "goods and services" is that its own use of the phrase "lending services" in non-litigation materials – which directly contradicts its position here that its banks do not offer services - was actually meant to describe the matching services performed by the LT system to match consumers with banks, and not the lending service provided by the banks themselves.   According to LT, the banks that lend money do not provide lending services, but the LT matching computer system, which does not lend money, does provide lending services.

In addition to being borderline frivolous on its face, this position must be rejected because LT is judicially estopped – on two different and independent grounds - from even making this argument.  Even if judicial estoppel did not apply, LT has clearly admitted that the litigation induced position it asserts here is inaccurate.

LT owns two patents, US patent No. 6,385,594, and 6,611,816.  (Exs. B, C).   The '816 patent is entitled "Method and Computer Network for Coordinating a Loan Over the Internet", and relates generally to a computer system that allows borrowers to obtain loans from banks over the Internet by matching borrowers' financial credentials with filter criteria supplied by various banks.    LT is presently in litigation in *LendingTree v. Lowermybills*, 3:05-CV-00153-GCM in the Western District of North Carolina, seeking what is believed to be hundreds of millions of dollars in damages, and an injunction.

The '816 patent specification contains no mention of the term "financial services".  (Ex. B).  It does however, contain the following "Summary of the Invention":

> [T]here is provided a method and apparatus for coordinating an electronic credit application between an Internet user and a plurality of lending institutions via the Internet. The method comprises the steps of displaying a plurality of documents to an Internet user, receiving a plurality of credit data sent from the Internet user; matching an electronic credit application to a filter comprising a plurality of selection criteria; transmitting the credit data to a plurality of lending institutions via one of four methods; and responding to the Internet user via the Internet…. The various types of loan applications include first and second mortgages, car loans, student loans, personal loans, and credit card applications. Other types of credit applications may exist without departing from the spirit of the invention. (Underlining added)

Importantly, there is no disclosure anywhere else in the '816 application of ***any*** other item that is procured by a user of the system from anyone – only loans and credit being procured by consumers from lending institutions.   LT filed an amendment with the '816 application, adding claim 42, which later became issued claim 18 in the '816 patent:

> A computer readable medium having computer-executable instructions for coordinating an electronic ***financial services application*** between an Internet user and a plurality of financial institutions via the Internet… transmitting the credit data to the selected ones ***of the financial institutions to assist a determination of offering financial services*** to the Internet user; and coordinating communication…so that the Internet user ***can accept financial services from one of the selected financial institutions.***(emphasis added)(Ex. B hereto, at Claim 18)

The structure of claim 18 (and its dependant claims 19-21) makes clear that LT, like everyone else, refers to the mortgage and credit service offered by the banks, and not the matching service offered by LT that selects the banks, as the financial services.  ("[S]o that the Internet user can accept financial services *from one of the selected financial institutions.*")(emphasis added).  Thus, LT's statements to this Court, that all of its non-litigation admissions about "services" are not directed to banks but to the LT matching system, are inaccurate.

More importantly, claim 18 recites that users "accept financial services from one of the selected financial institutions", that the matching system coordinates a "financial services application", and that the system assists in "a determination of offering financial services".  The *only* thing the '816 patent discloses as being applied for or accepted by users from financial institutions is loans – nothing else.  Thus, according to LT, issued claim 18, and dependant claims 19-21 in its own '816 patent, claim subject matter <u>disclosed nowhere</u> in the '816 patent specification.

The impact of the above is far greater than LT simply making an argument that clearly makes no sense.  35 USC §112 requires that the patent specification "shall contain a written description of the invention and of the manner and process of making and using it…".   If "first and second mortgages, car loans, student loans, personal loans, and credit card applications" are not financial services, then claims 18-21of the '816 patent are invalid as failing to meet the written description requirement of 35 USC §112.  *University of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916 (Fed. Cir. 2004)(Claim invalid for claiming subject matter not described in the written description); *Shu-Hui Chen v. Bouchard* 347 F.3d 1299 (Fed. Cir. 2003).

Further, the '816 patent is a continuation application, and claims priority under 35 USC §120 to the '594 patent.  In a filing made in the '816 patent, LT represented to the patent office as follows: "Applicants remind the Examiner that copies of these references are not necessary since the present application claims priority under 35 USC §120 to the parent case."  (Ex. D, p. 10).   This priority claim is noted on the cover of the '816 patent, and entitles the '816 patent to enjoy the filing date of LT's earlier filed '594 patent, thereby providing protection against nearly four years worth of intervening prior art.  (Compare filing dates, Exs. B and C).

Yet, the only disclosure in the '594 patent of users acquiring anything from anyone is limited to users acquiring loans from banks.  If those loans are not financial services, then the subject matter of claims 18-21 of the '816 patent is not disclosed in the '594 patent, and the '816 patent is not entitled to the claimed priority.  If LT really believed that those loans were not financial services, then its claim to priority constituted fraud on the patent office, and the '816 patent would be unenforceable.  The *Li Second Family Limited Partnership v. Toshiba Corporation*, 231 F.3d 1373 (Fed. Cir. 2001) ("[A]n applicant's misrepresentation that he is entitled to the benefit of an earlier filing date is highly material", holding patent unenforceable as a result of improper claim of priority); *Shu-Hui Chen v. Bouchard* 347 F.3d 1299 (Fed. Cir. 2003)(Claim not entitled to priority if parent application does not clearly disclose claimed subject matter).

LT achieved a filing date that was nearly four years earlier than that to which the '816 patent would otherwise be entitled, and also obtained the right to add a generic term "financial services" to its claim based upon the '816 specification discussing loans.  The generic term "financial services" provides much broader protection for LT than just the specific loans disclosed in the specification, and avoids LT's '816 patent being so limited.   Both of the

8

foregoing advantages were based <u>exclusively</u> upon the assertion to the patent office that the offering of mortgage loans, car loans, student loans, and other loans, constituted financial services, and neither of these advantages could have otherwise been obtained by LT.

LT's position here – that banks selected by its matching service do not offer financial services - is directly contrary to, and irreconcilable with, LT's position before the patent office. LT can not assert, for the purpose of obtaining priority rights and broadening its claims in the patent office, that banks on its network offer financial services, and also assert that those same banks offering the same services do not offer financial services for the purposes of attempting to obtain a non-infringement ruling in this Court.  This is classic judicial estoppel, and is barred as an attempt to play "fast and loose" with a federal court of law. *Ryan Operations, GP, v. Santiam Midwest Lumber Co*. 81 F.3d 355 (3rd Cir. 1995);  *Cummings v. Bahr* 295 N.J. Super 374 (App. Div. 1996); *Palcsesz v. Midland Mutual Life Insurance Company* 87 F.Supp. 2d 409 (D. NJ 2000)(Debevoise, SJ)(Judicial estoppel applies to agency proceedings as well, citing numerous cases).

Accordingly, LT is barred here from taking the position that loans are not financial services.  Even absent estoppel, the use of the term "financial services" in LT's patents is consistent with the normal use of that term and clearly refutes LT's position here.  This Court should enter summary judgment on this issue in SST's favor.[4]

---

[4] That LT would even assert here that lending services provided by its banks are not financial services is odd to say the least.  If this Court were to agree with LT, it would serve as a judicial ruling that many claims in LT's '816 patent are invalid as lacking support under 35 USC §112, and it might even mean that LT's priority claim was made knowing it to be incorrect, and fraudulent.  In either event, once this Court rules on the present motion, LT's own patent could be invalidated by the position it takes here, a fact in which LT shareholders, who place significant value in the competitive position the LT patents provide, would undoubtedly be interested.

**C.     LT's Remaining Arguments Concerning Goods and Services Are of No Merit**

LT's offers a brief assertion to the effect that the numerous Internet pages that classify financing as a service are not reliable because they classify other things as services.  However, virtually every respectable source that discusses mortgage lending classifies and/or describes it as a service. www.wikipedia.com , a respected on-line encyclopedia, defines a service as follows:

> In economics and marketing, a service is the non-material equivalent of a good. Service provision has been defined as an economic activity that does not result in ownership, and this is what differentiates it from providing physical goods. It is claimed to be a process that creates benefits by facilitating either a change in customers, a change in their physical possessions, or a change in their intangible assets.

Ex. J hereto, noting  "banks and building societies (offering lending services and safekeeping of money and valuables)".  *Id.* See also, Ex. E hereto, sample trademark registration.

Additionally, the '328 patent specifically discloses insurance as one of the contemplated "goods or services".   Col. 1, line 67 – col. 2, lines 26.   Insurance is "coverage by contract in which one party agrees to indemnify or reimburse another for loss that occurs under the terms of the contract" www.dictionary.com.   If an insurer's agreement to pay the buyer money in the event the buyer suffers a specified loss is deemed by the '328 patent a good or service, then there is no reason to believe that a lender's agreement to allow the buyer to use money to buy a home or car is not a good or service.[5]

---

[5] This Court defined services as performances of work.  Work is "productive or operative activity." www.dictionary.com.  A bank arranging for a consumer to obtain use of funds for 15 years is certainly providing to the consumer productive or operative activity.   To argue otherwise is to urge a finding that the funds are useless, an assertion that would undoubtedly come as a surprise to consumers using the LT system.

LT's reliance upon the fact that the Examiner did not classify the '328 patent into classes that include financial services is nonsensical. The Examiner did not classify the '328 patent into classes relating to refrigerators, office furniture, auto parts, roofing services or painting services, but these are all clearly goods or services. The Examiner correctly classified the '328 patent into classes that involve computerized inventions for buying and selling goods and services, not into classifications that relate to any good or service that can be sold - whether on the computerized ecommerce system of the '328 patent or otherwise.

In fact, the Examiner cited <u>against</u> the '328 patent claims, as prior art, several computerized electronic matching systems that are directed to trading financial instruments. (Ex. I, three cited patents, See also Op. Ex. A, listing these as cited prior art). Thus, the examiner clearly understood that the computerized system for buying and selling being claimed in the '328 patent included systems that trade financial services. Otherwise, that prior art would not have been relevant.

Finally, LT repeatedly states that the '328 patent never mentions loans in its specification, citing no case law that makes this relevant. The '328 patent never mentions roofing or painting services, car parts, or office furniture either, because the '328 patentee was not obligated to list every possible good or service that could be sold using the system. It is not SST's burden to show a disclosure of financial services in the '328 patent. Instead, as the Federal Circuit recently held, it is LT's burden to show that the '328 patentee clearly and unambiguously intended to exclude financial services from the ordinary definition of services:

> The Commission's argument that "there is no suggestion in the '649 patent that steps 2 and 3 of claim 1 could be performed outside a darkroom" has it backwards; ***the proper question is whether the specification indicates that the second and third steps cannot be performed outside a darkroom***, and

thus that the claim must be interpreted more narrowly than its language appears to require. *See Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002) (an accused infringer cannot overcome the heavy presumption that claims should be given their ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification"); *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed.Cir.2004) ("the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope"). (Emphasis added)

*Fuji Photo Film, Ltd. v. ITC*, 386 F.3d 1095 (Fed. Cir. 2004).

In summary, the fact that mortgage notes or obligations to repay money may not be services – even if it were true - does not detract from the fact that a bank offering financing to consumers is offering them a service.  Nor is there merit to LT's arguments that its own references to lending services are discussing a matching network – LT's patents show otherwise.  Finally, the financial literature, as well as the example of insurance directly in the '328 patent, all point to the inescapable conclusion that LT's member banks offer lending services or financial services.  LT is judicially estopped from arguing otherwise.  Accordingly, summary judgment on the issue in SST's favor should be entered.[6]

## III.    LT BORROWERS ARE NETWORK MEMBERS[7]

---

[6] LT's notes that Dr. Dowling, believes loans are better analyzed as goods because of the '328 patent's use of the term "product" to describe an insurance policy.  While either theory of infringement might be feasible, this difference of opinion merely points out that Dowling's opinion is his own, not a parrot of SST's position.  This stands in sharp contrast to the damages expert offered by LT, who indicated at deposition that his report was prepared by providing draft after draft after draft to LT's lawyers, who helped him revise it each time.  These drafts were reviewed by "webcam" to avoid sending emails or faxes of them that would have to be produced in discovery.  SST will put the issue of the admissibility of such testimony – really the lawyers' but being put forth as the expert's -  before this Court at the appropriate time.

[7] After September, 14, 2006, "consumers [could] no longer search the database of Qualification Forms in order to, for example, view their loan offers or modify a previously submitted Qualification Form. "   (Ex. F, representation to the Court from LT's counsel).   We denote the time prior to September 14, 2006 and subsequent thereto as **prechange** and **postchange**, respectively.   SST does not believe this change affects

## A. The RFQ Need Not Be Mutually Exclusive From the Membership Application

LT's arguments on the network member issue are contained at pp. 17-21 of LT's brief. First, LT asserts that the email addresses, contact information, and other items that a consumer must enter before applying for a loan are not an application for membership, but are actually part of the Qualification Form submitted to the LT system. (LT p. 18).  In the words of the '328 patent, LT is arguing that that the user's personal data is part of the RFQ, not an application for membership that must be completed prior to submitting an RFQ. (LT Br. at 18).  This assertion is without merit.

LT does not in any way dispute that Op. Ex. B accurately represents the prechange operation of the LT website, that is, the operation of the website prior to September 14, 2006. Yet, Op. Ex. B., and specifically, pp. 12480 -12482 show that before a user can apply for a loan, he *must* enter 15 items of information, including his name, phone number, email address (twice to verify its accuracy), mailing address, etc.  *Id.*   Additionally, as shown at 12480, the user must then "acknowledge receipt of our privacy policy and request that LendingTree save the information…."  *Id.*   The user is advised to create a password, because "You'll use your 4-10 character password and email address to login and view your offers".   This information is then submitted to the LT system upon the user clicking an icon.   A user later returning to the website can access his account and is greeted with a personalized welcome screen and can review her offers. (Op. Ex. H)[8]

---

the infringement analysis herein, but we discuss the two time frames separately in the event the Court finds otherwise.

[8] LT notes at p. 19 of its brief that "It is undisputed, however, that the *current* Lendingtree website does not allow prospective borrowers to access or modify previously entered information through a network account". (Emphasis added).  LT can not make this statement with respect to the prechange system.

It is undisputed that if the user does not enter an email address, for example, or acknowledge the LT privacy policy, he or she is not permitted to proceed to the next step, and is not given access to all of the loan application documents at Op. Ex. B 12483 - 12488.   However, when all this personal data is entered and the acknowledgment of the privacy policy is made, and the LT system receives and approves same, then ***and only then,*** is the user permitted access to complete and submit the required application for a loan, which includes entering information such as employment information, credit history, income sources, etc. Op. Ex. B, at 12483-12488.

The '328 patent notes that "A potential user accesses the Internet using any standard Web browser, and becomes a quotation network user by completing a registration application providing necessary data about itself.  Once registered a user can access the forms necessary for preparing a request for quotation" ('328 patent, Op. Ex. A, col. 4, line 67 – col. 5, line 3).  Thus, the idea of requiring a user to enter some contact information before he or she may complete a loan application (RFQ),  just like Op. Ex. B shows at 12480 - 12482, is precisely the exemplary embodiment of what a membership application is in the '328 specification.   Practicing the preferred embodiment in the '328 patent specification is not a defense to infringement, but instead proves the infringement.

With respect to the postchange system, the analysis is the same because the only difference between the prechange and the postchange system is that users do not have direct access to their previously entered membership data.  Only LT employees can access that data. This difference does not effect the infringement analysis here.

Specifically, Ex. A to the Baker declaration filed with LT's summary judgment motion shows a sequence of screen shots that LT asserts represents an accurate depiction of how the

*present day*, post change LT system works.  At pp. 5-7 of Baker, Ex. A, a user is requested to enter his contact information, email address, password, phone number, etc.  He also must acknowledge the LT privacy policy.  *Id.*, at 5.  He then clicks "Save and Continue", whereupon the system transmits the data to the LT system, processes the information, and next presents the user with a form to complete his financial profile, salary, social security number, mailing address, and other data constituting the mortgage loan application.  Baker Ex. A, pp. 8-11.

However, if a user accessing the postchange LT website fills out the screens in the membership application at Baker, Ex. A, pp. 5-7, but omits his last name, or his email address, or his acknowledgement of the privacy policy, or any of a number of other required fields, the system will prohibit him from accessing the forms necessary to enter his financial information and apply for a loan.  Instead, it will display an error message.  (e.g.; "We found errors in your information.  Please check the fields marked below and *try again*…Please enter a valid email address") (emphasis added).  (Ex G. hereto, and associated text from Kaplan Dec. describing error messages and prohibition against obtaining loan application (RFQ) when the membership application is not first completed.)

This is a membership application, and anyone failing to properly compete it will be *prohibited* from entering any of his financial information that forms the loan application.  The user's acknowledgement of the privacy policy serves an important purpose in limiting liability, because the user can not gain access to any of the subsequent forms to fill in any of his personal data (income, credit history, SS#) unless and until the user has agreed to the manner in which LT will treat that data.   Moreover, the system ensures that it has the user's name, contact number, email address, and password prior to providing the loan application documents.  This is precisely what is described in the '328 patent.  "A potential user accesses the Internet using any standard

Web browser, and becomes a quotation network user by completing a registration application providing necessary data about itself.  Once registered, a member can access the forms…"

LT appears to believe that infringement is avoided because the information entered as part of the membership application is also used as part of the loan application.  In other words, LT believes that the data entered into the membership application  must be mutually exclusive from the data entered in the RFQ. (LT Brief, P. 18, urging that the contact data of the user is actually part of the QF, what the '328 patent calls the RFQ).  This argument is perplexing.

First, LT has pointed to nothing in the '328 patent that represents a clear and unambiguous disclaimer of any system that includes in the RFQ any information that the user entered when he registered to use the system.  Second, col. 5, lines 1-2 of the '328 patent notes that a membership application includes identification of the user, and col. 4, lines 1-4 indicate that anyone can register as a buyer, presumably by supplying at least his identity.  Yet, that same identification of the user from the membership application is also included as the first field of the RFQ shown at Fig. 7 of the '328 patent.

Second, as Baker Ex. A, p. 7 shows, the membership application is entered, sent, and processed at the LT system first.  (Baker Ex. A, p. 7, "Save and Continue").  Then, either the further application forms are displayed to the user, or an error message is displayed if the membership application is not filled out correctly. (Ex. G hereto).  Thus, just like in the '328 patent, the membership application is first filled out and processed, and some data from it may subsequently be used in the RFQ.

The fact that the identifying information entered into the membership application by LT users is subsequently used as part of the RFQ itself does not avoid infringement, and is precisely what the '328 patent discloses. [9]

**B.     LT's Remaining Assertions with Respect to the "Network Member" Limitation are also Incorrect**

LT next asserts that "Anyone can use Lendingtree's website" (LT Br. p. 17), so there are no members. However, "anyone or any company…." can also use the '328 system. ('328 patent, Op. Ex. A, col. 4, lines 1-2).

Finally, LT notes that in the postchange system, a user returning to the LT website will have to fill in his contact details again, because he does not have access to the LT database that stores any prior information. This is irrelevant, for several reasons.

First, LT does not deny that the user's personal data previously entered is actually maintained by the LT system. Indeed, the LT website states "You acknowledge….and request that LendingTree save the information on your form…"    The website also notes that LT will use the entered email address to forward loan offers received from banks. Baker Dec. (Exs. A, p. 5, 6).

LT prohibits the consumer from accessing the saved information to avoid infringement of IMX's patent, which has a claim limitation requiring that "each party to a loan" (including the consumer) can "search and modify" the database of records.  Op. Ex. M, at claim 1, see also Ex. G hereto, noting "***consumers can no longer search*** the database of Qualification

---

[9] The consumer's acknowledgement of the terms of use of LT's website and its privacy policy are not even part of the loan application, as banks do not have any interest in this.  Instead, the acknowledgment is required to register to use the LT system itself, and clearly shows there is a membership occurring.

Forms"(emphasis added)).   As indicated at ¶ 13 of the Hodson declaration filed with LT's summary judgment motion, consumers wanting to modify or inquire about a previous application must call LT, whereupon an agent of LT will review/update the previously stored data.   See also, Ex. H hereto, indicating consumers can update a pending request by calling LT and having an agent do it for them.

The fact that a user does not have direct access to, or the ability to modify, his prior membership data, and instead must have another person do it for him, does not avoid the '328 patent.  The '328 patent nowhere has a requirement that to be a member, a user must be able to access or modify his membership data.    Instead, the '328 patent notes that once a user "provides necessary data about [him]self" he is registered and can submit RFQs.  This is indisputably present in the LT system, and the fact that a user can call and have an agent update this data merely proves that the registration data is in the LT database.

Nor does the fact that a consumer must register each time he visits the website avoid infringement.  At best from LT's viewpoint, this means that if a user visits the website three times, there will be three records in the LT database for that user.  While admittedly this is less efficient than using the saved registration information from a previous visit, as the prechange system did, it does not change the fact that in order to use the system, a user must first provide his contact details, and agree to an acknowledgement of the privacy policy.    Nor does this inefficiency effect that fact that each set of registration information is actually stored at the LT database for at least the purpose of returning loan offers, ensuring that LT has approval to maintain confidential user information, and for otherwise maintaining contact with the user.

This contact information is on the same form as the user's name, email address, phone number, privacy acknowledgment, etc., is shown at the Baker Dec. Ex. A, pp. 5-7, and is required to gain access to the loan application screens.  This form is an application to be a network member in the context of the '328 patent.  Indeed, it is precisely what the '328 patent describes as a membership application.   (Op. Ex. A, col. 4, lines 58-60.)[10]

In sum, neither the fact that anyone can register, nor the fact that users do not have direct access to their information that LT admits is maintained at the LT database, nor even the fact that some information from the membership application is used in the RFQ, detracts from the fact that in order to use the system to apply for a loan, users must first fill in their contact details and acknowledge an agreement, all of which is stored at the LT system.  This is shown in LT's own submission, at pp. 5-8 of Ex. A of the Baker Dec., which is an application for membership.  Thus, the LT system meets the claim limitation "network member" as that term is defined in the '328 patent, and this Court's *Markman*.

## IV.   LT INFRINGES CLAIMS 12-14

In an attempt to avoid infringement of claims 12-14, LT offers only one case that is clearly distinguishable on its facts, and presents a lengthy explanation that utterly distorts and misinterprets the case law on preambles. When that law is properly analyzed, it is clear that the preamble term "purchasing" is not a limitation of claim 12.  In any event, even if it were, LT has failed to address the fact that it does practice the "purchasing" step in issue.

---

[10] Most users, once they get their four loan offers, need not visit the website again.  Thus, even if the irrelevant fact that consumers register again when they revisit had something to do with this case, it would at best affect damages, not liability.  In the majority of the cases – when the LT system works for its intended purpose - there is no return visit needed.

### A.     LT Mistates the Law Concerning Preambles With Respect to Preamble Language Being Used as an Antecedent Basis

The general law concerning preambles appears largely undisputed.  A preamble generally is not limiting when the claim body describes a complete invention such that deletion of the preamble phrase does *not affect the structure or steps of the claimed invention*. *Bristol Myers Squibb Company v. Ben Venu Laboratories, Inc*. 246 F.3d 1368 (Fed. Cir. 2001) (claim to method for reducing hematologic toxicity is not limited by intended use phrase "for reducing hematologic toxicity");  *IMS Tech., Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1434, 54 USPQ2d 1129, 1136-37 (Fed.Cir.2000) (preamble phrase "control apparatus"  does not limit claim); *Intirtool, Ltd. v. Texar Corporation*,  369 F.3d 1289 (Fed. Cir. 2004) (Claim preamble generally not limiting if the body of the claim describes a structurally complete invention, independent of preamble)

Thus, preamble language merely extolling benefits or features of the claimed invention or claiming intended uses of the invention are not limiting. *STX, LLC v. Brine, Inc.,* 211 F.3d 588, 591 (Fed.Cir.2000) (preamble stating that invention provides " improved playing and handling characteristics"  is not a limitation); *Bristol-Myers,* 246 F.3d at 1375 (steps of claimed method are performed the same way regardless of whether result in preamble is reached.)

Courts have sometimes looked to whether the preamble language in issue is used as an antecedent basis for a term in the body of the claim.  *Bristol Myers*, supra.   Attempting to distort this line of cases, LT notes at pp. 23 – 24 that the preamble of claim 12 provides antecedent basis for the terms "goods and services" and "data network", and thus, the term purchasing from the claim preamble is a claim limitation.  This idea of using references in the claim body to one term

in the preamble, to read another preamble term into the claim, invites reversible error.  The law is clearly to the contrary.

In *Catalina Marketing v. Coolsavings* 289 F.3d 801 (Fed. Cir. 2002) the preamble read: "A system for controlling the selection and dispensing of product coupons at a plurality of remote terminals *located at predesignated sites such as consumer stores* wherein each terminal comprises"  (italics in original reported case).  The Federal Circuit noted specifically that "dependence on a ***particular disputed preamble phrase*** for antecedent basis may limit the claim scope" (emphasis added) because it "indicates reliance upon the preamble and claim body to define the invention."  Nonetheless, the Court found that the preamble did ***not*** rely upon this phrase to define the invention, even though two other preamble phrases, terminals and coupons, were stated in the body of the claim and did rely upon the preamble for antecedent basis.  *Id.*

Similarly, in *Bristol Myers Squibb Company v. Ben Venue Laboratories, Inc.* 246 F.3d 1368 (Fed. Cir. 2001), the claim preamble referred to a patient, and the body of the claim referred to "said patient".  The term taxol was also in the preamble, and referenced in the body. Despite the body referencing and relying upon the preamble, the Court found that two other preamble phrases, "for reducing hematologic toxicity" and "an antineoplastically effective amount" were not limitations of the claim 1, and that the method would operate the same way regardless of whether the preamble phrases were met or not.  The Court never mentioned the other terms in the preamble, not in issue, that were referenced in the body.

Importantly, each of the two preamble phrases, "for reducing hematologic toxicity" and "an antineoplastically effective amount" was analyzed separately and in detail, in different paragraphs of the opinion.  *Id.*, at 1375.   Yet, both phrases were in the same preamble.  Thus, it

is not an all or nothing proposition, whereby any reference to any part of the preamble reads in the entire preamble. Instead, the Court must undertake an analysis of each preamble term in dispute, independently, in order ascertain whether that "particular disputed preamble phrase" is being used as part of the definition of the invention. *Catalina,* 289 F.3d at 808.

The remaining cases, even those where the preamble has been found limiting, further support the foregoing, and require rejection of the faulty reasoning put forth by LT. In *Bell Communications v. Vitalink* 55 F.3d 15 (Fed. Cir 1995) the preamble read as follows:

> A method for transmitting a packet over **a system** comprising **a plurality of networks** interconnected by **gateways**, said packet originated by **a source device** connected to one of **said networks** and destined for a destination device connected to one of **said networks**, said packet including a source address and a destination address, and said method comprising the steps of: (bolding added)

All of the bolded language above in the preamble was referenced and relied upon for antecedent basis in the claim body. However, the Court did not even mention any of that language in resolving whether another preamble phrase, "said packet including a source address and a destination address" limited the claims. The Court's entire analysis was limited to the ***particular phrase in issue***. And this is why both cases cited by LT at p. 24 of LT's brief involve situations wherein the phrase in dispute was the phrase referenced in the preamble. See also *Schumer v. Laboratory Computer Systems, Inc*., 308 F.3d 1304 (Fed. Cir. 2002) (Holding preamble phrase of method not a limitation, even though many other preamble phrases were in fact cited in the body of the claim.)

LT has cited no case, and we are aware of none after what we believe is thorough research, wherein any court relied upon the citation in the body to one phrase in the preamble to read a different term from the preamble into the claim. While the reason for this is discussed in

detail below, noteworthy here is that the body of claim 12 does not reference the preamble term

"purchasing", and thus, it is not a limitation of the claim.

**B.      Precedent Mandates that Claim 12 Not be Limited by Its Preamble**

LT's misreading of the case law on preambles is best appreciated by first reviewing the

case law that *does* govern the preamble issue in dispute.  In *Bristol-Myers Squibb Company v.*

*Ben Venue Laboratories, Inc.*, 246 F.3d 1346 (Fed. Cir. 2001), the Federal Circuit held that none

of the preamble language in any of the three claims at issue limited them:

> The steps of the three-hour infusion method are performed in the same way regardless
> whether or not the patient experiences a reduction in hematologic toxicity…. We reach
> the same conclusion with respect to the expression " an antineoplastically effective
> amount"..
>
> We next construe the expression " [a] method for treating a cancer patient to effect
> regression of a taxol-sensitive tumor, said method being associated with reduced
> hematologic toxicity"  in the preambles of claims 5 and 8 of the 537 patent. Again, we
> agree with the defendants that this language is only a statement of purpose and intended
> result. ***The expression does not result in a manipulative difference in the steps of the***
> ***claim. Id.,*** at 1375-6. (emphasis added).

The relationship between the preamble and the body of the claims in *Bristol-Myers* is

strikingly similar to that of claim 12 here:

| *Bristol Myers*, Claim at Issue (Bold Added) | *Bristol Myers*, Claim at Issue (Bold Added) | US Patent No. 5,758,328, Claim 12 (Bold Added) |
|---|---|---|
| **A method for treating a patient suffering from a taxol-sensitive tumor** comprising (i) premedicating said patient with a medicament that reduces or eliminates hypersensitivity reactions, and (ii) parenterally administering to said patient about 135-175 mg/m2 taxol over about three hours.[11] | **A method for reducing hematologic toxicity in a cancer patient undergoing [t]axol treatment** comprising parenterally administering to said patient an antineoplastically effective amount of about 135-175 mg/m2 taxol over a period of about three hours. | **A method of purchasing goods or services over a data network** comprising the steps of: communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services; filtering, at said filter means, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services; and obtaining, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means. |

In both the present case and *Bristol Myers,* the body of the claim referred to ***other*** terms in the preamble.  In both cases the phrase in issue – here purchasing – was not in the body.  In both cases the steps in the body perform the same whether the preamble phrase in issue is removed or not.    In *Bristol Myers*, "The steps of the three-hour infusion method are performed in the same way regardless whether or not the patient experiences a reduction in hematologic toxicity".  In claim 12, the same steps are performed the same way whether a purchase is done, or whether quotes are returned without a purchase being made.

---

[11] A third claim, wherein the preamble was also found to be not limiting, reads as follows:  **A method for treating a cancer patient to effect regression of a taxol-sensitive tumor, said method being associated with reduced hematologic toxicity,** said method comprising: (i) premedicating said patient with a medicament that reduces or eliminates hypersensitivity reactions; and (ii) parenterally administering to said patient about 135-175 mg/m2 taxol over about 3 hours.

In both *Bristol Myers* and here, the claim had uses other than what was in the preamble. Indeed, the '328 patent discloses that a potential buyer can get quotes and follow up with phone calls and emails, and whether a purchase is made from the returned quotes over the data network – or at all – is stated to be ***an option***.  (Op. Ex. A, '328 patent, at col. 6, lines 2-5 "the option may be to request…a purchase order…").

Other case law is fully in accord.  *Schumer v. Laboratory Computer Systems, Inc*.  308 F.3d 1304 (Fed. Cir. 2002) (Body of method claim sets out complete invention, so preamble does not limit claim);  *Intertool, Ltd. v. Texar Corporation,* 69 F.3d 1289 (Fed. Cir. 2004).

LT relies on *Boerhenger Ingelheim, Inc., v Schering Plough Corp.,* 320 F.3d 1339 (Fed. Cir. 2003), but this reliance is misplaced.  *Boerhenger Ingelheim* involved a method of producing a virus by injecting tissue infected with the virus into mammalian cells, allowing the virus to grow, removing an aliquot of the virus after growing, and repeating the process several times.  Each time, the amount of virus produced increases, until enough exists that it can be isolated and used as a vaccine against the virus.

Absent isolation of the virus, the end result is a bunch of infected mammalian cells that would likely be discarded as waste.  The Federal Circuit found "Divorced from the process of growing and isolating virus, the claimed method reduces to nothing more than a process for producing [infected cells]  - a process whose absence of fathomable utility rather suggests the academic exercise."  *Id.*, at 1345.   Thus, the Court found that the ***only*** use of the method steps in

the body of the claim was to obtain isolated virus for use as a vaccine.  In fact, the patent owner himself put forth no other use.[12]

The Federal Circuit's holding in *Boehringer* was predicated upon the fact that absent the preamble, the claim lacked utility, and thus would have been invalid under 35 USC §101.   In fact, subsequent case law within this Circuit confirms this.  In *Advanced Medical Optics, Inc. v. Alcon Inc.,* 361 F.Supp.2d 370 (D. Del. 2005), the defendant similarly tried to rely upon *Boehringer*, but the Court rejected the argument:

> The {Federal Circuit in Boehringer} found that the " growing and isolating ... virus" language of the preamble was limiting because without it, "the claimed method [was] reduce[d] to nothing more than a process for producing cytopathic effects in sheets of cultured MA-104 cells-a process whose absence of fathomable utility rather suggests the academic exercise." *Id.* at 1345. Thus, the court recognized that <u>one of ordinary skill in the art would not understand the usefulness of the process without the " growing"  and " isolating"  language of the preamble</u>….

(Underlining and {} added, [] in original) *Id.*, at 397.

Here, the method steps in the body of claim 12 recite a method of communicating an RFQ to a filter, filtering it, obtaining quotes, and "forwarding quotes to said potential buyer". The potential buyer can then communicate with the vendors supplying the quotes, even outside the patented system.  (Op. Ex. A, col. 6, noting buyers and sellers can the follow up by phone, email, etc.)  The buyer might also use the returned quotes to verify that a quote he already got was reasonable, that he can afford an item he wishes to purchase, or to set a budget for future project.

---

[12] The parties had disputed the definition of "isolating" as well.  Defendants argued that "isolating" meant only a first step in a mulistep process, a step that had been performed by defendants before the issuance of the patent.  In case that interpretation prevailed, the patent owner wanted a finding that it did not matter because "isolating" did not limit the claim.  However, all parties appeared to agree that isolating the virus was the only purpose for which the method could be used.

In fact, the '328 patent itself describes its entire purpose as supplying quotes to potential buyers, and the purchasing of the items over the data network is described at col. 6 as merely an additional "option". Op. Ex. A, col. 6, lines 2-5. Thus, one of ordinary skill in the art would clearly understand that supplying quotes from various vendors is useful to a potential buyer, whether or not he actually completes a purchase immediately over the data network.

Moreover, if the preamble said "A method of obtaining quotes for goods and services over a data network", and thus omitted the word purchasing, the three steps would operate exactly the same. Therefore, like *Bristol Myers and Advanced Medical Optics*, claim 12 operates "the same way regardless of whether or not" a purchase is completed. And claim 12 has numerous uses that are discussed in the '328 patent and which are unaffected by whether a purchase is completed over a data network or not. Finally, the preamble expression "purchasing" does "not result in a manipulative difference in the steps of the claim." Accordingly, all of the factors that the Federal Circuit has looked to point to the inescapable conclusion that the term "purcashing" is not a limitation of claim 12.

## C.    *Boerhenger Ingelheim* **is in Accordance with Other Federal Circuit Case Law and Requires Rejection of LT's Position Here**

The Federal Circuit's use of the fact that a preamble phrase provides antecedent basis for a limitation in the body of the claim is not black magic, but common sense. The body of the claim unquestionably limits the claim, and if the term "the widget" is in the body, and refers to "a widget" in the preamble, this limits the claim. The reason is simple: if widget were not in the preamble, it would have to be somewhere else in the body, in order for the claim body to refer to "the widget." Thus, the claim requires a widget, either way, and the term widget is necessary to define the invention.

27

Similarly, if the only use that would be recognized for the claimed invention is described in the preamble, like *Boehringer*, then the claim depends for utility on the preamble. Absent the preamble, there is no utility and the claim is invalid. Thus, like the logic underlying the "preamble antecedent" rule, the logic underlying *Boehringer* is the same – the preamble term is required to define the invention, and whether that is so because it is required for antecedent basis for the claim body, or to show the statutorily mandated "utility" like in *Boehrenger*, makes no difference. Either way, the claimed subject matter is undefined absent the term in the preamble.

This is not so when the term in the preamble – here purchasing – is referenced nowhere in the body. Nor does it become so merely because other terms in the preamble that may in fact limit the claim are referenced in the body. This is also not so when there are numerous uses for the invention – some disclosed in the '328 patent itself – other than the suggested use described by the preamble term in issue. Instead, the invention is fully functional, for a variety of uses, without reference to the preamble for utility *or* for antecedent basis. Thus, *Boehringer* is fully in accord with other case law. This Court should rule that the preamble term purchasing does not limit claim 12.[13]

### D. LT Has Failed To Address SST's Remaining Arguments on "Purchasing"

Even if the Court holds that the "purchasing" term from the preamble limits the claim – and we submit that would be error – SST's summary judgment motion should still be granted. While LT cites an extrinsic definition of purchase, such a definition may not to be used to

---

[13] LT's attempt to distinguish numerous cases based upon them involving apparatus claims is without merit. First, many of the cases involve method claims. e.g.; *Schumer Labs*., *Bristol Myers*, ("The expression does not result in a manipulative difference in ***the steps*** of the claim" directed to a method"). Second, no law states or even implies that claim construction with respect to preambles is somehow different between method and apparatus claims.

contradict the intrinsic record.  *Phillips v. AWH Corp*. 415 F.3d 1303 (Fed. Cir. 2005).  In its

Opening Memorandum, SST pointed out that the '328 patent specifically contemplates

"conditional purchases" that depend upon future events outside of the computerized system. Op.

Ex. A, col. 6, lines 12-15.   Here, LT borrowers accept a loan product, and the bank is obligated

to lend the money when the specified conditions of the offer are met at some future time. (SST

Opening Memorandum p. 26-27 and citations therein).  This is exactly what is described at col. 6

of the '328 patent as a conditional purchase.

Finally, SST notes again that claim 12 is not directed to a method "to purchase", but a

method of purcha*sing*.  Hence, for the reasons stated at p. 35 of SST's Opening Memorandum,

this covers an in-process purchase, even if not completed.  LT has failed to address the issue

entirely.

## V.    THE DOCTRINE OF EQUIVALENTS (DOE) REQUIRES DENIAL OF LT'S SUMMARY JUDGMENT MOTION

LT summarily asserts that the '328 patent is entitled to no scope of equivalents because

permitting equivalents would vitiate claim limitations.  This broad brush statement has no

support in the law.  The Federal Circuit has noted that every DOE case is a case where the

accused infringement is missing something in the claim.   *Depuy Spine Inc. v. Medtronic*

*Sofamar Danek, Inc.* 469 F.3d 1005 (Fed. Cir. 2006).  The very purpose of the DOE, and the

only time it is of any use, is when insubstantial changes are made that avoid the literal claim

language. *Graver Tanks & Manufacturing Co. v. Linde Air Products Co*., 339 U.S. 605 (1950)

Further, the limitations placed on the DOE in *Festo Corp. v. Shoketsu Kinsoko*

*Kabushiki* 535 U.S. 722 (2002), to which LT cites, are not applicable here, because LT

has pointed to no amendment made during prosecution that relates in any way to the

terms purchasing, goods or services, or network members.  Those terms were not added

or amended during prosecution of the '328 patent to achieve patentability, and thus, each

is entitled to its full scope of equivalents pursuant to *Graver Tanks* and *Festo  Corp.*

Importantly, whether something is "equivalent" for purposes of the DOE is an

issue of fact – although LT asks the Court to rule on summary judgment in its favor.

*Abraxis Science Inc. v. Mayne Pharma USA, Inc*. 467 F.3d 1370 (Fed. Cir. 2006).    What

constitutes equivalence is not the subject of a strict formula, and must be determined in

the context of the patent, the prior art, and the particular circumstances at issue.  *Id.*

(finding infringement under DOE when claim limitation absent from accused product).

Even if this Court were to agree with LT on the three terms at issue, a jury could

easily find for SST under the factually intensive DOE analysis.  For example, a system

that performs all the patented filtering, selects banks, implements the network filter to

solve the too many problem, permits all the material terms of a financial product to be

sent to a borrower, then permits the borrower to accept those terms, and obligates the

bank to provide the product when the conditions are met, could easily be deemed the

equivalent of a purchase over the data network.   The insubstantial difference – merely

requiring the minor step of documentary verification of income off line – is precisely the

type of insubstantial change *Graver Tank* and the DOE in general is meant to address.

*Abbott Laboratories v. Andryx Pharmaceuticals Inc.*,  473 F.3d 1196 (Fed. Cir. 2007)

(Rejecting arguments identical to those put forth by LT here, and holding preliminary

injunction proper where defendant likely infringed under DOE);  *Abraxis Science Inc. v.*

*Mayne Pharma USA, Inc.* 467 F.3d 1370 (Fed. Cir. 2006) (Noting infringement can exist under DOE when claim limitation is clearly absent from accused device.)

The same is true for the other two terms. For example, even if this Court agreed with LT on the "network member" issue, a jury could easily find that sending an RFQ that has the membership application included in the beginning of it is the same thing as sending a membership application. Nothing in the '328 patent or prosecution prohibits the two from being sent together. The membership data serves the same function, operates the same way, and achieves the same result – the system can forward offers received from banks, have a record of the user, obtain his agreement to privacy terms, etc., all before allowing a loan application.[14] And finally, if a lending service is not a service – and SST can not understand how it is not – it is certainly close enough to one that equivalents could be found. Indeed, we know insurance services are a services, as the '328 patent says so.

Hence, a broad brush statement that the LT system is literally missing claim limitations – true in every DOE case – does not avoid application of the DOE. At the very least, for this reason, the Court must deny LT's motion for summary judgment.

## VI.    CONCLUSION

For the reasons set forth above, the Court should deny LT's motion for summary judgment and grant that of SST.

---

[14] In actuality, LT does not deny that the data entered at pp. 5-7 of Baker Ex. A is all sent to and processed by the LT system first, before the user is presented with any loan application documents.

31

Respectfully submitted,

KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*


By:    s/Jeffrey I. Kaplan/
    Jeffrey I. Kaplan (JK 4706)
    Michael R. Gilman (7608) *Pro Hac Vice*

August 27, 2007