# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Source Search Technologies, LLC, <br><br> Plaintiff/Counterclaim Defendant, <br><br> -against- <br><br> LendingTree, LLC, IAC/InterActiveCorp, and ServiceMagic, Inc., <br><br> Defendants/Counterclaim Plaintiffs. | Civil Action No. 04-CV-4420 (DRD) (ES) <br><br> **DOCUMENT ELECTRONICALLY FILED** |

## DEFENDANT LENDINGTREE, LLC'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

Kevin J. McKenna, Esq.
Elvin Esteves, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey  07102-5496
(973) 596-4500

Claude M. Stern, Esq.
Robert B. Wilson, Esq.
Evette Pennypacker, Esq.
James E. Baker, Esq.
Linda J. Brewer, Esq.
(all admitted *pro hac vice*)
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000 (tel.)
(212) 849-7100 (fax)

Attorneys for LendingTree, LLC,
IAC/InterActiveCorp, and
ServiceMagic, Inc.

Date:  September 17, 2007

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION................................................................ 1

II.   LENDINGTREE'S WEBSITE DOES NOT INVOLVE "GOODS" OR "SERVICES" (CLAIMS 1-3, 12-14) ...................................... 3

    A.    SST Improperly Reads "Goods And Services" to Mean Any Economic Activity .............................................................. 3

    B.    SST Improperly Reads "Goods and Services" to Include Any Tangentially Related Things or Activities............................................ 4

    C.    The Intrinsic Evidence Does Not Support SST's Arguments .............. 5

    D.    SST's Reliance on Extrinsic Evidence Is Unpersuasive ..................... 7

III.  LENDINGTREE'S WEBSITE DOES NOT HAVE "NETWORK BUYERS" (CLAIMS 1-3)...................................................... 9

    A.    SST's Argument That Website Users Unknowingly Become Network Buyers Has No Support in the '328 Patent........................... 9

    B.    SST's Remaining Arguments Have No Merit.................................... 11

IV.  LENDINGTREE'S WEBSITE DOES NOT ALLOW "PURCHASING . . . OVER A DATA NETWORK" (CLAIMS 12-14) ..... 14

    A.    SST's Process Argument Is Inconsistent with the Plain Meaning of the Claims......................................................... 14

    B.    SST Misrepresents the Law Regarding Preambles ............................ 15

V.   LENDINGTREE DOES NOT INFRINGE UNDER THE DOCTRINE OF EQUIVALENTS ...................................................... 18

VI.  CONCLUSION .................................................................. 19

i

#1227717 v1
105556-53216

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bell Communications Research, Inc. v. Vitalink Communications, Corp.*,
  55 F.3d 615 (Fed. Cir. 1995).........................................................................16, 17

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001)............................................................................17

*Catalina Mktg. Int'l, Inc. v. Coolsavings, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002).........................................................................16, 17

*Enercon GmbH v. Int'l Trade Comm'n*,
  151 F.3d 1376 (Fed. Cir. 1998)..............................................................................8

*Hormone Research Found., Inc. v. Genentech, Inc.*,
  904 F.2d 1558 (Fed. Cir. 1990)..............................................................................8

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005)..............................................................................9

*Network Commerce, Inc. v. Microsoft Corp.*,
  422 F.3d 1353 (Fed. Cir. 2005)............................................................................19

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..............................................................................7

*Planet Bingo, LLC, v. GameTech Int'l, Inc.*,
  472 F.3d 1338 (Fed. Cir. 2007)............................................................................18

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
  81 F.3d 355 (3d Cir. 1996)....................................................................................9

*TechSearch, LLC v. Intel Corp.*,
  286 F.3d 1360 (Fed. Cir. 2002)......................................................................3, 4, 5

*Texas Inst., Inc., v. Int'l Trade Comm'n.*,
  988 F.2d 1165 (Fed. Cir. 1993)..............................................................................4

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997)...............................................................................................18

#1227717 v1
105556-53216

## I.    INTRODUCTION

In its opposition, SST argues – without properly presented evidence or expert testimony – that the '328 claims don't really mean what they say.  SST attempts to read key limitations so broadly that they are written out of the patent entirely.  It divorces the claim language from the patent's specification and prosecution history, ignores the Court's constructions, and relies almost exclusively on disfavored (and dubious) extrinsic evidence.

First, SST argues that the claim language "goods and services" encompasses "*[a]ny* economic activity," directly contradicting the Court's express constructions of those terms as "articles of trade" and "performances of work for another." (Opp'n at 5, emphasis in original).  SST's expert goes even further, testifying that virtually all goods involve services and all services involve goods, thereby reading the two different terms so broadly that they mean the same thing.  SST stretches the claim language beyond recognition in an attempt to avoid the otherwise inescapable conclusion that loans are money, and although money may be used to buy goods and services, it is not in itself either a good or a service.

Next, SST reads the limitation "buyer members" out of claims 1-3.  SST submits no evidence that users of LendingTree's website understand themselves to be "members" or that the LendingTree system so regards them.  Instead, SST contends that website users unwittingly become "buyer members" through routine

1

and commonplace online acts, such as typing an e-mail address. That notion is flatly inconsistent with the description in the '328 specification, in which prospective buyers knowingly fill out applications with the intent to register as members of the network, are acknowledged by the network as members, and receive special benefits that distinguish them from non-members.

Finally, SST tries to read the limitation "purchasing goods and services over a data network" out of claims 12-14. The use of the language "purchasing . . . over a data network" ties these claims to a specific embodiment described in the specification in which buyers submit purchase orders over the data network to automatically complete a credit purchase of a quoted item or service. (*See* Esteves Decl., Ex. A at 6:2-6). SST chose to use explicit language relating to this particular embodiment. Claims 12-14 are not directed to methods for merely making inquiries or beginning the procurement process, as SST now argues. SST cannot ignore the express language that it used (and submitted during prosecution) because it now wants claims with a broader scope for purposes of this litigation.

In sum, the LendingTree website does not infringe multiple limitations of the asserted claims, either literally or under the doctrine of equivalents. Thus, the Court should deny SST's motion and grant LendingTree's cross-motion for summary judgment of non-infringement.

2

## II.    LENDINGTREE'S WEBSITE DOES NOT INVOLVE "GOODS" OR "SERVICES" (CLAIMS 1-3, 12-14)

### A.    SST Improperly Reads "Goods And Services" to Mean Any Economic Activity

SST sidesteps the fact that a loan (*i.e.*, money) is neither a good (*i.e.*, an "article of trade") nor a service (*i.e.*, a "performance of work") by construing the terms "goods" and "services" so broadly that they become devoid of any meaning. In particular, SST argues that "goods and services" encompass "*[a]ny* economic activity." (Opp'n at 5, emphasis in original). SST, however, may not rewrite its claims to advance its litigation position with an argument that flatly contradicts the Court's claim constructions and the intrinsic evidence of the '328 patent and prosecution, which identifies "goods" and "services" as specific types of standard articles and activities. (*See, e.g.*, Esteves Decl., Ex. A at 3:63-65). Tellingly, SST relegates the Court's constructions to a footnote, and never explains how its newly minted interpretation comports with those rulings. (*See* Opp'n at 10 n.5).[1]

---

[1]   SST's argument (raised for the first time in its opposition brief) is found nowhere in its responses to contention interrogatories or expert reports. (*See* Esteves Decl., Exs. D and E; Baker Decl., Ex. E (attached to LendingTree's 8/13/07 Opp'n and Cross-Motion)).  It is a last-minute attempt to shore up SST's position on summary judgment in the face of compelling – and ultimately uncontroverted – evidence that a loan is neither a good nor a service as described in the '328 patent.  SST's conclusory arguments do nothing to create a triable issue of fact.  *See TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) (holding that "general assertions of facts, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden" on summary judgment of non-infringement).

3

Not everything of economic value is either a "good" or a "service," as SST suggests. Land is neither. Money is neither. And a loan is just money. SST deliberately limited the claimed system to the procurement of "goods and services," and the Examiner did not classify the application as directed to loan or financial systems. SST cannot now read out the express limitation "goods and services" from the claims in order to ensnare LendingTree's website. *See Texas Inst., Inc., v. Int'l Trade Comm'n.*, 988 F.2d 1165, 1171 (Fed. Cir. 1993).

**B.    SST Improperly Reads "Goods and Services" to Include Any Tangentially Related Things or Activities**

SST argues that the activities performed by a bank in providing a loan to a borrower makes the loan itself a "service." (Opp'n at 3-5). In essence, SST interprets the term "services" to include any and all background or ancillary work related to any economic activity. In this way, SST attempts to expand the scope of "goods" and "services" far beyond their plain meaning and this Court's claim constructions by including any tangentially related things or activities.[2]

The deposition testimony of SST's expert, Dr. Eric Dowling, demonstrates the absurd results that follow when tangential things and activities are included in

---

[2]    As before, SST's contention is pure attorney argument, never disclosed in any interrogatory response or expert report and without any support in the factual record. (*See* Esteves Decl., Ex. D; Baker Decl., Ex. E (attached to LendingTree's 8/13/07 Opp'n and Cross-Motion). Such conclusory arguments should be disregarded. *See TechSearch*, 286 F.3d at 1372.

4

#1227717 v1
105556-53216

the definition of goods and services. Dr. Dowling testified that car rental services are also "goods" because they involve cars. (Esteves Decl., Ex. C at 65:10-66:4). Moreover, according to Dr. Dowling, the car provided by the rental company is also a "service" because "when you hit the gas pedal, the car moves forward. It is performing, in the laws of Newton's physics, it is performing work for you." (*Id.* at 66:5-66:17). Thus, in SST's new world of "goods and services," virtually every good is also a service, and every service is also a good. But, if "goods" and "services" really mean the same thing, there would have been no reason for the applicant to have included both words in the '328 claims when they were originally drafted. Dr. Dowling's conclusory (and nonsensical) testimony is, therefore, insufficient to defeat summary judgment. *See TechSearch*, 286 F.3d at 1372.[3]

### C.    The Intrinsic Evidence Does Not Support SST's Arguments

Nothing in the '328 patent or prosecution history supports SST's latest interpretation of the limitation "goods and services." The express language of the claims, the disclosure of the specification, and SST's representations during prosecution are all consistent: The goods and services provided by the vendors are

---

[3] Dr. Dowling's opinion on this point crumbled when he was asked a few follow-up questions. For example, when asked whether money was an "article of trade" or a "performance of work," he testified that he lacked the economic expertise to answer. (Esteves Decl., Ex. C, at 67:2-68:23). Thus, SST's latest contentions regarding "goods and services" are unsupported by any credible expert testimony.

#1227717 v1
105556-53216

the actual articles of trade sold to the buyer or the actual work that the buyer hires the vendor to perform. (*See, e.g.*, Esteves Decl., Ex. A at 3:55-65, Figs. 2A and 8). The '328 patent never identifies things or activities that are only tangentially related to providing goods or services as themselves being "goods and services" within the meaning of the '328 claims.

SST cites only a single sentence in the '328 patent in support of its argument that "goods and services" include loans (Opp'n at 10) – a brief reference to a prior art system involving insurance agencies.[4] This fleeting reference is far too thin a reed to support SST's attempt to shoehorn all financial systems into the term "goods and services," and has nothing to do with how the patent describes the claimed systems. This is not surprising, since the sentence appears only in the "Background of the Invention" section of the patent discussing existing systems in the prior art. In this regard, as discussed in LendingTree's opening brief, the Examiner could have classified the '328 patent as relating to financial systems, but did not because the patent does not relate to such systems. Contrary to SST's suggestion (*see* Opp'n at 11), classifications for financial systems were available

---

[4] The sentence, which SST fails to quote in its brief, is: "In yet another existing system a primary seller, such as an insurance agency, offers to provide quotations from the insurance carriers for which the agency is an agent." (Esteves Decl., Ex. A at 2:4-7).

when the '328 application was filed, and the Examiner was free to classify the
application in as many categories as he saw fit.

### D.    SST's Reliance on Extrinsic Evidence Is Unpersuasive

SST also relies almost exclusively on disfavored extrinsic evidence to
support its expansive interpretation of "goods and services." (Opp'n at 5-10). But
that evidence does not come close to rebutting the express language of the '328
claims, the disclosure in the specification, and the record during prosecution. For
example, SST relies heavily on general dictionary definitions, which the Federal
Circuit has recently confirmed should be viewed with skepticism when interpreting
the scope of a patent claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322 (Fed. Cir.
2005). Indeed, SST repeatedly cites to definitions from sources of questionable
authority, such as Wikipedia (*see* Opp'n at 5, 10), which bills itself as "the free
encyclopedia that anyone [including SST] can edit."[5]

Likewise, SST's contentions regarding LendingTree's patents are
unsupported attorney argument that flies in the face of well-established Federal
Circuit patent law principles.[6] Specifically, SST purports to construe the claims of

---

[5]  *See* http://en.wikipedia.org/wiki/Main_Page. Wikipedia's entries are written
and edited by volunteers from the public at large, who may or may not have any
relevant experience or qualifications relating to the subjects they describe.

[6]  SST first raised its arguments regarding LendingTree's patents in its opposition
brief. SST never identified these arguments in any response to Defendants'

7

LendingTree's patents, analyze the scope of the specifications, infer what the Examiner concluded during prosecution, and determine whether SST's proffered construction is necessary to the validity and priority of those patents (*see* Opp'n at 5-9). SST then invites the Court to rewrite its claim constructions in this case based upon a flawed analysis of completely unrelated patents that issued years after the '328 patent. The Court should decline this invitation, as LendingTree's patents are not at issue here. *See Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998) (explaining that the analysis of infringement requires a comparison of the asserted claims to the accused device).

Even assuming that the LendingTree patents use the term "financial services" to describe lending or loans, that usage would have no bearing on the analysis in this case of whether loans are "goods and services" as those terms are used in the '328 patent and have been construed by the Court. A patent applicant acts as its own lexicographer to define terms in any way it wants for purposes of its application. *See Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990). LendingTree's reference to "financial services" in its patents is simply irrelevant to the pertinent question in this case: Are loans goods or services for purposes of the '328 patent? The use of the word "services" is

contention interrogatories. Nor are these arguments supported by any analysis, opinion, or testimony of any SST expert.

#1227717 v1
105556-53216

patent-specific. The phrase "financial services" in LendingTree's patents has to be

considered in the context of the intrinsic evidence for those patents, and not taken

out of that essential context to define the word "services" in the '328 patent. *See*

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005).

Finally, SST contends that LendingTree is "judicially estopped" from

arguing that its website does not involve "goods and services." (Opp'n at 5).

Judicial estoppel, however, requires proof of two elements: (1) a present position

that is inconsistent with a position formerly asserted; and (2) bad faith in asserting

one or both of the positions with the intent to play "fast and loose with the court."

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir.

1996). SST's flailing arguments fail to come close to satisfying either element of

this standard. There is no inconsistency between LendingTree's reference to

"financial services" in its own patents and its position in this litigation that loans

are not "services" within the meaning of SST's patent. As such, there can be no

suggestion that LendingTree has acted in bad faith in taking that position.

## III.   LENDINGTREE'S WEBSITE DOES NOT HAVE "NETWORK BUYERS" (CLAIMS 1-3)

### A.   SST's Argument That Website Users Unknowingly Become Network Buyers Has No Support in the '328 Patent

SST does not contend that users of LendingTree's website understand that

they somehow have become LendingTree "members" or that LendingTree

#1227717 v1
105556-53216

considers the users of its website to be "members." Instead, SST argues that

"network buyers" need never know they are members of the claimed system, and

the system itself need not recognize that it maintains a network of buyer members.

(Opp'n at 13-17). SST's litigation-inspired position is that a "network buyer" is

any consumer who simply provides contact information to a website. But that is

not what SST said in the '328 patent.

The '328 specification explains that (1) buyers deliberately register to

become "buyer members" by submitting applications; (2) the system recognizes

buyer members as such; and (3) membership entitles buyers to certain benefits.

The network confirms the contact information for buyer members after an

application is approved to ensure that they are linked to the system and will receive

subsequent communications. (Esteves Decl., Ex. A at 4:58-60). Buyer members

can be provided with application software to facilitate communications with

vendor members and the processing of vendor responses. (*Id.* at 4:21-29, Fig. 2B).

Membership allows buyers to pre-register their interests so that the system can

automatically send them relevant quotations. (*Id.* at Fig. 3).

LendingTree's website operates in a manner far removed from the system

described in the '328 patent. SST submits no evidence that the LendingTree

website (whether the current version or prior iterations) confers membership on its

users or identifies them as such. SST does not identify any special benefits that

LendingTree ever made available to any subset of users identified as members as opposed to non-members. Nor does SST offer any evidence that users of LendingTree's website ever considered themselves to have applied for and received membership.[7]

To advance its argument, SST contends that merely entering certain contact information online is sufficient to turn a website visitor a "buyer member." (Opp'n at 13-16). But, if that were so, every user of every shopping website who was required to enter information, such as a mailing address, would be a member of that website. SST points to no evidence suggesting that Internet shoppers consider themselves to be members of the countless websites they visit, or that the website operators have a similar view. Common sense suggests otherwise.

## B.     SST's Remaining Arguments Have No Merit

SST argues that the Qualification Form ("QF") on the LendingTree website can serve as both the membership application to become a "buyer member" and the "request for quotation," or "RFQ." (Opp'n at 13-16). That argument, however, directly contradicts the intrinsic evidence. For example, the '328 specification

---

[7]  With respect to LendingTree's current website, SST concedes that prospective borrowers must submit a new Qualification Form every time they make a new inquiry. (Opp'n at 18). SST contends that this means that a prospective borrower applies for membership each time he or she uses the website. (*Id.*). That is nonsense. If a consumer had to register by filling out an application every time he

#1227717 v1
105556-53216

states that "*[o]nce registered*, a member can access the forms necessary for preparing a request for quotation ("RFQ") . . . ." (Esteves Decl., Ex. A at 5:3-5, emphasis added). Thus, SST's patent clearly contemplates the submission of an RFQ by a buyer who has *already* registered and been accepted as a network member. In other words, the application is separate and distinct from the RFQ.

Likewise, the claim language distinguishes between the membership application and the RFQ. For example, claim 1 recites a "means for network buyers to generate request for quotation." (*Id.* at 8:31-32). Thus, the claim itself requires a user to first complete and submit a membership application and then be accepted and registered as a "network buyer." Then, and only then, is that user allowed to submit an RFQ. If the membership application were synonymous with the RFQ, the language of the claims would be meaningless – the buyer member limitation would be written out of the claims.[8]

---

or she went to a gym, no one would seriously argue that the consumer was a gym member.

[8] In support of its argument that the membership application may be part of the RFQ, SST points to Figure 7 of the '328 patent. (Opp'n at 16). Figure 7, however, actually supports LendingTree's position, not SST's. Figure 7 is identified as an example of an RFQ. (*Id.* at 3:44-48). The RFQ example in Figure 7 includes buyer identification information, just like the QF form used on LendingTree's website. The '328 patent does not characterize the buyer identification information as an "application" for membership. It includes that identification information along with all the other information as part of the RFQ.

#1227717 v1
105556-53216

SST also argues that error messages that appear if borrower information is not entered correctly on the LendingTree website means that the borrower is submitting an application for membership that is approved or denied by the website. (Opp'n at 15-16). SST's argument overlooks the fact that error messages appear if any information is not entered correctly on any page of the QF. (Esteves Decl., Ex. B at 1-5). For example, the failure to input the desired loan amount is treated the same way as the failure to input one's zip code. Error messages triggered by erroneous or incomplete entry of information are ubiquitous on the Internet, and do not somehow serve to convert the websites that collect such information into membership clubs.

Finally, SST argues that the prospective borrower's acknowledgement of LendingTree's terms of use and privacy policy is part of a membership application process. (Opp'n at 15, 17 n. 9). LendingTree's terms of use, however, simply explain how the website works and what the prospective borrower's expectations should be in visiting the various webpages or submitting a QF. (Esteves Decl., Ex. B at 6-16). It is no more part of a membership application than the returns policy described on a shopping website. Similarly, the privacy policy sets forth LendingTree's practices with respect to maintaining the confidentiality of information submitted by prospective borrowers – whether or not they decide to submit a QF. (*Id.* at 17-24). Thus, the terms of use and privacy policies that SST

13

cites apply to everyone who enters information on the website, not just prospective borrowers who actually submit completed QFs.

## IV. LENDINGTREE'S WEBSITE DOES NOT ALLOW "PURCHASING . . . OVER A DATA NETWORK" (CLAIMS 12-14)

### A. SST's Process Argument Is Inconsistent with the Plain Meaning of the Claims

Claims 12-14 are directed to a preferred embodiment of the '328 system in which sales are completed electronically. In this system, the buyer may "request that an e-mail *purchase* order be sent to a vendor and that the buyer's credit information, e.g. on file with the quotation system, be used to effectuate automatically a credit *purchase* of the quoted product." (Esteves Decl., Ex. A at 6:2-6, emphasis added). The preamble in claims 12-14 – "purchasing . . . over a data network" – makes clear that those claims cover systems that are designed to complete purchases online. Because it does not allow loans to be finalized on its system, the LendingTree website does not infringe claims 12-14.

SST argues that the preamble of claims 12-14 describes only the process of making a purchase, and does not require that a purchase be completed. (Opp'n at 28-29). The plain language of the claims undermines SST's argument. Claim 12-14 recite "[a] method of purchasing goods and services *over a data network*." (Esteves Decl., Ex. A at 9:45-46, emphasis added). The language couldn't be simpler. The transaction is completed online. Doing something "over a data

14

network" does not mean starting something online and then completing it somewhere else. Tellingly, every time the '328 patent refers to completing a sale online, it uses the words "purchasing" or "purchase." (*Id.* at 6:2-6, claim 6, 12-14).

SST proposes a strained interpretation of the word "purchasing" to mean beginning, but not completing, a process of purchasing. (Opp'n at 29). SST contends that if the applicant had intended claims 12-14 to describe systems where the process is completed online, it would have used "purchase" instead of "purchasing." But contrary to SST's suggestion, the word "purchase" cannot replace "purchasing" in the claims. Otherwise, claim 12 would recite "a method of *purchase* goods and services over a data network," which would render that part of the claim unintelligible. Thus, SST's purported distinction between "purchasing" and "purchase" has no merit. The only difference between the two words is one of grammar, not meaning.

## B.    SST Misrepresents the Law Regarding Preambles

SST also mischaracterizes the law in an attempt to avoid the preamble of claim 12. (Opp'n at 20-28). SST argues that a preamble can be a limitation only if each and every word of the preamble is found in the body of the claim. (*Id.* at 20-22). That argument makes no sense and is not supported by any authority. If each and every word of the preamble is already in the body of the claim, those words are

15

already limitations. Consequently, the preamble would be redundant and the case law concerning when preambles limit claims would have no purpose.

The Federal Circuit's decision in *Bell Communications Research, Inc. v. Vitalink Communications, Corp.*, 55 F.3d 615 (Fed. Cir. 1995) is illustrative. The preamble recited "A method for transmitting a packet over a system . . . said packet including a source address and a destination address." The body of the claim referred to "said packet" without mentioning the "source address" or "destination address" limitations. The parties disputed whether the preamble limited the claims to information packets having both "source" and "destination" addresses. After analyzing the claim "as drafted and in light of the specification," the Court concluded that the recitation in the preamble of two addresses was, in fact, a limitation of the claim. The Court explained that "when the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." *Id.* at 620.

SST incorrectly asserts that *Catalina Mktg. Int'l, Inc. v. Coolsavings, Inc.*, 289 F.3d 801 (Fed. Cir. 2002) stands for the proposition that a preamble limits the claim only if it provides an antecedent basis for a particular word. (Opp'n at 21). SST completely mischaracterizes this case. In fact, the Court did not consider the issue of antecedent basis. Instead, it held that the preamble could not serve as a

16

limitation because "[t]o hold otherwise would effectively impose a method limitation on an apparatus claim without justification." *Catalina*, 289 F.3d at 810.

Similarly, SST distorts the holding in *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001). SST wrongly asserts that the phrase "an antineoplastically effective amount" was part of the preamble of the asserted claims. (Opp'n at 21). That is not so. That term actually appears in the body of one of the claims at issue. The Court held that the phrase "an antineoplastically effective amount" in the body of the claim was not an additional limitation because the claim already recited the administration of a specific amount of the drug taxol over a specified time frame. The Court reached a similar result with respect to the preambles of the asserted claims, concluding that they did not further limit the specific descriptions of the claimed methods, and therefore, should not be construed as separate limitations. *Bristol-Myers*, 246 F.3d at 1374-76.

In this case, by contrast, the preamble introduces two key elements of the method – "goods and services" and "over a data network." It also ties the method to a preferred embodiment in the specification through the use of the word "purchasing." In this way, the preamble gives "life, meaning and vitality to the claim" because it relates expressly to the description in the specification of systems in which sales are completed electronically. *See Bell*, 55 F.3d at 621.

17

## V.    LENDINGTREE DOES NOT INFRINGE UNDER THE DOCTRINE OF EQUIVALENTS

SST argues that the "factually intensive" analysis under the doctrine of equivalents precludes the Court from granting LendingTree's motion for summary judgment. (Opp'n at 29-31). SST is wrong. As discussed in LendingTree's opening brief, a patentee cannot expand the scope of its claims under the doctrine of equivalents to read out an express limitation. (Opp'n and Cross-Motion at 29-34). This is a legal requirement, not an issue of fact, as SST contends. *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28-29 (1997).

SST epitomizes the improper reading out of express limitations in arguing that "goods and services" means any economic activity, "buyer members" means both members and non-members, and "purchasing . . . over a data network" means purchasing both on and off the network. SST is precluded as a matter of law from relying on equivalents to expand the scope of its claims in this way. *See Planet Bingo, LLC, v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1344-45 (Fed. Cir. 2007).

Finally, SST has failed to provide any particularized analysis or opinions regarding infringement under the doctrine of equivalents, either in its responses to contention interrogatories or in its expert reports. Accordingly, SST's conclusions regarding "insubstantial differences" are unsupported attorney argument (*see* Opp'n at 30-31), and should be disregarded. The Federal Circuit has repeatedly held that conclusory arguments do nothing to sustain the patentee's burden of

18

proof on equivalents, which requires "particularized testimony and linking argument on a limitation by limitation basis." *See, e.g.*, *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005).

## VI.    CONCLUSION

For the foregoing reasons, LendingTree respectfully requests that the Court deny SST's motion for summary judgment and grant its motion for summary judgment of non-infringement.

DATED:    September 17, 2007    By:    s/ Elvin Esteves

Kevin J. McKenna, Esq. (KM 7530)
Elvin Esteves, Esq. (EE 2216)
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5496
(973) 596-4500

Claude M. Stern, Esq.
Robert B. Wilson, Esq.
Evette Pennypacker, Esq.
James E. Baker, Esq.
Linda J. Brewer, Esq.
(all admitted *pro hac vice*)
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000 (tel.)
(212) 849-7100 (fax)

Attorneys for LendingTree, LLC,
IAC/InterActiveCorp, and
ServiceMagic, Inc.

#1227717 v1
105556-53216