# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

```
-------------------------------------------------------X
                                              :
Source Search Technologies, LLC,              :
                                              :
                    Plaintiff,                :
                                              :          Civil Action No. 2:04-CV-4420 (DRD)
          v.                                  :
                                              :
Lendingtree, LLC, ServiceMagic Inc.   and:
IAC InterActiveCorp,                          :
                                              :
                    Defendants.               :
-------------------------------------------------------X
```

**PLAINTIFF SOURCE SEARCH TECHNOLOGIES LLC'S ("SST") COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF SST'S CROSS MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF OBVIOUSNESS UNDER 35 USC §103**

Dated: January 4, 2008

Jeffrey I. Kaplan (JK 4706)
Michael R. Gilman (7608) *Pro Hac Vice*
KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.    INTRODUCTION ...................................................................................................1

II.   KSR DID NOT CHANGE THE LAW OF OBVIOUSNESS
      AS DEFENDANTS CLAIM ....................................................................................1

III.  THE INVENTION CLAIMED IN THE '328 PATENT ......................................5

IV.   THE SCOPE AND CONTENT OF THE PRIOR ART .......................................7

      A.    Ecommerce Was In Its Infancy ...............................................................7

      B.    Ecommerce Had Two Goals – Broaden
            Consumer Choices and Increase Competition .........................................9

V.    DEFENDANTS HAVE NOT ESTABLISHED THE
      ELEMENTS OF OBVIOUSNESS .......................................................................11

VI.   NEITHER FAST NOR IQUEST CAN RENDER
      THE CLAIMS OBVIOUS ....................................................................................13

      A.    Description Of the FAST System ...........................................................13

      B.    FAST Teaches Away from Claims 13 and 14 of the
            '328 Patent and Thus, Cannot Establish Obviousness
            as a Matter of Law ..................................................................................15

      C.    Iquest is Less Relevant than FAST, and All of the
            Same Reasoning Applies .........................................................................17

      D.    On the Present Record, Defendants Cannot
            Establish the Required Expectation of Success .....................................19

VII.  AS A MATTER OF LAW, THE BRICK AND MORTAR
      PRIOR ART CANNOT RENDER CLAIMS 13 OR 14 OBVIOUS.................21

      A.    The Brick and Mortar Systems are Not Analogous Art.........................22

      B.    Dr. Scacchi's Opinion Should Not Be Considered on the
            Merits, But Should Be Considered To Support the Finding
            that the BAM Art is Not Analogous .......................................................27

      C.    Computerizing the BAM Art Would Not Result In the Claims ............30

D.      Even if the BAM Art Were Combined With Computers, It Would Have
        Been Done In a Manner Other than How Defendants Suggest ............................32

VIII.   NUMEROUS OTHER FACTORS COMPEL
        A CONCLUSION OF NON-OBVIOUSNESS ...................................................................36

        A.      Defendants Offer Only Cumulative Prior Art........................................................36

        B.      Defendants Have Acknowledged that the Claims are Patentable..........................37

        C.      Other Secondary Considerations...........................................................................41

IX.     A Similar Analysis Holds for Claim 3 .................................................................................42

X.      A Similar Analysis Also Holds for Claims 1-2 ...................................................................43

XI.     CONCLUSION .....................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
    725 F.2d 1350 (Fed. Cir.)................................................................37

*AT&T Corp v. Microsoft Corporation,*
    2004 WL 292321 (S.D.N.Y. 2004)..................................................22

*Bausch and Lomb, Inc. v. Barnes-Hind/Hydrocurvbe, Inc.,*
    796 F.2d 443 (Fed. Cir. 1986)........................................................35

*Bayer AG v. Dr. Reddy's Laboratories, Ltd.,*
    2007 WL 3120794 (D. NJ 2007) ............................................3, 19, 21

*Bell Atlantic Network Services, Inc. v.*
    *Covad Communications Group, Inc.,*
    262 F.3d 1258 (Fed. Cir. 2001).........................................................7

*Boston Scientific Corp. v. Johnson & Johnson,*
    2007 WL 2408870 (N.D. Cal. 2007) .............................................3, 12

*Caponey v. Ada Enterprises, Inc.,*
    2007 WL 2745601 (D.S.C.)................................................................3

*In re Clay,*
    996 F.2d 656 (Fed. Cir. 1992)........................................................22

*In re Coastal Plains Inc.,*
    179 F.3d 197 (5th Cir. 1997) ..........................................................39

*Cygnus Telecommunications Technology Patent Litigation,*
    481 F.Supp.2d 1029 (N.D. Cal. 2007) ............................................12

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
    2007 WL 4305933 ...........................................................2, 3, 4, 12

*Eaton Crop v. ZF Meritor LLC,*
    2007 WL 2901692 (E.D. Mich. 2007).................................................2

*Eli Lilly & Company v. Zenith Goldline Pharmaceuticals, Inc.,*
    471 F.3d 1369 (Fed. Cir. 2006)....................................................40, 41

*Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.,*
    501 F.3d 1263 (Fed. Cir. 2007)..............................................5, 19, 21

**TABLE OF AUTHORITIES (continued)**

Page(s)

*In re Gordon,*
    733 F.2d 900 (Fed. Cir. 1984)...............................................................17, 19, 21

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966) ...................................................................2, 5, 9, 11, 28

*In re Grout,*
    377 F.2d 1019 (CCPA 1967) ...............................................................23

*In re Gurley,*
    27 F.3d 551 (Fed. Cir. 1994)...............................................................17, 19

*In re Kahn,*
    441 F.3d 977 (Fed. Cir. 2006)...............................................................22

*KSR International Co. v. Teleflex Inc.,*
    127 S.Ct. 1727 (2007)...........................1-5, 11-13, 19, 21, 23, 28, 29, 32-35, 40

*Leapfrog Enter., Inc. v. Fisher Price, Inc.,*
    485 F.3d 1157 (Fed. Cir. 2007)...............................................................29, 35

*Leapfrog Enter., Inc. v. Fisher Price, Inc.,*
    2006 WL 891001 (D. Del. 2006) ...............................................................29, 35

*Legget & Platt, Incorporated v.*
*Hickory Springs Manufacturing Company,*
    285 F.3d 1353 (Fed. Cir. 2002)...............................................................7

*Levar v. Freeman Decorating Company,*
    967 F.Supp. 1055 (N.D.. Ill 1997) ...............................................................39, 40

*Levi Strauss & Company, v. Golden Trade, Srl,*
    1995 WL 710822 (S.D.N.Y. 1995)...............................................................22

*Mannesmann Demag Corporation v.*
*Engineered Metal Products Company, Inc.,*
    605 F.Supp 1362 (D. Del. 1985)...............................................................22

*McGinley v. Franklin Sports, Inc.,*
    262 F.3d 1339 (Fed. Cir. 2001)...............................................................17, 19

*In re Mercer,*
    515 F.2d 1161 (CCPA 1975) ...............................................................35

## TABLE OF AUTHORITIES (continued)

Page(s)

*In re Merck & Co., Inc.,*
    800 F.2d 1091 (Fed. Cir. 1986)................................................................4

*Norian Corporation v. Stryker Corporation,*
    363 F.3d 1321 (Fed. Cir. 2004)..............................................................22

*Northern Telecom, Inc. v. Datapoint Corporation,*
    908 F.2d 931 (Fed. Cir. 1990)................................................................22

*In re Omeprezole,*
    490 F. Supp.2d 381 (S.D.N.Y. 2007)...........................................3, 12, 22

*Ortho-McNeal Pharmaceutical, Inc. v. Mylan Laboratories, Inc.,*
    2007 WL 432792 (D. NJ. 2007) .............................................................36

*Phillips v. AWH,*
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................44

*Princeton Biochemicals, Inc. v. Backman Coulter, Inc.,*
    2004 WL 1398227 (D. NJ 2004) ............................................................29

*Ex parte Rinkevich,*
    2007 WL 1552288 (BPAI 2007).............................................................25

*Single Chip Systems Corporation v. Intermec IP Corp.,*
    495 F.Supp.2d 1066 (S.D. Ca. 2007) ................................................4, 23

*Solder Removal Co. v. United States International Trade Com.,*
    582 F.2d 628 (CCPA 1978) ....................................................................37

*South Corp. v. US,*
    690 F.2d 1368 (Fed. Cir. 1982)..............................................................23

*In re Sponnoble,*
    405 F.2d 578 (CCPA 1969) ..............................................................19, 21

*Standard Mfg. Co., Inc. v. US,*
    25 Cl. Ct. 1 (Cl. Ct. 1991) ......................................................................37

*Stryker Trauma SA v. Synthes USA,*
    2007 WL 1959231 (D. N.J. 2007) ............................................................3

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*In re Sullivan,*
    498 F.3d 1345 (Fed. Cir. 2007) ....................................................................................40

*Sundance, Inc. v De Monte Fabricating, Ltd.,*
    2007 WL 1655423 (E.D. Mich. 2007).............................................................................3

*Takeda Chemical Industries, Inc. v. Alphapharm PTY, Ltd.,*
    492 F.3d 1350 (Fed. Cir. 2007)..................................................................................2, 5

*Therapeutics, Inc. v. Viacell, Inc.,*
    491 F.3d 1342 (Fed. Cir. 2007)...............................................................................19, 21

*United States v. Adams,*
    383 US 39 (1966)..............................................................................................................3

*Wang Laboratories v. Toshiba Corporation,*
    993 F.2d 858 (Fed. Cir. 1993)...............................................................................22, 23

*Warner Lambert Company v. Teva Pharmaceuticals USA,*
    289 F.Supp.2d 515 (D. NJ. 2003) ..........................................................................36, 40

*Application of Wederham,*
    378 F.2d 981 (C.C.P.A. 1967) ........................................................................................4

*In re Wesslau,*
    353 F.2d 238 (CCPA 1965) ...........................................................................................35

*Z4 Technologies, Inc. v. Microsoft Corp.,*
    507 F.3d 1340 (Fed. Cir. 2007)......................................................................................4

# I.    INTRODUCTION

After interpreting *KSR International Co. v. Teleflex Inc*, 127 S.Ct. 1727 (2007) in a manner that has been rejected more than a dozen times by courts at all levels, defendants add to their errors by using impermissible hindsight, ignoring teach away in the prior art, and proposing combinations of prior art that would destroy the purpose for which that art is designed, and which would result in an inoperable system.   Defendants' position is contrary to the testimony of their own expert, which itself is entirely inadmissible on the merits.   Moreover, defendants provide no *Graham* analysis, but instead, provide a large matrix for the Court to sort through and pick the features it wants in order to arrive at the '328 claims.

When a proper analysis under 35 USC §103 and the relevant case law is undertaken, only one conclusion is possible:  no reasonable fact finder could find the '328 claims obvious on the record developed in this case.   Accordingly, SST respectfully requests the Court enter summary judgment that the claims in issue are not obvious.[1]

# II.    KSR DID NOT CHANGE THE LAW OF OBVIOUSNESS AS DEFENDANTS CLAIM

Defendants argue that *KSR* represented a "fundamental shift" in patent law. However, as confirmed by a large number of post-*KSR* Federal Circuit and District Court cases, *KSR* held only that in that particular case, the Federal Circuit had applied the teaching-suggestion-motivation ("TSM") test too narrowly because the person having ordinary skill in the art ("phosita") is charged with "common sense."   *KSR*, at 1742.   The TSM test, as long as it is

---

[1] SST presents the reports of Eric Dowling, PhD, at Exhs. P and S hereto.  At the very least, the experts' disputes about the teachings of the prior art, the factual issue of what is analogous art, etc., require denial of defendants' motion.  SST believes that the Scacchi testimony is not properly considered however, and thus SST is entitled to summary judgment.

applied with flexibility and common sense, is perfectly consistent with *Graham v. John Deere Co.* 383 U.S. 1 (1966). *KSR,* at 1743. Indeed, *KSR* re-emphasized that the TSM test can provide "helpful insight" on the obviousness issue, that there is "no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis", and that in many cases, the Federal Circuit had applied the TSM test correctly, in accordance with *Graham*. *Id.*, at 1741

KSR also stressed that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does", and that "A patent composed of several elements is not proven obvious merely by demonstrating that each of its elements was independently known in the prior art." Indeed, "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.*, at 1741.

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc* 2007 WL 4305933 (D. Mass) is one of many post-*KSR* cases on point:

> [O]ne must inquire whether "a person of ordinary skill in the art would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so….KSR reaffirms the relevance of motivation, noting that the Court of Customs and Patent Appeal "captured a helpful insight" when it "first established the requirement of demonstrating a teaching, suggestion, or motivation to combine known elements." *Id*. at 1741. *Id*. at 7.

See also, *Takeda Chemical Industries, Inc. v. Alphapharm PTY, Ltd.,* 492 F.3d 1350, 1357 (Fed. Cir. 2007) ("[I]it remains necessary [after KSR] to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound"); *Eaton Crop v. ZF Meritor LLC,* 2007 WL 2901692

(E.D. Mich. 2007) ("KSR requires a reasoned basis for combining multiple teachings" rejecting as conclusory expert's testimony that "common sense" would dictate the combination); *Sundance, Inc. v De Monte Fabricating, Ltd*., 2007 WL 1655423 (E.D. Mich. 2007);  *Bayer AG v. Dr. Reddy's Laboratories, Ltd*, 2007 WL 3120794 (D. NJ 2007); *Stryker Trauma SA v. Synthes USA,* 2007 WL 1959231 (D. N.J. 2007).  (All post-*KSR*)

 *KSR* also cited *United States v. Adams,* 383 US 39 (1966) for the proposition that prior art that teaches away from the invention can not establish obviousness.  Numerous post *KSR* cases have also reaffirmed this doctrine.  For example, *Depuy Spine*, held that "If the proposed invention would "defeat the purpose" of a reference, for example, that reference teaches away from the invention." (Internal citations omitted) *Id.*, at 6.

 *In re Omeprezole,* 490 F. Supp.2d 381 (S.D.N.Y. 2007), another post – *KSR* case concerning teach away, the patent claim was directed to a drug, *Omeprezole*, surrounded by a specific inner coating, itself surrounded by a specific outer coating.  The defendants offered prior art showing the same inner and outer coating with another drug on the inside, and argued it would have been obvious to replace the drug on the inside with *Omeprezole*.  What could be more obvious than simply replacing one known drug inside a known coating system with another known drug?  Yet, the Court rejected the argument, due to the teach away:

> These references provide no reason-explicit or implicit-to apply the disclosed subcoatings to an omeprazole formulation…Moreover, Tsuda [the coating reference] teaches away from Omeprazole because it warns against applying its subcoating to moisture-sensitive drugs, and Omeprazole is highly sensitive to moisture. *Id.*, at 523.

 See also, *Boston Scientific Corp. v. Johnson & Johnson,* 2007 WL 2408870 (N.D. Cal. 2007); *Caponey v. Ada Enterprises, Inc*., 2007 WL 2745601 (D.S.C.).

 *KSR* also did not overrule the long standing principle that simple does not equate to obvious.

Indeed, according to several cases, the fact that an invention is so "simple" actually rebuts

obviousness.  This idea was perhaps most eloquently explained by the predecessor court to the

Federal Circuit, whose precedent is now binding on the Federal Circuit:

> Once appellant's solution to the problem of making a tapered wall
> frusto-cone is disclosed, it is easy to see how the prior references
> can be modified and manipulated to produce this type of cone. The
> change admittedly is simple and by hindsight seems obvious.
> ***However, the simplicity of new inventions is oftentimes the very
> thing that is not obvious before they are made***…. Yet this does
> not necessarily negative invention or patentability… ***Indeed,
> simplicity may even be some evidence of invention.*** The fact that
> the invention seems simple after it is made is not determinative of
> the question of obviousness.

*Application of Wederham*,  378 F.2d 981 (C.C.P.A. 1967). (emphasis added).  This doctrine too

has been re-affirmed in several other post–*KSR* cases.  *Depuy Spine* (adding known compression

member to known medical screw not obvious, despite being simple combination of known

elements);  *Single Chip Systems Corporation v. Intermec IP Corp* 495 F.Supp.2d 1066 (S.D. Ca.

2007) ("[W]hether or not a solution is complex or simple is irrelevant in an obviousness analysis

in light of the statutory admonition that [p]atentability shall not be negative by the manner in

which the invention was made.") (internal quotes omitted).[2]   Even the idea that combinations of

prior art that merely yield predictable results are unpatentable has been rejected as an overly

broad reading of *KSR*. *Depuy*, at 7.

Soon after *KSR*, the Federal Circuit affirmed several district courts' pre-*KSR* decisions,

rejecting infringers' contentions that *KSR* changed the standard.  *Z4 Technologies, Inc. v.

Microsoft Corp.*, 507 F.3d 1340 (Fed. Cir. 2007) (*KSR* does not entitle infringer to a new trial

where pre-*KSR* jury instruction read: "to find an asserted claim obvious, you must find that there

---

[2]  The reviser's note to the second sentence of 35 USC 103 states "it is immaterial whether [the invention] resulted from long toil and experimentation or from a flash of genius.  *In re Merck & Co., Inc,* 800 F.2d 1091 (Fed. Cir. 1986).

was some teaching, suggestion or incentive to combine the items in the prior art into the particular claimed combination"); *Takeda Chemical,* 492 F.3d 1350 (Fed. Cir. 2007) (pre-*KSR* district court decision correct even post *KSR*, because there was no motivation to combine.); *Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.*, 501 F.3d 1263 (Fed. Cir. 2007).

*KSR,* fairly read, is nothing more than a rejection of the overly narrow application of the TSM test in that specific case before the Court. *KSR* instructs, as has always been the law, that this Court must examine the scope and content of the prior art, as a whole, <u>including its teach aways</u>, the differences between the claims and that prior art, the level of skill in the art, and secondary considerations, all while applying a flexible approach and using common sense, pursuant to *Graham.*

## III.    <u>THE INVENTION CLAIMED IN THE '328 PATENT</u>[3]

Several features of claims 12 – 14 are noteworthy.   First, the claimed system is ***not*** a search engine that electronically contacts a large number of various potential sellers' computers on the Internet to allow the buyer to engage in widespread comparison shopping and find the best deals.  Instead, upon receipt of the RFQ at the filter means, the set of potential sellers is first limited at the filter means to: 1) those sellers that "at the filter means", it is determined can supply the requested item; 2) of those, the subset that meet the buyer's filter conditions (claim 13); and 3) of those, the sub-subset that are within a predetermined number equal to the number of quotes to be received. (claim 14).  Only <u>after</u> the RFQ is filtered "at said filter means" to ascertain the foregoing sub-subset, does the system go out and obtain quotes from that sub-subset and then forward them to the buyer.  Second, the method of claim 14 uses multi-step filtering at

---

[3] We address first only the validity of claims 13 and 14 as exemplary.  The analysis of the remaining claims 1 – 3 follows in a straightforward manner toward the end of this brief.

the filter means to diminish eligible <u>sellers</u> on the way <u>out</u>, to equal the number of quotes

anticipated to be received back.  Claim 14 does <u>not</u> recite that <u>quotes</u> are diminished on the way

<u>back</u> to the buyer, although that would not be precluded.

A third noteworthy feature is that claim 13 requires <u>additional filter conditions</u> be set by

the buyer, <u>beyond simply naming the desired item </u>on which quotes are to be obtained.  While

defendants note that a filter condition can be as simple as the item requested in the RFQ,

defendants omit important portions of the Court's *Markman* ruling.    That ruling states: "Thus

the issue is whether filter conditions can <u>include</u> product designation, as Defendants contend or

whether filter conditions must <u>exclude</u> product designation, or [sic, as] SST contends.

(Underlining in original, Opinion of October 16, 2006, p. 25).   Then, the Court resolved that

question:

> [SST contends that if] the product [good or service] of claim 12
> were a filter condition, claim 13, which adds the step of accepting
> filtering conditions from the buyers, would add nothing to claim
> 12.  **Defendants respond that there is nothing inconsistent with
> having a product serve as a filter condition in both [claim 12
> and 13] contexts with <u>other filter conditions added in the claim
> 13 context.</u>**  (Bold and underlining added)  *Id.*

This Court's *Markman* ruling, that one term may be a superset of, and thus can include,

the other term, does not mean that two different terms are the same.  The Court's holding that the

product in claim 12 could be a filter condition was based upon the specific finding that claim 13

<u>adds </u>conditions to claim 12.    This is of course fully consistent with the facts that 1) the claims

throughout consistently refer to the goods and services in the RFQ, and also recite a different

thing in the RFQ - filter conditions set up by the buyer and 2) Fig. 7 of the '328 patent shows the

product identification in the RFQ as a separate item from the buyer's filter conditions in that

RFQ.  When the claims and specification refer to two items as being different, it is improper to

collapse the two into the same thing. *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.* 262 F.3d 1258 (Fed. Cir. 2001); *Legget & Platt, Incorporated v. Hickory Springs Manufacturing Company,* 285 F.3d 1353 (Fed. Cir. 2002).

In summary, claim 14 defines a system whereby, upon receipt of an RFQ, the central filter means first ascertains a set of preregistered sellers that are potentially able to supply the requested item. The filter then diminishes that set by determining which of the potential sellers meet additional conditions (claim 13) set by the buyer. From that subset, the system again cuts back by selecting a number of sellers equal to the predetermined maximum number from which quotes are to be received. Finally, from that sub-subset the filter <u>obtains quotes over the data network</u> and <u>forwards</u> actual quotes (price and other terms in sufficient detail to constitute an offer capable of acceptance) to the buyer.

## IV.    THE SCOPE AND CONTENT OF THE PRIOR ART[4]

### A.  Ecommerce Was In Its Infancy

With the claims in mind, the Court must turn to the scope and content of the prior art, as evidenced by the various technical publications of the day. One 1994 ecommerce publication notes: "as the number of deflated megadeals and delayed trials adds up, it's becoming clear that the electronic market and interactive playground for consumers <u>is years away</u>". (underlining added); "<u>As the year progresses</u>, members <u>will</u> be able to [use the Internet to] order up many types of electronic components, computers, and services - or offer their own…What makes it possible for CommerceNet members to even dream of <u>such</u> <u>advanced tools</u>…." (underlining added). Ex. X, at 1, 2.

---

[4] Although the '328 patent was filed in February, 1996, the invention date for purposes of prior art is actually during 1994. (See Giovannoli Declaration)

A 1995 textbook written by an experienced computer consultant (Ex. X, at 19), notes that "[U]se of the Internet to provide the direct sale of products is still in the experimental stage.  So far, more companies are failing than succeeding."  *Id.,* at 16, 28.   See also, *Id*., at 7 (use of Internet to obtain quotes is "experimental";  *Id.*, at 35 (Bargainfinder Internet commerce software was "experimental"); *Id.*, at 39;  ("AT&T plans to incorporate" (emphasis added) the idea of permitting an online purchase);  *Id.*, at 40 (Expert "expects to see…[software that] "will help you find the best products…");   *Id.,* at 43 ("The Internet is ushering in a new era of electronic commerce…This year, when it becomes possible to safely buy products and services…) (emphasis added) *Id*., at 45.

Defendant Lendingtree's patent No. 6,385,594, filed nearly four years after the '328 invention date, states:

> The Internet, a vast collection of computers world wide, is a relatively new medium for both personal and commercial entities to transact business.  To conduct business over the Internet, companies must find ways to communicate with potential customers.  (Ex. U, at col. 1 of '594 patent, lines 9-14)

See also, "It is important to note that the commercial Internet is still in the early stages of development....We think its part of the future" *Id*., at 54.  It was unclear "How much of this is hype and how much of it is true?"  *Id.*, at 54-55.  A 1995 article published by the Institute of Electrical and Electronic Engineers (IEEE), describes a "scenario from the not-too-distant future" (emphasis added) in which purchase orders can actually be received electronically, instead of on paper, and buyers can access "online catalogs" from manufacturers that store them on something called a "Web server." Ex. X, at 43-45.  "The Internet has serious limitations as a market place…. Today's [1995] Internet has four limitations that must be fixed before electronic commerce can become widespread: it is hard to get connected, hard to use, people don't trust it,

and you can't send money through it." *Id*., at 45.  Dr. Scacchi, defendants own technical expert,

notes that in 1994, the FAST system upon which defendants rely as prior art "was, in my view at

the time, the first such Internet based EC system developed and in operation." (Ex. N, p. 4), and

that most examples of Internet commerce in 1994 were "small scale pilot projects or

entrepreneurial start-up ventures."  (Ex. Q, p. 3).

It is hard today to even conceive of a world where "it is hard to get connected" to the

Internet, when wireless, worldwide, handheld Internet access, and the fact that virtually every

home and office has high speed Internet access from multiple computers, make it much harder to

get <u>dis</u>connected from the Internet to enjoy family time.  The thought of an on-line catalog or an

invoice being sent electronically being worthy of publication by scientists in a respected

engineering journal almost provokes a laugh today.

In 1994, a foot messenger, and not an ECF system, would have delivered this brief to this

Court, and a law clerk graduating law school now and accepting a clerkship with this Court

would have been a ten or eleven year old child.  It is from <u>this</u> framework that the Court must

approach the *Graham* analysis, as hard as it may be to remember things being so primitive.


### B.  Ecommerce Had Two Goals – Broaden Consumer Choices and Increase Competition

As infantile as the state of the art was, one thing was clear:  The main perceived

advantage of ecommerce – and the main goal driving it - was the potential ability for a consumer

to quickly sort through lots of materials from potential vendors automatically, using a computer,

to efficiently comparison shop.   This would change the world, by giving the consumer

instantaneous access to all offerings, far and wide, directly from his computer.

Rather than spending hours on the telephone calling airline after airline, and/or visiting travel agents, people began to talk about a world where one could type his destination and travel dates into a computer, and the computer could electronically query lots of airlines' computers, checking a large number of flights and getting the best quotes in seconds. Rather than visiting one or two stores over an hour, consumers would be able to "visit" thousands of stores in seconds, getting the best deal possible. This newfound ability was perceived as <u>the single key to the success of commerce on the Internet</u>. For example:

"Also planned for delivery in a year or so are intelligent agent programs that would ferret out the best deals in microchips and other parts in the electronic market.";  "Tell Bargainfinder what you want, and it tells you who has it – and at the best price.";  "Forthcoming intelligent software and services promise to empower the user and increase competition among online merchants.";  "it will empower the consumer and force merchants to lower prices and improve quality, because it will be very easy to do comparative shopping";  "Andersen consulting of Chicago is expected today to unveil an experimental software system for the Internet's World Wide Web that would allow users to kick back and let a so-called agent forage through electronic record stores in search of the right compact disk at the best price.";  "Several companies, including Sun Microsystems Inc…are developing agents, and various university researchers are developing Web 'spiders' that go out and catalog resources on the Web and remember their contents" Ex. X, at 2, 5-7, 15, 32, 33.  "Your computer can be your travel guide.  Through Compuserve, you can search databases of <u>hundreds of thousands</u> of flights in seconds…".*Id*., at 15. (emphasis added).

One individual involved in the FACNET prior art cited by Defendants testified that his company used expensive computers meeting military standards to ensure that the buyer's RFQ

was distributed as widely as possible, to <u>all interested vendors equally</u>. Ex. Z.  "The use of EC

[ecommerce] gives all suppliers an equal opportunity…"    "Regardless of business size and

geographic location, all suppliers have instant and equal access….."  In fact, the benefit of using

ecommerce for procurement is that "it will stimulate the creation of a massive, competitive

vendor database."  Ex. Y, at 2-11, 2-12, 4-1.  Defendants expert here thought the same thing.

(Ex. O, pp. 166 – 169).

   In short, the Internet's ability to electronically contact the computers of many sellers

quickly and return lots of information gathered as a result was deemed the single aspect of

ecommerce that drove investment in it to begin with.


V.    **DEFENDANTS HAVE NOT ESTABLISHED THE ELEMENTS OF OBVIOUSNESS**

   The manner in which an appropriate obviousness analysis should proceed is exemplified

in *KSR*: "For a designer <u>starting with</u> Asano… The consequent legal question then, is whether a

pedal designer of ordinary skill <u>starting with Asano would have found it obvious to put the

sensor on a fixed pivot point</u>."  (emphasis added). *Id.*, at 1744.  Countless other cases, both

before and <u>after *KSR*</u> all analyze the obviousness inquiry using the same procedure.  That is,

starting with a <u>single</u> prior art reference <u>in the field to which the invention pertains</u>, the question

for the Court under *Graham* is whether it would have been obvious to add one or more missing

teachings from the same or an analogous art to arrive at the claimed invention.  In many of these

cases, the Court found that a phosita would not be led to add the teachings of the other reference,

either due to a teach away, a lack of motivation, secondary considerations, or other factors, even

though the combination was simple. *Depuy Spine, Inc,;  In re Omeprezole* 490 F.Supp.2d 381

(S.D.N.Y. 2007) (phosita starting with one reference would not be led to the other reference as it

would be counterproductive); *Boston Scientific Corporation v. Johnson & Johnson* 2007 WL 2408870 (N.D. 2007) at 7. (All post-*KSR* cases)

Defendants have not followed the above proper procedure.  They do not start with FAST or Iquest, and explain how or why a phosita would modify it using other prior art from ecommerce or an analogous art to arrive at the claimed invention.  Nor do they explain any problem with an ecommerce reference that would have led a phosita to look into an analogous art with a similar problem for solutions.   Instead, they make the conclusory statement that the '328 patent is a computerized referral system, and cite to the affidavit and report of their expert, Dr. Scacchi.  Scacchi in turn, attaches hundreds of documents going back nearly three decades that relate to things like treatment centers for alcoholics and abuse victims, hardware stores, United Way counseling centers, and the like, along with other references showing ecommerce prior art, all in a large matrix.  (Scacchi 25 – 35, Scacchi 5). Moreover, <u>each</u> column of Scacchi 5 shows <u>every</u> claim limitation – a scenario that would support a defense of anticipation under 35 USC §102, not one of obviousness under 35 USC §103, and which thus further confuses the matter.[5]

Defendants then claim that one can find all the claim elements of the '328 claims among the combined documents in the large matrix at Scacchi  5, so the Court should declare the '328 patent invalid on summary judgment.   *In Re Cygnus Telecommunications Technology Patent Litigation*, 481 F.Supp.2d 1029, 1054 (N.D. Cal. 2007) was similar:

> Defendant has in essence handed the court the pieces of a jigsaw puzzle and asked the court to assemble it. Defendant has not shown whether a person of ordinary skill in the art would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so.

---

[5]  Dr. Scacchi also misrepresents the teachings of the references.  See, e.g.; Ex. S, Dowling report,  ¶ 195 – 202.

Defendants have thrown an incoherent matrix into Scacchi 5, and taken the position that with the claim before the phosita, he could collect all the elements from shopping through the matrix. On this basis alone, defendants' have failed to establish obviousness, and their motion must be denied. *KSR*.

## VI.    NEITHER FAST NOR IQUEST CAN RENDER THE CLAIMS OBVIOUS

Any possible combination that defendants could be alleging of FAST/Iquest with any other art they have cited to attempt to arrive at the '328 claims is either  1) taught <u>away</u> from by the prior art,  or  2) does not result in the invention claimed in the '328 patent even if made, or 3) both.   Accordingly, on this record, no reasonable fact finder could find the claims in issue invalid as obvious, and the Court must grant SST's motion for summary judgment.

### A.    Description of the FAST System

FAST was essentially a search engine, that took a part name or number from a potential buyer, and contacted electronically, over a data network or by other means (phone when necessary), <u>as many remote seller or third party databases</u> as possible to determine which sellers might be able to supply the item. (Ex. L, p. 16, figure and text, p. 32).  The only information FAST itself maintained was after the fact records of ***its own*** processing of RFQs, and any resulting sales.   ("FAST does not keep information about parts (<u>with the exception of its own procurement history</u>)…Instead, FAST initiates remote lookups to external parts databases

commercial and government) that are maintained by third parties…" (emphasis added) (Ex. L, at 16).[6]

Upon receipt of an RFQ, FAST checked two sources to find all possible vendors that sell the requested item.   First, "if the system has previously purchased an identical or similar item before, it will automatically query <u>all</u> the suppliers who previously carried it." (emphasis added, Ex. L at 6.)  Second, if FAST had not previously facilitated purchase of the exact same item, then it would contact electronically, over the data network, as many third party and vendor databases as it could to attempt to locate the part.

Importantly, when FAST queried these external databases from whom it had never purchased the part, it had no idea, when selecting potential sellers at the filter means, who sold the part, or who might have met other filter conditions set by the buyer.   (Ex. L, at 16, noting that other than its own procurement history, no information about which vendors sell what is maintained by FAST.).

Because FAST searched "far and wide" (*Id*., at 33) to find as many sellers as possible, FAST could even obtain quotes from sellers that had never heard of FAST:  "The sales manager at Pasternack Enterprises in Irvine said <u>he never heard of FAST</u>, although the company received an $8,600 order through the system." (emphasis added). Ex. L, p. 32; See also,   Ex. L, p. 16, showing "Appscan" program going <u>out to vendors to query their databases</u>, thereby sending them the RFQ even before knowing if the seller can provide the item.)

In short, FAST simply electronically connected to as many sellers' databases as it could, querying each one to determine if the seller sold the desired item.  If it had previously handled a

---

[6] Ex. _____ refers to the Kaplan declaration filed with the present set of 3 motions for summary judgment.  Scacchi _____ refers to the Scacchi declaration presented with defendants moving papers.  Citations to the '328 patent can be found in defendants moving papers at Esteves Ex. 1.

transaction for the same item, FAST sent a query to <u>all</u> of those from whom it previously procured that item, plus any new sellers it could find.    Ex. L.

<strong>B.    FAST Teaches Away from Claims 13 and 14 of the '328 Patent<br>and Thus, Cannot Establish Obviousness as a Matter of Law</strong>

As described above, claims 13 and 14 require that the RFQ is received and filtered "at the filter means" against the potential sellers, and the set of potential sellers is diminished to those that 1) are known by the filter means as potentially capable of supplying the item; 2) meet the additional conditions of the buyer (claim 13); and 3) are within the predetermined maximum number of quotes to be received. (claim 14)  From this sub-subset, quotes are <u>obtained and forwarded back to the potential buyer.</u>

FAST, like all the other ecommerce prior art of the day, emphasized the need for <u>the opposite</u> - that the system should immediately send the RFQ to as many remote sellers as possible:

> FAST gives you uniform, automated access to a very large number of suppliers…As quotes accumulate, they are sent to the customer…When all quotes have been received ***(or as many as FAST can obtain)*** a final response is sent back to the customer. (emphasis added)(Ex. L, at 1-2.)

FAST "charges a fee of 8 percent [to the buyer]…Still, the system's ability to <u>search far and wide</u> does often result in good prices."  (underlining added) (Ex. L, at 33).   Indeed, FAST personnel even step in and perform manual searching to find <u>more</u> quotes so the buyer can get an <u>even larger</u> selection. Ex. L, page 6.

In the limited circumstance where it used its own procurement history, the most it could do is query <u>all sellers</u> that had previously sold the requested item.  Thus, FAST did not ascertain

15

a set of seller that met the additional filter conditions of the buyer (claim 13), nor did fast select only the limited number of sellers equal to the predetermined number from which a quote was to be received. (claim 14).  Moreover, FAST clearly was designed to send the RFQ to, and obtain quotes from, vendors who did not meet the buyer's filter conditions, because FAST discloses a system for handling returned quotes from such non-compliant vendors:

> If the quote responses [not the outgoing ***request*** for quotes] obtained by FAST meet criteria provided by the customer, FAST will, under this option, order directly, without returning the quote to the customer….When quotes are not obtained that meet the customer's criteria…the information that was obtained about the item is returned to the customer. (underlining added) (Ex. L, at. 3)

Thus, if the buyer wanted red widgets, but only from a vendor that will do international shipping of the ordered product, FAST would send the RFQ to all vendors that it could locate that sold red widgets, obtain, for example, 40 quotes, and then order from one that provided a quote indicating the vendor would ship internationally.  If no quotes indicated so, all quotes would be sent to the buyer.   FAST could not determine whether to include a vender in the set "ascertain[ed] at the filter means" before routing the RFQ, because FAST did not know anything about the vendor until it received the quote after having sent the RFQ blindly to as many potential sellers as it could.

Claim 14 requires that the set of potential sellers from which the quotes are to be obtained is limited even further – to a predetermined maximum number from which a quote is to be received.   Intercepting the RFQ at the filter means, before it is routed, and diminishing the search to only sellers that had preregistered what they sell (Claim 12) and other filter conditions that match those of the buyer (claim 13), and then further diminishing the number of vendors to only a prescribed number (Claim 14) would destroy FAST's ability to get "as many [quotes] as

16

FAST can obtain", (Ex. L, at 3), to provide the <u>least cost source</u> for items and to give uniform access to a "very large number of suppliers" (*Id.*, at 1); to deepen the search with human intervention to get more quotes (*Id.*, at 6); to "search far and wide" to get the best deal (*Id.*, at 33); and to search out and contact sellers who never even heard of FAST before in order to grow its own database. *Id.*

When a proposed combination of a prior art reference with another reference would diminish the ability of the main reference to operate for its intended purpose, the combination teaches away, and fails to establish a prime facie case of obviousness, <u>as a matter of law</u>. *McGinley v. Franklin Sports, Inc.* 262 F.3d 1339 (Fed. Cir. 2001); *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *In re Gordon* 733 F.2d 900 (Fed. Cir. 1984); *In re Sponnoble* 405 F.2d 578, 587 (CCPA 1969). Accordingly, SST is entitled to summary judgment.

### C.  Iquest is Less Relevant than FAST, and All of the Same Reasoning Applies

As Dr. Dowling explains, and as the Iquest documents show, Iquest was a system for searching for publications and articles. Scacchi 18 – 23. Iquest instructs "Before beginning a search, use Smartscan to screen a group of Iquest databases related to your topic and display the results…Based on these results, <u>you</u> can limit your search to a single database or multiple databases containing your search topic." Scacchi 23, at p. 202. (emphasis added) In Iquest "Before beginning a search, <u>you must select</u> the type of source Iquest-I will search (magazines or books, for example)." (emphasis added) *Id.*, at 199. While Iquest does provide help to the user in selecting the right database(s) to search, <u>all</u> are selected in advance of the search query. *Id.* [7]

---

[7] Why or how a phosita would replace search strings and magazine articles with requests for quotes and quotes, and how an information system for searching articles is going to be adapted to sell products, remains unspecified by

Once the databases are selected by the consumer, a search query is submitted by a user seeking publications.   The query is not filtered <u>in any way</u> to select databases that are to receive the query - never mind based upon the criteria of claims 13 or 14.  Instead, the query is immediately matched against <u>all</u> the preselected databases.  *Id.* See also, Scacchi 20, p. 81 ("The disadvantage is that you will then have to review the results from all of these databases, which can be time consuming and costly.")

First, with or without menu help from Iquest, an important aspect of Iquest is that the <u>user preselects</u> the databases that <u>he</u> wants to be searched.  Scacchi, 20 – 23.  Ex. P. pp. 24-25. Claims 13 and 14 require that the filtering system filters the RFQ to decide which vendors should be in the set to quote on it, and the system diminishes the sellers, cutting out many that are capable of supplying the quote on the buyer's terms.   Query whether counsel for defendants would use Westlaw if counsel preselected the "Allfeds" database to search for cases on an issue in all federal courts, then entered the search phrase, and the Westlaw computer, on its own and without telling him, decided to search for cases from only the eighth and eleventh circuits while ignoring the rest.  Defendants have provided no reason why a phosita would have adopted such a counterintuitive idea in the context of Iquest, and it can only be the result of impermissible hindsight.  Iquest type systems were never so modified, and the idea of preselecting information databases against which to apply a later entered search string <u>still exists today</u>.  www.dialog.com, www.westlaw.com.

Second, like FAST, the main benefit of Iquest is the fact that the consumer has broad access to a much larger array of information than was previously possible.  Scacchi 23, *Id.* at 193, noting the benefits of Iquest to search 115,000 articles and 140 computer publications.

---

defendants.  We assume that replacement here, although defendants' failure to even address it is remarkable given their clear and convincing burden of proof.

Like FAST, "Iquest gives you access to over 800 publications, databases, and indices spanning the world…Iquest...takes your search out over the vast expanse of on-line databases it covers". "Being able to access and search hundred of databases across a wide spectrum of interest areas and topics can bring the world's information resources literally to your doorstep. When you access Iquest, you must always be aware that you are actually accessing a large body of different databases…<u>the sheer size of the overall system can make it challenging to pull out specific, useful information</u>" (emphasis added) *Id*, at 85 - 86.

Putting aside the fact that neither Iquest, nor the alcoholic treatment centers with which defendants seek to combine it, involve RFQ's or quotes, defendants can not establish a prime facie case of obviousness based upon Iquest because combining Iquest with any prior art that allowed the computer system to diminish the databases to be searched would destroy the purpose of Iquest. *McGinley; Gurley; Gordon; Sponnoble*.

### D.    On the Present Record, Defendants Cannot Establish the Required Expectation of Success

In addition to showing motivation to combine, defendants must show that the phosita would have had a reasonable expectation of success with respect to the proposed combination of FAST or Iquest. This requirement has also been repeatedly reaffirmed by Courts after *KSR*. *Forest*; *Bayer; Therapeutics, Inc. v. Viacell, Inc*., 491 F.3d 1342 (Fed. Cir. 2007).

The '328 patent teaches that sellers <u>preregister the items</u> they sell and also <u>preregister other filter conditions</u> at the filter means. As figure 7 and col. 6 of the '328 patent explain, by preregistering the seller's filter conditions in advance, the sellers receive only <u>prequalified RFQ's</u> on which they are very likely to be able to quote. (see, '328 Figure 7, noting prequalification by filter means). When the RFQ is processed in accordance with claim 13, the

identified sellers are those that match the buyer's filter criteria, and also sell the requested item. Thus, if the system sends the RFQ to ten potential sellers, it is very likely that it will get ten or nearly ten acceptable quotes – hence, the reasoning behind claim 14, limiting the set of potential vendors to be the same number as the maximum number of quotes to be received.[8]

Using FAST as the example (similar reasoning applies to Iquest) defendants also can not show that a phosita would have had any reasonable expectation of success if they altered FAST to only go out and query a number of vendors only equal to the maximum number of desired quotes, as claimed in claim 14. FAST explains its use of criteria (i.e.; filter conditions) entered by the buyer:

> If the quote responses obtained by FAST meet criteria provided by the customer, FAST will, under this option, order directly, without returning the quote to the customer….When quotes are not obtained that meet the customer's criteria…the information that was obtained about the item is returned to the customer. (underlining added) (Ex. L, at. 3)

This shows that prior to receipt of the quote, FAST had no way of knowing if any seller would meet the conditions of the buyer (claim 13), and in cases where FAST had not previously sold the product in issue, it would have no idea prior to receiving a response from the vendor if the vendor even sold the item. Therefore, sending the RFQ to ten remote databases if the buyer wanted up to ten quotes would likely result in no acceptable quotes, or perhaps only 1 or 2, because many queried seller databases will not sell the product, and many others might supply quotes that did not meet the buyers additional filter conditions of claim 13.

Using the common sense, flexible approach articulated in *KSR*, modifying the FAST system to query only ten sellers' remote computers for the purpose of getting ten quotes, would

---

[8] In the Lendingtree system the banks preregister their loan underwriting criteria and Lendingtree sends the bank only loan applications that indicate financial data that passes the bank's underwriting criteria. Thus, Lendingtree can send the application to four banks and be pretty sure it will get four offers for the consumer.

never be expected to succeed by the phosita. The buyer who wanted five quotes would be told that he only got one (or none) because FAST only checked five sellers, and omitted the other 500 sellers that were perfectly capable of supplying the product on the buyer's terms.  Without the prequalification process, the system would be expected to – and would – fail.  On this basis alone, the claims are not obvious. *Forest*; *Bayer*; *Therapeutics*.

In sum, defendants' combination of FAST or Iquest with other art depends upon the Court finding that the phosita would have modified those references in a manner that would have been expected to fail, and which would have rendered these references inoperable for their intended purpose. This is classic, impermissible, hindsight, and must be rejected.  *Gordon* (reversing PTO rejection of claim, and holding that simply turning prior art arrangement upside down is patentable.)


## VII.    AS A MATTER OF LAW, THE BRICK AND MORTAR PRIOR ART CANNOT RENDER CLAIMS 13 OR 14 OBVIOUS

Defendants also argue that the ecommerce designer in 1994, with an engineering degree and all of the computer ecommerce systems of Exhs. N and X before him, would have found it obvious to design a new ecommerce system by looking to how a 1981 office clerk assisted alcoholics and drug addicts with finding counseling, or a matchmaking service for those seeking romance.  (Scacchi 30, p. 37 – 38).  Defendants claim that by merely computerizing such "brick and mortar" ("BAM") systems, the '328 claims would result.  The argument fails on three different grounds.

First, the BAM art is not analogous art under relevant case law.  Second, defendants and their own PhD expert witness have both emphatically – and repeatedly – disagreed with the idea that the ecommerce computer engineer in 1994 would have taken such a path.  Third, if such a

combination were made, it would not result in the '328 claims, both because the art would have taught to make the combination in a different manner than defendants suggest, and because, even if made in the manner defendants suggest, the combination would still be missing several claim limitations of the '328 claims.

### A.    The Brick and Mortar Systems are Not Analogous Art[9]

Analogous prior art is either: (1) art from the same field of endeavor, regardless of the problem addressed, or (2) art from outside the patent's field of endeavor,  if it is still reasonably pertinent to the particular problem with which the inventor is involved. *In re Kahn* 441 F.3d 977 (Fed. Cir. 2006); *Wang Laboratories v. Toshiba Corporation,* 993 F.2d 858, 864 (Fed. Cir. 1993) (Prior art "may still be analogous if it is reasonably pertinent to the problem the inventor attempted to solve and if it "logically would have commended itself to an inventor's attention in considering his problem.") (emphasis added); *In re Clay*, 996 F.2d 656 (Fed. Cir. 1992).

*KSR* noted that "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining…." (emphasis added) *Id.*, at 1742.   It is clear beyond question however, that the defendant can not prove obviousness, regardless of whether or not the art is analogous, without identifying a known problem in the art to which the invention pertains, that would have pointed

---

[9] Although we address the BAM art on the merits, that art comprises articles and trade publications, without any evidence of when it was available to the general public, as opposed to some narrow trade group, or if it was published in the same form offered by defendants.  Simply introducing a dated product brochure, with no proof of publication from a sponsoring witness, is insufficient as a matter of law to prove that document constitutes prior art, even when the document is dated.   *In re Omeprazole Patent Litigation;  AT&T Corp v. Microsoft Corporation* 2004 WL 292321 (S.D.N.Y. 2004); *Norian Corporation v. Stryker Corporation,* 363 F.3d 1321 (Fed. Cir. 2004)*; Northern Telecom, Inc. v. Datapoint Corporation* 908 F.2d 931, 936 (Fed. Cir. 1990); *Levi Strauss & Company, v. Golden Trade, Srl,*  1995 WL 710822, 14 (S.D.N.Y. 1995); *Mannesmann Demag Corporation v. Engineered Metal Products Company, Inc*., 605 F.Supp 1362 (D. Del. 1985).  Thus, it would be error to even consider the BAM prior art.

the phosita to some other analogous art.  *Single Chip* (that problems in analogous art would have motivated the combination is "not supported in <u>KSR</u> as a sufficient basis for finding obviousness".)[10]

What is the art to which the '328 invention pertains?  *In re Grout,* 377 F.2d 1019 (CCPA 1967) instructs that the ordinary artisan is not the person who uses the invention, but the technologist who designs and makes it:

> Appellant's invention relates to novel fastening means used in beehives.  Under section§103, we must look to the person of ordinary skill in the art to which the invention pertains, not those who may use the invention.

*Id.*, at 1562. (finding phosita not a beekeeper, but someone who designs fastening structures)[11]  That the hardware store owner might use an ecommerce system to sell screws and nails does not make her a phosita designing ecommerce systems for purposes of the obviousness inquiry.  Instead, the phosita here is one with a "BS degree in computer science or an equivalent field like electrical engineering, or having the equivalent work experience, and someone with experience designing and/or using Internet related software and commerce systems." *Markman* Opinion, October 16, 2006, at 8.

For defendants to combine the ecommerce art with alcohol treatment centers and hardware stores, they must show that those references are "reasonably pertinent to the problem the inventor attempted to solve" <u>in ecommerce</u> such that alcohol treatment centers and hardware stores "logically would have commended itself to an inventor's attention in considering <u>his</u> problem." (emphasis added).  *Wang Laboratories*, at 864.   This showing is utterly lacking here,

---

[10]*Single Chip* was partially vacated as a result of a settlement between the parties.  The vacated portion does not affect the proposition for which we cite it, and in any event, was done by stipulation, not by a Court.

[11]   The precedent of the CCPA court was adopted as binding Federal Circuit precedent early in the existence of the Federal Circuit.   Thus, *Grout* has the presidential value of a Federal Circuit case. *South Corp. v. US*,  690 F.2d 1368 (Fed. Cir. 1982).

as defendants have identified no such ecommerce problem <u>at all</u> that would have led to such a solution, never mind the particular problem addressed by the '328 patent.

At cols. 1-2, the '328 patent notes the ecommerce problem it is addressing; i.e., how to manage or eliminate an overly large computer central database in an ecommerce system:

> The volume of information required to be maintained and updated in a [prior art] central database system restricts it to a limited type or number of goods and services or number of vendors it can offer. It is not feasible for such systems to provide access to all standard goods and services and all suppliers world wide. For such a central database to exist, the amount of information to be stored would be awesome as would be the task of keeping it current. It simply is not feasible...This would require an unrealistically large central database containing information about products, services and vendors….The present invention [allows] buyers to relate to vendors without a rigid structure operating through a centralized computer database as required by existing methods.

Defendants can not seriously argue that an electrical engineer designing an ecommerce system in 1994 would have found it obvious to look to hardware stores or alcohol treatment centers to solve this problem.   Hardware stores do not have this problem even today, never mind in 1994.

At page 32 of their brief, defendants cite the "too many" problem -  the idea that a computer search can return an overwhelmingly large number of "hits".  This problem – never mind a solution to it - certainly would not be expected to exist in hardware stores or alcoholism centers, or any of the other BAM references defendants cite, a fact confirmed by page 32 of defendants' brief – which cites only computerized Google and Westlaw searches as examples of the problem.   Moreover, the problem is not identified in either ecommerce reference upon which defendants rely.  FAST certainly did not recognize it, and Iquest simply displayed the most recent 10 articles, and allowed the user to go through the articles ten at a time.  (Scacchi 23, p.

24

198 – 199).    The '328 patent examiner himself noted that this problem had long ago been solved in computer searching and quoting systems by the time the '328 patent was filed.  Ex. T, p. 7.

Moreover, even if this problem was recognized in ecommerce, the phosita still could not have adopted the solution defendants propose.  The ecommerce art already provided <u>at least four different</u> solutions, which included 1) displaying the information ordered from best to worst (e.g.; most recent to oldest);  displaying it ten at a time; truncating the results to display only the best ten, for example, or redoing the search with a more narrow search query (e.g. all red widgets, not all widgets). Scacchi 23, 198 – 199; Ex. X, p. 10 .  Importantly <u>all four promoted</u> the purpose of these ecommerce systems, by giving the buyer wide access to as many vendors or sources as possible or as he wanted, while still providing a manner to limit or efficiently examine the results.

On the other hand, the solution defendants claim the phosita would have implemented, returning quotes by limiting the <u>sellers queried</u> to a sub-subset of potential sellers, and not querying the rest because the computer system on its own, without the approval of the buyer, simply deleted some of the potential quote sources on the way out – never mind to the specific level recited in claim 13 or to the predetermined maximum recited claim 14 - would <u>defeat</u> the purpose of these systems.

In *Ex parte Rinkevich*, 2007 WL 1552288 (BPAI 2007) (unpublished), the Board of Patent Appeals cited *KSR* in reversing an examiner's obviousness rejection.  The BPAI held that where two solutions to a problem existed, each of which apparently was equally acceptable and in the same art to which the invention pertained, the phosita "having common sense at the time of the invention would not have reasonably looked to Wu to solve a problem already solved by

Savill".  Here, defendants claim the phosita would have abandoned <u>plural</u> solutions, already well known and widely used,  <u>in the art to which the invention pertains,</u>  and which all <u>promoted the purpose</u> of the primary reference in favor of a <u>single</u> solution <u>outside</u> of the ecommerce art that <u>destroyed</u> the purpose for which the primary reference was designed.  This makes no sense.

Not coincidentally, defendants proposal is also contrary to subsequent history.  A 1993 FAST publication, under "Lessons Learned", notes "Operating an online electronic brokerage service for six years has taught the FAST project a set of useful lessons."  The article describes the problems with such an ecommerce system, and discusses how things such as software architecture and related items should be improved.  Ex. L, at 16-17.   No mention was made of the "too many" problem.  In November 1997,  the FAST team published another article, with a similar section, also listing problems with the system and how to improve several features.  The 1997 paper however, lists a problem <u>not</u> listed in the 1993 paper:

> Although we based the design… on the experience acquired over many years on FAST, our experience has already exposed a number of necessary further improvements…<u>Inquiries may sometimes generate too many responses</u>….What is needed is a means for requesters to express optimization criteria and a means for services to reason with them.  Preferences could be formalized into requester supplied metrics that could then be used by the service to <u>rank its potential responses.</u>  (emphasis added Ex. L at 24)

Once the FAST team finally recognized the problem – nearly three years <u>after</u> the '328 invention was made -  FAST solved it using one of the four well known ecommerce computer solutions – they used  "criteria" to "rank… potential <u>responses</u>", thus allowing the customer to see the best ten prices, or the shortest ten shipping times, etc.  The ecommerce engineers did not take the path defendants claim was obvious.

Defendants BAM art can not establish obviousness, because an electrical engineer

designing a computer system to eliminate the problem of a large database or too many computer hits in a search engine would not typically call his local hardware store or alcoholism treatment center for a solution that would ruin his system.  (Ex. P, Dowling Report, pp. 1 – 10, explaining why BAM art is not analogous).  Thus, the BAM art may not be considered.

      **B.**    **Dr. Scacchi's Opinion Should Not Be Considered on the Merits, But Should Be Considered To Support the Finding that the BAM Art is Not Analogous.**

The conduct of defendants and Dr. Scacchi also refutes defendants' position about where a phosita would look for an ecommerce solution to a problem.  In responding to discovery requests seeking all prior art upon which they would rely for invalidity, defendants identified 29 references, all related to computers, networks, ecommerce, software, and the like.  They also produced an 11 page invalidity claim chart based upon these references, indicating an extraordinarily detailed, specific, expensive, time consuming effort on the part of defendants and their expert purportedly showing the '328 patent to be invalid.   No mention of alcoholism treatment centers, dating services, or hardware stores is made.   Ex. M, Response to Interrogatory 6, and pp. 13-23.

On January 26, 2007, defendants' expert, Dr. Scacchi, served his invalidity expert report. This report is filled with networking diagrams, computer systems, engineering drawings, citations to ecommerce technical manuals, and citations to hundreds of publications and technical journals that all relate to computers and ecommerce. This report contained 128 pages of detailed element by element claim charts directed to six computer and ecommerce prior art references.  Although the report is nearly 200 pages long, it is almost entirely directed to anticipation under 35 USC §102, not obviousness under 35 USC §103.  (e.g., p.129, "The public use of FAST in the U.S. prior to February 1995 discloses <u>each and every limitation</u> of Claim 14",

see also e.g., pp. 39 – 48.  "The public use of FAST prior to February 1995 discloses <u>each and every limitation</u> of claim 1") (emphasis added).  Dr. Scacchi painstakingly went through each of the claims, applied each of the six references, and stated, repeatedly, that <u>each reference</u> <u>taught each and every element</u> of <u>each claim</u>.  Ex. N, pp. 31 – 128.

The entire obviousness section of the report comprises a single cursory statement that occupies a few paragraphs in slightly more than one page: "If one were to assume for the sake of argument, that any particular prior art reference is missing a particular claim limitation" then all six [ecommerce] references are combinable to arrive at the '328 claims.  (Ex. N, pp. 130-131).  No mention of *Graham*, or any other obviousness analysis, is made.

Dr. Scacchi was then instructed by defendants to end his relationship with the prior lawyers and begin "working with James Baker and Robert Wilson" (Ex. O, pp. 7-8), the newly hired New York lawyers at Quinn Emmanuel, now representing defendants.  Shortly thereafter, defendants told SST and Judge Salas that they needed to update their expert report – more than five months after it was served on the original due date - to account for *KSR*.  (Ex. G, Order permitting update).

Defendants then provided an "updated" expert report - 163 pages long, nearly the same length as the original report - and containing over one hundred pages of citations to things like alcoholic centers, dating services, and hardware store retailing magazines. (Ex. N1).  Concurrently therewith, defendants produced <u>several thousand new pages</u> of BAM prior art documents relating to thing like dating services and counseling centers  – many of which indicated they were pulled from Westlaw databases. (i.e.; by the new lawyers).  (Ex. N1, Ex. X).

Further, although inapplicable to the present facts, the legal proposition upon which the updated report is based  - that merely computerizing a manual referral service is unpatentable –

existed long prior to, and was unaffected by, *KSR*.  *Princeton Biochemicals, Inc. v. Backman Coulter, Inc*. 2004 WL 1398227 (D. NJ 2004) (obvious automation of a manual process not patentable).    Indeed, *Leapfrog Enter., Inc. v. Fisher Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007), the main precedent upon which defendants rely, was decided by the district court in March, 2006, thirteen months before *KSR*.   *Leapfrog Enter., Inc. v. Fisher Price, Inc* 2006 WL 891001 (D. Del. 2006).    And *KSR* certainly did not change the teachings of FAST, FECAT or FACNET, each of which Scacchi had claimed showed every feature of each of the claims.

Yet, the comparison between the reports at Ex. N and N1 is utterly astonishing – so much so that defendants' willingness to continue representing the latter as Dr. Scacchi's opinion to this Court, and their representations to Judge Salas, are nothing short of shocking.   While admittedly lengthy, we respectfully encourage the Court to compare the two reports very carefully, and form its own view as to whether *KSR* had anything to do with the new report.

Dr. Scacchi opined that each of six references contained each limitation of the claims, and that the '328 patent was thus anticipated by (i.e.; identical to) prior art that taught directly against the '328 claims.   Defendants' new counsel "fixed" this utterly hopeless situation for defendants, albeit via borderline representations to Judge Salas, through creative lawyering for which counsel is to be commended, i.e.; reaching into a social services office and a hardware store so Dr. Scacchi could correct his opinion.[12]

The much more important point here however, is that the idea of looking to the alcoholic treatment centers, dating services, and hardware stores for sources of prior art for an ecommerce patent is something that did not even occur to defendants or their own expert in nearly three years of litigation, with the '328 claims and the ecommerce prior art before them, and with more

---

[12] Dr. Scacchi also spent the four days immediately preceding his deposition in private meetings with defendants counsel, and then showed up at deposition to convey his new opinion only.  (Ex. O).  SST will move to exclude the Scacchi testimony if this case does not resolve via motion.

than enough motivation to locate invalidating prior art.  This conduct supports the view of Dr. Dowling, that the alcoholism treatment centers and the like would not be looked to by the ecommerce phosita 13 years ago, and without the '328 patent.  (Ex. P, Par. 5).  That an invention may have been obvious to some New York lawyers in 2007 proves nothing about what would have been obvious to an ecommerce phosita in 1994.  The BAM art is not analogous art.


### C.    Computerizing the BAM Art Would Not Result In the Claims

We first note that claims 12 through 14 do not define a computerized referral system as defendants claim.  As the plain language of claims 12 – 14 makes clear, the system obtains plural quotes (i.e.; the price and other terms in sufficient detail to constitute and offer capable of acceptance), not referrals, from potential sellers, and <u>forwards the quotes</u> to a potential buyer. [13]

In order for the method to be able to obtain and return quotes, as recited in claims 12 – 14, the RFQ itself must have enough information in it.  Otherwise, there would be no way to obtain or return the quote.  For example, one can not possibly submit to a computer an RFQ for "nursing services" and expect a quote - the price and other terms in sufficient detail to constitute an offer capable of acceptance.  The type of care, length of stay, medical conditions, etc. would be needed.   Defendants themselves recognized this requirement in order to return quotes, although they attempted to improperly extend it to claims 1 – 3, which do not require that quotes be returned.  (See ServiceMagic Motion for Summary Judgment, February 22, 2007, and Opinion of May 2, p. 18, noting defendants' argument)    This is also shown, for example, in Figure 8 of the '328 patent, and described in detail at the bottom of column 5 of the '328 patent.

---

[13] Defendants cite to a prior brief, involving only claims 1 – 3, where SST used the phrase referral system in a footnote in describing certain claims of the '328 patent.  However SST specifically noted on the record that claims 12 – 14 were different from those claims, and actually define a system for returning quotes, not a referral system. April 9, 2007 Argument, Tr. at 17-18.  In any event, the correct analysis does not depend upon a footnote giving general background in SST's prior legal brief.  Instead, it depends upon the claim language.

***None*** of the brick and mortar referral services can, or are designed to, allow the referral service to perform "obtaining...quotes to supply said goods or services, and forwarding say quotes to said potential buyer, wherein at least part of said quote information is stored at a location remote from said filter means" (Claim 12).  Consider the reaction of an alcoholic who called a treatment center for help, and was told that, rather than being referred to a counselor or psychologist, he instead should specify his own treatment plan in detail to the referral service, so that the referral service could go find ten counselors who could treat him, independently obtain quotes on the specified treatment plan from a selected four (that the service picked, not him), and then forward the quotes to the alcoholic.   Similarly, imagine the reaction of a consumer who walked into his local hardware store, asked for a referral to a contractor who could be consulted about options for building a new deck on the consumer's home, and was told instead to specify the exact measurements, the materials to be used, the finish, the fees for obtaining a permit, the color paint, the type of railings, etc., and the actual design drawings so the hardware store could go out and get quotes for him.

All of the alcoholic treatment centers, hardware stores, social services, pregnancy counseling centers, etc (e.g.; Scacchi 30) refer people to each other by determining whether the general subject matter matches, and then, providing contact information to the parties.   While defendants suggest these systems can be computerized to result in the '328 invention, these systems <u>are</u> now computerized, and they do <u>not</u> operate in the manner of claims 12 – 14.  For example, the popular website www.webmd.com (a physician referral service) and www.martindale.com (attorney referral website) both accept general information about the type of professional needed, but neither can obtain the price and other terms in enough detail to constitute an offer capable of acceptance, and there is no evidence that either of these uses the

diminishing features of claim 12 – 14 (or claims 1 – 3).  And, as soon as any system is built that has immediate access to all quotes by computer, the art would teach to scan all of them, just like FAST, and others.

For this reason as well, defendants' reliance upon the BAM systems - even if computerized - must be rejected. [14]

### D. Even if the BAM Art Were Combined With Computers, It Would Have Been Done In a Manner Other than How Defendants Suggest

If these alcoholism referral services and the like upon which defendants rely were modified to obtain and forward multiple quotes, and even if they were computerized as defendants suggest, the salient features of claims 13 and 14 would <u>still</u> be missing.  The Supreme Court went out of its way – five times - to ensure that its holding in *KSR* was clear (all emphasis added):

> A combination which only unites old elements ***with no change in their respective functions***…

> The combination of familiar elements ***according to known methods***…

> [W]hen a patent simply arranges old elements with ***each performing the same function it had been known to perform***

> [Obviousness involves] whether the improvement is more than the predictable use of prior art elements ***according to their established functions***.

> [Obviousness may arise from using] two known devices ***according to their established functions***[15]

---

[14] The Scacchi 5 claim chart, at p. 13, shows the limitation of obtaining quotes over the data network and forwarding them to the potential buyer as being allegedly met in the BAM art  because the "referral service either provided the client with the agency's information or called the agency directly to set up an appointment."    This does not show the referral service "obtaining" multiple quotes and "forwarding" them to the consumer so the consumer can immediately receive competing offers a buy the product if he wishes.

[15] Id., at 1739 – 1741.

Claims 13 – 14 require one or more methods that <u>decrease</u>, at the filter means, the number of vendors eligible to participate in the quoting process, even though the system has identified many <u>more</u> vendors that can quote the item, and even though the system has immediate, electronic access to all the vendors' quotes.    Each of the claims specifies <u>different specific criteria</u> regarding the <u>specific level</u> to which the potential vendor population is <u>decreased</u>.

If the phosita had started with an alcoholism center or a hardware store, and then modified it to obtain and return quotes – a bizarre proposition itself – that phosita would have had to look <u>back into</u> the computer, ecommerce art in order to implement those systems using computerized filtering, matching, and networking.  When the phosita looked back to the ecommerce art, he would have used that art – FAST and Iquest, for example – for their intended purposes.  In the words of *KSR*, "according to known methods", and for "each [i.e.; the BAM and ecommerce art] performing the same function it had been known to perform."  *KSR*, at 1739 -41 The ecommerce art was used to simplify comparison shopping by quickly spanning the network "far and wide" and then displaying the best "hits", while making all available.

Given the teachings of that ecommerce art described above, and the fact that all the quotes were immediately available electronically, the ecommerce phosita would have implemented the computerization in the manner taught by the ecommerce references – namely a manner that it fanned out and obtained better results for the buyer by allowing widespread comparison shopping, and the acquisition of as many quotes as possible.  Then, results could be truncated or organized <u>on the way back</u>.

Defendants own moving papers further emphasize the above.  Defendants argue that computerizing a referral service predictably gives buyers and vendors <u>better access</u> to each other, and that, by 1996, businesses were rushing to take advantage of the fact that the Internet provided "broader reach" for buyers and sellers.   They urge that as *KSR* notes, a phosita would have taken advantage of the "straightforward benefits" of the combination.  (Defendants' Brief, pp. 3, 25, 36).   This is precisely what systems like FAST did, and is exactly why there were lots of systems like those at Ex. X hereto.  FAST's ability to "search far and wide" was to provide "broader access" using the "straightforward benefits" of the Internet.   And this is why all the businesses that defendants claim were rushing to utilize the Internet – and all the ecommerce prior art defendants can cite – also built FAST- like systems that were rushing to take advantage of the Internet's ability to provide broader access.  (See Section IV(B), *Supra* "Ecommerce Had Two Goals – Broaden Consumer Choices and Increase Competition");  Phositas, <u>and experts</u>, ***did*** computerize these systems, just not in the way defendants suggest.

This is also borne out by common sense.  Prior to search engines and computers, people had no problem booking airline tickets by asking someone if they knew which airlines had flights to a particular destination, obtaining a few recommendations, and then phoning two or three such airlines to purchase a ticket.   But in the environment of a computer search engine, designed precisely to overcome this problem, and <u>when all the vendors' quotes are instantaneously available to the computer</u>, this makes no sense at all.  Who would use the travel website [www.orbitz.com](www.orbitz.com) if it only checked two airlines to obtain quotes, and the customer knew there were ten more available flights, with potentially better fares and flight times, but that

Orbitz had decided on its own to simply delete these airlines from the inquiry, even though the computer system could have instantly obtained quotes from all of them?[16]

The body of law that makes combining a primary reference with a secondary reference improper when the primary reference teaches away from adding the secondary reference would be meaningless if an infringer could avoid it by simply starting with the secondary reference – in a different field - and then reaching back into the field to which the invention pertains to select all the teachings of the primary reference that are helpful to him while ignoring the parts that teach away.   This is classic impermissible hindsight, and is improper:

> It is impermissible within the framework of section §103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests…The district court also failed to consider the Caddel reference in its entirety and thereby ignored those portions of the reference that argued against obviousness…Caddel actually taught away from the [patent claims].

*Bausch and Lomb, Inc. v. Barnes-Hind/Hydrocurvbe, Inc.*, 796 F.2d 443, 448-449 (Fed. Cir. 1986);  *See also*, *In re Wesslau*, 353 F.2d 238 (CCPA 1965); *In re Mercer* 515 F.2d 1161 (CCPA 1975). [17]

Any combination of the BAM art with the ecommerce art would have to account for the strong repeated and ubiquitous drive in the ecommerce art to fan out the request and obtain as many quotes as possible – the very motivation that was driving the entire industry.  Because such combination would use the ecommerce art for its "established function", as noted by *KSR*,  no

---

[16] Similarly, although it was well known among people that traveled by horse drawn carriage to stop every few miles to water the horse, inventing an automobile – even today – that had to stop every three miles would not be obvious, and is counterintuitive.  Defendants however, would claim that since the "stop every 3 miles" method was known in the manual BAM system, it is obvious to extend it to the automatic (i.e.; engine) system.  This makes no sense.  An automobile engineer is not a horsekeeper.

[17] In *Leapfrog*, cited by defendants, the patentee had just taken the same advantage the electronics always provided and applied it to a mechanical device conventionally.  That is in fact what FAST, Iquest, and FACNET represent – the conventional application of modern electronics to prior manual systems.

such combination can teach the '328 claims.  That is why when people <u>did</u> combine such BAM systems with ecommerce, systems of the type in the six references upon which Dr. Scacchi's <u>original </u>report resulted. (Ex. N).

Simply put, defendants have failed to cite <u>anything</u> that would teach an ecommerce engineer in 1994, with a search engine and immediate  access to all available quotes, to intentionally <u>not</u> check vendors - even though all could be queried at essentially zero cost in seconds -  but to go through the multi-step process defined in claims 13 and 14 to intentionally delete certain vendors from the process <u>before</u> any are sent the RFQ.  Accordingly, SST is entitled to summary judgment of non-obviousness.  *Ortho-Mcneal Pharmeceutical, Inc. v. Mylan Laboratories, Inc.* 2007 WL 432792 (D. NJ. 2007); *Warner Lambert Company v. Teva Pharmaceuticals USA* 289 F.Supp.2d 515 (D. NJ. 2003).


## VIII.   NUMEROUS OTHER FACTORS COMPEL A CONCLUSION OF NON-OBVIOUSNESS

### A.    Defendants Offer Only Cumulative Prior Art

As Dr. Dowling explains (Ex. P, pp. 20-30), and as the information filtering documents at Scacchi Ex. 43 shows, that filtering is all directed to permitting users to filter out some of the <u>returned information</u> when too much is generated, not to <u>diminishing</u> information <u>sources</u> on the way <u>out</u>. (See, e.g. Scacchi Ex. 43, Communications of the ACM, December 1992, p. 40 showing diagram whereby information from a source is diminished by a filter, and whatever information remains is then forwarded to a "user equipment".)

During prosecution of the '328 patent, the Examiner cited US Patent No. 5,237,499 ("Garback") as prior art.  Ex. R.  In Garback, a user sends a request for travel reservations to a central computer, which electronically queries all the airlines' computer systems, and, just like

36

FAST, finds the best deal. Ex. R, Figure 1, col. 3, lines 26 – 42, Figure 2A, col. 5, generally. Also during prosecution of the '328 patent, the examiner specifically noted that the filtering technology to cut down responses on the way back was known in computer searching technology. (Ex. T, p. 7).

Finally, the '328 patent examiner knew about brick and mortar referral systems, as these were referred to directly in the '328 patent specification. (Col. 1, lines 26 - 30). These did not relate to the problem the '328 patent addresses, or any ecommerce prior art, so of course the Examiner concluded they would not offer any solution to the ecommerce central database problem being addressed, and are not analogous art.

The combination of a brick and mortar referral systems, with filtering such as shown in Scacchi 43, and/or FAST type systems that gather all possible quotes, was fully known to the patent examiner. Defendants' burden here therefore, is even more difficult. *Standard Mfg. Co., Inc. v. US*, 25 Cl. Ct. 1 (Cl. Ct. 1991); *Solder Removal Co. v. United States International Trade Com.,* 582 F.2d 628 (CCPA 1978). In <u>addition</u> to the normal statutory presumption of validity that can only be overcome by <u>clear and convincing evidence</u>, defendants must overcome the deference due a qualified government agency official presumed to have performed his or her job. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350 (Fed.Cir.), *cert. denied,* 469 U.S. 821 (1984). Defendants Scacchi 5 matrix falls way short of such a standard, and requires the granting of SST's motion for summary judgment on the issue.

**B.    Defendants Have Acknowledged that the Claims are Patentable**

Years after the '328 patent was filed, and apparently without knowledge of it, defendant Lendingtree ("LT") filed a patent application that eventually resulted in US Patent No.

6,385,594. (Ex. U). The '594 patent describes a ecommerce system in which filter conditions entered by a borrower in a loan application are matched to "selection criteria", i.e.; filter conditions, set by the various lenders in advance in order to match borrowers with lenders. (Ex. U, pp. 1 – 18). Upon matching the lenders' filter conditions to the borrower's filter conditions, the LT '594 invention sends the loan application to the matched lenders, and obtains loan offers in response that it forwards to the borrowers. (Ex. U) With the application being the RFQ and the provided loans being services that are quoted, this is very similar to the '328 patent in suit.

After the original claims filed by Lendingtree were rejected over the prior art, LT presented an amendment, adding the following text to then pending claim 24:

> Forwarding the credit data to a selected number of matching lending institutions associated with a match of the credit data to the selection criteria, *said selected number of matching lending institutions being less than a total number of the identified matching lending institutions* Emphasis added, Ex. U, at 19.

Substantially similar amendments were added to several of the other claims.[18] For the specification support required under 35 USC §112 to add these limitations, Lendingtree relied upon the novel disclosure in the '594 patent application describing this feature. (Ex. U, p. 14, col. 6 of '594 patent, lines 26 – 34, explaining selection of subset of sellers on the way out.

Referring to a prior personal interview between its attorney and the patent examiner, LT explained this amendment in the remarks section:

> [T]he Examiners indicated that if the independent claims are amended to state that the selected number of lending institutions that receive the credit data [i.e.; the RFQ] is less than the lending institutions that may match the credit data, then such recitations may define the claims over the prior art of record. (Ex. U, p. 20).

---

[18] The '328 limitation of claim 14 is actually narrower, because it states that the diminution is to a prescribed number, whereas the Lendingtree amendment merely claimed that the number of sellers to receive the RFQ was diminished.

This argument, that the idea of the matching computer itself cutting back on the <u>way out</u>, otherwise perfectly qualified potential vendors that offer the consumer a mortgage loan, was made repeatedly, and formed the cornerstone of the '594 patent being allowed.  (Ex. U, p. 22, 23A, 23B, "[N]either [prior art reference] describes nor suggests forwarding credit data to selected number of matching lending institutions that is less than the total number of identified matching lending institutions." See also, Ex. U, pp.  24 – 27) . Lendingtree and the patent examiner were entirely correct.  Without the '328 patent before them, and based upon ecommerce systems of the day, as shown in Ex. X and in FAST and Iquest, a user of a search engine type system for obtaining mortgage quotes from banks via computer would have expected the computer to simply scan all the banks quotes and send the consumer a list of quotes.

Subsequently, LT enforced that patent – maintaining that case ***after*** the Supreme Court's issuance of *KSR*, and ***after*** defendants cited all the brick and mortar art in this case - in a patent infringement litigation styled *Lendingtree v. Lowermybills* 3:05-CV153-C (W. D N. C. 2005).  Dr. Peter Alexander, <u>Lendingtree's</u> technical expert in that case,  testified to the effect that there were several advantages to such an ecommerce system that eliminated qualified sellers on the way out, instead of quotes on the way back, and that such a feature would not have been obvious because the phosita <u>in **_1998_** would not have understood the advantages of such a feature</u>.   Ex. W, pp. 84 – 87.[19]

Judicial estoppel, unlike collateral estoppel, does not require a prior adjudication on the merits of the same issue.  Instead, judicial estoppel is intended to protect the integrity of the Court, so it only requires a looser standard, namely, that a litigant argues "inconsistent" positions.  Thus, Courts have applied judicial estoppel even in cases where the issue was not

---

[19] SST believes defendants received millions or tens of millions from Lowermybills as a result of that case.  Ex. V, third page.  To date, Lendingtree has refused to produce the settlement agreement.

identical to one argued or adjudicated in a prior claim.  *In re Coastal Plains Inc*., 179 F.3d 197 (5th Cir. 1997) (Judicial estoppel precludes debtors claim, simply because debtor failed to disclose claim in bankruptcy proceedings, as those two positions are "inconsistent");  *Levar v. Freeman Decorating Company,* 967 F.Supp. 1055 (N.D.. Ill 1997).  Defendants' position in the Patent Office and in a North Carolina Federal Court – that eliminating vendors on the way out as opposed to quotes on the way back in an ecommerce system was not obvious <u>in 1998</u>, is hopelessly and irreconcilably inconsistent with their position now – that eliminating vendors on the way out as opposed to quotes on the way back <u>in the specific manner of claims 13 and 14, and 4 years earlier,</u> is in fact obvious.

In any event, even if this Court is not prepared to apply judicial estoppel, the similarity between the features and arguments asserted in the '594 and '328 patents,  the fact that ecommerce engineers, whether or not employed by Lendingtree, believed this diminishing on the way out feature was novel and unobvious enough  <u>in 1998</u>  to warrant filing a patent,  the fact that the diminution feature is even narrower in the '328 patent because of the specifics of claims 13 and 14 about <u>how</u> to diminish the sellers, the '594 Examiner's allowance of the claims based upon this general feature, Lowermybills' willingness to settle for a huge some of money, and the opinions of Dr. Alexander and Dr. Dowling,  all provide powerful evidence of non-obviousness of the '328 patent.  *Warner* (granting summary judgment of <u>non-</u>obviousness, relying in part upon the actions of a European examiner with similar claims, even though under different law).  Under the "flexible approach" using "common sense" articulated by the Supreme Court in *KSR*, SST respectfully submits that this can not be ignored, and requires denial of defendants' motion.

### C.    Other Secondary Considerations

An obviousness analysis necessarily requires an examination of the secondary considerations of non-obviousness.   *In re Sullivan* 498 F.3d 1345 (Fed.Cir. 2007) (reversible error to ignore secondary considerations); *Eli Lilly & Company v. Zenith Goldline Pharmaceuticals, Inc*., 471 F.3d 1369 (Fed. Cir. 2006).   Here, while defendants claim there is no nexus between the claimed invention and their commercial success, they announced the issuance of their '594 patent discussed above by stating that the patented technologies "are major contributors to the success of our business".  (Ex. V).  Yet, that patent was allowed as a result of the assertion that the same feature defendants claim here would have been obvious – four years earlier – was novel and <u>unobvious</u>.   Moreover, the Compuserve system has existed since 1979 (Scacchi 15, p. v, FORWARD) and the social services prior art defendants cite was published in 1981 and 1983 (Scacchi 30, 33, 3rd. page of each, copyright notice).    If the '328 patent claims merely an obvious implementation of those services on a system such as Compuserve, why was such a system never implemented for the better part of two decades?    The answer is simple.  As FAST and other prior art shows, people ***did*** combine computers with shopping and referral services, just not in the manner claimed in the '328 patent.

The failure of others to come up with the '328 invention, given the same prior art, for nearly two decades, and the defendants own acknowledgement of the importance of the salient features of the '328 invention to their own commercial success, are both strong factors that point to a conclusion of non-obviousness.

41

## IX.   <u>A Similar Analysis Holds for Claim 3</u>

From the above, the analysis for claims 1 through 3 is similar.  Addressing first claim 3, that claim requires that the potential sellers are "network members" (i.e.; those that have previously completed an application to register) and that the system, upon receipt of the RFQ, "select[s] one or more appropriate vendors to be sent the buyer's request for quotation based upon filter conditions set by the buyer, vendor, <u>and the network software.</u>"  (emphasis added) The '328 patent specifically states that "the network software may be arranged to limit the number of vendors to receive a request for quotations."  (Col. 7, lines 45 – 47).

Thus, like claims 12 – 14, claim 3 decreases the eligible vendors, prior to seeking quotes, by 1) searching registered ones, not the entire Internet, 2) limiting the set to only those that match the buyer's filter conditions, and 3) limiting those further by the network software.  And, like claims 12 – 14, this diminishes <u>sellers</u>, on the way <u>out</u>, not the <u>quotes</u> on the way <u>back</u>.

Unlike claims 12 – 14, claim 3 does not requires the return of quotes, nor does it specify the extent to which the network will reduce the number of sellers to receive the RFQ.  Thus, with the exception of the arguments above that depend upon these two features, all of the arguments with respect to claims 12 – 14 apply with equal force.  Claim 3 does however, require network members to register in advance by completing an application, before such vendors can receive any RFQs.  This is also diametrically incompatible with FAST's stated purpose – to search "far and wide" to locate the best potential vendor for a particular RFQ, and would also defeat Iquest's goal for the same reason.

SST is entitled to summary judgment that claim 3 would not have been obvious.

X.     **A Similar Analysis Also Holds for Claims 1 - 2**

With respect to claim 1, it is necessary to first address an apparent misunderstanding defendants have concerning the filter means recited in the claim.   Specifically, the language of claim 1 reads, in relevant part: "filter means, for filtering the network members in said storage means ***to determine*** which network members are to receive said request for quotation based upon filter conditions <u>set up by the network buyer in said request for quotation or by the central processing unit in accordance with preestablished conditions.</u>"

This claim language is not met by a filter means that filters on only one or the other of the two underlined items.  Instead, as explained at column 7, lines 16 – 47 of the '328 patent, the buyer's conditions are first applied to determine which vendors will receive the RFQ.  If, and only if, there are too many, then the network steps in and determines a subset.   Thus, the filter means makes the determination based upon one of two types of filter conditions, as the case may require.

This is shown below, pictorially:



Fig. A
Observer

Fig. B - Observer
does not know who
will receive the
RFQ. It's not
determined.

Observer B

Assuming the network filter caps the eligible vendors at three, if the buyer filter conditions select only two vendors, an observer as shown in Figure A above can answer the question:  "Which particular vendors are to receive this RFQ?" This is because the buyer filter conditions have fully "determine[d]" the vendors who will receive the RFQ, in accordance with

the claim language.   (Figure A) As shown in Figure B however, in the case where the buyer

filter conditions select six potential sellers, if the cap is 3, the same observer cannot answer the

same question.  Instead, he would have to say, "I don't know which vendors will receive the

RFQ, because it is not yet determined."   In this case, the network filter, also called the central

processing unit filter, determines which five vendors will receive the RFQ, and only observer B

can answer the question of who will receive the RFQ.

Thus, the determining means determines which vendors get the RFQ based upon buyer's

filter conditions or network filter conditions, depending upon the selection made by the buyer's

filter conditions.   This is a throttle, that allows the buyer to increase or decrease the vendors to

receive his RFQ by altering filter conditions, up to a predetermined cap, just as described in

detail at col. 7 of the '328 patent, lines 1 - 47.

Defendants appear to interpret this as requiring a means for determining based *either*

upon buyer's filter conditions *or* based upon filter conditions set up "by the central processing

unit in accordance with preestablished conditions".   This makes no sense, because defendants

have themselves agreed that the preestablished conditions are those that are set up in advance of

the RFQ.   The system might send a buyer seeking Type J resistors to a seller that sells

eyeglasses.

Interpreting the claim such that the "or" means that the determination is based upon one

or the other, as the particular RFQ requires, reads the clause in issue directly on to the preferred

embodiment disclosed at column 7 of the '328 patent.  The determination is made based upon the

buyer's filter conditions or the central computer's filter conditions, depending upon whether the

buyer's filter conditions select too many.  Given a choice between a non-sensical, non-

functioning interpretation of claim 1, and a construction that reads directly on the disclosed

embodiment in the '328 patent, SST submits that only the latter construction is appropriate. *Phillips v. AWH*, 415 F.3d 1303 (Fed. Cir. 2005).

The claim language requires a means for making the determination based upon X or Y, not a means for making the determination either based upon X or based upon Y. Claims 1- 2 thus also require the computer system itself to cap and/or diminish the number of eligible sellers to receive the RFQ.  And claims 1 -2 also require network members.  Accordingly, the analysis is essentially the same as that for claim 3.


## XI.     CONCLUSION

Defendants ask this Court to accept the idea that the phosita would have modified ecommerce references to defeat their purpose, or started with an alcoholism treatment center and modified it to obtain quotes by computer in order to design an ecommerce system, all while ignoring all the teachings of ecommerce.   And, according to defendants, all of this would have been obvious at a time when engineers were publishing papers wondering if the idea of purchasing something online was hype or a reality from the "not to distant" future, and respected scientific journals were noting that use of the Internet for the sale of products was in the "experimental stage."

The BAM systems and computer systems upon which defendants rely existed for at least 15 years before the '328 patent was filed, and were combined by lots of engineers, as evidenced by FAST, Iquest, and many other documents at Ex. X hereto.  None of them made that combination in the manner of the '328 patent, and defendants have cited no reason why anyone would have contemplated doing so.  SST's motion for summary judgment of non-obviousness should be granted.

Respectfully submitted,
KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone: (732) 634-7634
*Attorneys for Plaintiff Source Search Technologies, LLC*

DATED: January 4, 2008            By:  _____s/Jeffrey I. Kaplan/_____
                                  Jeffrey I. Kaplan (JK 4706)
                                  Michael R. Gilman (7608) *Pro Hac Vice*