# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

```
-------------------------------------------------------X
                                        :
Source Search Technologies, LLC,        :
                                        :
                 Plaintiff,             :
                                        :        Civil Action No. 2:04-CV-4420 (DRD)
       v.                               :        ECF CASE
                                        :
Lendingtree, LLC, ServiceMagic Inc.  and:
IAC InterActiveCorp,                    :
                                        :
                 Defendants.            :
-------------------------------------------------------X
```

### PLAINTIFF SOURCE SEARCH TECHNOLOGIES LLC'S ("SST") *CORRECTED* OPPOSITION MEMORANDUM TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT

Dated: January 7, 2008

Jeffrey I. Kaplan (JK 4706)
Michael R. Gilman (MG 7608) *Pro Hac Vice*
KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*

## <u>TABLE OF CONTENTS</u>

<u>**Page(s)**</u>

I.     INTRODUCTION ..................................................................................................1

II.    DEFENDANTS MISSTATE THE STANDARD FOR
       WILLFUL INFRINGEMENT ............................................................................2

III.   NEITHER THE PRELIMINARY INJUNCTION ISSUE
       NOR SST'S DISCOVERY RESPONSE SUPPORT
       DEFENDANTS' POSITION................................................................................4

IV.    DEFENDANTS' LITIGATION CONDUCT IN THIS
       CASE HAS BEEN MALICIOUS AND IN BAD FAITH ..................................7

V.     EVEN IF DEFENDANTS HAVE A COLORABLE OBVIOUSNESS
       DEFENSE, THEIR PRESENT MOTION MUST BE DENIED.......................17

VI.    DEFENDANTS' CASES ARE NOT TO THE CONTRARY .........................18

VII.   CONCLUSION..................................................................................................21

# **TABLE OF AUTHORITIES**

**Page(s)**

*Abbott Laboratories v. Sandoz, Inc.,*
    2007 WL 4287503 (N.D. Ill. Dec. 4, 2007)...................................................20

*Amsted Industries v. Buckeye Steel Castings,*
    24 F.3d 178 (Fed. Cir. 1994)..........................................................................4

*Baden Sports, Inc. v. Kabushiki Kaisha Molten,*
    2007 WL 2790777 (W.D. Wash. 2007)..........................................................20

*Ball Aerosal v. Limited Brands, Inc.,*
    514 F.Supp. 1051 (N.D. Ill. 2007) ..................................................................18

*Bott v. Four Star Corp.,*
    807 F.2d 1567 (Fed. Cir. 1986)........................................................................7

*Cohesive Technologies, Inc. v. Waters Corp.,*
    2007 WL 2746805 (D. Mass. 2007) ........................................................ 17-19

*Depomed, Inc. v. IVAX Corporation,*
    2007 WL 4365476 (N.D. Cal 2007) ......................................3, 4, 7, 10, 18, 20

*Domestic Fabric Corp. v. Sears Roebuck & Co.,*
    326 F.Supp. 2d 694 (E.D.N.C. 2004).............................................................18

*Goadby v. Philadelphia Electric Company,*
    639 F.2d 117 (3rd Cir. 1981) ..........................................................................5

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)............................................................................................9

*IMX, Inc. v. Lendingtree, LLC,*
    469 F. Supp. 2d 203 (D. Del. 2007)..................................................................7

*Informatica Corp. v. Business Objects Data Integration, Inc.,*
    2007 WL 3203062 (N.D. Cal. 2007) ...............................................................19

*KSR International Co. v. Teleflex Inc.,*
    127 S.Ct. 1727 (2007)..........................................................................1, 10, 18

*Leapfrog Enter., Inc. v. Fisher Price, Inc.,*
    485 F.3d 1157 (Fed. Cir. 2007)......................................................................10

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Leapfrog Enter., Inc. v. Fisher Price, Inc.,*
  2006 WL 891001 (D. Del. 2006) ....................................................................10

*Princeton Biochemicals, Inc. v. Backman Coulter, Inc.,*
  2004 WL 1398227 (D. NJ 2004) ...................................................................10

*In re Seagate Technology LLC,*
  497 F.3d 1360 (Fed. Cir. 2007)..........................................................2-4, 7, 20

*TGIP, Inc. v. AT&T Corp.,*
  2007WL3194125 (E.D. Texas 2007)..............................................................19

*VNUS Medical Technologies, Inc. v. Diomed Holdings, Inc.,*
  2007 WL 3165548 (N.D. Cal. 2007) ..........................................................4, 20

## I.    __INTRODUCTION__[1]

SST opposes – <u>in part only</u> – defendants' motion for summary judgment of no willful

infringement.  Specifically, SST now agrees that any infringement prior to September 20, 2004,

when defendants were put on notice of the '328 patent in suit, can not be willful because

defendants had no notice of the '328 patent.  However, since the filing of this Complaint, the

infringement has clearly been reckless and willful, because defendants engaged in a variety of

tactics during this case that included 1) the assertion of a large number of defenses they now

have acknowledged are frivolous to the point that they were dropped, 2) misleading the Court on

numerous occasions, one of which resulted in defendants passing off testimony as originating

from a source from which it did not originate; 3) proceeding to expand their infringing conduct

with no justifiable basis for doing so, <u>after</u> being held to be infringers on summary judgment; 4)

asserting validity defenses that contradict their own representations to other federal courts and to

the patent office.

Defendants claim that their actions were justified because the '328 patent is invalid based

upon *KSR International Co. v. Teleflex Inc*, 127 S.Ct. 1727 (2007)*, and certain brick and mortar

("BAM") prior art in their concurrently filed motion for summary judgment of obviousness.  Yet,

*KSR* was decided over thirty one months after this case was filed,  and the BAM prior art was not

cited by defendants until even later, despite defendants having updated responses to discovery

several times over three years, and having cited lots of prior art.

Defendants LendingTree, LLC, IAC/InterActiveCorp and ServiceMagic, Inc.

(collectively hereinafter "defendants") easily meet the new legal standard for determining

willfulness for enhanced patent damages set out in the Federal Circuit's recent *en banc* decision

---

[1] Ex. _____ refers to the Kaplan Declaration filed in support of SST's Motion's for Summary Judgment on the Obviousness Issue, and SST's Motion for Summary Judgment on the Issue of Indefiniteness.  Willful Dec _____ refers to the Kaplan declaration filed herewith.

*In re Seagate Technology LLC*, 497 F.3d 1360 (Fed. Cir. 2007).  In any event, several post *Seagate* cases with much less egregious conduct on the part of an infringer have held that the willfulness issue is not disposed of merely because the infringer has a colorable defense, but instead, involves a large number of very factually intensive issues, making summary judgment inappropriate.

Finally, and at the very least, the willfulness claim can not be adjudicated until after the presently pending summary judgment motions concerning infringement and validity are decided. If the Court determines on summary judgment that any claim is valid and infringed or even likely to be valid and infringed, then clearly any continued infringement would have to be deemed willful.

## II.    <u>DEFENDANTS MISSTATE THE STANDARD FOR WILLFUL INFRINGEMENT</u>

To establish willfulness, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. … [and] that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."  *Seagate*, 497 F.3d 1360, at 1371.

However, the *Seagate* Court did not hold, as defendants would have the Court believe, that any time there is any colorable defense that passes Rule 11, there is no willful infringement. Instead, the *Seagate* Court went on to state that it would "leave it to future cases to further develop the application of this standard" and expressly adopted Judge Newman's concurring opinion by stating, "[w]e would expect, as suggested by Judge Newman, *post* at 1377 [1385], that the standards of commerce would be among the factors a court might consider."  *Id.* at

footnote 5.   These "standards of commerce" refer to the following statements by Judge

Newman:  " I trust that judicial wisdom will come to show the way, in the common-law

tradition.  The standards of behavior by which a possible infringer evaluates adverse patents

should be the standards of fair commerce, including reasonableness of the actions taken in the

particular circumstances.  It cannot be the court's intention to tolerate the intentional disregard or

destruction of the value of the property of another, simply because that property is a patent; …"

*Id.*, at 1385.

Thus, the standard still involves the <u>factually intensive</u> inquiries as to what would be

reasonable actions for business owners in defendants' position, and whether defendants

"intentionally disregarded" SST's rights.

Second, *Seagate* also did not hold, as defendants would have this Court believe, that post-

filing conduct by the infringer can never be remedied through an award of enhanced damages

unless the patentee first sought preliminary injunctive relief.  In fact, *Seagate* holds:

> We also recognize that in some cases a patentee may be denied a preliminary
> injunction despite establishing a likelihood of success on the merits, such as when
> the remaining factors are considered and balanced.  In that event, <u>whether a
> willfulness claim based on conduct occurring solely after litigation began is
> sustainable will depend on the facts of each case</u>. (underlining added).

*Id.* at 1374.[2]

In *Depomed, Inc. v. IVAX Corporation,* 2007 WL 4365476 (N.D.Cal 2007), the Court

denied a motion for summary judgment that there was no willfulness  - even though it found

issues of fact  about the validity of the patent in suit, even though the defendant had an invalidity

defense sufficient to plead in good faith, and even though it does not appear there was any

motion for a preliminary injunction.   The Court found that a jury could accept "Depomed's

---

[2] Defendants' failure to bring this to the attention of this Court, while attempting to convince this Court that willful
infringement claims must be accompanied by a preliminary injunction motion, simply adds to their conduct during
the litigation that justifies the award of treble damages.

argument that a reasonable party in Ivax's position would not have believed that Depomed's patents were invalid." *Id.*, at 11. *Depomed* was decided post – *Seagate*.

Similarly, in *VNUS Medical Technologies, Inc. v. Diomed Holdings, Inc.*, No. C-05-2972 MMC, 2007 WL 3165548 (N.D. Cal. October 24, 2007), also post *Seagate*, the court denied a motion for summary judgment of no willfulness based upon similar facts. Notably, the Court cited *Amsted Industries v. Buckeye Steel Castings,* 24 F.3d 178 (Fed. Cir. 1994) for the proposition that defendants' reliance on a preliminary assessment that they do not infringe, or even a preliminary opinion of counsel, would not foreclose a finding of willful infringement.

Yet here, defendants claim that simply because they have pled a defense that did not result in sanctions, they are free of willful infringement claims. Neither *Seagate*, nor any authority before or after it, supports such a proposition, and defendants' misreading of relevant case law must be rejected.

III.    **NEITHER THE PRELIMINARY INJUNCTION ISSUE NOR SST'S DISCOVERY RESPONSE SUPPORT DEFENDANTS' POSITION**

In accordance with *Seagate*, this Court must look to the facts surrounding whether SST's decision not to bring a preliminary injunction motion was reasonable.

First, SST is a tiny company that does not practice the patented invention, and thus, could not have shown any loss of market share. Defendants are megacorporations, with billions of dollars (http://phx.corporate-ir.net/phoenix.zhtml?c=111999&p=irol-fundSnapshot, showing more than 6 billion in annual sales), who would easily have shown that they could compensate SST with monetary damages. Second, SST had been aware of defendants practicing the technology in the '328 patent for several years prior to this case being brought. These facts

4

could not have supported the grant of a preliminary injunction. *Goadby v. Philadelphia Electric Company* 639 F.2d 117 (3rd Cir. 1981).[3]

With respect to the interrogatory answer, it is first important to note that the Lendingtree system is so nearly identical to the '328 patented system that 1) Lendingtree is judicially estopped from claiming the '328 patent is invalid based upon Lendingtree's assertions in obtaining its own patent on essentially the same technology (See SST's concurrently filed motion for summary judgment of non-obviousness, Section VIII(B))[4]; and 2) when Lendingtree enforced its own patent, the defendant in that case cited the earlier '328 patent as one of the main prior art references in the same field. (Willful Dec. Ex. A).

The original complaint sought, "[a] declaration that Defendants products and services infringe SST's United States Patent No. 5,758,328[5], and that such infringement *is, was and will continue to be* willful" (Esteves Decl., Exs. 1 and 2 at Prayer for relief ¶ A). When filing the complaint, given the similarity of the '328 patent and Lendingtree's patent, SST believed that defendants would clearly have been aware of the '328 patent during their IP due diligence in defendant IAC's 2003 purchase of Lendingtree. That transaction was valued at hundreds of millions of dollars, and typically would not have occurred absent some searching to ensure the technology being acquired did not infringe third party patent rights. While defendants have improperly withheld production of the acquisition agreement, no doubt there is contractual language concerning third party patents.

However, during discovery in this case, defendants' 30(b)(6) witness was questioned precisely about this extensively, and testified that the '328 patent had not been discovered during

---

[3] Neither of these of course, impacts the analysis with respect to a permanent injunction.
[4] Hereafter, SST's 103 Brief. The present brief relies upon SST's 103 brief extensively, and thus, we would respectfully request the Court review SST's 103 Brief *before* this one.
[5] Hereinafter referred to as "the '328 patent".

such due diligence, so SST cannot show notice of the '328 patent prior to September 2004. Therefore, the willfulness claim is being withdrawn for conduct prior to September 2004, and any dispute about a discovery response is irrelevant.

With respect to post suit infringement, defendants' assertion fails on two grounds. First, the interrogatory asks for contentions regarding what monetary damages are due SST from Lendingtree's infringement. SST correctly stated its contention that enhanced damages are due for willful infringement. With respect to the identification of documents to support such a claim requested in the interrogatory, those documents largely did not exist at the time. Instead, as discussed below, defendants' later representations to the Court, their expansion of infringing activities after being adjudged an infringer, their abandonment of - as having no merit - defenses that they claim were reasonable enough to avoid willfulness, and their ongoing continuing conduct that has no basis in law or fact, all form the basis of the willfulness claims.

The documents evidencing all of this were <u>subsequently</u> generated by <u>defendants themselves,</u> through their conduct and assertions to the Court in this case. Defendants thus seek to bar SST's claim of willfulness due to SST not giving documents to defendants that defendants served upon SST. This would be nonsensical even if it were not for the additional fact that when responding to document requests, SST specifically noted that it would not be producing documents already in defendants' possession, and defendants accepted this without further comment. (Willful Dec. Ex. B).

Accordingly, neither the failure to move for a preliminary injunction, nor the failure to produce documents defendants themselves generated, permit defendants to get a free pass and avoid adjudication on the merits of conduct that has been utterly outrageous since the start of this suit.

## IV.    DEFENDANTS' LITIGATION CONDUCT IN THIS
## CASE HAS BEEN MALICIOUS AND IN BAD FAITH

As confirmed by the post *Seagate* authority, the Federal Circuit's decision in *Bott v. Four Star Corp.* 807 F.2d 1567 (Fed. Cir. 1986), which indicates the infringer's conduct during this lawsuit is to be considered in ruling on willfulness, is still the law.   Moreover, as the Court held in *Depomed, Inc.,* this Court must examine whether defendants really had any good faith belief in what they have asserted to this Court.   Thus, whether the post filing infringement was willful depends upon the assertions and conduct of defendants in this case.

Here, the record is replete with not only frivolous assertions, but misrepresentations to the Court, and vexatious litigation conduct designed to ensure that a multibillion dollar corporation could drive a tiny company into submission before adjudication on the merits could be had.   The record is replete with three years' worth of conduct that literally shocks the conscience.   It is thus not surprising that defendant Lendingtree was subjected to enhanced damages and a finding a willful infringement in a scathing opinion penned by the Chief Judge of the District Court of Delaware in  *IMX, Inc. v. Lendingtree, LLC*, 469 F. Supp. 2d 203 (D. Del. 2007).

For example, after this Complaint was filed, defendants filed a Rule 12(b)(6) motion to dismiss – by denying numerous facts in the Complaint – when Rule 12(b)(6) requires the facts in the Complaint to be taken as true.   This motion was so frivolous that the Court entered a ten page Opinion denying it – **the same day it was argued**.   (Opinion, January 10, 2005)

Defendants were represented by experienced partners in large law firms, and could not have possibly believed that a 12(b)(6) motion filed before a responsive pleading, <u>disputing numerous facts</u> in the Complaint, could have possibly been granted.   Instead, this was nothing more than a bad faith attempt to run up SST's costs.

Next defendants claimed that they needed to take the deposition of SST's trial counsel, because they believed their system so clearly did not infringe, that there could not have possibly been any good faith investigation done prefiling.  Essentially, defendants took the position that when a defendant strenuously denies claims of infringement, he gets to depose the patent owner's trial counsel.  Notably, although it is customary in most patent cases, defendants did not seek at that time to depose the attorney who actually prepared and filed the '328 patent.  Judge Wigenton herself found this odd, and defendants later followed Her Honor's suggestion to do so.

SST, a tiny entity struggling to maintain its claims here, was forced to fully brief and argue that motion too.  Defendants of course, had the idea of turning SST's trial counsel into a fact witness to obtain disqualification and frustrate SST's cause.   Judge Wigenton issued an Opinion quashing defendants subpoena, also the same day the motion was argued.   (Order, July 7, 2005, quashing subpoena).

Defendants also blatantly misled this Court in their representations to Judge Salas, conduct which also wound up serving no purpose other than to prove defendants reliance on the defenses they asserted were unreasonable as a matter of law.  On January 26, 2007, defendants' expert, Dr. Scacchi, served his invalidity expert report.  This report is filled with networking diagrams, computer systems, engineering drawings, citations to ecommerce technical manuals, and citations to hundreds of publications and technical journals that all relate to computers and ecommerce. This report contained 128 pages of detailed element by element claim charts directed to six computer and ecommerce prior art references.  Although the report is nearly 200 pages long, it is almost entirely directed to anticipation under 35 USC §102, not obviousness under 35 USC §103.  (e.g., p.129, "The public use of FAST in the U.S. prior to February 1995 discloses each and every limitation of Claim 14", see also e.g., pp. 39 – 48.  "The public use of

FAST prior to February 1995 discloses <u>each and every limitation</u> of claim 1") (emphasis added). Dr. Scacchi painstakingly went through each of the claims, applied each of the six references, and stated, repeatedly, that <u>each reference</u> <u>taught each and every element</u> of <u>each claim</u>.  Ex. N, pp. 31 – 128.

The entire obviousness section of the report comprises a single cursory statement that occupies a few paragraphs in slightly more than one page: "If one were to assume for the sake of argument, that any particular prior art reference is missing a particular claim limitation" then all six [ecommerce] references are combinable to arrive at the '328 claims.  (Ex. N, pp. 130-131). No mention of *Graham v. John Deere Co.*, 383 U.S. 1 (1966), or any other obviousness analysis, is made.

Dr. Scacchi was then instructed by defendants to end his relationship with the prior lawyers and begin "working with James Baker and Robert Wilson" (Ex. O, pp. 7-8), the newly hired New York lawyers at Quinn Emmanuel, now representing defendants.  Shortly thereafter, defendants told SST and Judge Salas that they needed to update their expert report – more than five months after it was served on the original due date - to account for *KSR*.  (Ex. G, Order permitting update).

Defendants then provided an "updated" expert report - 163 pages long, nearly the same length as the original report - and containing over one hundred pages of citations to things like alcoholic centers, dating services, and hardware store retailing magazines. (Ex. N1). Concurrently therewith, defendants produced <u>several thousand new pages</u> of BAM prior art documents relating to thing like dating services and counseling centers  – many of which indicated they were pulled from Westlaw databases. (i.e.; by the new lawyers).  (Ex. N1, Ex. X).

Further, although inapplicable to the present facts, the legal proposition upon which the

updated report is based - that merely computerizing a manual referral service is unpatentable – existed long prior to, and was unaffected by, *KSR*. *Princeton Biochemicals, Inc. v. Backman Coulter, Inc*. 2004 WL 1398227 (D. NJ 2004) (obvious automation of a manual process not patentable). Indeed, *Leapfrog Enter., Inc. v. Fisher Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007), the main precedent upon which defendants rely, was decided by the district court in March, 2006, thirteen months before *KSR*. *Leapfrog Enter., Inc. v. Fisher Price, Inc* 2006 WL 891001 (D. Del. 2006). And *KSR* certainly did not change the teachings of FAST, FECAT or FACNET, each of which Scacchi had claimed showed every feature of each of the claims.

Yet, the comparison between the reports at Ex. N and N1 is utterly astonishing – so much so that defendants' willingness to continue representing the latter as Dr. Scacchi's opinion to this Court, and their representations to Judge Salas, are nothing short of shocking. While admittedly lengthy, we respectfully encourage the Court to compare the two reports very carefully, and form its own view as to whether *KSR* had anything to do with the new report.

Dr. Scacchi opined that each of six references contained each limitation of the claims, and that the '328 patent was thus anticipated by (i.e.; identical to) prior art that taught directly against the '328 claims. Thus, defendants misrepresented the facts to Judge Salas to convince the Court to permit them to have their new lawyers rewrite Dr. Scacchi's opinion, and then presented that rewritten opinion to SST and, more importantly, to this Court – pretending it was the opinion of Dr. Scacchi.[6]

Far from providing any defense to willfulness, this simply shows that defendants could not have had any reasonable belief that prior art that taught – in dozens of places – the exact opposite of the claimed invention, provided any reasonable defense to this action. *Depomed*

---

[6] Dr. Scacchi also spent the four days immediately preceding his deposition in private meetings with defendants counsel, and then showed up at deposition to convey his new opinion only. (Ex. O). SST will move to exclude the Scacchi testimony if this case does not resolve via motion.

(Whether defendants' invalidity defense is reasonable for purposes of willful infringement when the prior art teaches away is an issue of fact for a jury.)  Indeed, defendants do not even rely upon any of the <u>original</u> opinions of Dr. Scacchi in their motion seeking a finding that the '328 patent is obvious.

Defendants' infringement defenses asserted to the Court were equally frivolous, and involved similar misrepresentations.   In connection with the Court's May 2 summary judgment Opinion, defendants filed papers and declarations indicating that users of their computer system do not request quotes.  Yet, their own documents advertising their system emphasized users were actually expecting the contractor to "quote on" the job in response to the request.  This Court found defendants' assertion in this regard as "beyond comprehension." Opinion granting summary judgment, May 2, 2007, at 23.   A jury could <u>certainly</u> find it was not made with a reasonable belief it was correct such that willful infringement is avoided as a matter of law.

In the same motion, defendants claimed that the '328 patent in suit had a requirement that users of a personal computer had to <u>hire a separate agent to use their computers</u> for them in order to infringe the '328 patent.  While this was summarily dismissed as meritless in this Court's May 2 Summary Judgment Opinion, SST submits that given the teachings of the '328 patent, such an utterly bizarre assertion could not have possibly been made in good faith.  Did defendants really believe there was even a colorable argument that the claims require someone to hire another individual to use a PC?

Finally, when questioned by the Court in connection with that motion as to why two different words in the patent, with different definitions, should be treated as the same, defendants argued that SST was trying to draw an "arbitrary distinction" between two different words.  (Tr. April 9, 2007 argument, p. 34).  But defendants agreed at the same hearing that the

two words were defined differently in the dictionary.  (*Id.*, at 12).  So, defendants essentially asked for summary judgment by claiming SST failed to prove that two different words, which defendants admitted had different meanings, were different.  But SST did not have to prove that any more than it has to prove that all the different words in this brief are different from each other.  And this was done in good faith?

In connection with the presently pending motions for summary judgment against Lendingtree ("LT"), LT argued to this Court that it does not offer goods or services.  When SST pointed out that LT's own advertisements referred to the loans offered as financial and lending services, LT misrepresented the facts to the Court again.  At that time, LT represented to this Court that all of LT's statements referring to loans as lending services were referring to the services offered by the LT computer system, not the banks.  LT told this Court that the banks on its network, that lend money, do not offer lending services, but the LT matching computer that does not lend money, does offer lending services.

Not only was this argument frivolous, it was another misrepresentation of the facts to the Court.  SST pointed out that LT's own patent referred to the banks, not the LT matching computer, as offering services.  LT certainly knew that its statements about entities on its system offering financial services were not directed to the matching computer, but to the banks.  It simply made another frivolous argument, based upon misrepresentations to the Court, in an attempt to run up SST's legal fees.  (SST Reply Brief August 27, 2007, pp. 5-7, pointing out LT's misrepresentations in this regard).

In December, 2006, Judge Salas called all the parties in for a conference.  When her Honor asked the parties about the possibility of an amicable resolution, defendants, who appeared through both their outside counsel and an in house employee attorney, told Judge Salas

that there was no hope for settlement because SST was not a real business, but merely a patent troll. (Willful Dec.) Essentially, they admitted – to a Federal Court - that they would not take seriously the rights of a mere "patent troll" who did not have "a real business", in their view.

In connection with the filing of this brief, Defendants refused to consent to a one day extension permitting it to be filed on Saturday afternoon, January 5, when it was due anytime before midnight on Friday, January 4. (Willful Dec. Ex. D). Were defendants going to be seriously prejudiced overnight? This required SST's counsel to involve the Court, draft a letter motion, and waste the time of Your Honor's law clerk, Ms. Pitney, who was apparently interrupted from in Court proceedings to handle defendants' attempts to run up legal fees. Clearly, defendants could not have been acting in good faith, or in support of their legal cause, by such conduct.  The Court granted the motion *ex parte*, by telephone, before SST's written submission even was sent.  (Willful Dec.)  Why did defendants do something like this if not to intentionally run up costs and obstruct the judicial process, particularly, when the major important briefs on invalidity under 35 USC §112 and §103 were both filed before they were due by SST?

In October, 2007,  defendants obtained a stay of the case, to continue their infringement, by indicating they wanted to mediate.[7]  SST expressed concern that defendants would not have an individual with sufficient settlement authority at the mediation.  To put SST's concerns to rest, and at the request of the mediator, defendants' in house Vice President and Associate General Counsel signed a written representation to the mediator indicating:

> The undersigned represents to the mediator that **the following person(s) will personally attend the mediation session, and will have the final authority to settle this matter…this person does not have to call outside the room for settlement authority and has the ability to change settlement position based**

---

[7] SST does not seek to use any of defendants' statements in the mediation on the merits here, as that would violate Rule 408.

**on unfolding events during the mediation day**.  (Emphasis added, Willful Dec. Ex. D).

Mediators typically want this so they can interface directly – i.e.; "lean on" – the individual with authority.  In fact, the mediator and SST were outraged to learn at the mediation in California, that the individuals with settlement authority remained in New York, and the mediator had no chance to interact with them.  Instead, no specific monetary offer or counteroffer ever took place at the mediation, because defendants New York executives, who were not at the mediation, simply instructed those at the mediation that it should be ended – after SST spent countless hours preparing a mediation statement and flew four individuals to California for two days.  (Willful Dec.)  While defendants were more than free to refuse a settlement offer, they were not free to misrepresent the facts to SST and the mediator to entice SST to engage in an expensive mediation that delayed this case, and to which SST would not have consented if it had known the true facts.[8]

Defendants' reliance upon a defense under 35 USC §103 is utterly frivolous in view of their own patent, and the features they claim are obvious in the '328 patent.  Specifically, years after the '328 patent was filed, and apparently without knowledge of it, defendant Lendingtree ("LT") filed a patent application that eventually resulted in US Patent No. 6,385,594.  (Ex. U).  The '594 patent describes a ecommerce system in which filter conditions entered by a borrower in a loan application are matched to "selection criteria", i.e.; filter conditions, set by the various lenders in advance in order to match borrowers with lenders.  (Ex. U, pp. 1 – 18).  Upon matching the lenders' filter conditions to the borrower's filter conditions, the LT '594 invention

---

[8] Apparently recognizing the disrespect his client had shown, counsel for defendants eventually arranged for defendants to pay SST's half of the mediator's fee.  While this demonstrated a high level of professionalism on the part of defendants' counsel, which SST appreciates, it did not make up for the days of time SST spent preparing a mediation statement, nor did it compensate SST for having sent four individuals to California under completely false pretenses.  All of this resulted from defendants' willingness to have an in house attorney sign a false statement.

sends the loan application to the matched lenders, and obtains loan offers in response that it

forwards to the borrowers.   (Ex. U)  With the application being the RFQ and the provided loans

being services that are quoted, this is very similar to the '328 patent in suit.

After the original claims filed by Lendingtree were rejected over the prior art, LT

presented an amendment,  adding the following text to then pending claim 24:

> Forwarding the credit data to a selected number of matching lending institutions
> associated with a match of the credit data to the selection criteria, ***said selected
> number of matching lending institutions being less than a total number of the
> identified matching lending institutions***  Emphasis added, Ex. U, at 19.

Substantially similar amendments were added to several of the other claims. [9]   For the

specification support required under 35 USC §112 to add these limitations, Lendingtree relied

upon the novel disclosure in the '594 patent application describing this feature.  (Ex. U, p. 14,

col. 6 of '594 patent, lines 26 – 34, explaining selection of subset of sellers on the way out.

Referring to a prior personal interview between its attorney and the patent examiner, LT

explained this amendment in the remarks section:

> [T]he Examiners indicated that if the independent claims are amended to state
> that the selected number of lending institutions that receive the credit data [i.e.;
> the RFQ] is less than the lending institutions that may match the credit data, then
> such recitations may define the claims over the prior art of record.   (Ex. U, p.
> 20).

This argument, that the idea of the matching computer itself cutting back on the way out,

otherwise perfectly qualified potential vendors that offer the consumer a mortgage loan, was

made repeatedly, and formed the cornerstone of the '594 patent being allowed.  (Ex. U, p. 22,

23A, 23B, "[N]either [prior art reference] describes nor suggests forwarding credit data to

selected number of matching lending institutions that is less than the total number of identified

matching lending institutions." (See also, Ex. U, pp.  24 – 27) . Lendingtree and the patent

---

[9] The '328 limitation of claim 14 is actually narrower, because it states that the diminution is to a prescribed number, whereas the Lendingtree amendment merely claimed that the number of sellers to receive the RFQ was diminished.

examiner were entirely correct.  Without the '328 patent before them, and based upon ecommerce systems of the day, as shown in Ex. X and in FAST and Iquest, a user of a search engine type system for obtaining mortgage quotes from banks via computer would have expected the computer to simply scan all the banks quotes and send the consumer a list of quotes. (See 103 Brief).

Subsequently, LT enforced that patent – maintaining that case *after* the Supreme Court's issuance of *KSR*, and *after* defendants cited all the brick and mortar art in this case - in a patent infringement litigation styled *Lendingtree v. Lowermybills,* 3:05-CV153-C (W. D N. C. 2005). Dr. Peter Alexander, <u>Lendingtree's</u> technical expert in that case,  testified to the effect that there were several advantages to such an ecommerce system that eliminated qualified sellers on the way out, instead of quotes on the way back, and that such a feature would not have been obvious because the phosita <u>in *1998* would not have understood the advantages of such a feature</u>.   Ex. W, pp. 84 – 87.

Yet, defendants obviousness defense, as outlined in SST's 103 Brief, is premised entirely upon this Court finding that the same feature, with further additional improvements, was obvious 4 years earlier.  This makes no sense.

Defendants' reliance upon the defense under 35 USC §103, as outlined in their recently filed motion, as a basis for their good faith belief that the '328 patent was not valid rings hollow in view of the facts that 1) neither the precedent nor the prior art upon which that motion is based were known to defendants until nearly three years after they had notice of this lawsuit; 2) the opinion of Dr. Scacchi upon which it is based is nothing more than Dr. Scacchi's signature on a hindsight theory derived years later by some New York lawyers, and which would have been precluded from being entered into this case but for the misrepresentations to Judge Salas that it

was strictly an update based upon *KSR*; and 3) as shown in SST's 103 Brief, defendants do not have even a colorable defense under 35 USC §103 – indeed, they are arguing that the very feature they themselves patented was obvious four years earlier.

### V.     EVEN IF DEFENDANTS HAVE A COLORABLE OBVIOUSNESS DEFENSE, THEIR PRESENT MOTION MUST BE DENIED

In any event, even if defendants' assertions concerning invalidity were not incorrect as a matter of law, having a colorable defense does not automatically mean there is no willful infringement. Instead, it simply means the jury is entitled to weigh the merits of that defense against all the facts outlined above and in SST's 103 Brief and decide for themselves whether defendants had a good faith basis for believing the '328 patent was invalid, or whether their actions in continuing to infringe during this litigation were reckless. See *Cohesive Technologies, Inc. v. Waters Corp.*, Nos. 98-12308-DPW, 99-11528-DPW, 01-12307-DPW, 2007 WL 2746805 (D. Mass Aug. 31, 2007), post KSR case holding that facts relevant to willfulness go beyond whether there is a colorable defense, and that fact finder must consider: 1) whether the infringer solicited or followed the advice of counsel (none has been produced here); 2) whether there was continued infringement after notice of probable infringement was received (here, the Court has already ruled that at least one of the defendants infringes); 3) whether there was a degree of similarity between the patented and accused devices (Here, Lendingtree's own patent, describing its technology, relies upon the exact same features that it claims were obvious years earlier (See SST Motion for Summary Judgment of Non-Obviousness, pp. 37 – 41); 4) whether the infringer took efforts to avoid infringement (Here, none were taken, but a press release shows expanded infringement after this Court ruled that there was infringement. (Willful Dec., Ex. C) .

17

In fact, *Seagate* is simply not a license to keep infringing whenever there is a colorable defense. *Depomed* (Denying Summary Judgment of Obviousness); *Ball Aerosal v. Limited Brands, Inc.* 514 F.Supp. 1051 (N.D. Ill. 2007) (Post *Seagate*, doubling damages where infringers continued conduct after summary judgment of infringement, just like here, and relying upon nine factually specific inquiries to make determination); *Domestic Fabric Corp. v. Sears Roebuck & Co.,* 326 F.Supp. 2d 694 (E.D.N.C. 2004).

SST respectfully submits that a jury must be permitted to consider all of the above facts to determine on its own whether continued infringement was reckless, and that a defendant who simply makes out a colorable defense that it came upon nearly three years after notice of the patent in suit, after years of continued infringement, is not entitled to summary judgment.

Finally, at the very least, defendants' motion on willfulness is heavily dependant upon the outcome of the other pending summary judgment motions.  For example, if this Court denies their motions for non-infringement and/or invalidity, or grants SST's cross motions on the same issues, then clearly the equation will change.  For example, if the Court grants SST's cross motion that the '328 patent is not invalid for obviousness, defendants will be in no position to continue infringing while claiming they have a good faith belief that the patent is invalid.  Thus, at the very least, the claim of willfulness for any period beyond any rulings this Court makes that may change the situation can not be adjudicated at the present time.

## VI.    <u>DEFENDANTS' CASES ARE NOT TO THE CONTRARY</u>

In *Cohesive Technologies*, another post *KSR* case, the district court laid out several factors to be evaluated to determine whether infringement is willful, which included: 1) whether the infringer solicited or followed the advice of counsel (none has been produced here); 2)

whether there was continued infringement after notice of probable infringement was received

(here, the Court has already ruled that at least one of the two defendants infringes); 3) whether

there was a degree of similarity between the patented and accused devices (Here, Lendingtree's

own patent, describing its technology, relies upon the exact same features that it claims were

obvious years earlier (See SST Motion for Summary Judgment of Non-Obviousness, pp. 37 –

41); 4) whether the infringer took efforts to avoid infringement (Here, none were taken, but a

press release shows expanded infringement after this Court ruled that there was infringement.

The court then expressly held, "[b]cause I find that Waters obtained an opinion of

counsel in good faith, and because there was a bona fide dispute over whether the Oasis

polymeric particles infringed *Cohesive's* patents.  *Cohesive* has not demonstrated that Waters'

infringement was willful." *Id.*   This multifactor detailed analysis of the facts  - entered after a

full trial and based in part upon "the live testimony of Anthony Janiuk and Michael Early" at

trial – firmly refutes any idea that defendants are entitled to summary judgment.

In *TGIP, Inc. v. AT&T Corp.*, No. 2:06-cv-105, 2007WL3194125 (E.D. Texas Oct. 29,

2007), the **only** evidence of willful infringement offered **at trial** was a notice letter of

infringement and the fact that the jury actually found infringement.  SST stipulates that merely

noticing an infringement claim later proven does not imply the infringement was willful.

Otherwise, every infringement claim ultimately proven in an *inter partes* proceeding would be

willful.

In *Informatica Corp. v. Business Objects Data Integration, Inc.*, No. C 02-03378 EDL,

2007WL3203062 (N.D. Cal. Oct. 29, 2007) – another case not involving summary judgment, but

a finding after trial that infringement was not willful -  the reason not to award enhanced

damages was based upon the closeness of the case, both as to infringement and validity,

*Informatica* at *5, and the patentee's acceptance of a remittitur that represented a high end of damages the jury could have awarded. *Id.* at *6. Finally, in *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, No. C06-210MJP, 2007WL2790777 (W.D. Wash. Sept. 25, 2007), no willfulness was found based upon the court's belief that the defendant might have prevailed on its invalidity defense had its counsel disclosed its witness on the issue and not been inept. *Baden Sports* at *7. Again, a case clearly distinguishable from the infringement and validity facts of this case.

Although there are many post *Seagate* cases concerning willful infringement, there are only three post – *Seagate* cases of which we are aware that adjudicated the willfulness issue pre-trial. In two of them, *VNUS Medical* and *Depomed Inc*, the Court denied the motions by detailing all the facts and circumstances involved in a determination of willfulness, and holding that summary judgment was thus inappropriate. These cases support SST's position here, not that of defendants. The third case, *Abbott Laboratories v. Sandoz, Inc*., 2007 WL 4287503 (N.D. Ill. Dec. 4, 2007) in which a willfulness claim was dismissed pre-trial, involved a patent that was subject to a prior appeal in which the Federal Circuit had indicated there "was a very strong probability that the claims of the '718 patent were invalid." *Id.*, at 3.

## VII.    <u>CONCLUSION</u>

The Court should deny defendants' motion in part because serious issues of fact remain about defendants post litigation conduct – specifically, whether they are really asserting their infringement defenses in good faith, and whether a reasonable business person in their shoes would have relied upon an invalidity defense of which they were unaware for nearly three years after suit was filed, and in connection with which they have produced no opinion of counsel.

Respectfully submitted,

KAPLAN GILMAN GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095
Telephone: (732) 634-7634
Facsimile: (732) 634-6887
*Attorneys for Plaintiff*
*Source Search Technologies, LLC*

Dated: January 7, 2008          By: _____s/Jeffrey I. Kaplan/_____
                                    Jeffrey I. Kaplan (JK 4706)
                                    Michael R. Gilman (MG 7608) *Pro Hac Vice*

21