## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Source Search Technologies, LLC,

        Plaintiff/Counterclaim
        Defendant,

    -against-

LendingTree, LLC, IAC/InterActiveCorp,
and ServiceMagic, Inc.,

        Defendants/Counterclaim
        Plaintiffs.

**DOCUMENT
ELECTRONICALLY FILED**

Civil Action No.
04-CV-4420 (DRD) (ES)

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF INVALIDITY FOR INDEFINITENESS AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION

Kevin J. McKenna
Elvin Esteves
GIBBONS P.C.
  One Gateway Center
  Newark, New Jersey  07102-5496
  (973) 596-4500
  kmckenna@gibbonslaw.com
  eesteves@gibbonslaw.com

Claude M. Stern
Robert B. Wilson
Evette Pennypacker
James E. Baker
Linda J. Brewer
(all admitted *pro hac vice*)
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
  51 Madison Avenue, 22nd Floor
  New York, New York  10010-1601
  (212) 849-7000
  claudestern@quinnemanuel.com
  robertwilson@quinnemanuel.com
  evettepennypacker@quinnemanuel.com
  jamesbaker@quinnemanuel.com
  lindabrewer@quinnemanuel.com

Date:  January 18, 2008

Attorneys for LendingTree, LLC,
IAC/InterActiveCorp, and
ServiceMagic, Inc.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................1

II.     SST FAILS TO REBUT DEFENDANTS' INDEFINITENESS
        ARGUMENT.........................................................................................5

        A.      SST's Definition of "Standard" Introduces a Subjective
                Element into the '328 Claims That Renders Them Indefinite ..............6

        B.      SST's "Fuzzy Border" Argument Is Irrelevant....................................7

                1.      SST's Hypothetical Mischaracterizes the Indefiniteness
                        Problem ...........................................................................7

                2.      The Scope of the '328 Claims Changes, Depending on
                        Who Is Asked.....................................................................9

        C.      Even SST Cannot Settle on a Definition for the Group of
                Buyers................................................................................ 12

        D.      The '328 Specification Provides No Guidance ................................. 15

        E.      Established Case Law Unequivocally Supports a Finding of
                Indefiniteness.................................................................... 17

                1.      Claims May Be Indefinite in Light of Language in the
                        Construction ................................................................. 17

                2.      By Construing the '328 Claims, the Court Made No
                        Implicit Findings on Indefiniteness ....................................... 19

III.    THE COURT SHOULD DENY SST'S REQUEST FOR YET
        ANOTHER CHANCE AT CLAIM CONSTRUCTION ............................. 23

        A.      SST's Broad Construction Led to the Indefiniteness Problem .......... 23

        B.      SST's New Claim Construction Arguments Ignore the Court's
                Prior Rulings on the Intrinsic Evidence .............................................. 25

        C.      SST's Results-Oriented Approach to Claim Construction Flies
                in the Face of Federal Circuit Precedent ........................................... 29

i

IV.    THERE IS NO WAIVER ............................................................... 31

      A.    The Indefiniteness Issue Arose Only After the Court's Most
           Recent Claim Construction Rulings .................................................. 32

      B.    There Is No Prejudice to SST ............................................................ 32

V.    THE '328 CLAIMS ARE INVALID FOR MULTIPLE REASONS .......... 35

VI.    EITHER THE '328 CLAIMS ARE INDEFINITE OR
      DEFENDANTS DO NOT INFRINGE ....................................................... 36

VII.    CONCLUSION ............................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

<u>**Cases**</u>

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
   334 F.3d 1274 (Fed. Cir. 2003) ........................................................ 20

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ....................................................... 25

*Atmel Corp. v. Info. Storage Devices, Inc.*,
   198 F.3d 1374 (Fed. Cir. 1999) ....................................................... 34

*Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*,
   246 F.3d  1368 (Fed. Cir. 2001) ............................................. 29, 30, 31

*Cetel v. Kirwan Fin. Group, Inc.*,
   460 F.3d 494 (3d Cir. 2006) ....................................................... 32, 33

*Charpentier v.  Godsil*,
   937 F.2d 859 (3d Cir. 1991) ............................................................ 32

*Enzo Biochem Inc. v. Applera Corp.*,
   2007 WL 2669025 (D. Conn. 2007) ................................................ 21

*Enzo Biochem Inc. v. Applera Corp.*,
   U.S. Dist. LEXIS 74570 (D. Conn. Oct. 12, 2006) ........................... 21

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
   64 F.3d 1553 (Fed. Cir. 1995) ......................................................... 30

*Halliburton Energy Servs., Inc. v. M-I, LLC*,
   456 F. Supp. 2d 811 (E.D. Tex. 2006) ....................................... 17, 19

*Hybritech Inc. v. Abbott Labs.*,
   849 F.2d 1446 (Fed. Cir. 1988) ....................................................... 30

*Innova/Pure Water, Inc. v. Safari Water  Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ................................................. 17, 18

*Leggett & Platt, Inc. v. Vutek, Inc.*,
   2006 WL 3813677 (E.D. Mo. Dec. 26, 2006) .............................. 17, 18

*MBO Labs. v. Becton Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007) ....................................................... 28

*Maytag Corp. v. Electrolux Home Prods., Inc.*,
   411 F. Supp. 2d 1008 (N.D. Iowa 2006) .......................................... 21

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004) ....................................................... 27

*North Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
   7 F.3d 1571 (Fed. Cir. 1993).................................................................. 34

*Personalized Media v. Int'l Trade Comm'n*,
   161 F.3d 696 (Fed. Cir. 1998).............................................................. 34

*Pfizer Inc. v. Ranbaxy Labs., Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006) ............................................................ 28

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................ 17

*RP Delaware, Inc. v. Pac. Keystone Techs., Inc.*,
   326 F.3d 1255 (Fed. Cir. 2003) ............................................................ 20

*Rackable Sys., Inc. v. Super Micro Computer, Inc.*,
   2006 WL 3065577 (N.D. Cal. Oct. 27, 2006) ................................. 6, 17, 18, 19

*Ricoh v. Katun Corp.*,
   486 F. Supp. 2d 395 (D.N.J. 2007) .................................................. 32, 35

*Romala Stone Inc. v. Home Depot U.S.A., Inc.*,
   2007 WL 2904110 (N.D. Ga. Oct 1, 2007) ...................................... 15

*Seachange Int'l Inc. v. nCUBE Corp.*,
   115 F. Supp. 2d 473 (D. Del. 2000)................................................ 21, 22

*Semmler v. American Honda Motor Co.*,
   990 F. Supp. 967 (S.D. Ohio 1997) ................................................ 15

*Tantivy Commc'n Inc. v. Lucent Techs., Inc.*,
   2005 WL 1925911 (E.D. Tex. 2005) .............................................. 21, 22

## **Statutes**

35 U.S.C. § 112 ............................................................................ 6, 15, 19

## I.      INTRODUCTION

Defendants' Motion for Summary Judgment of Indefiniteness raises a question that Plaintiff Source Search Technologies, LLC's ("SST") has avoided rather than answered:  Can a person of ordinary skill in the art ***objectively*** determine whether a particular good or service is "standard" when that term has been construed to mean "familiar," "usual," or "common?"  The answer is plainly "no."  Whether a good or service is "familiar," "common," or "usual" depends on the subjective knowledge and past experience of the buyer.  And the '328 patent provides no guidance about which buyers to ask about what is "familiar," "common," or "usual," how to determine what they know, and how often this inquiry must be made in order to determine what goods and services are encompassed by the claims.  These unanswered questions are hallmarks of subjectivity that render the '328 claims invalid for indefiniteness.

If the '328 patent satisfied this essential requirement of objectivity, as SST contends, the explanation would presumably be straightforward.  It is not a trick question to ask:   "The goods and services of the '328 claims must be familiar, usual, or common ***to whom***?"  SST dodges the question by referring variously to "a normal user population of general consumers," "the public," and "most people."  These characterizations do nothing to advance the inquiry, and in fact, further cloud it with yet another layer of subjectivity.  SST does not explain (in its brief, in

an expert declaration, or in any other submission) where any of these descriptions are found in the '328 patent, how to determine who should be included in any of these groups, or how to establish whether a particular good or service is "standard" to them. One of the principal examples of a "standard" good in the '328 patent, the Type J resistor, highlights the inadequacy of SST's descriptions. "Most people" have never heard of a Type J resistor. Yet, it is a preferred embodiment discussed at several points in the '328 patent. Accordingly, SST's characterization of how to determine what is "familiar," "usual," or "common" reads out a preferred embodiment, and therefore, cannot be correct.

SST also mischaracterizes the problem as relating to words of approximation, such as "far" and "close." But the problem with the language of the '328 claims is not that it is "approximate," which may create some uncertainty at the outer fringes of the claims about what is covered and what is not. Instead, it is impossible to stake out with certainty the overall boundaries of the '328 claims because different groups are familiar with different types of goods and services. Even in the "fuzzy border" situation, there remains an objectively defined reference point that does not change based on the perspective of a particular individual. By contrast, the "test" for whether or not a particular good or service is "standard" for purposes of the '328 claims is untethered to anything that can be objectively determined. SST never addresses this problem. The only examples of

2

"non-standard" goods and services that SST identifies are made up examples, such as the "hopsidutical widget" and the "rumblestrip machine," which demonstrate that it cannot come up with a meaningful distinction between "standard" and "non-standard" under the current claim construction. Thus, the problem of subjectivity discussed in Defendants' opening brief remains completely unrebutted, and summary judgment of indefiniteness is warranted.

Because it cannot solve the subjectivity problem with the '328 claims, SST asks the Court to keep trying and construe "goods and services" for a ***third*** time. This request is telling. It confirms that SST is unable to rebut the evidence of indefiniteness under the Court's current construction, and demonstrates its complete disregard for the Court's time and effort expended in analyzing the issue in three earlier opinions. It is also unbelievable in light of SST's vigorous opposition to any further briefing after the Court adopted SST's definition of the term "standard" as part of its construction. It is simply amazing that having gotten the exact construction of "standard" that it asked for, SST would suggest that it should have another opportunity to propose alternative claim constructions to avoid the indefiniteness problem that it has created.

Moreover, SST's suggestion that two rounds of claim construction have been insufficient to construe the term "goods and services" strongly suggests that the problem is not with the construction, but with the '328 patent itself. The

disclosure in the '328 patent of the buyer as the benchmark of what is "standard" is so fundamentally flawed that even a third round of claim construction is unlikely to resolve it. Indeed, SST's only alternative construction is a rehash of its earlier argument that the use of the term "standard" in the '328 specification should be ignored, an argument that the Court flatly rejected **twice** in its earlier claim construction rulings.

Of course, the word "standard" cannot be ignored. If "standard" has any objectively ascertainable meaning, it must be an inherent characteristic of the good or service itself – *e.g*., the fungible, "off the shelf" Type J resistor – independent from the subjective understanding of an undefined group of potential buyers. Under that construction, the term would exclude "non-standard" goods and services that are customized to meet the needs of individual buyers. Thus, the customized loans and home contractor services offered on the LendingTree and ServiceMagic websites (which are individualized to meet the needs of every new borrower or homeowner) would not infringe.

Finally, SST's argument that Defendants waived their indefiniteness defense by not asserting it "three years" ago is incredible. Defendants preserved that defense at the outset of this litigation in their Answers to SST's First Amended Complaint. Moreover, the specific indefiniteness implications of SST's definition of "standard" have only become apparent after the Court's most recent claim

4

construction rulings in its May and June 2007 Orders regarding ServiceMagic.

SST cannot reasonably contend that it has now been prejudiced by an issue that it

put into play through its own infringement arguments.  Without any prejudice to

SST, there has been no waiver that would preclude summary judgment of

indefiniteness.

## II.    SST FAILS TO REBUT DEFENDANTS' INDEFINITENESS ARGUMENT

SST has offered absolutely nothing to rebut Defendants' indefiniteness

argument.  SST's brief is completely silent on the dividing line between "standard"

and "non-standard" goods and services.  Nor has SST submitted an expert

declaration explaining how a person of ordinary skill would understand the '328

patent to distinguish those goods and services that are encompassed by the claims

from those that are not.

Instead, SST mischaracterizes the basis for Defendants' motion.  According

to SST, Defendants' argument is that it is sometimes a "close call" whether certain

goods and services at the borderline are within the scope of the '328 claims.  SST

refers to this as the "fuzzy border" problem, and cites a series of Federal Circuit

cases purportedly rejecting "fuzzy border" arguments.  (Opp'n at 2, 20-26).  SST's

opposition confuses the issues by mischaracterizing Defendants' position,

responding to arguments that Defendants never made, and leaving the core of their

arguments regarding the subjectivity of the '328 claims entirely unrebutted.

### A.    SST's Definition of "Standard" Introduces a Subjective Element into the '328 Claims That Renders Them Indefinite

The term "standard," as construed to mean "familiar," "common," or "usual," is indefinite because the scope of the claims depends on what is known to the prospective buyer or group of buyers.  Because different groups of buyers will be "familiar" with different goods and services, the scope of the '328 claims changes, depending on who is asked.  The '328 patent provides no guidance regarding the buyers who must be "familiar" with a good or service, and thereby, fails to disclose what is encompassed by the '328 claims and what remains in the public domain.

Like the term "aesthetically pleasing," goods and services that are "familiar" to one buyer may or may not be "familiar" to another buyer.  The term "aesthetically pleasing" is indefinite because different things are "aesthetically pleasing" to different people.  The same is true in this case.  "Standard" (as construed) is indefinite because different goods and services are "familiar," "common," or "usual" to different buyers.  Thus, the '328 applicant did not satisfy his obligation under 35 U.S.C. § 112, ¶ 2 to provide an "objective anchor" for determining what is and is not covered by the claims.  *Rackable Sys., Inc. v. Super Micro Computer, Inc*., 2006 WL 3065577 at *7-8 (N.D. Cal. Oct. 27, 2006).  Accordingly, the '328 claims are invalid for indefiniteness.

### B.    SST's "Fuzzy Border" Argument Is Irrelevant

The "fuzzy border" problem addresses a fundamentally different question than the indefiniteness problem in this case.  In a "fuzzy border" case, the disputed claim term is capable of being objectively defined, but the contours of the claim may not be clearly demarcated in every instance.

Although the '328 claims may also suffer from a "fuzzy border" problem, the defect that renders them indefinite goes much deeper than that.  In making its "fuzzy border" analogy, SST *assumes* that there are fixed, objective criteria for determining which goods and services are "standard," and that the only problem is the difficulty of applying those criteria in close cases.  But SST's assumption is demonstrably wrong.  The '328 patent, as construed, discloses no fixed, objective criteria for determining the overall scope of the claims because what is "standard" or not depends on the subjective knowledge and experience of a given buyer or group of buyers.  Thus, SST's "fuzzy border" argument begs the fundamental indefiniteness questions raised in Defendants' motion:  *Who* are the prospective buyers to ask?  Is it the general public, electrical engineers, or some other group?  The '328 patent does not say.

### 1.    SST's Hypothetical Mischaracterizes the Indefiniteness Problem

The irrelevance of SST's "fuzzy border" argument is exemplified by Figure 2 from its brief (*see* Opp'n at 20), reproduced below:



SST poses a hypothetical using the terms "far" and "close," words that appear nowhere in the asserted claims and do not inform the meaning of "goods and services."  SST argues that the indefiniteness problem in this case is like the "fuzzy border" illustrated in Figure 2, which arises because "far" and "close" are inherently approximate terms.  (Opp'n at 20).

SST's hypothetical simply confuses the issues.  The indefiniteness problem arises because the '328 claims, as construed, require you to ask someone (a buyer or group of buyers) whether a good or service is "familiar."  The buyer's knowledge introduces an inherently subjective element because different things are "familiar" to different people, and therefore, the scope of the '328 claims changes, depending on who is asked.  It is the introduction of the subjective knowledge of the buyer that gives rise to the indefiniteness problem in this case, not some inherent ambiguity in the language used in the claims.

### 2.    The Scope of the '328 Claims Changes, Depending on Who Is Asked

The diagram set forth below illustrates the actual indefiniteness problem with the '328 claims.



***General public***:  The top row of the diagram illustrates the knowledge of the "general public."  The red area represents goods and services that the general public would consider to be "standard" (familiar, common, or usual).  The regions outside the red box represent goods and services that the general public would consider to be "non-standard" (unfamiliar, uncommon, or unusual).

9

***Electrical engineers***:  The middle row of the diagram illustrates the knowledge of electrical engineers.  If surveyed, it is likely that electrical engineers would be familiar with most, if not all, of the same goods and services as the general public.  Those goods and services are included in the red box in the second diagram.  As a group, however, electrical engineers are familiar with additional goods and services, specifically those related to their profession.  This is represented by the area of "standard" goods and services extending into the right hand side of the bar.  An example of a standard good that is familiar to electrical engineers, but not the general public, is the Type J resistor discussed in the '328 patent.  (*See, e.g*., Esteves Decl., Ex. 3, the '328 patent at 5:49-62, Fig. 8).  Thus, the scope of what is a "standard" good or service is different, depending on whether the buyers are members of the general public or a group of electrical engineers.

***Patent Lawyers***:  The third row of the diagram illustrates the knowledge of patent lawyers.  Like electrical engineers, patent lawyers are likely to be familiar with most of the goods and services that the general public would consider "standard."  Patent lawyers are also familiar with additional goods and services related to their profession, but these are different from the additional goods and services that are familiar to electrical engineers.  These specialty goods and services are represented on the left hand side of the bar.  An example of a service

that would be familiar to patent lawyers, but probably not the general public or electrical engineers, is a service that retrieves PCT applications.[1]

As before, the scope of what is a "standard" good or service changes. What is "standard" to a group of patent lawyers is different from what is "standard" to a group of electrical engineers or to members of the general public. In addition to these specific examples, there are countless buyer groups that can be defined based on criteria such as profession, age, gender, or geographic region, each of which is likely to be familiar with different goods and services. And because the answer changes depending on who is surveyed, it is impossible to determine objectively the scope of the goods and services that are encompassed within the '328 claims.

By contrast, the "fuzzy border" problem that SST describes relates to uncertainty at the outer limits of each of these areas. For example, what is standard to the public – or to electrical engineers or patent lawyers – may be somewhat unclear at the edges. But SST's "fuzzy border" hypothetical assumes that the group of buyers has already been identified as "the public," "electrical engineers," or "patent lawyers" (which the '328 patent does not do), and that a person of

---

[1]    SST suggests that Defendants first identified retrieval services for PCT applications as an example of a "non-standard item." (Opp'n at 17-18). That is not so. SST first relied on PCT retrieval services as an example of a "non-standard" service in the context of its infringement arguments with respect to ServiceMagic. (Suppl. Esteves Decl., Ex. 6, 4/7/07 SST Reply at 12).

ordinary skill would be able to determine (through a survey or otherwise) what that group thinks. The indefiniteness problem with the '328 claims involves the much more fundamental question of who the right group of buyers is to begin with. Because the '328 patent does not answer that essential threshold question, a person of ordinary skill would never even reach the issue of "fuzzy borders" because the overall scope of the claims cannot first be determined.

### C.    Even SST Cannot Settle on a Definition for the Group of Buyers

SST describes the group of buyers in a variety of different ways, including "a normal user population of general consumers," "the public," and "most people." (SST's Response to Defendants' Rule 56.1 Statement at ¶ 7). These descriptions do nothing to clear up the indefiniteness problem with the '328 claims, but instead add an additional layer of subjectivity. What exactly is a "normal" user population? Who are "general consumers," "the public," and "most people" for purposes of the '328 patent? Is it everyone in the world? Or is the group of potential buyers limited in some way by age, geographic location, nationality, gender, or other criteria? And even assuming the right group of people can be defined, how does the person of ordinary skill figure out what they consider to be "familiar," "common," or "usual?"

Additionally, SST fails to identify any part of the '328 patent that requires or even suggests that "standard goods and services" should be determined from the

perspective of "a normal user population of general consumers," "the public," or "most people." None of these terms is found anywhere in the patent. SST attempts to encompass the broadest possible range of potential buyers, presumably with an eye towards its infringement arguments with respect to LendingTree and ServiceMagic. But its characterizations find no support in the language of the '328 patent.

In fact, the disclosure in the '328 specification actually contradicts SST's broad interpretation, demonstrating that it cannot be right. For example, the '328 patent identifies Type J resistors, a specialty electronics item, as a preferred embodiment of a "standard" good. (*See* Esteves Decl., Ex. 3, '328 patent at 5:49-62, Fig. 8). But "general consumers," "the public," and "most people" are unlikely to have ever heard of a Type J resistor, let alone be familiar with what it is. Thus, SST's interpretation of the claims excludes this preferred embodiment.

At the same time, SST has argued that a specialty service that retrieves PCT applications is "non-standard" because it would not be familiar to "most people" who are not patent lawyers. (Suppl. Esteves Decl., Ex. 6, 4/7/07 SST Reply Br. at 12). SST cannot explain why this specialty service is "non-standard" when the '328 specification expressly discloses similar specialty items, such as the Type J resistor, as preferred embodiments of "standard" goods. SST's inconsistent arguments highlight the indefiniteness problem with the '328 claims.

13

Alternatively, SST attempts to characterize the buyers as "the user population to which the system is directed." (Opp'n at 27). But that attempt at an objective definition fails as well. Presumably, the systems of the '328 patent are directed to users who are likely to buy the goods and services offered. And users who are likely to buy particular goods and services are typically going to be "familiar" with them. Thus, SST's argument boils down to a tautology – goods and services are "standard" if they are "familiar" to users who are likely to buy them because they are already familiar with them. Under that definition, every good or service in existence is "standard" because it is familiar to some group of people, even if the group has to be narrowly defined.

For example, if Type J resistors aren't "standard" goods to the general public, the group of potential buyers can simply be redefined to be electrical engineers or some subset of electrical engineers to whom the system is allegedly directed so that the group is "familiar" with the item. Under that interpretation, however, the only goods and services that SST can identify as "non-standard" are imaginary things, like the "hopsidutical widget" (Suppl. Esteves Decl., Ex. 7, SST's 3/20/07 Mot. at 19) and the "rumblestrip machine" that SST makes up as examples in its briefs (Opp'n at 27).

By reading the claims to encompass all goods and services in existence, SST reads "standard" out of the construction and renders the express disclosure in the

'328 specification that the claimed goods and services *must* be "standard" completely superfluous because it distinguishes nothing but imaginary goods and services as "non-standard."  Armed with that construction, SST is able to expand the scope of the '328 claims at will, which defeats the requirement of §112, ¶ 2 that the claims be defined objectively.  *See, e.g., Semmler v. American Honda Motor Co.*, 990 F. Supp. 967, 975 (S.D. Ohio 1997) (holding that the asserted claims were indefinite because the patentee could expand their scope at will by arbitrarily defining the meaning of "considerable fuel savings").  *See also Romala Stone Inc. v. Home Depot U.S.A., Inc.*, 2007 WL 2904110 at *7 (N.D. Ga. Oct 1, 2007).

## D.     The '328 Specification Provides No Guidance

SST argues that the term "standard" cannot be indefinite if the '328 patent used the term to "clearly and unambiguously" define "goods and services.  (Opp'n at 1-2, 10-12).  Specifically, SST points to Defendants' claim construction argument that "goods and services" must be construed in light of the discussion of "standard" in the specification.  (Opp'n at 11-12).  SST attempts to stretch that argument beyond all recognition to mean that Defendants have somehow conceded that because the specification unequivocally defines "goods and services" as "standard," the term "standard" itself must be definite.  Defendants have made no such concession.

15

The '328 specification *is* clear about one thing:  Goods and services *must* be standard items."  (Esteves Decl., Ex. 3, '328 patent at 3:63, emphasis added).  The Court has recognized that the use of the word "must" means that "standard" is a mandatory requirement of the claimed system, not merely a preferred embodiment. (Esteves Decl., Ex. 5, 11/13/06 Order at 3-4; Esteves Decl., Ex. 1, 5/2/07 Order at 14).  But when it adopted SST's proposed definition of "standard," the Court made no ruling at that time about whether the proposed definition satisfied the indefiniteness requirement.  (*See* Esteves Decl., Ex. 1, 5/2/07 Order at 17-18).

Likewise, the claim construction cases that SST cites do not support its argument.  (*See* Opp'n at 10-11).  SST relies on those cases to argue that "standard" cannot be ambiguous because otherwise "that language could not have possibly constituted a clear disavowal of claim scope or a clear re-definition of the terms goods and services."  (Opp'n at 10).  SST is arguing about an issue that has already been conclusively decided against it following the Court's extensive analysis.  (Esteves Decl., Ex. 5, 11/13/06 Order at 2-5; Esteves Decl., Ex. 1, 5/2/07 Order at 13-18).

The '328 patent discloses that the claimed goods and services *must* be standard.  It is unambiguous that standard goods and services are a requirement of the claimed systems.  The '328 patent fails, however, to distinguish clearly and unambiguously "standard" goods and services from "non-standard" ones.  Thus,

there is no inconsistency between the Court's claim construction rulings and Defendants' indefiniteness argument, as SST suggests.  Indeed, SST's argument implies that if a court construes a claim term, that term cannot later be found to be indefinite.  As discussed in the following section, that is not the law.

### E.    Established Case Law Unequivocally Supports a Finding of Indefiniteness

SST is wrong when it asserts that defendants cannot cite "a single case" where a claim was found to be indefinite based on the words of the claim construction, as opposed to the words of the claim itself.  (Opp'n at 1-2, 12).  And SST is wrong to suggest that having construed the claims, the Court implicitly made findings with respect to indefiniteness.  (*Id*. at 12).

### 1.    Claims May Be Indefinite in Light of Language in the Construction

Recent cases leave no doubt that a finding of indefiniteness may be based on the language used to construe the claims, rather than the claim language itself.  *See Leggett & Platt, Inc. v. Vutek, Inc.,* 2006 WL 3813677 at *7 (E.D. Mo. Dec. 26, 2006); *Rackable Sys*., 2006 WL 3065577 at *7-8; *Halliburton Energy Servs., Inc. v. M-I, LLC*, 456 F. Supp. 2d 811 (E.D. Tex. 2006).

The policy behind this rule is straightforward.  The construction of the claims is what the claims mean as a matter of law.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water*

*Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Nothing is "read into" them, as SST suggests. (Opp'n at 2, 10).

Both *Leggett* and *Rackable Systems* are remarkably similar to the facts here. In *Leggett*, the patent-in-suit covered certain types of inkjet printers that were less likely to distort an image as it was being printed. The claims used the terms "deform," "deforming," and "deformation." The court, at the patentee's urging, construed these terms to mean print quality that had been degraded "such that the print is ***unacceptable for its intended purpose***." *See Leggett*, 2006 WL 3813677 at *7 (emphasis added). In later ruling on the defendant's motion for summary judgment of indefiniteness, the court found that whether print quality is "acceptable" or "unacceptable" depends on both the "commercial application for which the printer is being used" and the "***subjective belief of the customer***." *Id.* at *9 (emphasis added). This introduced an unacceptable "level of subjectivity" into the claims. *Id.* at *9. On this basis, the court held that the claims were invalid for indefiniteness and granted the defendant's motion for summary judgment. *Id.* at *10.

Likewise, in *Rackable Systems*, the claims of the patent-in-suit recited rack-mounted computer storage systems with components that required "intermittent physical access." 2006 WL 3065577 at *7-8. The court found that the specification defined "intermittent" to mean "***periodic*** attention at the front of each

computer." *Id.* at *7 (emphasis added).  The court explained that the patent's reference to "periodic" suggested time frames and a certain regularity that "depends on a ***user's*** purpose." *Id.* (emphasis in original).  But because the "user's purpose" introduced a subjective element into the claims, the court subsequently concluded that the patent did not provide the type of "objective anchor" required by 35 U.S.C. §112.  *Id.* at *8.  Thus, the court held that the claims were invalid for indefiniteness.  *Id.* at *6.

Finally, in *Halliburton*, the court held the that the asserted claims were invalid because "any possible construction . . . would include subjective terms that render the claims indefinite."  *Halliburton*, 456 F. Supp. 2d at 816.  The patentee argued that the claimed gel should be construed to mean "a gel that ***easily transitions*** to a liquid state."  *Id.* (emphasis added).  The court found that neither the specification nor any other evidence provided "an objective standard for determining the scope of . . . amorphous terms" like "easily transitions" or similar terms found in the specification.  *Id.*  Thus, under any possible construction, the claims were invalid as indefinite.

### 2.    By Construing the '328 Claims, the Court Made No Implicit Findings on Indefiniteness

SST argues that the '328 patent cannot be indefinite because the Court would never have construed the claims using the word "standard" if that construction was going to create an invalidity problem.  (Opp'n at 12).  Again, SST

is wrong.  In issuing its claim construction, the Court made no findings, express or implied, with respect to the validity of the '328 patent.  Indeed, the Federal Circuit has explained that any such finding at the claim construction stage would have been improper.  *See Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274 (Fed. Cir. 2003).

In *Abbott Labs.*, the claims of the patent-in-suit recited pharmaceutical formulations that covered an active ingredient and an inhibitor in "an amount effective" or "an amount sufficient" to prevent degradation.  *See Abbott Labs.*, 334 F.3d at 1276-77.  The record was clear that the prior art included formulations with inhibitors in concentrations up to 131 parts per million (ppm).  *See id.*  Despite the absence in the patent of a "clear disavowal" of  these formulations, the district court held that the terms "amount effective" and "amount sufficient" must be limited to concentrations above 131 ppm to avoid invalidity problems.  *See id.*  The Federal Circuit held that this approach was improper, explaining:  "Without [clear and convincing evidence of invalidity], and without the issue of validity properly presented for the record, the district court erred by giving the claim term "effective amount" a narrow reading to preserve its validity."  *Id.* at 1282.  *See also RP Delaware, Inc. v. Pac. Keystone Techs., Inc.,* 326 F.3d 1255, 1264 n.4, (Fed. Cir. 2003) (noting that §112 enablement defense was not relevant to claim construction

but would be considered later in the proceedings); *Maytag Corp. v. Electrolux Home Prods., Inc.,* 411 F. Supp. 2d 1008, 1056 (N.D. Iowa 2006) (same).

Thus, parties are left to make their own decisions about the risks of proposed claim constructions with respect to the issues of validity and infringement of the patent-in-suit. And, time and again, courts have explained that patentees – like SST – who opt for an overly broad construction for infringement purposes run the risk of invalidating their own patents. *See Enzo Biochem Inc. v. Applera Corp.,* 2007 WL 2669025 at * 9-12 (D. Conn. 2007); *Tantivy Commc'n Inc. v. Lucent Techs., Inc.,* 2005 WL 1925911 at *6 (E.D. Tex. 2005); *Seachange Int'l Inc. v. nCUBE Corp.,* 115 F. Supp. 2d 473, 480 (D. Del. 2000).

For example, in *Enzo*, the court construed the claims in the manner urged by the patentee. *Enzo Biochem Inc. v. Applera Corp.,* U.S. Dist. LEXIS 74570 at *16 (D. Conn. Oct. 12, 2006). On a subsequent motion for summary judgment, however, the court held that the claims, as construed, were invalid for indefiniteness. The court explained that "[h]aving used language in its patent application which stakes out the zone of exclusivity for its invention, the plaintiff must now be able to show that its language is nonetheless definite enough to put others skilled in the art on notice of what has been patented." *Enzo*, 2007 WL 2669025 at 12.

In *Tantivy,* the claim recited that "a data rate of each subchannel is much less than the nominal rate of the . . . radio signals." *Tantivy*, 2005 WL 1925911 at *6. During claim construction, the defendant argued that "much less than" meant "less than or equal to approximately 1/64th of the expected data rate of one radio frequency channel" because the absence of this limitation would make the phrase "inherently subjective" and give "no notice to the public" of the scope of the claim. *Id.* On the other hand, the patentee argued that the phrase needed no construction. *Id.* Although the court agreed with the patentee for purposes of the ruling on claim construction, it explained that "[t]his ruling, however, should not be construed as a holding that the claim is definite, only that the court will reserve judgment on indefiniteness until such time as it considers motions for summary judgment." *Id.*

Similarly, in *Seachange*, the court adopted the broad construction urged by the patentee, but warned that the breadth of the construction may later render the patent invalid for lack of written description or enablement under §112. The court explained: "The Court's conclusion that [invalidity concerns] do not affect its [claim construction] analysis here is not meant to foreclose any defense available to [the accused infringer] at trial, including assertions that the construction of certain terms form part of a chain of clear and convincing evidence that the asserted claims are invalid." *Seachange,* 115 F. Supp. 2d at 480.

## III.   THE COURT SHOULD DENY SST'S REQUEST FOR YET ANOTHER CHANCE AT CLAIM CONSTRUCTION

SST asks the Court to revisit, once again, its claim construction (Opp'n at 1, 12, 19), even though SST's argument for a broad definition of "standard" ultimately lead to the indefiniteness problem it faces now.  Throughout this litigation, SST has consistently sought the broadest possible construction in order to ensnare the LendingTree and ServiceMagic websites.  Having obtained its desired construction for purposes of infringement, SST must live with the consequences with respect to invalidity.

Moreover, after two rounds of claim construction, the only alternative "construction" that SST now proposes is to ignore the express description of "goods and services" in the '328 specification as "standard."  SST's inability to propose a clear definition of "goods and services" that is consistent with the specification suggests that indefiniteness is a problem that goes to the very core of the '328 patent, and therefore, cannot be resolved with yet a third round of claim construction.

### A.    SST's Broad Construction Led to the Indefiniteness Problem

In its initial claim construction rulings, the Court adopted Defendants' proposed construction of "goods and services" as "standardized articles of trade and performances of work by another."  (Suppl. Esteves Decl., Ex. 8, 10/16/06 Order at 28-29; Esteves Decl., Ex. 5, 11/13/06 Order at 3-5).  On SST's motion for

23

reconsideration, the Court considered in detail SST's argument that "goods and services" required no construction, and should be interpreted as broadly as possible. The Court rejected SST's argument and reaffirmed the definition proposed by Defendants because SST's proposed construction "would open up the request for goods and services to *any* product or service, ***standardized or not***." (Esteves Decl., Ex. 5, 11/13/06 Order at 4, emphasis added).

On the basis of the Court's claim construction, ServiceMagic moved for summary judgment of non-infringement on February 22, 2007. ServiceMagic argued that the individualized services offered on its website were not "standardized," and therefore did not infringe the "goods and services" limitation of the '328 claims. (*See* Esteves Decl., Ex. 1, 5/2/07 Order at 12). SST opposed ServiceMagic's motion and cross-moved for summary judgment of infringement.

Because SST was unable to support its infringement contentions under the Court's operative construction of "goods and services, SST urged the Court to revise its earlier claim construction rulings. (*Id*. at 13). Specifically, SST argued that the claims should be construed as referring to "standard" goods and services, and that "standard" merely meant goods and services that are "familiar, common, or usual" ***to the buyer***. (*Id*. at 16-18). The court agreed and "adopt[ed] SST's definition of 'standard.'" (Esteves Decl., Ex. 1, 5/2/07 Order at 18). This revised construction enabled SST to persuade the Court to apply the '328 claims to cover

24

custom services that are individualized for every buyer, such as the home

contractor services offered on ServiceMagic's website. But by construing

"standard" this way in order to support its infringement contentions, SST

introduced an inherently subjective element into the '328 claims because different

buyers will consider different goods and services to be "familiar, common, or

usual."

Having obtained everything it asked for, SST vigorously opposed

ServiceMagic's request for additional briefing on claim construction following the

Court's infringement ruling. (Suppl. Esteves Decl., Ex. 9, SST's 5/16/07 Response

to ServiceMagic's Motion for Reconsideration at 5-8). SST was doubtless aware

of the black letter patent law principle that claims must be construed the same way

for purposes of analyzing infringement and invalidity. *See Amgen Inc. v. Hoechst

Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003). SST's current request

for another chance at claim construction is an attempt to avoid the black letter law

and have it both ways. When it couldn't establish infringement, SST asked for,

and obtained, a new construction. Now that it has an invalidity problem on its

hands, SST asks the Court for yet another chance.

## B.    SST's New Claim Construction Arguments Ignore the Court's Prior Rulings on the Intrinsic Evidence

SST's results-oriented approach is exemplified by its latest claim

construction arguments. SST has no coherent explanation of the meaning of

25

"standard" as used in its own patent.  Instead, it chooses to ignore that express language in the specification and ask for a new construction that drops this essential element from the claims.  (Opp'n at 12-16).  Accordingly, SST argues that the Court should not construe the term "goods and services" at all.  (*Id*.).  But this is a rehash of SST's original claim construction argument, which the Court has already flatly and repeatedly rejected.  (Esteves Decl., Ex. 5, 11/13/06 Order at 4-5; Esteves Decl., Ex. 1, 5/2/07 Order at 14-16).

SST tries to brush aside the description of "standard goods and services" in the specification as a "preferred embodiment."  (Opp'n at 15-19).  Its arguments go far beyond any credible reading of the specification and burden the Court with arguments on issues that have already been decided.  The specification states unequivocally that "the goods and services ***must*** be standard items to ensure that there is no confusion as to what buyers are requesting and what sellers are offering to buyers."  (Esteves Decl., Ex. 3, '328 patent at 3:63-65, emphasis added).  As the Court has already ruled, the word "must" is "pretty unambiguous language."  (Esteves Decl., Ex. 5, 11/13/06 Order at 3; 5/2/07 Order at 14).  It is mandatory, not permissive.

The location of this sentence in the specification confirms that it is an essential feature of the claimed system.  The sentence appears under the heading "Detailed Description of the Invention."  (Esteves Decl., Ex. 3, '328 patent at 3:52-

26

54).  It is the third sentence that the applicant used to describe his invention.  (*Id*. at 3:63-65).  It is not merely a "preferred embodiment."  *See, e.g.*, *Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d 1340, 1348 (Fed. Cir. 2004) (holding that statements in "Summary of the Invention" portion of the specification were not limited to describing a preferred embodiment, but more broadly described the overall invention of the patents-in-suit).  Indeed, the '328 applicant plainly knew the difference between a preferred embodiment and an essential feature of the claimed system.  The applicant specifically described a "preferred embodiment" later in the '328 specification, and clearly identified it as such.  (*See, e.g.*, Esteves Decl., Ex. 3, '328 patent at 4:61 ("The invention can be understood readily from the following description of the ***preferred embodiment*** in conjunction with the flow diagram of Fig. 2 . . .") (emphasis added)).

SST revisits its losing claim construction by once again attempting to read "standard" out of the specification.  But the applicant deliberately included that unequivocal description of "goods and services" in the '328 patent.  He told the public that, to be covered by the '328 claims, the "goods and services" ***must*** be "standard."  SST simply ignores this mandatory language that the applicant expressly wrote into the '328 specification, and in doing so, wastes the Court's time by rearguing its original claim construction, which the Court has already rejected.

Unable to come to grips with the language that is actually in the specification, SST argues about statements that it has made up and are not found anywhere in the '328 patent. (Opp'n at 15-16). It rewrites what the applicant actually said, and then argues why its made-up statements relate to preferred embodiments, and would not be limiting with respect to the claims. SST offers no persuasive reason why its hypothetical statements would not limit the claims. Like the actual statement in the '328 specification requiring the claimed "goods and services" to be "standard," they too all use the word "must."

But more importantly, SST's hypotheticals are irrelevant. It is attempting to rewrite the '328 specification to say what it now wishes the applicant *might have* said, instead of what he *actually* said. Indeed, the Federal Circuit has strongly cautioned that courts must not rewrite patents in the context of litigation. *MBO Labs. v. Becton Dickinson & Co.*, 474 F.3d 1323, 1332 (Fed. Cir. 2007); *Pfizer Inc. v. Ranbaxy Labs., Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006). It is the applicant's job to ensure that its patent satisfies the requirements of § 112 *at the time the application is filed*. SST cannot rewrite the '328 patent now, in the context of litigation so that it can argue about what its *wishes* the applicant had said.

Finally, SST accuses Defendants of somehow misleading the Court during claim construction by arguing that the '328 patent used the terms "standard" and "standardized" interchangeably. (Opp'n at 18-19). Absolutely nothing in the

record supports SST's accusation.  If anything, the record reveals that SST, not Defendants, misled the Court.

During claim construction, both parties used the words "standard" and "standardized" interchangeably.  (*See* Suppl. Esteves Decl., Ex. 10, ServiceMagic's 4/5/07 Reply in Support of Its Motion for Summary Judgment of Non-Infringement at 8-9).  Indeed, counsel for SST stated during the claim construction hearing that "both ['standard' and 'standardized'] are talking about ***the exact same thing***."  (Suppl. Esteves Decl., Ex. 11, 4/9/07 Hearing Tr. at 83-84, emphasis added).  It was not until ServiceMagic's motion for summary judgment of non-infringement that SST first argued that the words had different meanings, and therefore, the Court needed to revisit its earlier claim construction.  SST executed this about-face in order to salvage its infringement contentions.  If there was any misleading conduct here, it was SST's decision to raise this belated argument after remaining completely silent on the issue during months of claim construction briefing and argument.

### C.    SST's Results-Oriented Approach to Claim Construction Flies in the Face of Federal Circuit Precedent

SST's results-oriented approach to claim construction has been repeatedly condemned by the Federal Circuit.  As previously noted, it is black letter law that the claims must be construed the same way for purposes of infringement and invalidity.  *See Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d

1368, 1374-75 (Fed. Cir. 2001) (holding that the patentee's "claim construction arguments violate the rule of consistency, which requires courts to construe claims consistently for both validity and infringement"); *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1454 (Fed. Cir. 1988) (criticizing the patentee for having sought and obtained a broad construction of the claim against an accused infringer and then arguing for a narrow construction of his claim to avoid anticipation).

"The language through which claims are expressed is not a ***nose of wax*** to be pushed and shoved into a form that pleases and that ***produces a particular result***." *Exxon Chemical Patents, Inc. v. Lubrizol Corp.* 64 F.3d 1553, 1563 (Fed. Cir. 1995) (emphasis added).

*Bristol-Myers* is directly on point.  In that case, the patent disclosed a chemotherapy drug.  The asserted claim included the phrase "antineoplastically effective amount."  Although the patentee at first argued that the claim term ***was not*** limiting in order to support its infringement contentions, it later argued that the term ***was*** limiting with respect to whether the claim was invalid.  246 F.3d at 1373-75.

The Federal Circuit admonished the patentee for making inconsistent, results-oriented arguments:  "For purposes of infringement, Bristol apparently does not see this expression as requiring efficacy; Bristol [previously] stated its view . . . that the claims of each patent would be infringed without a showing of an objective

response in every patient.  Bristol cannot have an expression be limiting in this context and non-limiting in another."  *Id.*

The same is true for SST.  Having argued for and secured the benefits of a broad construction for purposes of establishing infringement, SST must now live with that construction in the context of invalidity.

## IV.    THERE IS NO WAIVER

Without a persuasive argument on the merits, SST resorts to the assertion that Defendants have waived their indefiniteness defense.  (Opp'n at 1, 3-9).  This is, by now, a familiar tactic.  As it has done repeatedly in this litigation, SST attempts to avoid the burden of proving its contentions and rebutting Defendants' defenses by arguing some combination of collateral estoppel, judicial estoppel, or waiver.  And as before, SST fails to recite, much less establish, the elements of any of those doctrines.  This time around, SST's waiver argument fails because the indefiniteness issue has arisen only recently in the context of the Court's latest rulings on claim construction, in which the Court adopted SST's proposed definition of "standard."  Moreover, SST can point to absolutely no prejudice arising from Defendants' motion for summary judgment of indefiniteness in reliance on that construction.

A.    **The Indefiniteness Issue Arose Only After the Court's Most Recent Claim Construction Rulings**

SST contends that Defendants should have raised their indefiniteness argument "three years ago" at the very outset of this case.  (Opp'n at 1, 39).  SST ignores two critical facts.  First, Defendants preserved their indefiniteness defense at the beginning of this case.  In their Answers to SST's First Amended Complaint, Defendants asserted an affirmative defense and counterclaim of invalidity, and specifically identified §112 in their counterclaims.  (Suppl. Esteves Decl., Ex. 12, IAC's 1/21/05 Answer at 4-5; Suppl. Esteves Decl., Ex. 13, LendingTree's 11/10/04 Answer at 5, 7; Suppl. Esteves Decl., Ex. 14, ServiceMagic's 11/10/04 Answer at 6-8).

Second, as discussed above, the Court's construction of the term "goods and services" has evolved over the course of this case, at SST's urging.  The current indefiniteness issue has arisen in the aftermath of the Court's latest claim construction rulings, and is a problem of SST's own making.

B.    **There Is No Prejudice to SST**

Waiver cannot be established without cognizable prejudice.  *See Ricoh v. Katun Corp.*, 486 F. Supp. 2d 395 (D.N.J. 2007); *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 506 (3d Cir. 2006) ("Affirmative defenses can be raised by motion, at any time (even after trial), if plaintiffs suffer no prejudice."); *Charpentier v.*

*Godsil*, 937 F.2d 859, 863-64 (3d Cir. 1991).  SST has suffered no prejudice, and therefore, its waiver defense should be summarily rejected.

SST's argument boils down to a complaint about not having had an opportunity for discovery on Defendants' indefiniteness contentions.  SST suggests that the Court might have to reopen fact and expert discovery before deciding whether the '328 claims are invalid for indefiniteness.  (Opp'n at 9).  SST is silent, however, on what discovery it believes it would need.  Presumably, SST already has a view as to what its patent claims mean and what they cover.  Any facts supporting that view would already be within the possession, custody, or control of SST, not Defendants.  And SST does not suggest otherwise.

Similarly, SST's complaint that Defendants did not update their interrogatory responses to include the specific indefiniteness contention raised by their motion (Opp'n at 3-4) rings hollow in light of SST's failure to update any of its responses to contention interrogatories since January 2007.  SST's failure has been particularly egregious with respect to its response to Defendants' contention interrogatory regarding willfulness.  As explained in Defendants' Motion for Summary Judgment of No Willful Infringement, SST never identified during discovery a single one of the many facts that it now relies on to oppose that motion.  (11/30/07 Mot. at 3-5 ).  This is so, even though one of SST's principal arguments in opposition is that the analysis of willfulness is "factually intensive."

(SST's 1/10/08 Opp'n at 2, 3). Given SST's own discovery shortcomings, it can hardly complain that Defendants didn't spell out the indefiniteness problem with SST's claim construction immediately after the Court adopted it. Indefiniteness is an issue of law that SST was just as capable of identifying in the context of its own claim construction arguments as Defendants. *See Personalized Media v. Int'l Trade Comm'n*, 161 F.3d 696, 702-03 (Fed. Cir. 1998); *North Am. Vaccine, Inc. v. Am. Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed. Cir. 1993); *Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1378 (Fed. Cir. 1999).

Finally, no expert testimony is required to resolve the indefiniteness issue. As Defendants explained in their opening brief, courts routinely decide on summary judgment that patent claims are invalid for indefiniteness when they include a subjective element. (Br. at 10-11).

SST apparently agrees that the indefiniteness issue in this case is not amenable to expert discovery. In response to Defendants' motion, SST cross-moved for summary judgment. Yet, SST did not submit an affidavit or any other evidence from its own technical expert in support of its cross-motion. Thus, SST concedes that no further discovery is necessary and the indefiniteness of the '328 claims is ripe for summary judgment.

The recent case of *Ricoh* in this District confirms that SST's waiver argument should be rejected. In that case, the defendant moved for summary

judgment of indefiniteness.  The plaintiff argued that this defense had been waived

because defendants had failed to identify it in their interrogatory responses or to

provide plaintiffs with any discovery on the issue.  *See Ricoh*, 486 F. Supp. 2d at

404.  The Court declined to "wade into any quagmire" concerning whether general

statements in the defendants' Answer were sufficient to preserve the defense or

whether intervening caselaw had provided an explanation for delay.  *See id.*

Instead, the Court simply found that the plaintiff had suffered no harm, and

therefore, any alleged delay was irrelevant to whether the Court should consider

the merits of the defense.  *See id.*

## V.    THE '328 CLAIMS ARE INVALID FOR MULTIPLE REASONS

SST argues that because Defendants' technical expert, Dr. Walter Scacchi,

was able to identify "standard goods and services," the '328 claims cannot be

indefinite.  (Opp'n at 2, 7).  SST ignores the critical differences between invalidity

based on the prior art and indefiniteness.

To undertake his prior art analysis, Dr. Scacchi had to determine only

whether the art disclosed one or more examples of a system for providing goods or

services that fell within the '328 claims.  In his expert reports, Dr. Scacchi relied

on prior art concerning goods that are "off the shelf" items or services of the type

that the Court had already held fall within the dictionary definition of "standard"

that SST had proposed.  (11/30/07 Defendants' Br. on Summary Judgment for

Obviousness at 29-38).  SST has argued for the broadest possible application of the term "standard goods and services" to encompass virtually every good or service in existence.  Thus, under SST's interpretation, any prior art system offering any type of good or service anticipates or renders obvious the "standard goods or services" limitation of the '328 claims.

In conducting his prior art analysis, Dr. Scacchi did not have to (nor did he) make a determination about whether the construction of the term "standard" introduced a subjective element into the '328 claims.  Disclosing the full scope of what is claimed and what remains in the public domain was the obligation of the '328 applicant under §112.  Determining the full scope of the claims was not a prerequisite to the prior art analysis that Dr. Scacchi performed.

In sum, Defendants have alternative theories of invalidity that are not mutually exclusive or mutually dependent.  If the '328 claims are construed as broadly as SST has proposed, they are invalid for indefiniteness because "standard," as defined, introduces an inherently subjective element.  The claims are also invalid as anticipated or obvious in light of systems for procuring goods and services in the prior art.

## VI.    EITHER THE '328 CLAIMS ARE INDEFINITE OR DEFENDANTS DO NOT INFRINGE

SST argues that Defendants' non-infringement arguments are inconsistent with their indefiniteness defense.  (Opp'n at 2).  SST is wrong.  Defendants'

alternative theories are not inconsistent.  If "standard" is construed broadly, as SST has urged, the '328 claims are indefinite for all the reasons discussed above.  If, however, "standard" is construed to mean fungible, "off the shelf" type goods and services, the customized loans and home contractor services offered on the LendingTree and ServiceMagic websites (which are individualized to meet the needs of each new borrower or homeowner) do not infringe the '328 claims.

In this regard, at his deposition, even SST's own expert concurred with Defendants' construction of "standard" when he admitted that there are items, such as a "blue tie" with a specific pattern, that are too individualized to be "standard" goods as required by the '328 claims, even though a blue tie is presumably a "familiar" good to "most people."  Dr. Dowling explained that the issue for him was where to draw the line between a "standard" item and a "non-standard" item:

> Q.    So if the lenders don't provide exactly the standard loan you requested and you were matched to that lender, that system is still encompassed within the '328 claims, is that correct?
>
> A.    The word "standard" would have some form of – that the actual scope of how – like if I say I'm looking for a blue tie.  Well, most people don't have a blue tie, they have a tie with blue in it.  But it is not pure blue.
>      So there might be different kinds of blue ties that meet that, and then they might say – you know, so I guess what I am trying to say, ***when you say a standard item, I am looking for a blue tie, and then if I say I'm looking for a blue tie with a zigzag pattern so I can – the question is where – what is the definition of standard item and where is the line drawn and does it***

> *have to meet every single parameter that you specify to*
> *be a standard item or can they give you some leeway?*
> *That seems to be what the issue is.*

(Suppl. Esteves Decl., Ex. 15, Dowling Dep. Tr. at 100:7-25, objection omitted,

emphasis added).  With respect to the "blue tie" example, Dr. Dowling concluded

that because of the wide variety of specific patterns, "blue ties" would probably not

be a "standard" good, as that term is used in the '328 claims:

> Q.    Is it your opinion a blue tie is not a standard good?
>
> A.    *I think that a blue tie probably wouldn't be a very*
> *good example because generally there are so many*
> *different kinds that you would really have to look at*
> *them to make – to see whether you would really want to*
> *buy it or not*.
>
> Q.    So the '328 claims don't cover systems that provide
> matches to tie retailers, is that correct?
>
> A.    Well, unless there were some – *I think on the tie on*
> *something like that you would need – to get the exact*
> *pattern* – I don't know.  I don't know.

(Suppl. Esteves Decl., Ex. 15, Dowling Dep. Tr. at 101:1-15, emphasis added).

Dr. Dowling acknowledged the inherent difficulty in trying to shoehorn

individualized items such as blue ties into the concept of "standard" goods and

services" described in the '328 patent.  Like loans and home contractor services,

blue ties are distinctive, with very specific patterns that cannot readily be classified

as "standard," even though they may be "familiar, common, or usual" things.  By

contrast, the "goods and services" discussed in the '328 patent are "one-size-fits-

all" type items.  They are items that can be pulled off a shelf and shipped to a

buyer – like Type J resistors (Esteves Decl., Ex. 3, '328 patent at 5:51-53, Fig. 8),

IBM type computer monitors (*id.* at Fig. 3), and Seagate model 225 hard disk

drives (*id.* at Fig. 2A).  These are the type of fungible items that "ensure that there

is no confusion as to what buyers are requesting and what sellers are offering."

(Esteves Decl., Ex. 5, 11/13/2006 *Markman* Order at 3-4; '328 patent at 3:55-67).

By their very nature, individually customized goods and services do not satisfy this

essential requirement of the '328 patent.

Accordingly, should the Court decide to reconsider the construction of

"standard goods and services," Defendants respectfully submit that "standard"

should be construed (consistent with the disclosure in the '328 specification and

the testimony of SST's own expert) to mean "fungible, off-the-shelf" goods and

services.  That definition necessarily excludes goods and services that are "custom,

individualized, or tailor-made."  Thus, if "standard" is construed as Defendants

propose, the '328 claims are not infringed by the individualized loans and

contractor services offered on the LendingTree and ServiceMagic websites.

In sum, it is SST's arguments that are inconsistent, not Defendants'

arguments.  SST cannot establish infringement unless the claims are construed

broadly, but under such a broad construction, they are invalid.  Either way, SST

loses.  But this is not because Defendants' arguments are inconsistent or somehow

unfair.  By expanding the meaning of "standard" to include custom and

individualized goods and services, SST itself has invalidated the '328 claims.

## VII.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court

grant its motion for summary judgment of indefiniteness and deny SST's cross-

motion.

Alternatively, if the Court decides to reconsider its claim construction,

Defendants respectfully request that the term "standard goods and services" be

construed to mean "fungible, off-the-shelf" goods and services and to exclude

"custom, individualized, or tailor-made" goods or services.  Should the Court

adopt that construction, Defendants also respectfully request that the Court grant

summary judgment of non-infringement with respect to all three Defendants.

Respectfully submitted,


Date:  January 18, 2008              By:  s/ Elvin Esteves

40

Kevin J. McKenna
Elvin Esteves
GIBBONS P.C.
  One Gateway Center
  Newark, New Jersey  07102-5496
  (973) 596-4500
  kmckenna@gibbonslaw.com
  eesteves@gibbonslaw.com

Claude M. Stern
Robert B. Wilson
Evette Pennypacker
James E. Baker
Linda J. Brewer
(all admitted *pro hac vice*)
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
  51 Madison Avenue, 22nd Floor
  New York, New York  10010-1601
  (212) 849-7000
  claudestern@quinnemanuel.com
  robertwilson@quinnemanuel.com
  evettepennypacker@quinnemanuel.com
  jamesbaker@quinnemanuel.com
  lindabrewer@quinnemanuel.com

Attorneys for LendingTree, LLC,
IAC/InterActiveCorp, and ServiceMagic,
Inc.