# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Source Search Technologies, LLC,

      Plaintiff/Counterclaim
      Defendant,

  -against-

LendingTree, LLC, IAC/InterActiveCorp,
and ServiceMagic, Inc.,

      Defendants/Counterclaim
      Plaintiffs.

**DOCUMENT ELECTRONICALLY
FILED**

Civil Action No. 04-CV-4420
(DRD/ES)

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF OBVIOUSNESS AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Kevin J. McKenna
Elvin Esteves
GIBBONS P.C.
  One Gateway Center
  Newark, New Jersey  07102-5496
  (973) 596-4500
  kmckenna@gibbonslaw.com
  eesteves@gibbonslaw.com

Claude M. Stern
Robert B. Wilson
Evette Pennypacker
James E. Baker
Linda J. Brewer
(all admitted *pro hac vice*)
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
  51 Madison Avenue, 22nd Floor
  New York, New York  10010-1601
  (212) 849-7000
  claudestern@quinnemanuel.com
  robertwilson@quinnemanuel.com
  evettepennypacker@quinnemanuel.com
  jamesbaker@quinnemanuel.com
  lindabrewer@quinnemanuel.com

Date:  January 25, 2008

Attorneys for LendingTree, LLC,
IAC/InterActiveCorp, and
ServiceMagic, Inc.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   SST'S BRIEF SHOULD BE STRICKEN ...................................................... 4

III.  SST RAISES NO MATERIAL ISSUE OF FACT THAT WOULD
      PRECLUDE SUMMARY JUDGMENT OF OBVIOUSNESS.................... 4

IV.   SST'S ARGUMENTS ARE INCONSISTENT WITH THE
      REQUIRED ANALYSIS UNDER *KSR*........................................................ 6

      A.    SST Applies a Rigid Approach to Obviousness................................... 7

      B.    SST Cannot Dismiss "Bricks and Mortar" Systems As "Non-
            Analogous" Art.................................................................................. 9

      C.    SST Overemphasizes the Alleged "Problem to Be Solved" .............. 14

      D.    SST's "Teaching Away" Arguments Treat the Person of
            Ordinary Skill Like an Automaton ..................................................... 17

            1.    SST Ignores the Teachings of the Prior Art as a Whole .......... 18

            2.    The Multiple Solutions to the "Too Many" Problem
                  Support the Obviousness of the '328 Claims............................. 22

            3.    The Claimed Combination Was Straightforward.................... 22

      E.    SST Identifies No Technological Barriers to Computerization ......... 23

      F.    SST's Arguments Confirm the Overwhelming Market Forces
            Driving the Combination .................................................................... 24

      G.    Secondary Considerations Do Not Raise a Material Issue of
            Fact..................................................................................................... 26

      H.    SST's Cited Cases Do Not Change the Analysis ............................... 27

      I.    SST's Alleged 1994 Invention Date Is Irrelevant ............................. 28

V.    SST ATTEMPTS TO REWRITE THE '328 CLAIMS TO AVOID
      OBVIOUSNESS ........................................................................ 30

      A.    "Request for Quotation" (Claims 1-3, 13-14) .................................... 30

      B.    "Buyer or Network Filter Conditions" (Claim 1).............................. 31

      C.    "Network Vendors" (Claim 3).......................................................... 32

      D.    "At Least One Quote Over the Data Network" (Claims 13-14) ........ 33

VI.   DEFENDANTS ARE NOT JUDICIALLY ESTOPPED............................ 34

      A.    SST Cannot Establish Any of the Elements of Judicial Estoppel ...... 34

      B.    The LMB Settlement Is Irrelevant.................................................... 36

VII.  SST'S ATTACK ON DEFENDANTS' EXPERT IS BASELESS ............. 37

VIII. CONCLUSION ............................................................................ 40

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*,
   246 F.3d 1368 (Fed. Cir. 2001)..................................................................................29

*Callicrate v. New Age Industrial Corp., Inc.*,
   2005 WL. 1027095 (D. Kan. 2005) .............................................................................35

*Forest Labs., Inc. v. Ivax Pharms., Inc.*,
   501 F.3d 1263 (Fed. Cir. 2007)..................................................................................28

*Hybritech Inc. v. Abbott Labs.*,
   849 F.2d 1446 (Fed. Cir. 1988)..................................................................................30

*KSR Int'l Co. v. Teleflex Inc.*,
   127 S. Ct. 1727 (2007) ......................................................................................... passim

*Leapfrog Enter., Inc. v. Fisher-Price, Inc.*,
   485 F.3d 1157 (Fed. Cir. 2007)..................................................................................23

*Mallinckrodt, Inc. v. Masimo Corp.*,
   254 F. Supp. 2d 1140 (C.D. Cal. 2003) .....................................................................35

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005)..................................................................................36

*Mercexchange LLC v. Ebay Inc.*,
   83 U.S.P.Q. 2d 1688 (E.D. Va. 2007).........................................................................27

*Morgan v. Gay*,
   471 F.3d 469 (3d Cir. 2006).......................................................................................34

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
   864 F.2d 757 (Fed. Cir. 1988).....................................................................................27

*Single Chip Sys. Corp. v. Intermec IP Corp.*,
   495 F. Supp. 2d 1066 (S.D. Cal. 2007).......................................................................27

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007)..................................................................................28

*Tech Licensing Corp. v. Gennum Corp.*,
   2007 WL. 1319528 (N.D. Cal. May 4, 2007) ............................................................27

*Z4 Techs., Inc. v. Microsoft Corp.*,
   507 F.3d 1340 (Fed. Cir. 2007)..................................................................................28

**Statutes**

35 U.S.C. §102(b) ................................................................................................29

Local Rule 7.2(d)   ................................................................................................4

## I.    INTRODUCTION

Source Search Technologies, LLC's ("SST") opposition is a textbook example of how ***not*** to conduct an obviousness analysis according to the Supreme Court's decision in *KSR*. *See KSR Int'l Co. v. Teleflex Inc*., 127 S. Ct. 1727, 1739-43 (2007). In its brief, SST fails to consider the teachings of the prior art as a whole, but instead focuses on the FAST and I-Quest e-commerce systems as the exclusive starting point for its argument. It attempts to distinguish the teachings of those systems from the '328 patent by narrowly defining the alleged problem that the patent applicant purported to solve. It ignores the overwhelming market forces at play in the design of e-commerce systems in the midst of the Internet boom, when the '328 patent was filed. It fails to give the person of ordinary skill in the art credit for being a person of ordinary creativity and innovation, and not an automaton. Most importantly, it defies the mandate of the Supreme Court that the analysis of obviousness requires, above all, the application of common sense.

The lynchpin of SST's argument is that a person of ordinary skill would not have considered the analogous "bricks and mortar" art when designing an e-commerce system. (*See, e.g*., Opp'n at 27). This conclusory assertion is completely unsupported in the record. Indeed, the use of "bricks and mortar" systems as the starting point for designing e-commerce systems is clearly described in the '328 patent itself and in the testimony of the inventor – both of which SST

conveniently overlooks.  The '328 patent describes early e-commerce systems as "analogous" to their "bricks and mortar" counterparts, such as "a vendor[']s store" and "shopping in a mall."  (Esteves Decl. Ex. 1 at 1:65-66).  And in its opposition, SST explicitly acknowledges that the prior art e-commerce systems identified by Defendants were developed from earlier "bricks and mortar" systems:

> That is in fact what FAST, I[Q]uest, and FACNET represent – the ***conventional application of modern electronics to prior manual systems***.  (Opp'n at 35 n.17, emphasis added).

These admissions undercut SST's contrary argument, and confirm that a person of ordinary skill who was designing an electronic referral system would have naturally looked at existing "bricks and mortar" counterparts.  Such an approach is just common sense.  Rather than starting from scratch, a designer could use the "bricks and mortar" systems as a model to figure out how they work, how people use them, how information flows through the system, and the advantages and disadvantages of different variations that had already been tested against competition in commerce.  After using this approach for years to design other e-commerce systems (as SST admits), it would make no sense for a person of ordinary skill to turn a blind eye to the most useful prior art when designing an electronic referral service like the one described in the '328 claims.

Without any support for its central argument, SST's opposition completely unravels.  At the time the '328 patent was filed, a person of ordinary skill had

everything at his or her disposal to make the claimed systems.  A roadmap of the claimed buyer, vendor, and network filtering was disclosed in countless "bricks and mortar" referral services that had been widely used for decades in the prior art. And the computer technology was in place to implement an electronic version of the "bricks and mortar" referral service.  SST does not dispute any of these facts.

With the prior art in hand, a person of ordinary skill would have easily followed the well-worn path of starting with a familiar "bricks and mortar" system and creating an analogous, electronic version adapted for use on a computerized network.  Tellingly, SST avoids any mention of the "bricks and mortar" home contractor referral services discussed extensively in Defendants' opening brief – presumably because the straightforward analogy between this example in the prior art and the accused ServiceMagic system is unmistakable.  Indeed, in the market environment of the mid-1990s, the rush of companies adapting their existing business methods to the Internet would have made the combination not only obvious, but irresistible.

Like the e-commerce systems that came before it, the system described in the '328 claims is nothing more than "the conventional application of modern electronics" to a well-established model for making referrals used in the "bricks and mortar" art.  SST's unsupported argument that a person of ordinary skill would ignore the "bricks and mortar" systems when designing a computerized version of

the same type of referral service defies common sense and does not even remotely raise a material issue of fact for trial. Accordingly, Defendants respectfully submit that summary judgment of obviousness is warranted.

## II.     SST'S BRIEF SHOULD BE STRICKEN

As a preliminary matter, Defendants note that SST's opposition brief far exceeds the 30-page limit set by Local Rule 7.2(d). SST's brief is 45 pages in 12 point Times New Roman font with 19 footnotes in 10-point font – and thus is at least **15 pages (or 50%) longer** than what SST was entitled to file. SST's brief reflects a casual disregard for the Court's time and resources. It is also unfair to Defendants, who must respond to SST's long-winded arguments within the limits of the Local Rules. Accordingly, Defendants move to strike pages 31-45 of SST's brief, or in the alternative, to compel SST to file a conforming brief that satisfies the length requirements of the Local Rules.[1]

## III.     SST RAISES NO MATERIAL ISSUE OF FACT THAT WOULD PRECLUDE SUMMARY JUDGMENT OF OBVIOUSNESS

The key facts supporting Defendants' argument that the '328 claims are invalid for obviousness are unrebutted. SST does not contest that the filtering criteria recited in the '328 claims are disclosed in the prior art "bricks and mortar"

---

[1]  Defendants are aware of nothing in SST's submissions indicating that it asked the Court for leave to file an overly long brief or that the Court granted such a request – and certainly not a request to file a brief that is **50% longer** than the Local Rules allow.

referral services.  Specifically, SST does not contest that the prior art "bricks and mortar" systems use **buyer, vendor, and network filters**.  SST does not contest that the "bricks and mortar" systems filter requests **before** they are sent to vendors.  And SST does not contest that the "bricks and mortar" systems set a **predetermined maximum** number of vendors who will receive requests.  With respect to all of these facts, SST says absolutely nothing.

SST's silence is remarkable.  SST has repeatedly described information "filtering" as the key innovation of the '328 claims.  It has done so in multiple briefs to the Court on the issue of infringement.  (Esteves Decl. Ex. 2 at 5-9, Ex. 4 at 2-8;  Supp. Esteves Decl. Ex. 7 at 9-11, Ex. 8 at 6, 26-30).  And it continues to do so in its opposition to this motion.  (Opp'n at 5-7).

By its silence, SST has conceded that there is no material issue that the prior art disclosed the filtering criteria that are described in the '328 claims.  The significance of this concession cannot be understated.  The filtering that SST touts as nothing short of revolutionary (*see* Opp'n at 5-7) was actually well known and had been used to make referrals for decades.  All the '328 patentee did was to write down the idea of incorporating this known filtering approach into a computerized system.  That is not an invention.

Likewise, SST does not dispute that there was no technological barrier to implementing the "bricks and mortar" filtering features on a computerized

network.  Indeed, SST cannot do so because the '328 patent itself tells a person of ordinary skill in the art that well-known computer technology could readily be used to implement the claimed system.  (*See* Esteves Decl. Ex. 1 at 3:5-21, 6:35-47).  Thus, this key fact is also unrebutted.

SST's only recourse is to argue that the Court should pretend that the "bricks and mortar" prior art does not exist.  (*See* Opp'n at 21-27).  But it is precisely because SST cannot distinguish the filtering in the prior art from its claims that the Court ***must*** consider the "bricks and mortar" systems.  They are the logical starting point.  Having done so, it becomes clear that SST is not entitled to its patent, which merely put these well-known systems on a computer network using technology that even the '328 patent concedes was known in the art.

## IV.    SST'S ARGUMENTS ARE INCONSISTENT WITH THE REQUIRED ANALYSIS UNDER *KSR*

SST argues that the Supreme Court's decision in *KSR* should be limited to its facts because "fairly read, [the decision] is nothing more than a rejection of the overly narrow application of the TSM [teaching, motivation, or suggestion] test ***in that specific case*** before the Court."  (Opp'n at 5, emphasis added).  That is nonsense.  The Supreme Court of the United States is not in the business of issuing decisions that are intended to be applied only to the facts of a specific case.  The sweeping language in the Supreme Court's unanimous decision on the law of obviousness – the first in forty years – cannot be interpreted as anything other than

a total rejection of the Federal Circuit's approach.  As discussed below, SST's

arguments disregard fundamental principles that the Supreme Court articulated in

*KSR* as essential to the obviousness analysis.  *See KSR*, 127 S. Ct. at 1739-43.

### A.    SST Applies a Rigid Approach to Obviousness

SST argues that the "proper procedure" for an obviousness analysis is to

start with "a ***single*** prior art reference" – one of its own choosing – and ask

"whether it would have been obvious to add one or more missing teachings" to

arrive at the claimed system.  (Opp'n at 11, 12, emphasis in original).  SST's

formalistic prescription of a "proper procedure" ignores the central principle

animating the entire decision in *KSR*.  The Supreme Court firmly rejected the

Federal Circuit's "rigid" approach to the determination of obviousness and

reaffirmed the "expansive and flexible approach" described in its earlier cases.

*KSR*, 127 S. Ct. at 1739.  The Court explained that without such a flexible

approach "patents might ***stifle, rather than promote***, the progress of useful arts."

*Id*. at 1746 (emphasis added).  Thus, the analysis of obviousness "must not be

confined within a test or formulation ***too constrained to serve its purpose***."  *Id*.

(emphasis added).

The Supreme Court's analysis of the facts in *KSR* demonstrates that SST's

narrow approach is too restrictive.  *KSR* involved numerous prior art references,

each disclosing different aspects of the asserted claims.  *Id*. at 1735-36.  In

reviewing the merits of the case, the Supreme Court did not choose one reference as the starting point of its analysis to the exclusion of the others. Instead, the Court reviewed the obviousness of the asserted claims from multiple vantage points, starting first with one reference and then another. *Id.* at 1744-45. The Court concluded that the claimed gas pedal would have been obvious in light of the overall teachings in the art, regardless of where it began. *Id.*

Here, SST argues that the Court ***must*** begin its analysis with the e-commerce FAST and IQuest systems. (Opp'n at 12). SST simply ignores the fundamental requirement of flexibility imposed by *KSR*. SST starts with the prior art that it prefers to discuss, and ignores the rest. Indeed, SST argues that the Court should not even consider Defendants' argument that it would have been obvious to take the "bricks and mortar" prior art referral services and put them on a computerized network to arrive at the '328 claims. (Opp'n at 12-13). SST also ignores the references demonstrating that the claimed filtering had already been applied in the e-commerce art with the "IQuest-I" system (the IQuest option in which the network selects a single database to be searched), and that it would have been obvious to apply that method to e-commerce systems involving other types of goods and services, besides just publications. Thus, even if everything SST says about FAST and IQuest were true, summary judgment of obviousness would still be warranted because SST has failed to rebut Defendants' core argument – the

filtering of the '328 claims was disclosed in the prior art "bricks and mortar" systems and in IQuest-I.  Starting from any point in that prior art, it would have been obvious for a person of ordinary skill to arrive at the '328 claims.

Finally, invoking its made-up "one reference rule," SST criticizes Defendants for relying on an allegedly "incoherent matrix" of multiple references in the "bricks and mortar" art.  (Opp'n at 13).  Lacking answers on the merits, SST wildly overstates the complexity of Defendants' motion, which focuses on two specific types of "bricks and mortar" systems as exemplary of the state of the prior art – systems for home contractor and social service referrals.  Both of these systems were used throughout the country.  And both used the claimed filtering criteria.  The fact that these systems (and their filtering criteria) are discussed in multiple references demonstrates how widespread the use of the claimed filtering actually was, and strongly supports a finding of obviousness.

## B.    SST Cannot Dismiss "Bricks and Mortar" Systems As "Non-Analogous" Art

SST argues that the Court should not consider the "bricks and mortar" referral systems because they are "not analogous" to the systems claimed in the '328 patent.  (Opp'n at 22-27).  This overly narrow view of what constitutes analogous art is flatly inconsistent not only with *KSR*, but also with SST's own admissions about how a person of ordinary skill would have gone about designing an e-commerce system by first looking at the analogous "bricks and mortar" art.

In *KSR*, the Court recognized that a person of ordinary skill does not operate in a vacuum. Technological advances inevitably build on what went before, but the results of "ordinary innovation" based on what is found in the prior art do not merit exclusive patent rights:

> We build and create by bringing to the tangible and palpable reality around us new works based on instinct, simple logic, ordinary inferences, extraordinary ideas, and sometimes even genius. These advances, once part of our shared knowledge, define a new threshold from which innovation starts once more. And ***as progress beginning from higher levels of achievement is expected in the normal course, the results of ordinary innovation are not the subject of exclusive rights under the patent laws***. *Id.* at 1739 (emphasis added).

It was SST that first introduced the analogy between referral services and the '328 claims. In arguing that ServiceMagic's website infringes the '328 patent, SST repeatedly represented to the Court that the systems described in claims 1-3 were nothing more than a referral service. (Supp. Esteves Decl. Ex. 7 at 10 n.8) ("SM [ServiceMagic] notes that the '328 patent does not use the term referral . . . SM can call this what it wants, but this is a referral service."). SST said so again and again in arguing that there were no differences between ServiceMagic's website and the elements of claims 1-3 requiring "requests for quotation" and responses to the buyer's request. (Esteves Decl. Ex. 2 at 1, 6-9; Supp. Esteves Decl. Ex. 7 at 7-12).

SST's expert, Dr. Eric Dowling, agreed with SST's characterization and confirmed that claims 12-14 also describe referral services. (Supp. Esteves Decl.

Ex. 18 at 163:7-25). SST cannot walk away from its unequivocal representations to the Court and the admissions of its own expert that the '328 patent discloses computerized referral services. If the patent is about referral services, common sense dictates that prior art referral services – whether electronic or not – are analogous art.

For example, the home contractor referral services discussed in detail in Defendants' opening brief are directly analogous to ServiceMagic's website. They are the "bricks and mortar" version. The only difference between that prior art and the '328 claims is the use of a computerized communication system. Notably, SST's opposition brief studiously avoids discussion of the "bricks and mortar" home contractor referral services, presumably because SST has nothing to say to rebut the direct analogy between such prior art systems and the '328 patent, which SST has argued successfully is infringed by ServiceMagic's website.[2]

Moreover, the '328 patent itself explains how the claimed systems allegedly build upon the "bricks and mortar" art that came before. The patent starts with a discussion of "bricks and mortar" methods for finding vendors using "trade

---

[2]  SST makes several elliptical references to "hardware stores" that appear to be directed at the "bricks and mortar" home contractor referral services discussed in Defendants' opening brief. (*See* Opp'n at 12, 24). But a "hardware store" is a far cry from such home contractor referral services. Presumably, SST adopts this gross mischaracterization to deflect attention away from the straightforward analogy between the "bricks and mortar" systems, ServiceMagic's website, and the '328 claims.

publications, directories, recommendations, and other means." (Esteves Decl. Ex. 1 at 1:28-30). The patent then discusses examples of existing "computerized shopping systems," which have been designed to emulate "bricks and mortar" counterparts. The '328 patent actually uses the word "analogous" to describe the electronic versions of "bricks and mortar" "supermarkets" and "shopping malls." (*Id*. at 1:61-2:4). Thus, the '328 patent describes analogous "bricks and mortar" systems as the starting point for understanding the computerized system of the claims.

This description in the '328 patent is not surprising in light of the named inventor's deposition testimony describing how he came up with the idea for the claimed systems after observing first-hand a "bricks and mortar" purchasing department and considering how to improve speed and efficiency by implementing the procurement process on a computerized network. (Supp. Esteves Decl. Ex. 19 at 50:20-51:4). This testimony makes perfectly clear that "bricks and mortar" procurement methods led to the '328 claims.

Likewise, in its opposition, SST states plainly that prior art e-commerce systems – FAST, I-Quest, and FACNET – are all "the ***conventional application of modern electronics to prior manual systems***." (Opp'n at 35 n.17, emphasis added). It is only logical that a person of ordinary skill would start with analogous "bricks and mortar" versions when designing an e-commerce system, so as to

benefit from the prior art knowledge about how such a system should function in order to be most competitive in the marketplace.  The very art that SST admits a person of ordinary skill would start with to design the claimed system cannot credibly be labeled "non-analogous" for purposes of the obviousness analysis.

Finally, SST argues that the "bricks and mortar" references that Defendants cite are merely "cumulative" of the description in the specification in the '328 patent and were, therefore, already before the Examiner.  (Opp'n at 37).  SST's arguments are hopelessly inconsistent.  On the one hand, SST relies on the discussion in the '328 patent to argue that the Examiner was fully aware of "bricks and mortar" referral services, but allowed the claims anyway.  But, if the "bricks and mortar" services were truly non-analogous art, the '328 applicant would not have discussed them.

The '328 applicant plainly understood that "bricks and mortar" referral services were pertinent prior art, and so he described them generally in the specification.  What he did not do, however, is tell the Examiner that the claimed filtering features had been used for decades in the "bricks and mortar" art.  Without this critically important information, the Examiner allowed the claims without having been apprised of the direct correlation between the allegedly distinctive features of the '328 claims and the prior art "bricks and mortar" referral services.

## C.    SST Overemphasizes the Alleged "Problem to Be Solved"

SST argues that the Court should not consider the "bricks and mortar" art because it does not address the problem allegedly solved by the '328 patent. (Opp'n at 24). SST misstates both the law and the motivations underlying the '328 patent.

SST's argument is a throwback to the Federal Circuit's narrow application of the TSM test. The Supreme Court specifically considered this type of analysis in *KSR*, and flatly rejected it. *KSR*, 127 S. Ct. at 1742-43. The Court held that the scope of pertinent prior art is not limited to that which addresses the particular problem that the patentee was trying to solve. As the Court stated:

> In determining whether the subject matter of a patent claim is obvious, ***neither the particular motivation nor the avowed purpose of the patentee controls***.

*Id*. (emphasis added). The Court explained that "the problem motivating the patentee may be only one of many addressed by the patent's subject matter." *Id*. at 1742. The Court also observed that "a person of ordinary skill attempting to solve a problem will [not] be led only to those elements of prior art designed to solve the same problem." *Id*. Thus, the prior art must be considered for everything it teaches, even if it was directed to a different problem.

There are three principal problems discussed in the '328 patent. In its opposition, SST focuses on the problem of storing a large amount of information

on a central database.  (Opp'n at 24).  In its submissions to the Court on the issue of infringement, SST emphasized the problem of returning "too much" information to the buyer.  (Esteves Decl. Ex. 2 at 3, Ex. 4 at 2).  Finally, the '328 patent emphasizes the problem of the prior art "bricks and mortar" procurement systems being cumbersome and time-consuming.  (Esteves Decl. Ex. 1 at 1:26-41).

The prior art "bricks and mortar" and e-commerce systems identified all three of these problems and pointed the way for a person of ordinary skill to solve them.  Thus, although the problems described in the '328 patent are not dispositive of the issue, the solutions set forth in the prior art strongly support the conclusion that the '328 claims would have been obvious.

*The Central Database Problem*:  The '328 patent discloses a "hub and spoke" structure to avoid the problem of having an overwhelming amount of data in a central database that needs to be stored and updated.  (Esteves Decl. Ex. 1 at 2:15-23).  The prior art "bricks and mortar" and e-commerce systems both disclose the exact same structure.  They store and update key information about the vendors who provide goods or services so that they can be matched to prospective buyers. (Scacchi Aff., Ex. 6 at 3-5, 15, Ex. 7 at 2-4, 14-18, Ex. 8 at 5-13, 31-35, Ex. 9 at 2-6, 18-22).  But not all of the information about the goods and services provided is maintained in a central database.  (*Id*.).  For example, in the home contractor referral systems, the homeowner must contact the contractor to obtain a quote on a

particular project.  (Defendant's Br. at 12).  Thus, the prior art plainly discloses the exact solution to the central database problem utilized in the systems of the '328 claims.

SST argues that a "bricks and mortar" system would never have had the problems associated with maintaining and updating a central database.  (Opp'n at 24-25).  But because information was stored and maintained by hand (using a rolodex, card file, or other "hard copy" means), the "bricks and mortar" systems experienced "central database" problems with a far smaller amount of information than a computerized system.  Thus, this problem was actually more acute in the "bricks and mortar" systems than with computerized networks.

*The "Too Much" or "Too Many" Problem*:  In its briefs on infringement, SST argued extensively about the importance of the "too many" problem and of the '328 patent's purportedly novel solution to it.  (Esteves Decl. Ex. 2 at 3, Ex. 4 at 2; Supp. Esteves Decl. Ex. 8 at 30).  But as discussed in detail in Defendants' opening brief, the prior art "bricks and mortar" and e-commerce systems had already solved the problem of  providing "too much" information to the buyer by using exactly the same filtering disclosed in the '328 claims.

In its opposition on this motion, SST has changed tactics, arguing that the real focus of the '328 patent was the central database problem, and suggesting that the "too many" problem was first raised by the Defendants.  (Opp'n at 24).

Indeed, SST goes so far as to argue that the Examiner found during prosecution that the "too much" problem had been solved long before the '328 application was filed.  (*Id*. at 25).  Thus, SST's earlier representations to the Court  about the significance of the "too much" problem and the alleged novelty of the solution provided by the '328 patent were simply false.  SST's about-face underscores the fact that it cannot clearly and consistently articulate its infringement and invalidity positions, and will change them on a dime for purely tactical reasons.

*Speed and Efficiency*:  Finally, the '328 patent describes the prior art "bricks and mortar" procurement systems as "costly and time consuming." (Esteves Decl. Ex. 1 at 1:27-40).  As discussed in Defendants' opening brief, the use of a computerized network to increase the speed and efficiency of the procurement process was an obvious solution.  SST admits that these advantages of computer technology were plainly understood.  (Opp'n at 9-11; *see also* Scacchi Aff. Ex 43, *Communications of the ACM* at 39-51).  Indeed, the '328 patent does not disclose any new computer hardware or software, but instead merely instructs the person of ordinary skill that existing technology was fully capable of implementing the claimed system.  (Esteves Decl. Ex. 1 at 3:5-21, 6:35-47).

### D. SST's "Teaching Away" Arguments Treat the Person of Ordinary Skill Like an Automaton

SST argues that the prior art would have taught the person of ordinary skill to fan out and get as many quotes as possible, and therefore, "teaches away" from

the claimed filtering. (Opp'n at 33-36). SST's argument assumes that because some prior art e-commerce systems sought to maximize the number of quotes, a person of ordinary skill would not understand that there were advantages and disadvantages to that type of system. Instead, SST assumes that a person of ordinary skill would have blindly followed only the specific references that SST has chosen to address, and would have been utterly incapable of spotting the alternative approaches that were also disclosed both in the prior art "bricks and mortar" and other e-commerce systems. SST's argument fails to give sufficient – indeed, any – credit to the capabilities of the person of ordinary skill.

In *KSR*, the Supreme Court emphasized that "[a] person of ordinary skill is also ***a person of ordinary creativity, not an automaton***." *KSR*, 127 S. Ct. at 1742 (emphasis added). The Court cautioned not to abandon common sense with arguments that underestimate the ability of the person of ordinary skill to understand and apply the teachings of the prior art:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, ***a person of ordinary skill has good reason to pursue the known options within his or her technical grasp***. If this leads to the anticipated success, it is likely the product ***not of innovation but of ordinary skill and common sense***. *Id*. (emphasis added).

### 1.    SST Ignores the Teachings of the Prior Art as a Whole

SST's "teaching away" argument is based exclusively on its interpretation of FAST and certain options on the IQuest system. (Opp'n at 13-17). Based on those

two systems, SST contends that the overriding goal of *all* e-commerce systems was to obtain as many quotes as possible and that those quotes could be obtained "immediately" or "instantly" at "essentially zero cost in seconds." (Opp'n at 33, 35, 36). But SST's argument that a person of ordinary skill would mechanically apply the teachings of two examples of e-commerce systems to the exclusion of all else does not make sense.[3]

A person of ordinary skill in the art would have understood that, at some point, there are diminishing returns (in terms of time and money) in seeking quotes from every possible vendor. Buyers don't want to have to wade through hundreds or thousands of responses. And vendors are not likely to respond if the chances are small that they will make an actual sale because they are competing against a large number of other vendors.

Indeed, the prior art "bricks and mortar" systems plainly recognized and dealt with the issue of diminishing returns to both the buyer and the vendor from "too many" quotes. For example, the home contractor referral services recognized that sending a request to all possible contractors did not benefit homeowners or the contractors. They limited the number of contractors who received the

---

[3]   Defendants disagree with SST's characterization of the FAST and IQuest options as being designed to obtain as many quotes from as many vendors as possible. But it is unnecessary to address those disagreements on summary judgment because, as discussed above, it is undisputed that other prior art e-commerce systems limited the number of vendors before obtaining quotes.

homeowner's request to a "predetermined maximum" to avoid overwhelming the buyer with more matches than were necessary to obtain a good quote. (Defendants' Br. at 12). These referral services also recognized that limiting the number of contractor referrals was also in the contractors' best interest so that they would not be competing against a large number of others for every job. (Scacchi Aff., Ex. 35 at 6). Indeed, one service limited the number of contractor referrals to one. (Scacchi Aff., Ex. 31 at 3).

Likewise, the social services networks recognized the importance of limiting the number of referrals so that the client would not be overwhelmed with too much information about agencies that provide the desired service. (Defendants' Br. at 16). SST does not even attempt to rebut these plain disclosures in the prior art.[4]

Finally, SST simply ignores the IQuest-I system, which limits the databases to be searched to one. This example destroys SST's argument that the driving force of all e-commerce systems was to "fan out" and obtain as many quotes from as many vendors as possible.

---

[4]  SST repeatedly sneers at the social service networks as providing referrals for "alcoholics and drug addicts" and "pregnancy counseling centers." (Opp'n at 21, 23, 24, 31, 32, 33). SST's attempt to disparage these networks ignores the fact that they also provided referrals for much more routine services, such as babysitting, eyeglass repair, and transportation. (*See* Defendants' Br. at 13). Moreover, it is unrebutted that the social service networks used exactly the same filtering to make referrals as the '328 claims, regardless of the services requested.

SST mischaracterizes IQuest when it argues that the "user [on IQuest] preselects the databases that *he* wants to be searched" (Opp'n at 18, emphasis in original).  As discussed in Defendants' opening brief, I-Quest offered three options to potential buyers.  One option allowed the buyer to select the database to be searched.  Another option, called "SmartScan," would narrow the databases based on information submitted by the buyer.  SST focuses on these two options.  But it leaves out the most important option, IQuest-I, in which the computer system itself selects *a single database* to search based on the information from the buyer, and *performs the search*.  This network selection feature is spelled out clearly in the prior art references cited in Defendants' opening brief.  (Defendants' Br. at 19).

The IQuest-I system plainly teaches "network filtering" (claims 1-3) and a "predetermined maximum" number of vendors selected by the network (claim 14) in exactly the same way as the '328 claims.  Rather than "teach away," as SST argues, IQuest-I is actually an embodiment of the claimed combination.  Thus, IQuest-I completely undermines SST's argument about the prior art and its theory that a person of ordinary skill would not have been able to understand the advantages and disadvantages of filtering potential vendors before sending out a buyer's request.  SST's unsupported arguments that are directly contradicted by the record fall far short of raising a material issue of fact.

## 2.    The Multiple Solutions to the "Too Many" Problem Support the Obviousness of the '328 Claims

SST argues that a person of ordinary skill would not have used the claimed combination to solve the "too many" problem because there were many other solutions that had already been identified in the prior art.  (Opp'n at 26).  Again, SST's argument defies common sense.  The fact that there were multiple solutions to the "too many" problem actually confirms the obviousness of the '328 claims, not the reverse.  It demonstrates that the person of ordinary skill was well aware of the "too many" problem and would have been familiar with a variety of ways to solve it – including the filtering disclosed in the "bricks and mortar" systems and IQuest-I, which is exactly the same as the '328 claims.[5]

## 3.    The Claimed Combination Was Straightforward

Finally, SST argues repeatedly that the obvious combination of the prior art "bricks and mortar" referral services and computer network technology requires "impermissible hindsight."  (Opp'n at 1, 4, 18, 21, 32-35).  SST relies far too heavily on its "hindsight" argument, particularly when the combination at issue is a straightforward application of known computer technology and was made at a time

---

[5]    SST's acknowledgement that those of skill in the art were well aware of the "too many" problem and knew how to solve it (as Defendants have argued all along) is a complete about-face.  SST's expert, Dr. Dowling, opined in his supplemental report that the "too many" problem was "unknown" in the world of e-commerce until the '328 applicant allegedly identified and solved it. (Supp. Esteves Decl. Ex. 9 ¶¶ 8, 93).  SST provides no explanation for the sudden reversal.

when the overwhelming market drive to computerize existing business methods was in full swing. *See Leapfrog Enter., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) ("Applying modern electronics to older mechanical devices has been commonplace in recent years."). Indeed, in *KSR*, the Supreme Court criticized the Federal Circuit for overemphasizing "the risk of courts and patent examiners falling prey to hindsight bias." *KSR*, 127 S. Ct. at 1742. The Court acknowledged that the "factfinder should be aware . . . of the distortion caused by hindsight bias," but emphasized that "*[r]igid preventative rules* that deny factfinders recourse to common sense . . . *are neither necessary under our case law nor consistent with it*." *Id*. at 1742-43 (emphasis added).

## E.    SST Identifies No Technological Barriers to Computerization

SST suggests that the combination of "bricks and mortar" referral services and a computerized network would not have been obvious because of alleged technological difficulties with early e-commerce systems. (Opp'n at 8-9). SST confuses non-obviousness with commercialization.

As discussed above, the '328 applicant told the public in his application that the computer infrastructure and software were already available to automate each and every feature recited in the '328 claims. (Esteves Decl. Ex. 1, at 3:5-21, 6:35-47). In contrast, the alleged problems with computer networks (*i.e.*, the Internet) that SST identifies relate to the commercial viability of automated systems.

Specifically, SST argues that users complained about prior art e-commerce systems because they were hard to access, hard to use, untrustworthy, and not designed to accept payment for goods and services. (*See* Opp'n at 8-9). None of these issues implicates a required element of the '328 claims. There is no limitation in any claim regarding accessibility, ease of use, or security. And with respect to processing payments, the '328 patent expressly discloses the use of "e-mail purchase order[s]" to "effectuate automatically a credit purchase of the quoted product." (Esteves Decl. Ex. 1 at 6:2-6). Thus, SST's suggestion that there was some barrier to computerizing "bricks and mortar" referral services to arrive at the '328 claims falls apart in light of the express disclosures in its own patent.[6]

### F.    SST's Arguments Confirm the Overwhelming Market Forces Driving the Combination

SST argues that "[t]he main perceived advantage of ecommerce – and the main goal driving it – was the potential ability for a consumer to quickly sort through lots of materials from potential vendors ***automatically***, ***using a computer***, to efficiently comparison shop." (Opp'n at 9, emphasis added). This argument strongly supports the obviousness of the '328 claims.

---

[6]    SST has argued on infringement that claims 12-14 ***do not*** require purchases to be made "over the data network," even though that feature is expressly recited in the preamble of claim 12. (Supp. Esteves Decl, Ex. 8. at 25, 27). Yet now on invalidity, SST questions the technical feasibility of computerizing certain aspects of e-commerce systems that it has previously asserted are not even elements of the asserted claims. This is one more example of SST's gamesmanship.

As SST acknowledges, a person of ordinary skill would have looked for ways to use the computer network to sort through information so that the buyer did not have to do it. That is exactly what the combination of the "bricks and mortar" referral services and computer technology would do. Instead of having a human being sort through information about potential vendors, the computer could do it. A computerized system would have the recognized benefit of being able to process a greater volume of vendor information than a human being. But the fundamental filtering approach would be the same.

A computerized system based on a "bricks and mortar" referral service would automatically sort through the information that had been collected earlier from vendors, such as the goods and services that they offer, their location, available methods of payment, and shipping terms. In doing so, the computer would be able to "fan out" and compare the buyer's request with information about a larger number of potential vendors in a shorter period of time than a human being would be able to do. The computerized version would then be able to select the vendors who were most likely to offer the "best quotes" or "the best deal possible" from among the available vendors (*see* Opp'n at 10) without having to get an actual quote from every single one. Thus, SST's argument confirms that the competitive market forces in play in the mid-1990s would have driven a person of

ordinary skill to make the claimed combination, and further undermines its argument that the prior art "taught away."

### G.    Secondary Considerations Do Not Raise a Material Issue of Fact

SST's conclusory arguments regarding secondary considerations do not even come close to raising a material issue of fact in light of the overwhelming evidence of obviousness. The weakness of SST's contentions is highlighted by its "nexus" argument. (*See* Opp'n at 41). SST has completely failed to meet its burden of proving the required nexus because it relies on the features of LendingTree's patent (which is not in suit) and statements about the commercial success of the LendingTree's website. Under the correct analysis, there must be a nexus between the '328 claims (not LendingTree's patent claims) and the success of the LendingTree website. Moreover, LendingTree's patent and statements regarding LendingTree's success have absolutely nothing to do with ServiceMagic's website. Accordingly, SST's nexus argument is entitled to no weight.

SST also argues that if the '328 claims were so obvious, a person of ordinary skill would have made the combination long before the '328 patent was filed. (Opp'n at 45). As discussed above, the claimed filtering *was* previously implemented on a computerized network for IQuest-I. SST simply ignores the unambiguous statements in the prior art references describing that system.

Moreover, in making this argument, SST acknowledges that "[a]s FAST and other prior art shows, people *did combine computers with shopping and referral services*" (Opp'n at 41, emphasis added) – a statement completely at odds with SST's earlier argument in the same brief that a person of ordinary skill would not have considered the "bricks and mortar" art and would never have put those systems on a computerized network. (*See* Opp'n at 21, 33). Thus, SST's argument on this secondary consideration actually reinforces the obviousness of the '328 claims by undermining its opposition to Defendants' evidence of obviousness on the primary factors.

As the Supreme Court discussed in *KSR*, even *some* evidence of secondary considerations is not sufficient to preclude summary judgment. *KSR*, 127 S. Ct. at 1745. *KSR* confirms earlier cases that make exactly the same point. *See, e.g.*, *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).

### H. SST's Cited Cases Do Not Change the Analysis

Contrary to SST's feeble attempt to limit *KSR* to its facts, the Supreme Court's decision in that case has been widely recognized as a fundamental shift in the law of obviousness. *See, e.g.*, *Mercexchange LLC v. Ebay Inc.*, 83 U.S.P.Q.2d 1688, 1692 (E.D. Va. 2007); *Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1066, 1069 (S.D. Cal. 2007); *Tech Licensing Corp. v. Gennum Corp.*, 2007 WL 1319528 at *18 (N.D. Cal. May 4, 2007). *See also* Panel Discussion,

*Obviousness in Patent Litigation: KSR Int'l v. Teleflex*, 6 J. Marshall Rev. Intel. Prop. L., 590, 600 (2007).

The cases in SST's brief are not to the contrary. Two of them say ***nothing*** about whether *KSR* represents a change in the law or not. *See Forest Labs., Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1269 (Fed. Cir. 2007); *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1356 (Fed. Cir. 2007). And the third confirms that the law has changed. *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356 (Fed. Cir. 2007).

In *Takeda*, the Federal Circuit clearly stated that *KSR* "rejected a rigid application of the teaching, suggestion, or motivation ("TSM") test in an obviousness inquiry," and reaffirmed that the proper inquiry requires application of the *Graham* factors. *Id.* at 1356. The Court explained that it would not reverse the judgment of non-obviousness because "[i]n a thorough and well-reasoned opinion, albeit rendered before *KSR* was decided by the Supreme Court, the district court made extensive findings of fact and conclusions of law as to the four *Graham* factors," which the Supreme Court in *KSR* had just reaffirmed as the proper standard for determining obviousness. *Id.* at 1355-56.

## I.    SST's Alleged 1994 Invention Date Is Irrelevant

SST submits a declaration from the named inventor and suggests in a footnote that the references cited in Defendants' opening brief are not prior art in

light of its alleged 1994 date of invention. (Opp'n at 22 n.9). SST's argument is wrong as a matter of law.

A reference is prior art if it was published "more than one year prior" to the date the application was filed. 35 U.S.C. §102(b). SST's application was filed on February 22, 1996. Accordingly, the one year critical date for prior art is February 22, 1995, and *any* publication before that date is prior art, ***regardless*** of the invention date. *See, e.g.*, *Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001). Thus, SST's contentions regarding the alleged invention date for the '328 patent (rather than the date of filing, which is undisputed) are completely irrelevant.

The prior art systems that Defendants rely upon were well documented long before February 1995 (*see* Scacchi Aff. at ¶¶ 9, 20-52), and SST's conclusory statement that there may be some question regarding the dates of some of the references is false. (*see* Opp'n at 22 n.9). Indeed, in its argument on secondary considerations, SST admits that the CompuServe system (which hosted IQuest) existed as early as 1979 and that two of the social service references were published in 1981 and 1983, respectively. (Opp'n at 41). Thus, there is absolutely no question that these systems are prior art under §102(b). The same holds true for the home contractor referral services and the FAST system, which were both

comprehensively documented in publications well before the 1995 critical date in this case.  (*See* Scacchi Aff. at ¶¶ 22, 26, 31, 34, 36-38, 40, 43, 44, 50, 51).

## V.    SST ATTEMPTS TO REWRITE THE '328 CLAIMS TO AVOID OBVIOUSNESS

SST attempts to avoid a finding of obviousness by rewriting the express language of the claims and the Court's construction of certain terms.  (Opp'n at 44-45).  SST's arguments are flatly inconsistent with its earlier contentions on infringement and violate the fundamental principle that claims must be construed the same way for invalidity as for infringement.  *See, e.g.*, *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1454 (Fed. Cir. 1988).

### A.    "Request for Quotation" (Claims 1-3, 13-14)

SST argues that the prior art referral systems do not disclose "requests for quotation" because they do not provide enough information so that the vendor can return an "offer capable of acceptance."  (Opp'n at 30).  SST's reversal on this issue is astonishing.  In its briefs on infringement, SST argued the exact opposite. SST insisted that all that was necessary was a request from a buyer intending to obtain a quote sometime in the future.  (*See, e.g*., Esteves Decl. Ex. 4 at 36-37). SST specifically opposed ServiceMagic's interpretation of the claims to require the request to include all the information necessary for the vendor to return an offer capable of acceptance in response to the RFQ.  (*Id.*).  And the Court accepted SST's arguments.  (Supp. Esteves Decl. Ex. 10 at 19-23).

SST cannot have it both ways.  Under the broad construction of RFQ that SST relied on for infringement, the claims are invalid.  Under the much narrower construction that SST now proposes for invalidity, Defendants do not infringe.

### B.    "Buyer or Network Filter Conditions" (Claim 1)

The extremes to which SST is willing to go in its opposition is exemplified by its argument regarding the filtering limitation of claim 1.  Claim 1 recites "filter conditions set up by the network buyer in said request for quotation *or* by the central processing unit in accordance with preestablished conditions."  (Esteves Decl. Ex. 1 at 8:36-39, emphasis added).  SST argues that the word "or" in claim 1 really means "and."  (Opp'n at 43-45).  Based on that argument, SST reads into the claim a two-step filtering process whereby a request is first filtered against buyer conditions and then, optionally filtered against network conditions.  (Opp'n at 45).

Nothing in the language of claim 1 supports SST's contentions.  SST's construction of the disjunctive "or" is inconsistent with the plain meaning of the word.  The fact that the '328 patent uses the conjunctive "and" to separate the different types of filters in claims 3 and 14 demonstrates that the '328 applicant knew how to require more than one filter.  What is more, SST's alleged two-step filtering process is simply a fabrication.  The '328 patent says nothing about filtering occurring in more than one stage, and SST made no mention of such multi-step filtering when it argued infringement.  Ultimately, SST's tortured

construction fails to save claim 1 from a finding of invalidity because it is undisputed that the prior art "bricks and mortar" systems all use filter conditions from both the buyer and the network.

SST makes a similar argument restricting "buyer filters" in claim 13 to something other than product code, and requiring the buyer and network filters in claim 14 to be applied in a particular order. (Opp'n at 6-7). As with claim 1, claims 13 and 14 impose no such requirements. Indeed, the Court rejected SST's argument that "the term 'filter conditions' must exclude product information." (Esteves Decl. Ex. 5 at 24-28). In any event, SST does not dispute that the "bricks and mortar" systems use both buyer filters and a network filter that limits the number of vendors to a "predetermined maximum," as recited in claims 13 and 14.

## C. "Network Vendors" (Claim 3)

SST argues that the prior art does not disclose the "network vendors" recited in claim 3. (Opp'n at 42). This argument is baseless in light of SST's argument on infringement that a buyer becomes a "member" of a network by simply providing contact information. (Esteves Decl. Ex. 2 at 39-40, Ex. 4 at 12-13).

It is undisputed that the "bricks and mortar" systems and IQuest all require vendors to provide information about the goods and services that they provide. (Defendants' Br. at 11-12, 14-15, 18). Accordingly, there is no issue that these vendors are "members" of the prior art systems, as that term has been construed in

the '328 claims.  SST cannot have it both ways by arguing (for purposes of

infringement) that the requirement for network buyers is simply contact

information, whereas the requirement for network vendors (for purposes of

invalidity) requires something more than information about the goods and services

offered and how to contact them with matching buyer requests.

### D.    "At Least One Quote Over the Data Network" (Claims 13-14)

SST argues that claims 13 and 14 require multiple "competing" quotes to be

obtained.  (SST Opp'n at 32 and n.14).  The claims recite no such thing.  SST is

attempting to write in a "multiple quote" limitation that is simply not there.

Claim 12 (from which claims 13 and 14 depend) recites "obtaining, from ***at

least one*** of said potential sellers, over a data network, quotes to supply said goods

and services."  (Esteves Decl. Ex. 1 at 10:4-5, emphasis added).  The words "at

least one" are unequivocal.  The claim simply does not say "more than one" or

"two or more."  The claims therefore encompass a system that returns one or more

quotes to the buyer.  SST's expert agrees.  (Supp. Esteves Decl. Ex. 18 at 148:7-

13).  In its brief, SST nonetheless attempts to mislead the Court by clip quoting

claim 12 to ***exclude*** the language "from at least one of said potential sellers."  (*See*

Opp'n at 31).  Thus, SST literally rewrites claim 12 in attempt to avoid invalidity.

Moreover, despite SST's arguments (see Opp'n at 30-31), the limitation

requiring at least one quote to be returned to the buyer through the system does not

distinguish claims 13 and 14 from the prior art.  There is nothing novel about returning a quote over the network.  The e-commerce systems plainly did so. (Defendants' Br. at 19, 22).  And the social services networks also obtained quotes and other information that the network representative passed along to the client as part of the process for setting up an appointment for the desired services.  (Scacchi Aff., Ex. 33 at 9).

## VI.    DEFENDANTS ARE NOT JUDICIALLY ESTOPPED

SST argues that Defendants are estopped from raising their obviousness defense in light of LendingTree's arguments in a different case against LowerMyBills, Inc. ("LMB").  This is, by now, a familiar refrain, as SST does not hesitate to cry "waiver" or "estoppel" whenever it senses danger on the merits. True to form, SST asks the Court to preclude Defendants without citing any legal standard for estoppel or demonstrating how that standard is met in this case.

### A.    SST Cannot Establish Any of the Elements of Judicial Estoppel

In the Third Circuit, judicial estoppel arises only when (1) the position is "clearly inconsistent" with a position taken in previous litigation; (2) the party has "succeeded in persuading a court to accept its earlier position;" and (3) allowing the party to assert its position would provide that party with an "unfair advantage" or impose an "unfair detriment" on the opposing party.  *Morgan v. Gay*, 471 F.3d 469, 478 n.9 (3d Cir. 2006).  SST cannot establish any of these elements.

First, LendingTree's arguments in this case are not "clearly inconsistent" with its contentions in the LMB case. The LMB case involved LendingTree's U.S. Patent No. 6,611,816, which has completely different claims in the context of a different specification and prosecution history than the '328 patent in this case. Thus, LendingTree's arguments in the LMB case cannot be "clearly inconsistent" because they did not even involve the same patent. *See Mallinckrodt, Inc. v. Masimo Corp.*, 254 F. Supp. 2d 1140, 1149-50 (C.D. Cal. 2003) (construction of patent claims in prior infringement litigation did not estop patentee from arguing different construction of similar language in different patents in subsequent infringement suit, even though patents shared common specifications); *Callicrate v. New Age Industrial Corp., Inc.*, 2005 WL 1027095, at *17 (D. Kan. 2005) (no estoppel where identical phrase was construed in earlier action that involved different patent, with different specification, and different prosecution history).

As the Federal Circuit has explained, even when patents contain the same word or phrase, the meaning may diverge because: (1) "[a] patentee may define a particular term in a particular way, and in that event the term will be defined in that fashion for purposes of that particular patent, no matter what its meaning in other contexts;" (2) "claim terms are typically given their ordinary and accustomed meaning as understood by one of ordinary skill in the pertinent art, and the generally understood meaning of particular terms may vary from art to art;" and (3)

"the manner in which the term is used in the patent may dictate a definition that differs from the definition that would be given to the same term in a different patent with a different specification or prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318-19 (Fed. Cir. 2005).

Second, LendingTree did not "succeed in persuading" the court in the litigation against LMB to adopt any of its alleged positions. The LMB case settled before the Court issued ***any*** claim construction or made ***any*** substantive rulings.

Finally, SST cannot show that it has been unfairly disadvantaged simply because LendingTree has asserted affirmative defenses of non-infringement and invalidity in response to SST's allegations of infringement. For example, SST can make no showing that it in any way relied to its detriment on any allegedly inconsistent position taken by LendingTree in the LMB litigation.

## B.     The LMB Settlement Is Irrelevant

Unable to establish any of the elements required to invoke judicial estoppel, SST resorts to making unfounded accusations about LendingTree's settlement of the LMB case. (*See* Opp'n at 39-40). In particular, SST falsely contends that LendingTree enforced its patent against LMB after *KSR* was decided and obtained what it characterizes as a "huge some [sic, sum] of money" in settlement. (*See* Opp'n at 39). Because the terms of the LMB settlement are confidential, SST's characterization is pure speculation.

Moreover, the publicly-available docket (which is readily accessible to SST) makes clear that LendingTree and LMB reached an agreement in principle on the major terms of the settlement ***prior to KSR***. LendingTree filed its lawsuit against LMB case in April 2005. In early 2007, the parties decided to mediate the case and asked for a stay of the litigation, which the Court granted on March 19, 2007. (*See* Supp. Esteves Decl. Ex. 11 at ¶ 2). On April 19, the parties reported that they had "reached agreement on almost all of the issues" at the close of mediation on April 16. (Supp. Esteves Decl. Ex. 12 at 1). By April 27, the parties had discussed "the remaining issues" and "a definitive settlement agreement" had been drafted. (Supp. Esteves Decl. Ex. 13 at 1). That was three days before the Supreme Court issued its opinion in *KSR*. No further activity occurred in the case until August 22, when the parties informed the Court that they had "executed a settlement agreement" and expected "the case to be dismissed within the next two weeks." (Supp. Esteves Decl. Ex. 14 at 1). Given this timeline, it is clear that LendingTree's lawsuit against LMB has nothing to do with this case.

## VII.   SST'S ATTACK ON DEFENDANTS' EXPERT IS BASELESS

SST tops off its opposition by making wild accusations regarding the integrity of the Defendants, their outside counsel, and their expert, Dr. Scacchi. (Opp'n at 27-29). SST has absolutely no factual basis for any of its overreaching conclusions. SST relies on insinuation and unsupported inferences, apparently

with the objective of somehow tipping the balance against Defendants on this motion. Defendants respectfully submit that these accusations have exactly the opposite effect, and call into question SST's good faith in pursuing this litigation and the professionalism of its counsel.

For example, SST falsely suggests that counsel for Defendants somehow misled the Court about their reasons for requesting leave to serve a supplemental expert report. (*See* Opp'n at 28-29). As Defendants' letters to the Court on this issue make plain, Defendants argued clearly that *KSR* had changed the legal standard for obviousness, and as a result, expanded the scope of pertinent prior art that invalidated the '328 claims. (Supp. Esteves Decl. Ex. 15 at 1, Ex. 16 at 2).

Likewise, SST has absolutely no basis to suggest that Dr. Scacchi was not fully involved with the development of the opinions in his supplemental expert report. (*See* Opp'n at 28-30). Indeed, SST did not ask Dr. Scacchi a ***single*** question at his deposition about how he prepared his report or how much time he spent on it, despite having seven hours on the record to do so. (*See* Supp. Esteves Decl. Ex. 17). SST's freewheeling theories are nothing more than unsupported conjecture.

SST is also wrong to suggest that Dr. Scacchi abandoned his earlier anticipation opinions by submitting a supplemental report on obviousness. (*See* Opp'n at 29 and n.12). It is hornbook patent law that anticipation and obviousness

are alternative theories of invalidity.  Dr. Scacchi's supplemental report in response

to *KSR* is, not surprisingly, directed to obviousness.  But nothing in that report

suggests that Dr. Scacchi had abandoned his opinions regarding anticipation.

Again, SST did not bother to ask Dr. Scacchi a ***single*** question at his deposition

about whether he was withdrawing any of his earlier opinions.  Indeed, SST

marked all three of Dr. Scacchi's expert reports and asked questions about all of

them.  (Supp. Esteves Decl. Ex. 17 at 11:23-12:21).  Thus, at the time of Dr.

Scacchi's deposition, SST understood that all of his earlier opinions remained in

issue.

SST also threatens to move to preclude Dr. Scacchi's testimony because it

believes he spent too much time preparing for his deposition.  (Opp'n at 29 n.12).

Not surprisingly, SST cites no authority for the proposition that an expert witness

can only prepare for his deposition for a limited amount of time, particularly when

the issues involve complex subject matter, voluminous documents, and responses

to extensive expert reports from the opposing side.  Indeed, Dr. Scacchi would

have been remiss had he ***not*** prepared for his deposition.  And had he been unable

to answer SST's questions, SST would have surely complained to the Court and

moved to preclude on that basis instead.

Finally, SST cites pre-*KSR* cases in which the Federal Circuit invalidated

claims that applied conventional computer technology to prior art manual devices

or systems.  (Opp'n at 28-29).  SST relies on these cases to argue that Dr. Scacchi's expert opinions should be precluded because there might have been a pre-*KSR* legal basis to support his supplemental obviousness opinions.  (Opp'n at 29).  SST cites no authority to support this *non sequitur*.  Even a cursory review of Dr. Scacchi's supplemental report demonstrates that it is a focused response to the new standard set forth in *KSR*.  The report makes that point over and over again. (Supp. Esteves Decl. Ex. 17 at ¶¶ 3, 5, 9, 12).

Indeed, the fact that courts in other cases may have invalidated claims that were merely computerized versions of the prior art under the Federal Circuit's "TSM" test further supports summary judgment of obviousness here.  If the '328 claims would have been obvious under the Federal Circuit's "rigid" analysis, they are unquestionably obvious under the "expansive and flexible" approach mandated by the Supreme Court.

## VIII.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant its motion for summary judgment of obviousness and deny SST's cross-motion.

Respectfully submitted,

Date:  January 25, 2008           By:   s/ Elvin Esteves
                                         _____

51200/2321247.4                          40

Kevin J. McKenna
Elvin Esteves
GIBBONS P.C.
  One Gateway Center
  Newark, New Jersey  07102-5496
  (973) 596-4500
  kmckenna@gibbonslaw.com
  eesteves@gibbonslaw.com

Claude M. Stern
Robert B. Wilson
Evette Pennypacker
James E. Baker
Linda J. Brewer
(all admitted *pro hac vice*)
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
  51 Madison Avenue, 22nd Floor
  New York, New York  10010-1601
  (212) 849-7000
  claudestern@quinnemanuel.com
  robertwilson@quinnemanuel.com
  evettepennypacker@quinnemanuel.com
  jamesbaker@quinnemanuel.com
   lindabrewer@quinnemanuel.com

Attorneys for LendingTree, LLC,
IAC/InterActiveCorp, and ServiceMagic,
Inc.