<u>NOT FOR PUBLICATION</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Source Search Technologies, LLC,<br><br>                                   Plaintiff,<br><br><br>v.<br><br><br>LendingTree, LLC,<br>IAC/InterActiveCorp, and<br>ServiceMagic, Inc.,<br><br>                                   Defendants. | Civ. No. 04-4420 (DRD)<br><br><br><br>**O P I N I O N** |

*Appearances by:*

Jeffrey I. Kaplan, Esq.
Michael R. Gilman, Esq. (admitted *pro hac vice*)
KAPLAN, GILMAN, GIBSON & DERNIER LLP
900 Route 9 North
Woodbridge, NJ  07095

        *Attorneys for Plaintiff Source Search Technologies, LLC*

Kevin J. McKenna, Esq.
Elvin Esteves, Esq.
GIBBONS, P.C.
One Gateway Center
Newark, NJ  07102

Claude M. Stern, Esq. (admitted *pro hac vice*)
Robert B. Wilson, Esq. (admitted *pro hac vice*)
Evette Pennypacker, Esq. (admitted *pro hac vice*)
James E. Baker, Esq. (admitted *pro hac vice*)
Linda E. Brewer, Esq. (admitted *pro hac vice*)
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010

    *Attorneys for Defendants Lending Tree, LLC, IAC/InterActiveCorp, and ServiceMagic, Inc.*

**DEBEVOISE, Senior District Judge**

    Plaintiff, Source Search Technologies, LLC ("Source Search"), instituted this patent infringement action against defendants, Lending Tree, LLC ("Lending Tree"), IAC/InterActive Corp. ("IAC"), and Service Magic, Inc. ("Service Magic) (collectively "Defendants"), alleging infringement of U.S. Patent No. 5,758,328 ("the '328 patent").  Defendants deny infringement and assert that the '328 patent is invalid and unenforceable.

    Now before the Court are the following motions: (i) Source Search's motion for summary judgment on the infringement issue with respect to Lending Tree; (ii) Lending Tree's cross-motion for summary judgment of no infringement; (iii) Defendants' motion for summary judgment of invalidity for indefiniteness; (iv) Source Search's motion for summary judgment that the '328 patent is not indefinite; (v) Defendants' motion for summary judgment for obviousness; (vi) Source Search's motion for summary judgment of non-obviousness; (vii) Defendants' motion for summary judgment of no willful infringement; and (viii) Source Search's motion to strike the supplemental report of Defendants' expert, Dr. Walter Scacchi.  For the reasons set forth below, the Court finds that the Lending Tree website infringes the '328 patent and that the

2

'328 patent is not invalid due to indefiniteness, but that it is invalid due to obviousness.  The parties' motions will be granted and denied accordingly.

## I.  PROCEDURAL HISTORY

On March 31, 2006, the Court held a <u>Markman</u> hearing to determine the meaning of the disputed terms in the '328 patent.  The opinion that followed, <u>Source Search Tech., LCC v. Lending Tree, LLC</u>, 2006 U.S. Dist. LEXIS 79651 (D.N.J. Oct. 16, 2006) (hereinafter "<u>Source Search I</u>"), began by determining that a person of ordinary skill in the art is someone "with a BS degree in computer science or an equivalent field like electrical engineering, or having the equivalent work experience, and someone with experience designing and/or using Internet related software and commerce systems."  <u>Id.</u> at *21.  Next, the Court determined that a "request for quotation,"or RFQ, is a "request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance."  <u>Id.</u> at *26.  The Court then accepted Source Search's definition of "filter means" as a "computer programmed to apply or compare specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information."  <u>Id.</u> at *35.  "Filter conditions" are "limitations or conditions that determine which of the network vendors will receive a buyer's request for quotation and/or which buyers will receive a response from a network vendor."  <u>Id.</u> at **38, 44.  Filter conditions can include product designations; they do not have to be excluded from the categories of filter conditions.  "Network members" are defined as stated in the specification as "anyone or any company which has registered as a user by completing an application."  <u>Id.</u> at *45.  "Storage means" is a "device into which bits of information can be written and later recalled," such as a disk or a hard drive or any other permanent or temporary storage.  <u>Id.</u> at *53.

3

Because the Court overlooked Source Search's objections to Defendants' definition of "good and services" in the <u>Markman</u> opinion, the Court granted Source Search's motion for reconsideration. <u>Source Search Tech., LCC v. Lending Tree, LLC</u>, 2006 U.S. Dist. LEXIS 82451 (D.N.J. Nov. 13, 2006) (hereinafter "<u>Source Search II</u>"). After considering Source Search's alternative definition, the Court reaffirmed its definition of goods and services as "standard[][1] articles of trade and performances of work for another." <u>Id.</u> at *7.

Following the issuance of the <u>Markman</u> opinion, discovery resumed. In February 2007, Source Search filed a motion for summary judgment on the issue of infringement against Defendant Service Magic. In an opinion dated May 2, 2007, the Court found that Service Magic was infringing the '328 Patent. <u>Source Search Tech., LCC v. Lending Tree, LLC</u>, 2007 U.S. Dist. LEXIS 32282 (D.N.J. May 2, 2007) (hereinafter "<u>Source Search III</u>"). The Court concluded that the services provided by the Service Magic website were standard services within the meaning of the '328 Patent. <u>Id.</u> at *28. Standard services were found to be any services that are usual, common, or familiar. <u>Id.</u> The fact that a contractor may need more information than simply the class of service in order to provide a quotation for the service did not "automatically make that service not standard." <u>Id.</u> The Court also concluded that the forms that homeowners completed on the Service Magic website constituted requests for quotations. <u>Id.</u> at *36. Finally, the Court concluded that users of the Service Magic website qualified as network members because they had to register with the website by completing an application. <u>Id.</u> at *39. These conclusions formed the basis of the Court's finding that the Service Magic website was

---

[1] "Standardized" in the definition of goods and services was changed to "standard" by the Court's May 2, 2007 Opinion. <u>See</u> <u>Source Search III</u>, 2007 U.S. Dist. LEXIS 32282, at **20, 24.

infringing the '328 Patent.

## II.  BACKGROUND

Source Search is the owner, by assignment, of the '328 patent entitled "Computerized

Quotation System and Method."  The '328 patent was invented to address the problem of internet

consumers having too many or too few options to choose from when shopping online for goods

or services.  The '328 patent is described as a "computerized system for forming a computer

based communications network of network members," which includes network buyers and

vendors, for the purpose of "processing requests for quotation for goods and services."  U.S.

Patent No. 5,758,328 Abstract (filed Feb. 22, 1996).

The '328 patent claims to be unique because it requires no central database; instead the

buyers' requests for quotation are broadcast to certain network vendors, who are selected based

on filter criteria set by the buyer, the seller, and/or the network operator.  '328 Patent col.2 l.35-

47.  Compatible responses are then processed by the quotation system and submitted to the

requesting buyer over the communications network.  Id. col.2 l.47-51.

The model communications network envisioned is the internet.  The Description of the

Invention envisions an internet web page being set up to provide access to the network.  '328

Patent col.4 l.64-66.  To become a network member, buyers and seller must complete an

application that provides relevant information about the prospective member.  Once a member is

registered, the member can place or receive RFQs.  Id. col.5 l.1-8.

The goods or services that are the subject of the RFQs must be standard items.  '328

Patent col.3 l.63.  This ensures that buyers are requesting what vendors are selling and avoids

confusion.  Id. at col.3 l.64-65.  To aid in the standardization, pre-programmed menu information

is provided to classify products or services in categories that are broken down into functional classes or subclasses that correspond to how the products or services are commercially known or identified.  Id. at col.4 *l*.12-16.

When a network buyer submits an RFQ, the request is processed to determine which vendors are capable of quoting on the RFQ and then which vendors meet any other conditions set by the requesting buyer.  '328 Patent col.5 *l*.9-11.  The buyer may expand or contract the qualifications necessary for a vendor to receive the RFQ by adding or removing additional filter conditions.  See id. col.7 *l*.1-6.  Vendors may "deselect" themselves from receiving certain RFQs by registering their preferences with the quotation system, id. col.5 *l*.12-15, or by defining buyers from whom they would like to receive RFQs, such as wholesalers or governmental agencies. The quotation system itself also has the ability to filter or prioritize requests so that the members who receive requests or quotations can be modified based on the quotation system's business objectives, id. col.5 *l*.21-35, and RFQs are not simply sent to all matching vendors.  Thus, the quotation system narrows the field of vendors who will receive the buyer's RFQ.

The method of connecting member buyers and sellers through the processing of RFQs by a central system and returning quotations to the requesting buyer through the same central system can be referred to as a "two-way embodiment."  The '328 patent does not require, however, that quotations be returned through the quotation system or even that RFQs be submitted to vendors. The '328 patent also describes a "one-way embodiment," which is a method of referral where RFQs are placed in the quotation system, but quotations are not returned through it.

With the one-way embodiment, the quotation system simply provides a member buyer with a list of vendors who meet all of the filter conditions imposed by the buyer, the vendor, and

6

the quotation system. '328 Patent col.8 *l*.41-45. The buyer then has the option of contacting the vendors directly. Similarly, once a vendor receives an RFQ, the vendor is not required to respond by submitting a quotation through the quotation system, but rather has the option of contacting the buyer directly. Id. col.6 *l*.6-11.

The quotation system's ability to filter RFQs before vendors are matched with the buyer's request is not only what sets the '328 patent apart from the previous central database method but is also what makes the '328 patent's technology profitable. Member vendors know that, because the quotation system reduces the number of vendors to whom the RFQ is sent, they are not one of many vendors who are receiving the same RFQ; but rather they have been selected by the quotation system and it is worth their time to respond with a quotation. Additionally, the quotation system's ability to filter RFQs means that member buyers are not overwhelmed by responses to their RFQs. Thus, the quotation system is providing a service to the vendors by ensuring that the member buyers receive a reasonable number of quotations and thereby increasing the vendors chances of completing a transaction.

### III. DISCUSSION

**A. Standard of Review**

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of

summary judgment.

On a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. If there are no issues that require a trial, then judgment as a matter of law is appropriate.

In a patent infringement action, summary judgement should only be granted to the patent holder when "it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1369 (Fed. Cir. 2002). When an accused infringer is seeking summary judgment on the grounds of non-infringement, it must either provide "evidence that would preclude a finding of infringement" or show that "the evidence on file fails to establish a material issue of fact essential to the patentee's case." Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001).

## B. Infringement Motions

The first issue that the Court must resolve is whether the Lending Tree website infringes the claims of the '328 Patent. An infringement analysis is broken down into "a two-step process." TechSearch L.L.C. v. Intel Corp., 286 F.3d 1360, 1371 (Fed. Cir. 2002). First, a court must construe the terms of the patent's claims to determine their scope and meaning. Cybor Corp. v. Fas Technologies, Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998). Then, the court must

8

compare the allegedly infringing system to the asserted claims to determine whether infringement has occurred.  Id.  Infringement of the asserted claims may be shown either "literally or equivalently."  TechSearch, 286 F.3d at 1372.  To establish literal infringement, "all of the elements of the claim . . . must be present" in the allegedly infringing system.  Id. at 1371. Under the doctrine of equivalents, literal infringement is not necessary; a claim may be found to have been infringed if "there is equivalence between the elements of the accused product or process and the claimed elements of the patented invention."  Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997).  Thus, every claim limitation, or its equivalent, must exist in the accused system in order for a court to find infringement.  These determinations are questions of fact, and on summary judgment, the issue is whether there is no genuine issue of material fact regarding infringement.  Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998).

The Court, having already construed the terms of the '328 patent in its Markman opinion, Source Search I, 2006 U.S. Dist. LEXIS 79651, and in its reconsideration of its Markman opinion, Source Search II, 2006 U.S. Dist. LEXIS 82451 (D.N.J. Nov. 13, 2006), now embarks on the second step of the infringement analysis, namely comparing the two systems to determine whether Lending Tree's website infringes claims 1, 2 and 3 as well as claims 12, 13 and 14 of the '328 patent.

**(1) The Lending Tree Website:** Lending Tree, a subsidiary of IAC, operates the website www.lendingtree.com.  The website describes itself as "the leading lending and realty services exchange," which "lets consumers choose from up to four competitive loan offers."  About Lending Tree, http://www.lendingtree.com/stm3/aboutlt/default.asp.  The website also provides

9

access to information about the type of loans available from participating lenders and general advice regarding the loan process. However, no application or enrollment is required to access the information, which is publicly available to all visitors of the website.

A prospective borrower looking to use the Lending Tree system selects the type of loan she is interested in and then continues to complete an online loan request form, also known as a "qualification form." The qualification form is a 4-5 page web-based form, whose questions vary depending on the type of loan selected, and serves as a request for loan pre-qualification. (Baker Decl. Ex. A at 16.) Generally, the qualification form asks the prospective borrowers about herself, her financial situation, and questions related to the loan. (See, e.g., Baker Decl. Ex. A at 3-11; Kaplan Decl. Ex. B.)

The information in the qualification report and the potential borrower's credit score are used to match the borrower with potential lenders. Once borrowers and lenders are matched, Lending Tree sends an email to the borrower that contains the names of the lenders who are reviewing the loan request. (Baker Decl. Ex. A at 19; Kaplan Decl. Ex. I at 6.) When a lender responds with a loan offer, Lending Tree will send the borrower another email with the details of the offer. The borrower receives an email for each lender making an offer. A borrower is then able to negotiate with the lender directly or through the Lending Tree website. (Kaplan Decl. Ex. I at 6.) Once a borrower accepts a loan offer, then the borrower communicates directly with the lender to complete the loan closing process. (Baker Decl. Ex. A at 20; Kaplan Decl. Ex. I at 8.) Lending Tree does not charge the borrower any kind of fee for this service of matching the borrower to the lender.

Lending Tree arranges for offers through either its network of non-affiliated lenders or its

own affiliate, Home Loan Center, which does business as Lending Tree Loans. (Kaplan Decl. Ex I at 3.) Lenders provide Lending Tree with information about the type of loan that the lender is interested in extending and the type of borrower that the lender is interested in lending to. Lending Tree uses this information to match the prospective borrowers with the potential lenders. If more than five lenders match a prospective borrower's profile, then Lending Tree will select five potential lenders, giving preference to those lenders that have the highest customer satisfaction scores and the best records of making loans to previous Lending Tree customers. If, however, a borrower only matches with Lending Tree Loans, the borrower will be provided with up to four offers based on the rates and terms provided Lending Tree Loans by its wholesale mortgage banks and investors.

In matching prospective borrowers with potential lenders, Lending Tree employs an Auto Decision Engine, as well as a non-Auto Decision Engine ("non-ADE"). The non-ADE systems, known as the LenderWeb system and the LOS system, allow Lending Tree to post an online loan request, thereby giving potential lenders access to the terms of the request (LendingWeb), or send the borrower's online loan request directly to potential lenders for processing (LOS). (Hodson Decl. ¶¶ 4-5.) The lenders can then decide whether to generate offers, and either return them to Lending Tree, or contact the borrowers directly. If a lender posts an offer on LenderWeb or returns an offer through the LOS system, then Lending Tree forwards the offer to the borrower.

A prospective borrower who is not matched with any potential lenders is free to complete a new loan request at any time. (Kaplan Decl. Ex. I at 7.) A returning borrower, however, must enter all of the information needed to complete the qualification form again because a borrower is not permitted to access qualification forms that were previously submitted on the Lending Tree

system.

    **(2) Claims 1, 2 and 3:** Source Search contends that Lending Tree literally infringes

claims 1, 2, and 3 of the '328 patent[2] because Lending Tree's website employs a filtering system

---

    [2] Claim 1 describes the patent as:

> A computerized system for forming a computer based communications network of network members inclusive of network buyers and or [sic] network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit, said network members being remotely located from said central processing unit and connected thereto via a communications channel storage means containing identification of the network members, means for network buyers to generate requests for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for filtering the network members in said storage means to determine which network members are to receive said request for quotation based upon filter conditions set up by the network buyer in said request for quotation or by the central processing unit in accordance with preestablished conditions, means for broadcasting said request for quotation to the network members selected by said filter means and means for responding to the generator of said request with either a response from the selected network members or with a list of said selected network members for said generator of said request to establish independent communication.

'328 Patent, col.8 *l*.22-45.

Claim 2 adds:

> A computerized system as described in claim 1 wherein said network members communicate via the Internet through said central processing unit.

<u>Id.</u> at col.8 *l*.46-48.

Claim 3 describes the patent as:

> A method for processing requests for quotation for goods and/or services from a party representing a buyer or supplier of goods and/or services through a computerized system forming a computer based communications network of network members for linking buyers to suppliers with the computerized system having at least one central processing unit including operating system software for controlling the central processing unit and storage means containing the identification of the network members, wherein the method comprises

in processing and matching its users' requests for quotations to its network of vendors.   In

response, Lending Tree argues that there is no infringement because its website does not

facilitate the sale of goods or services; the users of its website are not "network buyers"; and

because the website does not process RFQs.  However, not only does the Lending Tree website

process RFQs, but it also facilitates the sale of services, and the users of the website become

network members upon the submission of their loan applications.  Therefore, the Lending Tree

website infringes claims 1, 2 and 3 of the '328 patent.

(a)  *Goods and Services:* Lending Tree argues that it does not infringe the '328

patent because its website provides loans and loans are neither goods nor services.  Source

Search counters by arguing that loans are indeed services, namely financial services.  However,

providing loans qualifies as a service and Lending Tree's argument is unavailing.

The '328 patent refers to "goods and services" in the context of requests for quotations.

Specifically, a network user requests a quotation on some good or service.  That user's request is

then processed by the central processing unit before being distributed to vendors of the good or

service.  The meaning of "goods and services" as used in the '328 patent was settled in the

---

the steps of:
receiving a buyer's request for quotations over a communication
network;
selecting one or more appropriate vendors to be sent the buyer's
request for quotation based upon filter conditions set by the
buyer, vendor and the network software; transmitting the
buyer's request for quotation separately to said selected
vendors over said communications network; and with said
selected vendors communicating their quotations either
directly to the buyer or to the computerized system which in
turn transmits said received quotations to the requesting
buyer.

Id. at col.8 *l*.49-col.9 *l*.2.

Court's opinion granting summary judgment against Service Magic on the issue of infringement. Source Search III, 2007 U.S. Dist. LEXIS 32282.  There, the Court concluded that "goods and services" means "standard articles of trade and other performances of work for another."  Id. at *24.

Clearly, loans are not goods.[3]  Goods are "articles of trade."  Source Search II, 2006 U.S. Dist. LEXIS 82451 at *7.  Loans, on the other hand, are a type of financial instrument.  Although financial instruments can be bought and sold, financial instruments are generally considered to be different from goods.  The Uniform Commercial Code, for example, distinguishes goods from financial instruments, devoting Article 2 to the sale of goods while dealing with financial instruments in Articles 3 and 8.

Furthermore, as Lending Tree correctly points out, the '328 patent uses the word "goods" interchangeably with the words "products" and "items."  See, e.g., '328 Patent col.1 *l*.35; col.3 *l*.35; col.4 *l*.28; col.6 *l*.53; fig. 2A.  The '328 patent also describes goods as things that are produced by a manufacturer, id. col.7 *l*.19-20, sold from inventory, id. col.2 *l*.2-3, accumulated as surplus, id. col.1 *l*.39, or that can be donated to charity, id. col.8 *l*.2.  A loan cannot be described as any of these things.  Finally, the '328 patent provides examples of goods, which include computer products, appliances, electronic parts and components, id. fig. 2A, type J resistor 5%, id. fig. 8, and unwanted equipment, id. col.8 *l*.2.  A loan would not be classified in the same category as these items.  Thus, loans are not goods within the meaning of the '328 patent.

Loans, however, do qualify as services.  Services include the "performance[] of work for

---

[3] While many courts would agree that loans are not goods, see Hastings v. Fidelity Mortgage Decisions Corp., 984 F. Supp. 600, 612 n.13 (N.D. Ill. 1997), finding that loans are goods within the meaning of the Real Estate Settlement Procedures Act.

another." Source Search II, 2006 U.S. Dist. LEXIS 82451 at *7. In its simplest form, a loan is a

debt. But a loan is more than just a debt; it also involves the contractual promise of the debtor to

repay the sum of money, which is given in exchange for the lender's promise to pay a sum of

money to the debtor or to a third party on the debtor's behalf. See Black's Law Dictionary 936

(6th ed. 1990). In advancing money to the debtor or to a third party, the lender is providing a

service to the debtor, which the lender is typically compensated for through interest payments on

the loan.

Furthermore, it is generally accepted that providing loans is a type of financial service,

see, e.g., Freedom Sav. & Loan Asso. v. Way, 757 F.2d 1176, 1183 (11th Cir. 1985); Rapier v.

Capital One Auto Fin., Inc., 2007 U.S. Dist. LEXIS 78582, at *1 (S.D. Ind. 2007); In re Ocwen

Fed. Bank FSB Mortg. Servicing Litig., 2006 U.S. Dist. LEXIS 21715, at *3 (N.D. Ill. 2006);

Midwest Guar. Bank v. Guar. Bank, 270 F. Supp. 2d 900, 906 n.1 (E.D. Mich. 2003); Citigroup

Inc. v. City Holding Co., 2003 U.S. Dist. LEXIS 1845, at **5-6 (S.D.N.Y. 2003) (financial

services offered by Citigroup include providing loans), and there is no reason to infer that the

term services would not encompass the particularized sub-set of services that are referred to as

financial services. Thus, providing a loan is a service within the meaning of the '328 patent.[4]

The analysis cannot stop there, however, because the '328 patent requires that the goods

or services offered by the network vendors "be standard items." '328 Patent col.3 *l*.63.

"Standardization of product or service descriptions . . . avoid[s] confusion," id. col.4 *l*.9-11, and

---

[4] Lending Tree takes issue with what it refers to as Source Search's "about-face" with
regards to the classification of loans first as good and then as services. Source Search's apparent
change in position is of no moment because providing a loan is a service, regardless of how
Source Search chooses to characterize it.

15

ensures that buyers are requesting the same things as what the sellers are offering, id. col.3 *l*.64-65.  Services are standard when they are usual, common or customary and would not cause confusion to an ordinary consumer.  Source Search III, 2007 U.S. Dist. LEXIS 32282, at *28.  A loan is a standard item, regardless of whether it is a traditional mortgage or an auto loan. Furthermore, consumer loans are commonplace in our modern economy, so the service of providing loans would not cause confusion because consumers and vendors would have a shared understanding of what was being requested and provided.  The fact that a potential borrower might have to provide more information, such as use of proceeds, duration, or credit history, in order for a lender to make an offer, does not automatically mean that the service is not standard. See id.  Therefore, the service of providing a loan is a standard service within the meaning of the '328 patent.

(b)  *Network Members:* Lending Tree also argues that it does not infringe the '328 patent because users of its website cannot be considered network members.  Source Search responds, arguing that prospective borrowers are indeed network members because they must complete a detailed form before receiving any loan offers, which is effectively an application for network membership.  In these circumstances, the users of the Lending Tree website qualify as network members.

The '328 patent describes a network member as "anyone or any company which has registered as a user by completing an application."  '328 Patent col.4 *l*.1-2.  A network member can be either a "buyer" or a "vendor" of the goods or services provided.  Id. col.4 *l*.3.  In its Markman opinion, the Court found that "network member" should be defined as it is described by the '328 patent's own specification.  Source Search I, 2006 U.S. Dist. LEXIS 79651 at *45.

16

Thus, in order for prospective borrowers using the Lending Tree website to be considered network members within the meaning the '328 patent, the prospective borrowers must be found to have registered by completing an application.[5]

There are strong indications that users of the Lending Tree website qualify as network members. For instance, prospective borrowers must complete a lengthy form that provides details not only about the type of loan being sought, but also personal information. (See Baker Decl. Ex. A at 3-11.) A prospective borrower must also provide an email address where the borrower can receive messages from Lending Tree with each lender's loan offer and from the lenders directly with the details of the offer. Id. at 6, 19. A prospective borrower must also create a password, id. at 6, although it is unclear from the party's submissions what the password is used for after it has been created. Finally, Lending Tree's terms of use page states that users of the website "agree to be bound by the terms and conditions" found on the web page and that users who do not agree to the terms and conditions should not access the site. (Esteves Decl. Ex. B. at 6.)

Lending Tree, however, argues strenuously against the conclusion that prospective borrowers qualify as network members. Lending Tree states that users of its website are never asked to login. Because users are never required to login, Lending Tree theorizes that they never

---

[5] Although Lending Tree disputes whether prospective borrowers qualify as network members, it does not assert in support of its non-infringement claim that its lenders are not network vendors. Indeed, it would be difficult for Lending Tree to sustain such an assertion as the Lending Tree website invites financial institutions to "join the Lender Network." (Baker Decl. Ex. A at 22.) Prospective lenders use the application form to "identify the type of customers" from whom the lender wants to receive inquiries through the Lending Tree system. Id. Therefore, lenders within Lending Tree's Lender Network are network members within the meaning of the '328 patent.

become members of any network.  In further support of this position, Lending Tree explains that returning users must fill out a completely new application, rather than accessing previously entered information, because the Lending Tree system does not store users' information. Therefore, Lending Tree concludes that users of its system never become network members.

Lending Tree also argues that the form that prospective borrowers must complete is not an application for network membership, but rather a qualification form that begins the process of matching the borrower with a prospective lender.  Lending Tree insists that the application to become a network member must be distinct from the submission of a request for quotation from a network member; otherwise the prospective borrower would not yet be a network member when submitting the RFQ and the language of claims 1-3 would not make sense.  Because the '328 patent envisions a two-step process of registration followed by the RFQ submission, see '328 Patent col.5 *l*.3-5, Lending Tree concludes that its prospective borrowers cannot become network members at the same time that they are submitting the loan request form.

There is no reason why a network member cannot submit a request for quotation at the same time she becomes a network member.  Indeed, the portion of the patent that Lending Tree points to in support of its position is taken from the description of a preferred embodiment, and thus is merely an example, see '328 Patent col.4 *l*.61-65, rather than a limitation of the definition of a network member, see Source Search I, 2006 U.S. Dist LEXIS 79651, at *45.  The defining characteristic of a network member is registration as a user by completion of an application.  The loan qualification form on Lending Tree's website is essentially that application.  Once the application is submitted, the prospective borrowers become network members and are bound by the web site's terms and conditions.  Even if membership is not retained between one loan

18

application and the next, during the time that a loan application is being processed, prospective borrowers are network members within the meaning of the '328 Patent.

(c) *Requests for Quotation:* Finally, Source Search argues that Lending Tree infringes the '328 patent because the Lending Tree website processes requests for quotations. Lending Tree asserts that its users are not submitting requests for quotations, but rather that they are merely submitting a request for loan pre-qualification. This semantic distinction, however, is untenable because a request for quotation is nothing more than "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance," Source Search I, 2006 U.S. Dist. LEXIS 79651, at *26.

The Lending Tree website forthrightly states that consumers are able to "choose from up to four competitive loan offers." In order to receive the loan offers, consumers must complete a "loan request" form. (Baker Decl. Ex. A at 16.) Indeed, what Lending Tree refers to as a qualification form in its papers, is frequently referred to as a loan request form on the Lending Tree website. Furthermore, the Lending Tree website advises consumers that Lending Tree will notify them with the details of each lender's offer and that they are under no obligation to accept the offers that are sent to them by Lending Tree. Even though the website advises prospective borrowers that they may be obligated to supply the lenders with additional information, nothing suggests that the loan requests are anything other than the prospective borrowers' requests for a loan offer that is capable of being accepted—and, indeed, loan offers are exactly what the borrowers receive from Lending Tree. Thus, it is quite plain that the Lending Tree website processes requests for quotation within the meaning of the '328 patent.

(d) *A Finding of Infringement:* In order for a court to find that a product or system

19

infringes the claims of a patent, the court must determine that every aspect of the claim is found, either literally or equivalently, in the accused product or system. In this case, claim 1 of the '328 patent describes a computerized system that forms a computer-based communications network that is used to exchange RFQs for goods or services between the network members of buyers and vendors. The computer system must have at least one central processing unit, which is located remotely from the network members, must be able to facilitate the communication and exchange of RFQs electronically, filter information in order to match buyers and vendors based on filter conditions set by either the buyer or the central processing unit, and respond to the network member who sent the RFQ with either quotations or a list of vendors for the buyer to contact.

There is no question that the Lending Tree website is a computerized system that facilitates the exchange of RFQs between prospective borrowers and lenders through a central processing unit that employs filters to match borrowers and lenders. Also, the Court has concluded that providing a loan is a standard service and that prospective borrowers become network members once their loan applications have been submitted. Thus, all of the aspects of claim 1 are found in the Lending Tree website, and therefore, the website infringes claim 1 of the patent.

Similarly, the Lending Tree website infringes claim 2 of the '328 patent. Claim 2 is a dependent claim to claim 1. It incorporates all of claim 1 and adds that the communications network, over which the network members and the central processing unit communicate, is the internet. The Lending Tree website uses the internet as the communication means between network members and the central processing unit. Therefore, because all of the aspects of claim 2 are found in the Lending Tree website, it also infringes claim 2 of the patent.

Finally, claim 3 describes the method for processing RFQs for goods or services through a central processing unit where the buyer's RFQ is received in the central processing unit over a communication network, then sent to vendors who are selected based on filter conditions over the same communication network.  The selected vendors then send their quotations either directly to the requesting buyer or back to the central processing, which then forwards the quotation to the buyer.  Again, there is no question that the process a prospective borrower goes through on the Lending Tree website when seeking loan offers mirrors the process described by claim 3 of the '328 patent.  Indeed, Lending Tree barely seems to contest the fact that its method for matching prospective borrowers with lenders follows exactly the steps laid out in claim 3.  Therefore, because all of the aspects of claim 3 are found in the Lending Tree website, the website infringes claim 3 of the '328 patent.

**(3) Claims 12, 13 and 14:** Although Source Search's motion does not seek specifically a summary judgment of infringement of claim 12, Lending Tree's motion addresses that claim, and it relates closely to the infringement issues involving claims 13 and 14.  Source Search contends that Lending Tree literally infringes claims 12, 13 and 14 of the '328 patent[6] because the

---

[6] Claim 12 describes the patent as:
> A method of purchasing goods or services over a data network comprising the steps of:
>> communicating, over said network, to a filter means, at least one request for quotation from a potential buyer of said goods or services;
>> filtering, at said filter means, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services; and
>> obtaining, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a

preamble does not limit claim 12 and because the Lending Tree website facilitates the distribution of quotations for services. In response, Lending Tree argues that the preamble to claim 12 is a necessary limitation on the claim and that when the preamble is read as a part of claim 12, and also the dependent claims 13 and 14, its website cannot be found to be infringing. The Court, however, finds that the preamble does not act as a limitation on claim 12 and therefore, because there are no other elements in dispute, that the Lending Tree website infringes claims 12, 13 and 14 of the '328 patent.

(a) *Preamble to Claim 12:* As an initial matter, it must be determined whether the preamble to claim 12 acts as a limitation on the claim. Source Search argues that since the preamble language merely describes the intended use for the claimed method, and was not intended to distinguish claim 12 from the prior art, the preamble does not limit claim 12. Lending Tree, however, contends that the word "purchasing" in the phrase "a method for purchasing good or services" imposes a limitation on claim 12 because it sets forth an essential purpose of the claimed method.

The issue of whether a term that appears in the preamble of a claim creates a separate

---

location remote from said filter means.

'328 Patent col.9 *l.*45-col.10 *l.*8.

Claim 13 adds:

> The method of claim 12 further comprising that step of accepting filtering conditions from said potential buyer, and utilizing said filter conditions in said step of filtering to determine a subset of potentially capable sellers.

Id. col.10 *l.*9-12.

Claim 14 adds:

> The method of claim 13 wherein said set is limited by said filter conditions and by a predetermined maximum number from which a bid is to be received.

Id. col.10 *l.*12-14.

limitation was recently addressed by the Court of Appeals for the Federal Circuit.  In concluding

that a preamble generally serves to give context to the claim that is being described without

creating any additional limitations, the Federal Circuit stated:

> In general, a preamble is construed as a limitation "if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." <u>Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d 801, 808 (Fed. Cir. 2002) . . .  A preamble is not limiting, however, "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." <u>Id.</u>
> . . .
> Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble "generally is not limiting." <u>Id.</u> at 809.  Thus, in general, the purpose of a claim preamble is to give context for what is being described in the body of the claim; if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation.

<u>Symantec Corp. v. Computer Assocs. Int'l, Inc.</u>, 522 F.3d 1279, 1288-1289 (Fed. Cir. 2008).

Similarly, the Federal Circuit has stated that when considering whether a preamble limits a claim,

the preamble must be "analyzed to ascertain whether it states a necessary and defining aspect of

the invention, or is simply an introduction to the general field of the claim." <u>Computer Docking

Station Corp. v. Dell, Inc.</u>, 519 F.3d 1366, 1375 (Fed. Cir. 2008).  A preamble states a necessary

and defining aspect of an invention, and is therefore considered to be limiting, when it gives life,

meaning, and vitality to the claim.  <u>See</u> <u>Pitney Bowes, Inc. v. Hewlett-Packard Co.</u>, 182 F.3d

1298, 1305 (Fed. Cir. 1999).

  In this case, the additional verbiage in the preamble to claim 12 adds nothing to the

meaning of the claim. The essential steps of the method described in claim 12, namely the filtering of RFQs, ascertaining a potential set of vendors, obtaining quotes to supply goods and services, and the forwarding of quotes to the potential buyers, are described in the body of the claim. Indeed, the same method would be described if the preamble only read: "A method comprising the steps of" because the words "of purchasing goods or services over a data network" do not describe anything that is not also described in the body of the claim. Therefore, the preamble to claim 12 does not provide any necessary or defining characteristic of the claim and it will not be read as a limitation on the claim.

(b) *Quotes for Goods or Services:* The body of claim 12 states that the system obtains quotes to supply goods and services. In the <u>Markman</u> opinion, the Court defined a quote as the terms of a particular transaction, including price, "in sufficient detail to constitute an offer capable of acceptance." <u>Source Search I</u>, 2006 U.S. Dist. LEXIS, at *25. Thus, under claim 12, a quote is essentially an offer to supply goods or services.

Lending Tree appears to have backed away from the argument that its website does not obtain quotes to supply services and forward them to its users. This was prudent because it would be difficult for Lending Tree to maintain in this action that the responses sent to its users were not quotes when quotes are essentially offers and the Lending Tree website advertises that users can get up to four customized loan offers. Therefore, there is no question that the Lending Tree website obtains quotes to supply goods and services which are forwarded to its users.

(c) *A Finding of Infringement:* Lending Tree argues that it cannot infringe claims 12, 13 or 14 because the preamble to claim 12 limits that claim, and that limitation is incorporated into the dependent claims 13 and 14. Because, according to Lending Tree, its

24

website does not allow potential buyers to purchase goods and services over a data network, Lending Tree concludes that it cannot infringe claims 12, 13 or 14 of the '328 patent. However, it has already been determined that the preamble to claim 12 does not create a limitation on the claim; therefore the essential elements of the claim are contained within the body of claim 12.

Claim 12 describes a method wherein an RFQ is sent over a data network to a filter means, the RFQ is then filtered in order to ascertain a set of potential sellers, and a quote is obtained from the sellers and then forwarded to the requesting party. Given the Court's previous conclusions, there is no question that the Lending Tree website infringes claim 12 of the '328 patent. The website processes RFQs over the internet, applies a filter to match prospective borrowers with potential lenders, and then forwards the loan offers from the potential lenders to the requesting borrowers.

The Lending Tree website also infringes claim 13 of the '328 patent. Claim 13 adds to claim 12 the requirement that the system accept filtering conditions from the buyers, which are then used to determine a subset of potential sellers. Lending Tree has not disputed that it collects information from its prospective borrowers to use as filter conditions when selecting which lenders will be asked to provide loan offers.

Finally, the Lending Tree website infringes claim 14 of the '328 patent. Claim 14 adds to claim 13 the requirement that the set of sellers is limited by the filter conditions and capped at a predetermined maximum, which prescribes the number of offers that the buyer would like to receive. Again, Lending Tree has not disputed that it caps the number of offers that it will send to the users of its website. Indeed, the website states that users will receive up to four loan offers. Therefore, because there is no dispute as to the existence of the aspects of the '328 patent

25

in the Lending Tree website, no issues of fact exist and summary judgment in favor of Source

Search on the issue of infringement is appropriate.

## B.  Indefiniteness Motions

Defendants have moved for an order of summary judgment of invalidity for

indefiniteness.  Source Search has cross moved for summary judgment in its favor on the issue of

indefiniteness.

The Patent Act requires the applicant to "particularly point[] out and distinctly claim[] the

subject matter which [he or she] regards as [the] invention."  35 U.S.C. §112.  The §112

definiteness requirement focuses on whether the claims "adequately perform their function of

notifying the public of the [scope of the] patentee's right to exclude."  Honeywell Int'l, Inc. v.

Int'l Trade Comm'n, 341 F.3d 1332, 1338 (Fed. Cir. 2003).  A patent is indefinite and thus

invalid if it fails to distinguished what is claimed from what falls outside the claims.  Datamize

LLC v. Plumtree Software Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).  A plaintiff must be able

to show that the language of a claim is sufficiently definite to put one skilled in the art on notice

of what has been patented.  If the claim fails to "clearly circumscribe what is foreclosed from

future enterprise," then the patent is void.  Id.

Defendants note that in its May 2, 2007 Opinion the Court concluded "that 'goods and

services' [as used in the '328 patent claims] is construed to mean standard articles of trade and

performance of work for another."  In the context of Source Search's motion for summary

judgment of infringement by Service Magic, the Court accepted Source Search's definition of

"standard" as goods and services that are "usual, common, or customary" or "normal, familiar, or

usual . . . commonly used or supplied."  Accepting this definition of "standard," the Court found

that the services offered on the Service Magic website fell within the scope of the '328 patent claims.

It is Defendants' contention that having prevailed upon the Court to adopt this broad construction of "goods and services," Source Search "has introduced an unavoidably subjective element into the '328 claims that makes it impossible to know where the dividing line is between what is claimed and what remains in the public domain.  As a matter of law, such claims are invalid as indefinite."  (Def. Indefiniteness Mem., docket no. 192, at 3.)  Defendants argue that it is impossible to determine what is well known, common or familiar, or to whom or what group must a product be well known, common or familiar.  New products may come into existence after the issuance of the '328 patent, and it is a question whether they would be "standard" goods or services within the meaning of the patent claims.  Defendants point to the specialty item, the type J resistor, which is hardly a well known, common or familiar item; yet the disclosure of preferred types of goods and services in the '328 patent includes specialty items like the type J resistor.

Subjective claim terms have been held to fail to provide adequate direction as to what is and what is not within the bounds of the patent.  Because such terms "would not notify the public of the patentee's right to exclude," claims containing subjective language are indefinite. Datamize, 417 F.3d at 1347; STX, Inc. v. Brine, Inc., 37 F. Supp. 2d 740 (D. Md. 1999), aff'd, 211 F.3d 588 (Fed. Cir. 2000).

In Datamize, the Federal Circuit held that the term "aesthetically pleasing" was too subjective to provide any guidance as to the outer bounds of the claims.  417 F.3d at 1350. Instead, the Federal Circuit held that claim language cannot depend "solely on the unrestrained

27

subjective opinion of a particular individual purportedly practicing the invention." Id.  If this were so, then the meaning of the claim term would impermissibly depend on "the unpredictable vagaries of . . . one person's opinion of . . . aesthetics." Id.

According to Defendants, "standard goods and services" has been construed to include a purely subjective element—goods and services that are "usual, common, or customary . . . normal, familiar, or usual . . . commonly used or supplied."  Thus, Defendants contend, like the words "aesthetically pleasing"—they have no fixed meaning and therefore make it impossible to determine what is covered by the '328 patent claims and what is not, rendering the claims of the '328 patent indefinite.

Source Search opposes Defendants' motion for summary judgment and supports its cross motion for summary judgment on the indefiniteness issue on two grounds: (i) Defendants have waived this particular indefiniteness defense, having failed to raise it three years ago at the outset of the case or at any time thereafter until they filed their summary judgment brief in March, 2007, and (ii) Defendants are wrong on the merits.

In order to address the waiver issue, it is necessary to review the manner in which the Court and the parties, have dealt, in the litigation of this case, with the use of the words "goods and services" as employed in the claims of the '328 patent.  This has been a checkered history. At the outset, Source Search contended that those words could stand by themselves and needed no further definition.  In its October 16, 2006, Markman opinion the court stated:

> Defendants construe "goods and services" as "standardized articles of trade and performance of work for another."  They rely upon the following language in the specification for support:
>
> There is no central pricing database to limit the

> number of buyers and vendors of goods and services which can be processed. <u>However the goods and services must be standard items</u> to ensure that there is no confusion as to what buyers are requesting and what sellers are offering buyers.
>
> '328 Patent, col.3 *l*.60-65 (emphasis added).  Source Search has not objected to Defendants' contention, and therefore it will be accepted.

<u>Source Search I</u>, 2006 U.S. Dist. LEXIS 79651, at **45-46.

The Court was in error as to Source Search's failure to object to Defendants' proposed definition of "goods and services," and Source Search moved for reconsideration of the <u>Markman</u> ruling on that point.  The Court, recognizing its error, granted the rehearing.  In a November 13, 2006, Opinion it addressed Source Search's position that goods and services needed no construction and that "the '328 patent merely stated that in order to ensure that there was no confusion about what is being requested by a buyer, either the descriptions of the products had to be standardized, or the products had to be described with text to be clear."  (Pl.'s <u>Markman</u> Reply Br., docket no. 59, at 45).  Analyzing the contentions of both parties, the Court adhered to its original position, finding that use of the word "must" required that the claim term "goods and services" incorporates "standardized" goods and services.

It should be noted that the Court and the parties in the opinions and briefs used the words "standard" and "standardized" interchangeably, treating them as synonymous.  Both terms are used throughout the specification, but the word "standard" is used in the critical sentence of the '328 patent: "However, the goods and services must be <u>standard</u> items to ensure that there is no confusion as to what buyers are requesting and what sellers are offering to buyers."  '328 Patent, col.3 *l*.63-65 (emphasis added).

29

The interchangeable use of "standard" and "standardization" became an issue during Source Search's and Service Magic's cross-motions for summary judgment on the issue of infringement. Service Magic argued that home projects for which it provided contractor referrals were not standardized and not amenable to standardization because the scope, nature, and cost of any given home project depends upon numerous factors, including the layout and condition of the home, the subjective preferences of the homeowner, the type and quality of the materials to be used on the project and the complexity of the work to be done.

Source Search contended, correctly, that in its November 13, 2006, opinion the Court inadvertently used the word "standardized instead of "standard." As a result, in its May 2, 2007 opinion denying Service Magic's motion for summary judgment of non-infringement and granting Source Search's motion for summary judgment of infringement, the Court modified its November 13, 2006, opinion, seeking to use the word "standard" where appropriate and the word "standardized" where appropriate. Critically, the November 13, 2006 opinion, as revised, concluded "that the 'goods and services' is construed to mean <u>standard</u> articles of trade and performances of work for another."

In this context, Source Search offered a number of criteria to determine whether particular goods or services are standard. As stated in the May 2, 2007, opinion: "Here, [Source Search] offers several definitions of 'standard' and ultimately argues that standard means 'usual, common or customary' . . . or 'normal, familiar or usual . . . commonly used or supplied.' . . . As [Service Magic] has not offered a different definition, the court adopts [Source Search's] definition." <u>Source Search III,</u> 2007 U.S. Dist. LEXIS 32282, at *28.

Through this extended process the court and the parties have arrived at the conclusion

that the claim term "goods and services" is limited by the specification term "standard" and that the term "standard" is defined to mean "usual, common, or customary" or "normal, familiar or usual . . . commonly used or supplied."

Source Search contends that Defendants waived the indefiniteness defense, having failed to raise it until the briefing of the pending motions. Throughout the course of these proceedings Defendants failed to challenge "standard" on indefiniteness grounds, although they contended that other claim terms were indefinite. In its March 20, 2007, summary judgment brief, Source Search provided its definition of "standard," which resulted in the finding of Service Magic's infringement of the '328 patent. Defendants offered no opposition to this definition, nor did they content that it was indefinite. When Defendants applied for reconsideration for leave to submit briefing on the word "standard," the Court denied the application because Defendants "did not submit evidence to the court that was available to them." Source Search Techs., LLC v. Lending Tree, LLC, 2007 U.S. Dist. LEXIS 43128, at *7 (D.N.J. Jun. 14, 2007).

Nor did Defendants advise Source Search that it intended to raise an indefiniteness defense during the period between the Court's May 2, 2007, summary judgment opinion and October or November, 2007, when Defendants began preparing their present motion papers. Source Search contends that it has been prejudiced by the failure to raise the indefiniteness defense because it relinquished several arguments it could have made in the proceedings leading to the May 2, 2007, summary judgment opinion and it could have had its experts address the issue, noting that Defendants' six other indefiniteness defenses to the '328 claims were all supported with their expert testimony, testimony which Source Search rebutted with its own expert testimony. These circumstances, however, do not rise to the level of a waiver.

31

Defendants raised the defense of indefiniteness in general terms at the beginning of the case and in their answer and counterclaim responsive to Source Search's First Amended Complaint. Source Search did not advance its specific definition of "standard" until the summary judgment motion and cross motion directed to Service Magic's infringement of the '328 patent. The Court did not arrive at Source Search's proffered definition until it issued its May 2, 2007, opinion. Defendants were not in a position to challenge this definition until then, and the pending motions for summary judgment provided an appropriate occasion to raise the challenge. Source Search is not prejudiced in any way. It has had ample opportunity to address the defense and has suggested nothing that an expert witness could contribute to the debate or any legal arguments that it has not already raised. Source Search's waiver contention lacks merit.

On the merits of the indefiniteness issue Source Search must prevail. Throughout the claims of the '328 patent, the terms "goods and/or services" and "goods and services" are frequently used. The Court has held on the basis of language from the specification that the word "standard" must be read into the claim language and, further, that "standard" means "usual, common, or customary" or "normal, familiar or usual . . . commonly used or supplied." See Source Search III, 2007 U.S. Dist. LEXIS 32282.

A patent is presumed valid, as are the individual claims of a patent. 35 U.S.C. § 282. The party claiming invalidity bears "the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1364 (Fed. Cir. 1998). Addressing validity upon the application of §112, indefiniteness is a question of law to be determined by the court. Intel Corp. v. VIA Tech., Inc., 319 F.3d 1357, 1365 (Fed. Cir. 2003). The standard for indefiniteness is whether "one skilled in the art would

understand the bounds of the claim when read in light of the specification." Exxon Research &

Engineering Co. v. U.S. 265 F.3d 1371, 1375 (Fed. Cir. 2001). The skill of the art is that which

prevails at the time of the patent's application. Middleton, Inc. v. Minnesota Mining & Mfg.

Co., 311 F.3d 1384, 1389 (Fed. Cir. 2002).

    The test for indefiniteness does not depend on a potential infringer's ability to ascertain

the nature of its own accused product to determine infringement, but instead on whether the

claim delineates to a skilled artisan the bounds of the invention. SmithKline Beecham Corp. v.

Apotex Corp., 403 F. 3d 1331, 1341 (Fed. Cir. 2005).

    When a court construes a claim's terms, it starts with the language of the claim itself and

considers that language in light of the specification and the prosecution history. "The ordinary

and customary meaning of a claim term is the meaning that the term would have to a person of

ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415

F.3d 1303, 1313 (Fed. Cir. 2005). The person of ordinary skill in the art is "deemed to read the

claim terms not only in the context of the particular claim . . . but in the context of the entire

patent, including the specification." Id. "The words in the claim may also be interpreted in light

of the prosecution history, if in evidence." Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d

1313, 1324-25 (Fed. Cir. 2002) (citations omitted). "Such intrinsic evidence is the most

significant source of the legally operative meaning of disrupted claim language." Vistronics

Corp. v. Conceptronics, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

    Before engaging in this inquiry, it should be noted that the claim language "goods and

services" has been subjected to a double embellishment. It has been construed to incorporate the

word "standard" from the specification, and "standard" has been defined by the Court to mean

33

"normal, familiar or customary."  Only the word "standard" has been made a part of the claim language.  The further definition of "standard" is not a part of the claim language.

In <u>Minnesota Mining & Manufacturing Co. v. Johnson & Johnson Orthopaedics, Inc.</u>, 976 F.2d 1559 (Fed. Cir. 1992), the Special Master in her opinion used the word "slippery" when referring to the claim terms "lubricant" and "pre-lubricated resin coated sheet."  The Federal Circuit held that the word "slippery" did not render the claim terms indefinite: "However, JJO's argument is improperly framed in its use of the term "slippery" because the term is not used in the claims.  The claims only require lubrication.  The term "slippery" was used by the master to define and explain what was meant by the term "lubricant."  <u>Id.</u> at 1567

Relying on this case, a district court, deciding whether the words "one or more clicks" and "short period of time" rendered the claim term "single action of a user input device" indefinite, stated: "the phrases, 'one or more clicks' and 'short period of time,' do not render the term indefinite.  These phrases are not part of the claim language, and thus, to the extent defendants argue that the claim term is indefinite based on those phrases, their argument is improper."  <u>Trading Techs. Int'l, Inc. v. eSpeed, Inc.</u>, 2008 U.S. Dist. LEXIS 292, at *6 (N.D. Ill. Jan. 2, 2008).

The words "usual, common, or customary" and similar words were not used in the claims of the '328 patent; nor were they used in the specification.  The cautionary language of the <u>Minnesota Mining & Manufacturing</u> and <u>Trading Technologies</u> cases appears to be particularly appropriate in the present case.  The Federal Circuit has warned of the "danger of reading limitations from the specification into the claim."  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1323 (Fed. Cir. 2005).  The danger is magnified when, as Defendants seek here, the court reads an

34

interpretation of a limitation from the specification into the claim.

An imprecise claim limitation does not impart invalidity to the claims as long as, read in the light of the specification, it reasonably apprises those skilled in the art and is as precise as the subject matter permits.  Andrew Corp. v. Gabriel Electronics, Inc., 847 F.3d 819, 821-22 (Fed. Cir. 1988).

Putting aside the question whether "usual, common, or customary" should be construed as incorporated in the language of the claim—"goods and services"—the Court will address Defendants' contention that "usual, common, or customary" injects a totally subjective element into the claims.  Defendants state: "Because different groups of buyers will be familiar with different goods and services, the scope of the '328 claims changes, depending on who is asked. The '328 patent provides no guidance regarding the buyers who must be 'familiar' with a good or service, and thereby, fails to disclose what is encompassed by the '328 claims and what remains in the public domain."  (Def. Indefiniteness Reply Mem., docket no. 226, at 6.)  Defendants continue: "But by construing 'standard' this way in order to support its infringement contentions, Source Search introduced an inherently subjective element into the '328 claims because different buyers will consider different goods and services to be 'familiar, common, or usual.'"  Id. at 25.

The claim language, without more, is clearly unambiguous.  The terms "goods and services" and "goods and/or services" and are well known and understood.  The addition of the modifying word "standard" from the specification introduces a limiting element that must be construed.

The extent and nature of the limitation can be ascertained from the specification, and, contrary to Defendants' contentions, the limitation is an objective one and does not depend upon

subjective criteria.   "The invention relates generally to a computerized system forming a computer based communications network of buyer and vendor members for processing requests for quotation for goods and/or services from network members or their representatives and for linking buyers to sellers through the computer based communications network of network members having means for selectively controlling the linkage between network members in accordance with filter conditions of the buyers and/or sellers as well as filter conditions established by the computerized system."  '328 Patent, col.1 *l*.4-14.

Potentially, the universe of goods and services can fall within the scope of the claims. There are no limitations in the diagrams, see '328 Patent, fig.1-fig.8, and they use different kinds of products as examples.  Figure 2A recites that "The Buyer Next Selects a Product Type, e.g.: Computer Products, Appliances, Electronic Parts and Components, Et Cetera."  Figure 8, illustrating a price quotation, calls for: "Prod. Type No.: 12432, Prod. Category: Resistors, Product Name: Type J Resistor 5%, Product Number: OH006-200656, Product Manufacturer: OHMITE."  '328 Patent, fig.8.

The specification states that "[t]he prior art describes computerized shopping systems which employ some kind of central database of goods and services offered to buyers."  '328 Patent, col.1 *l*.43-45.  In the past "[b]uyers in need of goods and services often spend considerable time locating an appropriate vendor.  Buyers use trade publications, directories, recommendations, and other means to locate vendors."  Id. at col.1 *l*.27-30.

To function effectively the system claimed in the '328 patent requires that the buyer submit requests for quotations for "standard goods and services."  They must be standard at the time the request for quotation is submitted; they are not frozen to products or services that were

36

"standard" at the time the patent application was filed.

> Instead, buyers formulate requests for quotations and transmit them to the computerized network which broadcasts the request for quotation of one or more specified standard products to prospective sellers based on filter conditions set by the buyer and/or the seller and/or the network operator.

'328 Patent, col.2 *l.*42-47 (emphasis added).

> There is no central database to limit the number of goods and services which can be processed.  However, the goods and services must be standard items to ensure that there is no confusion as to what sellers are offering to buyers.  Fig. 1 shows the system of this invention as configured using the internet as the communications network

Id. at col.3 *l.*60-68 (emphasis added).

> [Programming] would include information sufficient for network members to identify standard goods or services that they wish to identify in a request for a quotation.  Standardization of product or service descriptions is essential to avoid confusion unless a more text oriented specification is appropriate to the product or service type. To this end programmed menu information is provided to classify product and services in categories broken down by functional class and subclass corresponding to the products as they are commercially known and identified.  Such means are readily upgraded to include new and revised commercially available products and services from the manufacturers or suppliers of such products and services.  Buyers would use this information to prepare requests for quotation which will then be clearly understood by vendors.

Id. at col.4 *l.*8-21 (emphasis added).

It is Defendants' position that when "standard" is construed to mean "usual, common, or customary" or "normal, familiar, or usual . . . commonly used or supplied"' it is hopelessly subjective because what is "usual, common, or customary" to one person may not be to another, and the patent provides no guidance as to how to determine what is "usual, common, or customary."  Defendants point to the embodiment referred to in the specification, type J resistors,

37

and to a request for a search for foreign patent applications as examples of a product and a service which most people never heard of and could hardly be considered "usual, common, or customary" to the public at large.

Defendants rely heavily upon <u>Datamize</u>, which involved a patent disclosing a software program that allowed a person to author user interfaces for electronic kiosks. Claim 1 of the patent defined a method comprising steps including "providing a plurality of predefined interface screen element types . . . wherein each said element type permits limited variation in its on-screen characteristics in conformity with a desired uniform and <u>aesthetically pleasing</u> look and feel for said interface screens on all kiosks of said kiosk system." 417 F.3d at 1348 (emphasis added). The words "aesthetically pleasing" were used two other times in Claim 1.

The district court began its analysis of the definiteness of "aesthetically pleasing" by referring to dictionary meanings, determining that the ordinary and customary meaning of the phrase is "having beauty that gives pleasure or enjoyment" or "beautiful." The court found "beautiful" to be subjective and, finding no further definition in the specification or the prosecution history, and rejecting expert testimony, granted summary judgment of invalidity for indefiniteness. The Federal Circuit, conducting its own analysis, agreed with the district court's definition of "aesthetically pleasing" and with its conclusion that the words were indefinite, stating:

> . . . Datamize has offered no objective definition identifying a standard for determining when an interface screen is "aesthetically pleasing." In the absence of a workable objective standard, "aesthetically pleasing" does not just include a subjective element, it is completely dependent on a person's subjective opinion . . . . The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing

38

the invention.

417 F.3d at 1350.

Datamize itself cautions that care must be taken not to reject a patent as lacking specificity too freely. "The definiteness requirement, however, does not compel absolute clarity. Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite," 417 F.3d at 1347. "Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning. Furthermore, a difficult issue of claim construction does not ipso facto result in a holding of indefiniteness." Id. "By finding claims indefinite only if reasonable efforts at claim construction prove futile," respect is accorded "to the statutory presumption of validity and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." Id. at 1347-48.

When the language of the specification of the '328 patent is examined in its entirety, the words "standard" and "usual, common or customary" are not subjective. They have objective content. In the first place, contrary to Defendants' contention, the goods or the services with respect to which an infringement claim is made need not be "usual, common or customary" to the public at large. They need only be "usual, common or customary" to the particular category of buyer and seller using the system, who are part of the network in which a request for a quotation is being made. This is apparent from the diverse examples referred to in the specification: computer products, appliances, electronics parts and components, type J resistors, et cetera. The prior art referred to in the specification includes in general computerized shopping systems and databases of goods and services without limitation.

Similarly, if instant recognition or common sense did not enable a person skilled in the art

to recognize a particular good or service as standard, that is, usual, common or customary in the field subject to a violation claim, the specification suggests how the prior art enabled any person, let alone one skilled in the art, to recognize the nature of a good or a service—by references to trade publications, directories or other means.

There might be situations where it would be difficult for a person skilled in the art to determine whether a particular good or service was so unusual or unique that it could not be found to be standard.  The determination by the person of skill in the art, however, would be on the basis of objective observations, not his subjective feelings.  Thus <u>Datamize</u> does not require a finding of indefiniteness.

In <u>Andrew Corp. v. Gabriel Electronics, Inc.</u>, 847 F.2d 819 (Fed. Cir. 1988), the Federal Circuit reversed a district court that had held that the claim terms "approach each other," "close to," "substantially equal," and "closely approximate" were too vague to satisfy § 112's requirements.  It noted that "[i]f the claims read in the light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more."  <u>Id.</u> at 822.

In <u>Talecris v. Biotherapeutics, Inc. v. Baxter International Inc.</u>, 510 F. Supp. 2d 356 (D. Del. 2007), the claim language in issue was "<u>acceptable</u> level suitable for intravenous administration."  <u>Id.</u> at 359.  In rejecting an indefiniteness defense, the court noted that whether such "acceptability" limitation was met was "dependent upon a number of variables, which may include . . . the individual characteristics of the patent."  <u>Id.</u> at 360.  The court held that those of skill in the art would know, for a particular patent, what would be within acceptable limits, and thus, what would meet the claim language.  <u>Id.</u> at 361, <u>see</u> <u>also</u>, <u>Young v. Lumenis, Inc.</u>, 492 F.3d

40

1336 (Fed. Cir. 2007) ("near," describing a location on an animal, not indefinite, although the location of the cut will vary from animal to animal by virtue of the animal's size).

It is evident from reading the specification of the '328 patent to what public the term "standard" applies.  It is the membership of a particular network.  Thus if an engineering product was the good in which the network membership was interested, engineers are the public among whom the product must be normal, familiar or usual.  The population among whom the items must be well known to be considered standard is the population to whom the system operator will offer network membership—not the general public.

An examination of the '328 patent confirms this conclusion.  The word "standard" does not appear in the claims; it is incorporated in the claims by the mandatory language of the specification: ". . . the goods and services must be standard items . . . ."

The specification itself demonstrates that "standard" cannot mean goods and services familiar to the general public and must mean familiar to the interested network membership.  Otherwise it would not have included a type J resistor as a preferred embodiment.  A type J resistor is not familiar to the general public, but it would be familiar to the electrical engineers who use such a device and would be the network membership.

Fuji Photo Film v. ITC, 386 F. 3d 1095 (Fed. Cir. 2004) involved whether a step of a claimed film loading and assembly had to be performed in the dark.  The specification provided: "[F]ilm loading and film package assembly has to be done in the dark room."  Id. at 1105 (emphasis added).  The Federal Circuit reversed the lower court for improperly limiting the claims.  Because the patent explicitly disclosed an embodiment that did not require dark room loading, this "context ma[de] it clear that the statement [that film loading has to be done in the

41

dark] refers to a preferred embodiment of the invention, not to the invention as a whole."  Id.

Source Search suggests that Fuji supports its position that the claim language "goods and services" should not be limited by the specification language "standard," eliminating altogether the "normal, familiar, or customary" issue.  Source Search's position on that subject has already been rejected.  However, Fuji might be interpreted as supporting Source Search's contention that "goods and services" should not be further limited by the "normal, familiar, or customary" language.

As noted above, it is unnecessary to decide that question.  The word "standard" as used in the specification can only mean "normal, familiar, or customary," not to the world at large, but only to a member of a particular network.  As so limited none of the uncertainties posed by the Defendants would arise, and a person skilled in the art would understand the bounds of the claims.

For these reasons, Defendants' motion for summary judgment of invalidity for indefiniteness will be denied and Source Search's cross motion for summary judgment that the claim term "goods and services" is not invalid on grounds of indefiniteness is granted.

## C. Obviousness Motions

**(1) General Principles:** Having concluded that the '328 Patent is sufficiently definite, the Court will now consider whether the patent is invalid due to obviousness.  As a general rule, a patent may not be issued "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  However, once a patent has been obtained, it is presumed to be

42

valid.  35 U.S.C. § 282.[7]  The burden is on the party challenging the patent to show by clear and convincing evidence that the patent's claims are obvious.  Pharmastem Therapeutics, Inc. v. Viacell, Inc., 491 F.3d 1342, 1360 (Fed. Cir. 2007).

Defendants have asserted obviousness as an affirmative defense against Source Search's claims of patent infringement and have moved for summary judgment on the grounds that the claims of the '328 Patent are obvious and therefore invalid.  For its part, Source Search has moved for summary judgment on the grounds that the '328 Patent is not obvious.  Whether a patent should be deemed to be obvious is based on the statutory language of 35 U.S.C. § 103(a).

The Supreme Court, in Graham v. John Deere Co. of Kansas City, 383 U.S. 1 (1966), set out the framework for applying the statutory language of § 103(a).  The analysis is objective and requires a court to determine (1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue, and (3) the level of ordinary skill of a person in the relevant art.  Graham, 383 U.S. at 17-18.  Secondary considerations, such as the commercial success of the invention, a long felt but unsolved need, and the failure of others, can be "utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."  Id. Against the background of these considerations, the court assesses the obviousness of the claims at issue.  Id.  Once this analysis has been conducted, if the court "concludes the claimed subject matter was obvious, the claim is invalid under § 103."  KSR Int'l Co. v. Teleflex Inc., 550 U.S. ___, 127 S. Ct. 1727, 1734 (2007).

The Graham factors "continue to define" an obviousness inquiry.  KSR, 127 S. Ct. at

---

[7] "The presumption of validity is based on the presumption of administrative correctness of actions of the agency charged with examination of patentability."  Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1569 (Fed. Cir. 1996).

1734.  The Supreme Court affirmed this principle in KSR, rejecting the "rigid" application of the

teaching, suggestion, or method test ("TSM test"), 127 S. Ct. at 1739, which the Federal Circuit

had applied for the purpose of assessing obviousness.  Under the TSM test, a patent claim "is

only proved obvious 'if some motivation or suggestion to combine the prior art teachings'

[could] be found in the prior art, the nature of the problem, or the knowledge of a person having

ordinary skill in the art."  Id. at 1734.  The Court found that a rigid or formalistic application of

the TSM test was inconsistent with the case law on obviousness, which had set forth an

expansive, flexible, and functional approach to the question of obviousness.  Id. at 1739.

However, the Court did not reject the TSM test on principle.  Indeed, it found that there was "no

necessary inconsistency between the idea underlying the TSM test and the Graham analysis."  Id.

at 1741.  Rather, the Court merely rejected the Federal Circuit's "narrow conception of the

obviousness inquiry," which was reflected in its application of the TSM test.  Id. at 1741.  The

Court found that the narrowness of the Federal Circuit's inquiry denied recourse to the use of

common sense when assessing the obviousness of a patent that combined elements from the prior

art.  Id. at 1742-43.

      **(2) Scope and Content of the Prior Art:**  The first Graham factor requires a court to

consider "the scope and content of the prior art."  Graham, 383 U.S. at 17.  What constitutes

"prior art" is "frequently couched in terms of whether the art is analogous or not" to the subject

matter of the patent.  In re Clay, 966 F.2d 656, 658 (Fed. Cir. 1992).  Analogous art is either from

"the field of the applicant's endeavor" or some reference that "is reasonably pertinent to the

problem with which the inventor was concerned."  In re Kahn, 441 F.3d 977, 987 (Fed. Cir.

2006).  "A reference is reasonably pertinent if, even though it may be in a different field from

that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem."  In re Icon Health & Fitness, Inc., 496 F.3d 1374, 1379-1380 (Fed. Cir. 2007) (citing In re Clay, 966 F.2d 656, 659 (Fed. Cir. 1992)).  Thus, prior art includes references from the art in question, as well as references that a person with ordinary skill in the art would be expected to examine in finding a solution to the particular problem.

(a) "Brick and Mortar" Referral Services: The parties agree that the field of endeavor for the '328 Patent is computerized network technology and that the IQuest and FAST systems are two prior art references within the field of endeavor.  The parties disagree, however, on whether "brick and mortar" referral services constitute analogous prior art.  Defendants argue that "brick and mortar" referral services, such as home contractor networks and social services networks, should be considered analogous art because those services used exactly the same flow of information described in the claims of the '328 Patent to match vendors and buyers and because the '328 Patent explains how the claimed system is built on the "brick and mortar" art that came before it.  Thus, Defendants assert that it would have been logical for a person of ordinary skill in the art to have looked to the "brick and mortar" referral systems when designing an e-commerce system for a competitive marketplace.

Source Search argues that "brick and mortar" referral services are not prior art because they are not reasonably pertinent to the problem that the '328 Patent was attempting solve.  Source Search asserts that the '328 Patent was designed to overcome the limitations of a centralized database while also solving the e-commerce problem of a user receiving too many or too few returns from an internet search engine or database.  Because the '328 Patent was

attempting to solve an e-commerce problem, Source Search argues that it would not have been

logical for a person of ordinary skill in the art to have considered "brick and mortar" referral

systems.  Because there was nothing that would have pointed the inventor to consider "brick and

mortar" referral systems, Source Search concludes that they cannot be considered as prior art.

KSR acknowledged that courts should not succumb to hindsight bias.  127 S. Ct. at 1742

("A factfinder should be aware . . . of the distortion caused by hindsight bias and must be

cautious of arguments reliant upon ex post reasoning.").  Indeed, the Federal Circuit has held that

the obviousness determination "cannot be based on the hindsight combination of components

selectively culled from the prior art to fit the parameters of the patented invention."  ATD Corp.

v. Lydall, Inc., 159 F.3d 534, 546 (Fed. Cir. 1998).

Defendants note that the '328 patent discloses an electronic referral service in which a

prospective buyer submits a request for a particular good or service over a computer network and

obtains the names of potential vendors.  The unique feature of this method is the use of

filters—criteria set by the buyers, the vendors and the network—to determine which vendors will

receive the buyer's request.

It is Defendants' contention that this process is not new, and that for decades consumers

have used referral services to find doctors, lawyers, mechanics, contractors and other service

providers.  These "brick and mortar" services made referrals based upon the consumers' needs

(buyer filters), the providers abilities (vendor filters) and their own judgment (network filters).

According to Defendants, these services exhibited all of the elements of Source Search's claims

except that the referrals were made in person or over the phone, rather than on a computer

network.

Defendants describe two examples of "brick and mortar" systems: home contractor and social service networks. In the case of homemakers looking for contractors to perform home repair or improvement work, a service representative may be the equivalent of the computer network, interacting with homeowners. In the case of individuals seeking social services, information and referral services use service representatives to help people find answers to their questions and services for their needs. These kinds of referral services fill essentially the same needs as those to which the '328 patent is directed.

"Brick and mortar" systems are so closely related to the problems to which the '328 patent is directed, a person with skill in the art would surely be aware of them and take them into account when dealing with the subject matter of the '328 patent. As stated in KSR:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. To facilitate review, this analysis should be made explicit. See In re Kahn, 441 F. 3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness"). As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person or ordinary skill in the art would employ.
> . . .
> One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.

127 S. Ct. at 1740-41, 1742.

The "brick and mortar" systems had at the time of the invention the referral problems that the '328 patent addressed and for which there was an obvious solution encompassed by the patent's claims. The '328 patent itself recognized its relationship to the entire field of purchasing goods and services. The Field of the Invention recited:

> This invention relates generally to a computerized system forming a computer based communications network of buyers and vendor members for processing requests for quotation for goods and/or services from network members . . . .

'328 Patent, col.1 *l.*4-12. The Background of Invention states:

> Buyers in need of goods and services often spend considerable time locating an appropriate vendor. Buyers use trade publications, directories, recommendations and other means to locate vendors.
> . . .
> The prior art describes computerized shopping systems which employ some kind of control database of goods and services offered to buyers. Information about the goods and services offered is stored centrally and must be kept current centrally.
> . . .
> These systems are like electronic supermarkets which are owned by a single company or an association of supplier [sic]. In such systems a vendor provides its database of goods and/or services to a buyer who orders items from the vendor's database. It is analogous to walking into a vendors [sic] store and selecting items from the vendors [sic] available stock. Another such system is analogous to shopping in a mall.

Id. at col.1 *l.*27-30, 43-46, 61-65.

The "brick and mortar" systems were reasonably pertinent to the problems with which the inventor was concerned and can be deemed prior art.

*(b) IQuest:* IQuest was a computerized system that could be used for finding and purchasing copies of articles and other documents from various databases. The system was accessed through CompuServe, one of the first online commercial servers. The CompuServe

network originally linked purchasers to its various databases using high-speed modems. However, by early 1994, CompuServe's mainframes could be accessed via the internet.

To use the IQuest system, a purchaser searched for articles by first responding to a series of menus and prompts and then entering key words to define the search. IQuest then used the information provided by the purchaser to search its various databases. The databases were maintained by providers such as Dialog, Questel, and DataSolve.

IQuest had different options which allowed purchasers to receive IQuest's assistance in selecting a database or select a database themselves. The IQuest-I option identified for the purchaser the single database that was most likely to satisfy the purchaser's search criteria. The SmartScan option could be used to identify a subset of databases that would be most likely to have the purchaser's desired documents. Finally, the IQuest-II option allowed the purchaser to select a database herself.

After a database or databases were selected, the IQuest system searched the selected databases using the criteria and search terms provided by the purchaser. Any matching publications were returned to the purchaser in reverse chronological order and accompanied by a message stating: "Search completed. There are [X] item(s) which satisfy your search phrase. We will show you the most recent 10." (Scacchi Aff. Ex. 23 at 9.) The purchaser was then able to purchase any article from the list.

The IQuest system was described by Alfred Glossbrenner's Master Guide to CompuServe as being "like a professional shopper. You tell it what you want, and it goes to the vendors and gets the items matching your descriptions." (Scacchi Aff. Ex. 21 at 9.) According to Glossbrenner, "[t]his means [that] IQuest can act as a filter and an interpreter. It can interview

49

you [the purchaser] with menus to help focus your search on the appropriate databases and vendors . . . ." Id.

(c) FAST: The FAST system was a computerized "parts broker system"—essentially a search engine—that began operating in 1987. (Scacchi Aff. Ex. 28 at 1.) The FAST procurement system allowed customers to request quotes and place orders through an electronic data interchange. A customer began the process by filling out a "quote request" form or a "quote and order request" form, which required the customer to supply information regarding the identification number or a description of the thing to be ordered, the quantity requested, the timing of the shipment, the shipping address, and the shipping method. The FAST system then acquired competing quotes from multiple online vendors and returned them to the customer through the electronic data interchange.

Suppliers could register with FAST and their information would be stored in the FAST database. The FAST database contained detailed information about both the customers and suppliers that was collected from the processing of customers' requests for quotations and resulting sales. This information was used to match a buyer's request with appropriate suppliers. FAST decided which specific suppliers were likely to carry the product sought and sent queries only to those suppliers. (Scacchi Aff. Ex. 28 at 2.)

Upon receipt of a customer's request for quotation, FAST automatically queried any supplier from whom an identical or similar item had been purchased. FAST also had the ability to search for new suppliers by contacting electronically as many third party or vendor databases as it could in an attempt to locate the desired part. In addition, FAST allowed customers to specify whether the system should search for substitute products if the product they desired was

not available.  With this option, if FAST did not find an exact match for the customer's request, it could search its database to determine whether there were any vendors who might sell alternative goods that would satisfy the buyer's needs.

Once the queries had been sent out, FAST returned quotes from suppliers directly to the customer.  FAST compiled the quotes into one response message that was sent to the customer. The customer could then purchase merchandise from one of the suppliers by completing an order form which was forwarded by FAST to the supplier.

(d) FACNET: The Federal Acquisition Computer Network, or FACNET, is a procurement system used by the federal government.  Originating in 1994 with the Federal Acquisition Streamlining Act, FACNET automated the government's procurement process. Government agencies wishing to make certain purchases sent solicitations electronically to a supporting "gateway."  Eric Aaserud, FACNET – Government Electronic Procurement, The Federal Marketplace, May 19, 2005, http://www.fedmarket.com/articles/facenet-electronic-procurement-government.shtml.  The gateway then processed the information and transmitted the request across data networks to vendors.  The vendors responded electronically, sending quotes over the data network and through the gateway back to the procurement office.

(e) Contemporary Publications: Defendants have submitted several publications from the early 1990s in support of their assertion that the '328 patent is obvious.[8]  A 1992 issue

---

[8] Source Search has suggested 1994 as the relevant date for the purpose of prior art publications.  However, the relevant date for prior art purposes is set at one year before the date of the invention, which is presumed to be the filing date on the application for the patent.  See 2 Chisum on Patents § 5.03[2][a].  In this case, the application for the '328 patent was filed on February 22, 1996.  Therefore anything published at least one year before that date—in other

of Communications of the ACM devotes several articles to the issues of information filtering.

Communications of the ACM, Vol. 35, No. 12 (Dec. 1992), Sacchi Aff. Ex. 43.  These articles

acknowledge and discuss the need for information filtering in the growing field of information

retrieval.  Another publication from 1995 purports to distill the information about internet

marketing techniques and to aid businesses when making the decision whether to create an

electronic presence.  Jim Sterne, World Wide Web Marketing: Integrating the Internet into Your

Marketing Strategy xv-xvi (1995), Sacchi Aff. Ex. 38.

    Source Search has also submitted several articles to rebut Defendants' assertion of

obviousness and to support its own claims of non-obviousness.  (Kaplan Decl. Ex. X.)  Source

Search uses these articles in an attempt to establish that in the early 1990s, e-commerce was still

in its infancy and that little was known about how to turn it into a profitable industry.  One Wall

Street Journal article from 1995 noted that the challenge was designing software that is able to

handle complex instructions and search criteria.  Id. at 32-33.

---

words, before February 22, 1995—will be considered part of the relevant prior art.  See 35
U.S.C. § 102(b).
    Source Search also contends that none of Defendants' articles are admissible because no
evidence of their publication date has been offered.  According to Source Search, a copyright
date is not sufficient evidence of publication.  When there is  no question that the prior art
references are printed publications under 35 U.S.C. § 102(b), then there is no requirement that
additional evidence, beyond the copyright date, be presented as proof of publication for books,
articles, or trade publications.  See In re Omeprazole Patent Litig., 490 F. Supp. 2d 381, 517-522
(S.D.N.Y. 2007) (accepting prior art references as printed publications without additional
evidence of their publication date); Ajinomoto Co. v. Archer-Daniels-Midland Co., 1998 U.S.
Dist. LEXIS 3833, at **31-48 (D. Del. Mar. 13, 1998) (questioning the availability of a doctoral
thesis, but admitting other references as prior art without evidence of their availability beyond the
publication date).  In this case, there has been no suggestion that the prior art references do not
qualify as printed publications; nor has there been any suggestions that the publication dates are
different from the copyright dates.  Therefore there is no reason to doubt the reliability of the
copyright date as representative of the references' public availability.

**(3) Difference between Prior Art and '328 Patent's Claims:** Having identified the prior art, the second <u>Graham</u> factor requires a court to assess the differences between the prior art and the claims of the patent at issue. <u>Graham</u>, 383 U.S. at 17. Defendants rely upon two forms of prior art, the "brick and mortar" prior art and the computer devices that filter buyer and vendor requirements. The Court has found that the "brick and mortar" processes are prior art in that they are reasonably pertinent to the problems with which the inventor was concerned—aligning the requirements of the buyers and the requirements of the vendors. There is a world of difference between the solution of these problems mechanically or by personal communications and the solution of these problems through use of a computer. There was at the relevant time nothing novel in resorting to a computer to address such problems, and it is appropriate to consider the basic process of "brick and mortar" filtering solutions when considering the obviousness of the '328 patent.

Turning to the FAST and IQuest devices, the main difference between the '328 Patent and this prior art is in the results of the search. The '328 Patent uses filters to both limit the vendors who are able to bid on an RFQ, as well as to limit the numbers of quotes that are returned to the customer. The filter criteria are supplied in advance by the buyer and vendor network members and the '328 Patent applies the filters based on the members' stated preferences. The FAST and the IQuest systems of the prior art do not use filters in the same manner. The FAST system returned to the customer as many quotes as it could obtain. The IQuest system allowed users to set search criteria through database selection, menu prompts, and key words.

A second difference between the '328 Patent and this prior art is in the vendors searched.

The '328 Patent does not describe a search engine or create a database. RFQs under the '328 Patent are only sent out to vendors or suppliers who have registered with the network. The system described by the '328 Patent only stores information about the vendors or suppliers—it does not store details of the products or services offered by those vendors or suppliers. The FAST system is essentially a search engine which queried vendors or suppliers who had registered with the network as well as any other vendor or supplier of the particular item that it could find. The IQuest system is a computerized database. Users of the IQuest system were limited to searching only for articles found in the various databases.

A final difference between the '328 Patent and the prior art is the goal or objective of the systems. The stated goal of the '328 Patent is to solve the too many or too few problem of internet search engines or databases. Both the FAST and IQuest systems were geared towards returning as many quotes or articles that fit the search criteria as possible. Indeed, the e-commerce industry as a whole seemed to be geared towards providing customers with an efficient means of comparison shopping by gathering as much information for the consumer as possible.

**(4) Person of Ordinary Skill in the Art:** The third <u>Graham</u> factor instructs the court to determine the "level of ordinary skill in the pertinent art." <u>Graham</u>, 383 U.S. at 17. In its <u>Markman</u> opinion, the Court held that a person of ordinary skill in the art with respect to the '328 Patent is someone with a bachelor of science degree "in computer science or an equivalent field like electrical engineering, or having the equivalent work experience, and someone with experience designing and/or using Internet related software and commerce systems." <u>Source Search I</u>, 2006 U.S. Dist. LEXIS 79651, at *22.

54

**(5) Secondary Graham Factors:** In addition to the three primary factors, a court may also consider such things as "commercial success, long felt but unsolved needs, [or the] failure of others" when assessing the obviousness of a patent in order to "give light to the circumstances surrounding the origin of the subject matter sought to be patented." Graham, 383 U.S. at 17-18. In this case, the only secondary factor that has been raised is commercial success.

Source Search contends that the development of the Service Magic and the Lending Tree websites, which have both been found to be infringing the '328 Patent, demonstrate the commercial success of the '328 Patent. Defendants, however, assert that the success of the Service Magic and Lending Tree websites could just as easily be attributable to advertising, operational expertise, and customer service. Therefore, Defendants contend that Source Search has not shown a link between the claims of the '328 Patent and the alleged success of the websites.

**(6) Whether the Invention is Obvious:** Applying the primary and secondary factors, it is necessary to determine whether the claims of the '328 Patent are obvious. In assessing obviousness, it is error to look only to the problem that the patentee was trying to solve; the question is not whether the claims were obvious to the patentee, but whether they would have been obvious to a person with ordinary skill in the art. See KSR, 127 S. Ct. at 1742. When a patent claims to improve the existing art, the question is whether the purported improvements produce something new or whether the result is a predictable use of the prior art elements. Id. at 1740. "When work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." Id.

Source Search asserts claims 1-3 and 13-14 against Lending Tree and claims 1-3 against Service Magic.  Each of the asserted claims has two parts.  First, the claims describe a flow of information.  They explain how buyer and vendor information is processed by the system in steps in order to match buyer requests with vendors who can provide the desired goods and services.  The claims describe the computer technology used to match buyers and vendors.  The '328 patent does not claim new computer hardware or software.

The principal difference among the claims is the combination of filters that are used to limit or prioritize vendors.  The claims describe what general types of filters are used to match buyers and vendors:

> Claims 1-2: Filter conditions are set by the buyer or the network.
>
> Claim 3: Filter conditions are set by the buyer, the vendor, and the network.
>
> Claim 13: Filter conditions are set by the buyer.
>
> Claim 14: Filter conditions are set by the buyer, and a filter condition is set by the network to limit the number of potential vendors to a "predetermined maximum."

None of the differences in the language of these claims distinguishes one from another for the purpose of a finding of obviousness.

Defendants' obviousness argument can be summarized as follows:

> Patents like [Source Search]'s are sometimes called "combination patents" because they merely combine elements that existed in the prior art . . . the '328 patent does nothing more than take "bricks and mortar" filtering instructions and plug them into a pre-existing computer network that matches buyers and vendors through a centralized mainframe.  This straightforward combination of well-known elements produces no unexpected results.  As with the prior art e-commerce systems, computerizing a referral service predictably

reduces transaction time and gives buyers and vendors more and better access to each other. Indeed, those very benefits led over and over again to the development of Internet versions of "bricks and mortar" businesses in the mid-1990s. Because the '328 patent is a mere "combination of familiar elements" that "yield[s] predictable results," it is invalid for obviousness under the Supreme Court's recent landmark decision in <u>KST Int'l Co. v. Teleflex Inc.</u>, 127 S. Ct. 1727, 1739 (2007).

(Def.'s Obviousness Mem., docket no. 193, at 2-3.)

In addition to its contention that "brick and mortar" art is not analogous art, Source Search's non-obviousness argument, with its teaching away emphasis, can be summarized as follows:

[D]efendants have several prior art references that are directed to automatically obtaining quotes through a computer over a data network. All these references teach to get <u>as many quotes as one can</u>, and are in a field that had <u>numerous</u> ways to efficiently sort through and display the most relevant ones if too many were returned. Defendants are faced with <u>emphatic, multiple teachings against</u> limiting the <u>vendors on the way out</u> to the specific number of quotes to be received, like in claim 14. Second, defendants have some [brick and mortar] prior art that teaches to give a limited number of <u>referrals</u> to someone. When a patient or victim is going to call and/or meet with <u>each referred professional</u>, in the brick and mortar world, it makes sense to give someone one or two names, rather than <u>every</u> name. However, in these systems, there are emphatic teachings that the referral service should <u>not</u> obtain and forward quotes to the buyers, but instead, should ensure users are matched to one another for further consultation. Thus, defendants are here faced with multiple teachings <u>against</u> those systems obtaining quotes (price and other terms in sufficient detail to constitute an offer capable of acceptance).

(Pl.'s Obviousness Opp'n Br., docket no. 207, at 5.)

Source Search relies upon <u>In re Omeprezole</u>, 490 F. Supp. 2d 381 (S.D.N.Y. 2007) in which the infringer offered a first reference showing a subcoating used for drugs, and a second

reference showing a drug, Omeprezole, without a subcoating. Defendant argued that it would have been obvious to put the Omeprezole of the second reference inside the coating of the first reference, which was specifically made as a drug subcoating. The court concluded that a person skilled in the art starting with the first reference would not have been motivated to add the second and starting with the second would also not be motivated to add the first because each reference did not suggest the other and in fact taught away: "Tsuda [the coating reference] teaches away from Omeprezole because it warns against applying its subcoating to moisture-sensitive drugs, and Omeprezole is highly sensitive to moisture." Id. at 523.

Source Search equates the situation in the present case to the teaching away situation in Omeprezole. In fact the situations are very different. In Omeprezole, only a single drug was involved and the question was whether encasing the drug in a coating was obvious. The teach away was a warning against applying the subcoating to a moisture-sensitive drug such as Omeprezole. Here there is no such teaching away. Rather, the invention takes place in a highly volatile commercial period when all manner of business, trades and products were seeking to take advantage of e-commerce techniques. It is true that the e-commerce prior art upon which Defendants relied sought to a large extent to maximize access to the product or service in question, but refining responses and limiting them was also a recognized need.

In 1992, the Association of Computing Machinery dedicated an entire issue of its Communications to the subject of "information filtering," and discussed at length solutions to the problems of "too much" or "too little" information. (Scacchi Aff., Ex 43.)[9] The authors

---

[9]  Source Search urges that Dr. Scacchi's opinion should not be considered on the merits of Defendants' motion. It notes that his original 200-page report was almost entirely directed to anticipation under 35 U.S.C. § 102, with only slightly more than a page devoted to obviousness.

emphasized the use of network filters as "essential mediators between information sources [such as vendors] and their users [such as potential buyers]."  In most cases, the information sources and the information users do not have sufficient "mutual knowledge" to guide them to the information most relevant to the users' needs.  As a result, system filters are "positioned logically as 'third parties' to the communication between users and sources" in order to "examine the information in the sources and to forward the information 'they judge' as relevant to individual users."  Id. at 39.  One of the principal advantages of the computerized systems is that "some of that filtering need no longer be done by us but [can] be done automatically by the system that presents the information."  Id. at 51.

In this context, and in view of the state of the art, a person of ordinary skill in the art would not be steered away from addressing the "two much" problem by the fact that much, if not most, of the existing art sought to maximize responses.  Excess information was a recognized problem.  Already the existing art was addressing it.  The person of ordinary skill would readily have made the connection between brick and mortar referral systems and the computerized world of the internet.  Market place pressures to move into the computer world would have pushed persons of ordinary skills to implement on a computer the filtering taking place in "brick and mortar" systems.

By the critical date, February 22, 1995, e-commerce was a burgeoning industry.  The IQuest, FAST, and FACNET systems demonstrated the viability of systems that assisted a

_____

It further notes that after Defendants changed attorneys, Defendants told Source Search and Magistrate Judge Salas that they needed to update their expert report to account for KSR.  Thereafter, Defendants filed a 163-page report devoted to the obvious defense based on the new "Brick and Mortar" contention, which, Source Search contends has nothing to do with KSR.  The Court concludes that there is no reason not to consider Dr. Scaachi's report.

consumer with finding products electronically.  The goal of these systems was to provide the user

with as much information as possible.  However, the problem that the '328 Patent was trying to

solve—the too much or too little problem—was known within the industry.  The use of filters,

either as the information was on its way in or on its way out, was a logical way to address the

problem.  Thus, the claims of the '328 Patent are obvious because they would have been obvious

to try to a person with ordinary skill in the art.  See KSR, 127 S. Ct. at 1742 ("When there is a

design need or market pressure to solve a problem and there are a finite number of identified,

predictable solutions, a person of ordinary skill has good reason to pursue the known options

within his or her technical grasp.  If this leads to the anticipated success, it is likely the product

not of innovation but of ordinary skill and common sense.")  In this case, the claims of the '328

Patent resulted from common sense and ordinary skill and not from pure innovation.

　　　　The differences between the asserted claims of the '328 Patent and the prior art are not

substantial and do not alter the conclusion that the '328 Patent is the predictable application of

prior art elements.  Nor do the secondary factors change the analysis.  The commercial success of

the Service Magic and Lending Tree websites cannot clearly be linked to the claims of the '328

Patent.  Because "the asserted commercial success of the product must be due to the merits of the

claimed invention beyond what was readily available in the prior art," J.T. Eaton & Co. v.

Atlantic Paste & Glue Co., 106 F.3d 1563, 1571 (Fed. Cir. 1997), the alleged commercial

successes cannot overcome the conclusion that the claims of the '328 Patent are obvious and

therefore invalid.[10]

---

[10] Source Search argues that based on the filing and subsequent enforcement of the U.S.
Patent No. 6,385,594 ("the '594 Patent"), Defendants should be estopped from arguing that the
'328 Patent is obvious.  The '594 Patent is held by Lending Tree.  It describes an e-commerce

**D.  Wilfulness Motions**

Because the Court has concluded that the '328 patent is obvious and therefore invalid, there is no need for the Court to address the remaining issue of whether Defendants are willfully infringing the patent.  Therefore Defendants' motion for summary judgment on the issue of willful infringement will be dismissed as moot.

## VI.  CONCLUSION

For the reasons set forth above: (i) Lending Tree's motion for summary judgment that it does not infringe the '328 patent will be denied; (ii) Source Search's motion for summary judgment that Lending Tree infringes claims 1-3 and claims 13-14 of the '328 patent will be granted; (iii) Defendants' motion for summary judgment that the '328 patent is invalid for indefiniteness will be denied; (iv) Source Search's motion for summary judgment that the '328 patent is not invalid for indefiniteness will be granted; (v) Source Search's motion for summary judgment that the '328 patent is not invalid for obviousness will be denied; and (vi) Defendants' motion for summary judgment that the '328 patent is invalid for obviousness will be granted.

---

system that uses information entered on a loan application as the filter conditions to match the applicant with different mortgage lenders.  Once applicants are matched with lenders, the '594 Patent sends the loan application to the selected lenders and forwards any loan offers to the applicants.  Source Search asserts that Lending Tree secured the '594 Patent in 1998 by focusing on the elimination of lenders as loan applications were being sent out; a position which, according to Source Search, is irreconcilably inconsistent with the position that Defendants are advancing on this motion.

Defendants respond by arguing that there is no basis for judicial estoppel because it was Lending Tree's related patent, U.S. Patent No. 6,611,816 ("the '816 patent"), which was the subject of previous litigation, not the '594 Patent, and the case settled before any substantive rulings were made on the construction of the patent's claims.

The Court lacks sufficient information about the '594 and the '816 patents to determine their relevancy in the present case, but there is no reason why Defendants should be prevented from presenting potentially meritorious arguments in this case.

Defendants' motion for summary judgment of no willfulness will be dismissed as moot.  Source

Search's motion to strike the supplemental report of Defendants' expert, Dr. Walter Scacchi, will

be denied.


                                        /s/ Dickinson R. Debevoise
                                        DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:   July 8, 2008