# CLERK'S OFFICE COPY
## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**OPINION ANNOUNCING
JUDGMENT OF THE COURT**

# RECEIVED

DEC - 9 2009

OPINION FILED AND JUDGMENT ENTERED: 12/07/09

AT 8:30_____M
WILLIAM T. WALSH, CLERK

The attached opinion announcing the judgment of the court in your case was filed today. The judgment was entered pursuant to Rule 36. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Each side shall bear its own costs.

Regarding exhibits and visual aids: Your attention is directed to FRAP 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The Clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

JAN HORBALY
Clerk

cc:     Jeffrey I. Kaplan
        Claude M. Stern

SOURCE SEARCH V LENDINGTREE, 2008-1505
DCT - NJ, 04-CV-4420

CLERK'S OFFICE COPY

# United States Court of Appeals for the Federal Circuit

2008-1505, -1524

SOURCE SEARCH TECHNOLOGIES, LLC,

Plaintiff-Appellant,

v.

LENDINGTREE, LLC,
IAC/INTERACTIVECORP, and SERVICEMAGIC, INC.,

Defendants-Cross Appellants.

Jeffrey I. Kaplan, Kaplan Gilman Gibson & Dernier LLP, of Woodbridge, New Jersey, argued for plaintiff-appellant. With him on the brief was Michael R. Gilman.

Claude M. Stern, Quinn Emanuel Urquhart Oliver & Hedges, LLP, of Redwood City, California, argued for defendants-cross appellants. With him on the brief were Evette D. Pennypacker; Robert B. Wilson, Aaron S. Kaufman and James E. Baker, of New York, New York, and Linda J. Brewer, of San Francisco, California.

Appealed from:  United States District Court for the District of New Jersey

Senior Judge Dickinson R. Debevoise

# United States Court of Appeals for the Federal Circuit

2008-1505, -1524

SOURCE SEARCH TECHNOLOGIES, LLC,

Plaintiff-Appellant,

v.

LENDINGTREE, LLC,
IAC/INTERACTIVECORP, and SERVICEMAGIC, INC.,

Defendants-Cross Appellants.

Appeal from the United States District Court for the District of New Jersey in case no. 04-CV-4420, Senior Judge Dickinson R. Debevoise.

---

DECIDED:  December 7, 2009

---

Before RADER, PLAGER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

The United States District Court for the District of New Jersey held that the asserted claims of U.S. Patent No. 5,758,328 ("'328 patent") were infringed but invalid on obviousness grounds.  See Source Search Techs., LLC v. LendingTree, LLC, Case No. 04-CV-4420 DRD, 2007 WL 1302443 (D.N.J. May 2, 2007) ("Summary Judgment on Infringement").  Because genuine issues of material fact bar summary judgment on both obviousness and infringement, this court vacates and remands.

I.

Source Search Technologies, LLC ("SST") is the owner by assignment of the '328 patent, which was filed on February 22, 1996, and issued on May 26, 1998. The '328 patent claims a computerized procurement service for matching potential buyers with potential vendors over a network. Under the claimed system, the buyer submits a request for quotation ("RFQ") for a standard good or service, which is then broadcast via the network to certain vendors. '328 patent col.2 ll.42-47. The vendors who receive the RFQ are selected based on filter criteria set by the buyer, the seller, and/or the network operators. Id. The selected vendors then submit responses to the RFQ to the network which in turn communicates the responses to the buyer. Id. col.2 ll.50-51.

The '328 patent claims to solve the "too much" or "too little" information problem commonly associated with running searches over a network or system—e.g., Google or Westlaw. With respect to the "too much" situation, a user will enter broad search terms into the system which yield an unmanageable number of "hits" or results. Because of the excessive number of search results, the user cannot locate the specific target in a reasonable time or with reasonable accuracy. Correspondingly, in the "too little" situation, the user enters narrow search terms which yield few, or no, results for the initial inquiry.

The '328 patent addresses these problems by using buyer, vendor, and network criteria to return both a manageable and a sufficient number of search results. The network envisioned by the '328 patent is the internet. Id. col.4 ll.61-65. Buyers and vendors complete a sign-up application on a webpage to give relevant information about the prospective member. Id. col.4 l.67-col.5 l.3.

Once registered, a buyer or vendor may submit or receive, respectively, RFQs for goods or services. "[T]o ensure there is no confusion as to what buyers are requesting and what sellers are offering" the goods and services must be "standard items." Id. col.3 ll.63-65. To this end, the network contains pre-programmed menus and submenus classifying products and services into categories corresponding to their standard commercial identifications. Id. col.4 ll.12-16.

When a buyer submits an RFQ, the network applies pre-set filter conditions defined by the buyer, vendor, and/or system to determine which vendors are capable of quoting on the RFQ. Id. col.5 ll.9-12. The buyer may set certain qualifications necessary for a vendor to receive the RFQ—e.g., vendor location. Id. col.5 l.12. Similarly, the vendor may also narrow the eligible RFQs by designating certain types of buyers it wishes to do business with—e.g., government agencies. Id. col.5 ll.12-15. Lastly, the network itself can choose to filter or prioritize results based on pre-selected criteria or business objectives—e.g., vendor reliability. Id. col.5 ll.21-25. In this way, the procurement service narrows the field of vendors who will receive and subsequently bid on an RFQ. With this knowledge, vendors are more willing to provide quotations because their chances of successfully completing a transaction are increased. Buyers too are benefited because the system returns only a reasonable number of quotes.

LendingTree LLC ("LendingTree"), a subsidiary of IAC/InterActiveCorp, operates the website www.lendingtree.com. The website refers prospective borrowers to potential lenders for a variety of home, auto, and personal loans. Prospective borrowers access the website, select a type of loan, and fill out a "qualification form" ("QF") containing a variety of financial information about the borrower. The website

describes the QF as a "request for a loan pre-qualification." Lenders wishing to affiliate with the website provide LendingTree with information indicating the type of loan the lender may extend and the type of borrower likely to receive approval from the lender.

LendingTree's website then uses the information submitted by the lenders along with the QF to match the borrower with potential lenders. If many lenders match the borrower's submitted profile, the website will limit its results to five potential lenders with preference given to those lenders with high customer satisfaction scores and previous success rates. A prospective borrower who is not matched with any lender is free to complete a new loan request at any time.

Once prospective lenders are identified, the website sends an email to the borrower containing the names and information of the lenders reviewing the borrower's application. When a lender responds with a loan offer, the website sends the borrower an email containing details about the offer. LendingTree plays no further role in the process once the loan offers are sent to the borrower. The borrower and lender are free to contact one another on their own to complete the loan process. Verification of the QF, examination of W-2 forms, and all other steps regarding loans take place without the help of LendingTree.

In March 2006, SST initiated this action against LendingTree and ServiceMagic Inc., alleging that websites operated by each infringed the '328 patent. Initially, SST asserted claims 1-7 and 11-14. Over the course of litigation, however, SST dropped claims 4-7 and 11-12. On appeal, only claim 14 remains at issue. Claim 14 is dependent on claim 13 which in turn is dependent on claim 12. Each is stated below:

> 12. A method of purchasing goods or services over a data network
> comprising the steps of:

2008-1505, -1524                            4

- Communicating over said data network, to a filter means, at least one <u>request for a quotation</u> from a potential buyer of said <u>goods or services</u>; filtering, at said filter means the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services; and

- Obtaining, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.

13. The method of claim 12 further comprising the step of accepting filtering conditions from said potential buyer, and utilizing said filtering conditions from said potential buyer, and utilizing said filtering conditions in said step of filtering to determine a subset of potentially capable sellers.

14. The method of claim 13 wherein said set is limited by said filter conditions and by a predetermined maximum number from which a bid is to be received.

<u>Id.</u> col. 9 l.45–col.10 l.16 (emphases added).  Because claim 14 was not asserted against ServiceMagic, it is no longer a party to this appeal.

Following a <u>Markman</u> hearing, the district court construed several disputed terms in the asserted claims.  Only two are relevant for this appeal.  The trial court construed "request for a quotation" to mean "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance."  The district court also construed "goods or services" to mean "standardized articles of trade and performances of work for another."  <u>Source Search Techs., LLC v. LendingTree, LLC</u>, Case No. 04-CV-4420 DRD, 2006 WL 2990363, at *9, 16 (D.N.J. Oct. 16, 2006) ("<u>Claim Construction Order</u>").

Over the next several months, the parties submitted three summary judgment motions and cross motions:  (1) infringement of claims 1-3 and 12-14 by LendingTree; (2) invalidity of all claims on obviousness grounds; and (3) invalidity of all claims based

on indefiniteness. SST also moved to strike the supplemental expert report of LendingTree's expert, Dr. Walter Scacchi, for its untimely reliance on previously undisclosed prior art—the "bricks and mortar" prior art. The district court granted SST's summary judgment motion of infringement, granted LendingTree's summary judgment motion of invalidity on obviousness grounds, and denied LendingTree's motion for invalidity based on indefiniteness. That is, the district court found the patent infringed but invalid. In addition, the district court denied SST's motion to strike Dr. Scacchi's supplemental report.

SST and LendingTree timely appealed each adverse judgment. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).

### III.

This court reviews a grant of summary judgment without deference. Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1353 (Fed. Cir. 1998); Conroy v. Reebok Int'l Ltd., 14 F.3d 1570, 1574 (Fed. Cir. 1994). Thus, this court must decide for itself "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing a genuine issue of material fact, this court draws all justifiable inferences in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A.

Obviousness is a question of law based on underlying findings of fact.  The factual determinations for obviousness include: (1) the scope and content of the prior art, (2) the characteristics and understanding of an individual of ordinary skill in the relevant field of art at the time of invention, (3) the differences between the claimed invention and prior art, and (4) the evidence of secondary factors, also known as objective indicia of non-obviousness.  Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).  In reviewing a district court's summary judgment of non-obviousness, this court also recognizes the movant's burden to prove invalidity by clear and convincing evidence.  See Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH, 139 F.3d 877, 881 (Fed. Cir. 1998).

The district court's grant of summary judgment of obviousness was based on two sets of prior art references:  the "e-commerce" prior art and the "bricks and mortar" prior art.  The former refers to early e-commerce systems employing the internet for access and distribution.   The latter refers to pre-internet referral services, such as home contractor networks or social services networks, used by consumers to help locate a suitable service provider for a particular project.

The district court relied on three e-commerce prior art systems to support its finding of obviousness.  First, the FAST system was a parts-procurement service that accepted "requests for quotation" from clients, solicited responses from registered suppliers to fill those requests, and returned the supplier responses to clients.  This system procured goods that varied from electronic components to hand tools.  Upon receipt of a request by a client, the FAST system would send a query to all registered

vendors within its database who could potentially fill the request.  To help broaden its search, FAST personnel could also manually access un-registered vendor databases or contact vendors directly via phone or email.  Once FAST received responses to the requests from the vendors, it would send an email to the client listing <u>all</u> vendors who submitted quotes and their corresponding quote prices.  Thus, the FAST system did not filter which vendors received a client's request in any meaningful way or subsequently limit the list of potential vendors sent back to the client.  The purpose of the system was to simply return the lowest possible quote regardless of any pre-set qualifications designated by the client, vendors, or system.

To place an order, the client had two options.  The user could first submit a separate purchase order to FAST which would then forward the purchase order to the vendors via email or fax.  Alternatively, the user could preauthorize FAST to select the vendor who returned the lowest quote and automatically submit a purchase order to that vendor.  In either case, however, the quotes submitted by vendors were "non-binding, inventory availability responses, <u>not</u> contractual offers."  In other words, vendors were not contractually bound by the responses submitted to the FAST system.  Once a purchase order was received, a vendor could reject the offer or attempt to renegotiate its terms.

The second prior art system relied upon by the district court was IQUEST—a document-searching system where users could enter queries to locate various publications and articles.  Once the user selected a particular database in which to query, IQUEST would run a search and return all matching results.  Aside from database selection, the system did not filter results.  Nor did this system send or receive

quotes. Rather, IQUEST charged subscribers a one-time fee per search depending on the selected database.

The third prior art system was the Federal Acquisition Computer Network, FACNET. FACNET was a federally run procurement service for government agencies. A government agency wishing to make a purchase would submit a request for a quote electronically to the system. The system would then solicit vendors across all its databases to bid on the quote. Vendors, in turn, would respond to the request with quotes which were then ranked in order of price by the system and communicated to the requesting agency. This system had the goal of increasing vendor competition by broadening the vendor network and ensuring solicitation of a maximum number of offers.

The district court also relied on an article appearing in a 1992 issue of Communications of the Association of Computing Machinery ("ACM") magazine. The article discusses generally the need for information filtering to act as a mediator between information sources and their users. As described therein, an information filter can act as a "third party" in the communication line between users and sources passing only information it deems relevant to individual users.

In addition to these e-commerce references, the district court placed significant weight on the "bricks and mortar" prior art. According to LendingTree, for years prior to the '328 patent, consumers used referral systems that inherently embodied all the elements of claim 14 except that a person, rather than a computer, did the "filtering." LendingTree highlights two such referral systems.

With home contractor networks, homeowners wishing to perform home repair or improvement would contact a referral company who would match the homeowner with a contractor based on mutual terms provided by each party. For example, a homeowner wishing to remodel his kitchen would call a referral system and provide information pertaining to the desired project—e.g., location, project type, and budget. The referral system would then search its database of vendors who had previously provided information regarding the type of services they provided—e.g., job specialties or locations serviced. After obtaining a full list of potential contractors, the referral system would typically return only a pre-set number, around three or five, back to the homeowner. From there, the homeowner was free to call the contractor to setup an appointment and obtain a quote for the project.

Social service networks matched up individuals to providers of services for various needs such as housing, attorney referrals, counseling, and childcare. A client would call a particular social service network and provide information relating to the type of service desired. The social service network typically kept all its information regarding the providers in a card file. The service representative would then use the information submitted by the clients to match them with a particular provider who could meet their needs. Upon identifying a suitable provider, the representative would forward that information to the client who could then contact the provider directly. On occasion, the representative would contact the provider directly to setup an appointment on the client's behalf.

As a threshold issue, SST argues that LendingTree is estopped from relying on the bricks and mortar prior art for failure to raise it in a timely manner. Whether judicial

estoppel applies is a matter of regional circuit law. W ang Labs., Inc. v. Applied Computer Scis, Inc., 958 F.2d 355, 358 (Fed. Cir. 1992).  Under Third Circuit law, judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 424 (3d Cir. 1988).  The Third Circuit reviews the application of judicial estoppel under an abuse of discretion standard.  Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 109 (3d Cir. 1999).

Notably, LendingTree did not cite to any bricks and mortar reference until after service of its opening invalidity expert report.  Thus, only supplemental invalidity expert reports referred to the bricks and mortar references.  SST seeks estoppel based on this delay.  LendingTree, for its part, contends that the belated addition was strictly due to new developments in the case, specifically the Supreme Court's decision in KSR International Co. v. Teleflex Inc., 550 U.S. 398 (2007), and the district court's "modified" construction of the term "goods or services" in a summary judgment order.

While LendingTree's proffered grounds for modifying its invalidity contentions are questionable, the district court did not abuse its discretion by allowing LendingTree to rely on the bricks and mortar prior art.  Despite its current objections to the bricks and mortar references, SST waited nearly nine months after being served with the supplemental expert report to raise any objection with the district court.  In the time that followed, SST had ample opportunity to conduct full discovery on the bricks and mortar prior art.  SST did so. As such, no "miscarriage of justice" occurred.

Turning to the ultimate question at hand, this court finds that the district court erred in its finding of obviousness.  Genuine issues of material fact bar entry of

summary judgment.   Specifically, factual disputes prevent a conclusion on the obviousness of claim 14, viewed as a whole, in light of the prior art.  Claim 14, through independent claim 12, requires the e-commerce system to obtain "quotes" from potential sellers and to forward "said quotes" to the potential buyer.  Although the district court did not construe the term "quotes," it did construe the term "request for a quotation" to mean "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." Claim Construction Order, 2006 WL 2990363 at *9.  The district court therefore intended "quote" to mean "price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance."   Significantly, neither party contests that construction on appeal.

In its opinion finding the asserted claims obvious, the district court stated:

> The FAST system . . . acquired competing quotes from multiple online vendors and returned them to the customer through the electronic data interchange. . . . Once the queries had been sent out, FAST returned quotes from suppliers directly to the customer.

The record shows that some of these points about this critical prior art reference remain in factual dispute.  For instance, the record reflects that the "quotes" forwarded back to the potential customers in the FAST system were "non-binding, inventory availability responses, not contractual offers."  Thus, even where a FAST customer pre-authorized the system to submit an offer on their behalf, this prior art system did not forward a "quote" from a seller, as the term was effectively construed by the district court.  Indeed, the potential seller retained the option to reject or to renegotiate the terms of the offer.  As well, when the FAST system placed an order automatically, the system would necessarily never send a "quote" back to the buyer as required by the district court's

construction.  Similarly, none of the other prior art e-commerce systems on the record returned "quotes," as defined in claim 14, to its users.

Nor do the bricks and mortar references fill the gap by supplying a qualifying "quote."  Quite the opposite, those referral systems had even greater points of difference in comparison to claim 14.  The clients of these prior art services contact the "network" which in turn connects them with service providers.  After establishing a connection between the client and service provider, these systems left the burden on the client to set up an appointment with the provider.  Only at a meeting between the client and service provider would a quote, in any meaningful sense of the word, arise. The prior art referral systems, however, had nothing to do with this post-connection process or any later "quote."  The record explains this difference between the claimed invention and the prior art.  Unlike the '328 patent, the referral systems of the bricks and mortar prior art involved non-fungible, non-commodity services that could not be quantified or quoted immediately over the phone.  In other words, a referral system would have no way to know the cost to remodel a kitchen without first notifying a contractor to visit the location and put together an estimate.  Similarly, a referral system would have no way to know the cost of representing a client in a legal proceeding without first sending an attorney to ascertain the specific facts in the dispute.

For this reason, among others, LendingTree's argument that the '328 patent discloses nothing more than a computerized version of the bricks and mortar prior art fails.  But cf. Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("We agree with the district court that one of ordinary skill in the art of children's learning toys would have found it obvious to combine the Bevan device with the SSR to

update it using modern electronic components in order to gain the commonly understood benefits of such adaptation, such as decreased size, increased reliability, simplified operation, and reduced cost."). Simply computerizing the bricks and mortar referral systems would not yield the invention taught in the '328 patent. If a prior art attorney-referral network was computerized, a potential client would still have to provide all the details of their desired representation before obtaining a quote. These details would undoubtedly be given directly to the attorney—not the referral network.

Combining the bricks and mortar references with any of the e-commerce systems produces the same conclusion. In simple terms, none of the prior art discloses a qualifying "quote" that is directly forwarded to a client. Even if the prior art included a quoting feature, a person with ordinary skill in this art would still have to take the further step of equating the "filtering" done by human judgment in the bricks and mortar systems with the search results of the e-commerce procurement services. The record shows that the prior art lacked any meaningful filtering process in all of the e-commerce prior art. Indeed, the claimed invention places great emphasis on addressing this problem. A person of ordinary skill in this art may not have even recognized the problem addressed by the filtering feature of the claimed invention in 1996, at the dawn of the internet era. And even if the problem was apparent to one of ordinary skill, a solution may not have been a straightforward step. The article in the ACM publication does generally discuss filtering in the computer context, but does not apply those general filtering methods to the '328 patent's context of matching buyers with vendors. More specifically, that article does not teach the use of specifications submitted by the buyer, vendor, and network. Nor does it suggest that these specifications might be

simultaneously used to filter one set of results. Thus, even beyond the problem of no "quote" in the prior art systems, the claimed invention's filtering system presents factual issues preventing a conclusion that one of ordinary skill in 1996 would find the advances of the '328 patent easy, obvious, routine, or within the grasp of a common sense application of prior art to the apparent problems.

In sum, the district court erred in finding claim 14 obvious in view of the prior art e-commerce systems and the bricks and mortar referral services. Genuine issues of material fact related to the understanding of a person of ordinary skill, the character and number of the differences between the claimed invention and the prior art, and even the scope of those prior art references prevent a grant of summary judgment. Without resolution of these factual issues, the trial court cannot venture to reach a legal conclusion that a person having ordinary skill would have known to combine those references to achieve the system taught in claim 14.

B.

Turning to infringement, the district court found that LendingTree's website infringed claim 14 of the '328 patent. LendingTree challenges this finding because its service lacks two limitations in claim 14: "request for a quotation" and "goods and services."

As explained above, the district court construed "request for a quotation" to mean "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." Claim Construction Order, 2006 WL 2990363, at *9. LendingTree contends that its website does not infringe claim 14

because it only provides prequalification responses—not actual offers—to its customers.

As an initial matter, SST argues that LendingTree is collaterally estopped from arguing that its website does not provide "quotes" to its customers. The basis for SST's argument is a decision in a different case involving LendingTree and a third party company IMX. See IMX, Inc. v. LendingTree, LLC, 469 F. Supp. 2d 203 (D. Del. 2007). In that case, the district court rejected LendingTree's contention that its website did not meet the claim limitation "bid," which was construed to mean "an offer to make a loan."

"Because the application of collateral estoppel is not a matter within the exclusive jurisdiction of this court, this court applies the law of the circuit in which the district court sits." Bayer AG. v. Biovail Corp., 279 F.3d 1340, 1345 (Fed. Cir. 2002). The Third Circuit has described the doctrine of collateral estoppel as "preclud[ing] the relitigation of an issue that has been put in issue and directly determined adversely to the party against whom the estoppel is asserted." Melikian v. Corradetti, 791 F.2d 274, 277 (3d Cir. 1986). Application of the doctrine requires the presence of four factors: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." Raytech Corp. v. White, 54 F.3d 187, 190 (3d Cir. 1995). This court reviews whether the district court properly applied the doctrine of collateral estoppel for an abuse of discretion. Id. ("We review for abuse of discretion whether the district court properly applied the doctrine of collateral estoppel.").

In this case, the district court declined to apply the estoppel doctrine. This court perceives no abuse of discretion in that decision. Significantly, the IMX litigation involved an unrelated patent, with different asserted claims, and dissimilar claim constructions. In other words, the issues presented in the IMX case were wholly different from those in this case.

Turning to the merits, this court again perceives that a material issue of fact bars summary judgment that LendingTree's website meets the "request for quote" limitation. To restate from above, users of the LendingTree website fill out a four- to five-page qualification form before applying for a loan. The "Licenses and Disclosures" page of the website explains that the form is "NOT an application for credit" but rather "a request for a loan qualification." The glossary page of the website defines the term "qualification:"

> [T]he initial process to see if you have enough cash and sufficient income to meet the requirements of the lender for a loan you want. Qualification is not an approval because it does not include your credit history. Qualified borrowers can be turned down if they have poor credit history.

The "Frequently Asked Questions" page adds:

> After you accept an offer, you will need to communicate with the Lender directly (via mail, email or phone) to complete the loan process. You will need to verify the information you provided through our site through W-2 forms, pay stubs, house appraisals etc. You also need to sign the official application forms from the Lender and schedule a closing.

These references indicate that the buyer must take significant steps before closing a loan.

On the other hand, the record supports a finding that the LendingTree website returns an "offer capable of acceptance" to users. Lenders affiliated with LendingTree receive specialized software in advance to help create an interface where the data and

terms associated with a potential loan can more readily be established before forwarding to the user. The '328 patent describes a similar process. See '328 patent col.6 ll.46-52 ("Any operating system may be resident on the computer. Programming for the buyer's and vendor's computer type equipment would be appropriate to the variety of goods and services buyers and vendors wish to sell over the network and would change as new goods and services come into existence and old ones are discontinued.").

LendingTree also explains to its lenders that any "conditional offer for the Loan Product type requested" must contain "any conditions which must be satisfied before the Lender is obligated to provide the Loan Product to the Site User." This language suggests that the forwarded offer contains all material terms for acceptance by the user. The LendingTree website often refers to "offers" forwarded to users. In addition, the '328 patent arguably envisions conditions, such as credit verification, that must still be satisfied before a transaction is complete:

> Shipping companies can be included in the process if a credit purchase conditions the vendor's payment on the confirmation from the shipper that the delivery has been received and accepted by the buyer. The quotation system would verify the buyer's credit and notify the vendor of the purchase order and credit code.

'328 patent col. 6 ll.12-17.

As this court has repeatedly instructed in the past, "[i]t is axiomatic that claims are construed the same way for both invalidity and infringement." Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003); see also Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("Because the claims of a patent measure the invention at issue, the claims must be

interpreted and given the same meaning for purposes of both validity and infringement analyses."); C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1363 (Fed. Cir. 1998) ("Claims must be interpreted the same way for determining infringement as was done to sustain their validity."); Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."); Beachcombers, Int'l, Inc. v. WildeWood Creative Prods., Inc., 31 F.3d 1154, 1163 (Fed. Cir. 1994) ("We have already interpreted the claims for purposes of assessing their validity. The same claim interpretation of course applies to the infringement analysis."). In that connection, this court has found that a material issue of fact precludes summary judgment on obviousness because the prior art does not contain a "request for a quotation" feature. The same analysis applies to infringement. Under the district court's construction, a "quote" effectively means a "price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." This record shows factual issues regarding the "quotes," if any, forwarded to buyers by LendingTree's website. Without the presence of undisputed facts showing that LendingTree site provides "quotes" as in claim 14, this court must vacate the district court's summary judgment on this point.

The district court construed the term "goods or services" to mean "standardized articles of trade and performances of work for another." LendingTree first argues that the loans offered on its websites are not a good or a service. To the contrary, LendingTree's website provides a location where potential borrowers can seek particular types of loans. These loans are simply a debtor's promise to repay a sum of money to a lender in exchange for the lender's promise to advance a sum of money to

the debtor. In advancing the money, the lender is offering a service to the borrower—namely, a financial service. The '328 patent expressly contemplates similar types of services. See '328 patent col. 2 ll.3-7 ("In yet another existing system a seller, such as an insurance agency, offers to provide buyers premium quotations from the insurance carriers for which the agency is an agent." (emphasis added)).

LendingTree also contests the district court's holding that loans are "standard" services because the majority of loans are customized to the borrower's means and needs. This court also detects no merit in that argument. According to the '328 patent's specifications, "[s]tandardization of product or service descriptions is essential to avoid confusion . . . ." Id. col.4 ll.9-11. The district court properly relied on this language in the patent. A loan is a "standard" item because both the borrower and lender have a shared understanding of the promises made and the financial services offered. In other words, this court perceives no fundamental likelihood of misunderstanding in the transaction. Even if borrowers submit and receive different types of information to and from lenders, the transaction remains within the realm of a standard financial operation. Thus, this court sustains the trial court's summary judgment that LendingTree's website meets the "good or services" limitation.

C.

The last question presented is one of indefiniteness. "The statutory requirement of particularity and distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236 (1942). A claim term pinned solely on the "unrestrained, subjective

opinion of a particular individual purportedly practicing the invention" will not suffice. Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1350 (Fed. Cir. 2005). Absolute clarity, however, is not necessary. "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Only claims "not amenable to construction" or "insolubly ambiguous" are indefinite. Id.

LendingTree asserts that the district court's construction of "goods or services" introduces a subjective element into claim 14 that renders it indefinite. More specifically, LendingTree argues that a person practicing the claimed invention would not be able to differentiate between "standard" and "non-standard" "goods or services." Beyond its conclusory statements and bald assertions, LendingTree offers no support for this position. Of course a person wishing to practice the invention will not know the exact terms of the "good or service" until the specific market or network is chosen. Upon that choice, however, the "good or service" comes into clear focus. To hold otherwise would require the patent to list every possible good or service. This court does not load the indefiniteness requirement with this unreasonable baggage. Although at times difficult to determine the bounds of a "standard" product or service, a person having ordinary skill in the art will possess an understanding of the system that will supply an objective definition to the various markets and applications of the system. See Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed. Cir. 1985) ("If the claims, read in light of the specification, reasonably apprise those skilled in

the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." (quoting Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2d Cir. 1958))).

This court does not judge indefiniteness according to the subjective impressions of any particular user of the system, as LendingTree urges. Instead, this court measures indefiniteness according to an objective measure that recognizes artisans of ordinary skill are not mindless "automatons." KSR, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."). From that vantage point, a skilled artisan will understand the markets and the system enough to determine what is a "standard" item. This court therefore does not accept LendingTree's contentions.

## IV.

For the above-stated reasons, this court vacates-in-part, affirms-in-part, and remands. The district court's grant of summary judgment of invalidity and infringement are vacated except to the extent that the latter grant forecloses LendingTree's argument that its website does not offer "goods or services." This court also affirms the district court's grant of summary judgment on the charges of indefiniteness.

VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED.

## COSTS

Each party shall bear its own costs.